BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com

BOYDEN GRAY & ASSOCIATES PLLC
C. BOYDEN GRAY\*
JONATHAN BERRY\*
MICHAEL BUSCHBACHER\*
JORDAN E. SMITH\*
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
berry@boydengrayassociates.com

*Pro hac vice* applications to be submitted

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| ALLIANCE FOR FAIR BOARD RECRUITMENT,<br><br>Plaintiff,<br><br>v.<br><br>DR. SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,<br><br>Defendant. | CASE NO.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1. In 2018 and 2020, California enacted two laws—SB 826 and AB 979—requiring all publicly traded corporations headquartered in California to discriminate based on sex and race in selecting their board members.

2. The 2018 statute, SB 826, requires corporations headquartered in California to have specific numbers of women on their boards, depending on how many seats the board has.

3. The 2020 statute, AB 979, similarly requires these companies to set aside a specific number of director seats for members of "underrepresented communit[ies]," which it defines as those who self-identify as "Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, [] Alaska Native, . . . gay, lesbian, bisexual, or transgender."

4. These laws are unconstitutional and patronizing social engineering. The legal regime they institute relies on and perpetuates invidious racial categories and sex stereotypes that the American legal system has rightly discarded. These statutes do not claim to remedy any particular past discrimination. Rather, California says that mandating race and sex discrimination is justified on the pretext that discrimination will be lucrative for California's corporations and shareholders and thus for the state.

5. That is unconstitutional. If the Fourteenth Amendment and our foundational civil rights laws stand for anything, it is that private moneymaking is no justification for race or sex discrimination. Our nation's history is all the evidence one needs to see that a policy of wealth-through-discrimination has been tried and found profoundly wanting, wanting not only because race and sex discrimination are wrong, but also because this policy does not even provide the gains that it promises. It is (and always was) a devil's bargain. Had California actually looked at contemporary empirical research on these issues rather than the unsupported advocacy pieces cited in the legislative record, it would have seen that the imposition of race and sex quotas on corporate board hiring is unlikely to bring California's corporations even one red cent,

and it may well have the opposite effect—harming pensioners and other investors by reducing shareholder value.

6. States are generally free to try out bad ideas—this was in part what Justice Brandeis meant when he spoke of the states as laboratories of democracy. But what states may not do is open those laboratories up to perform experiments that rely on debunked, pseudo-scientific racial categories or shopworn stereotypes about men and women. In the language of constitutional law, states may not require discrimination on the basis of race without making a convincing showing at the outset that the discrimination is narrowly tailored to advance a compelling state interest. And they may not compel discrimination on the basis of sex without demonstrating that the discrimination is substantially related to achieving an important governmental interest.

7. California's discriminatory quota regime cannot withstand constitutional scrutiny. The pursuit of demographic balancing or increased financial returns for California's corporations are not sufficiently compelling or important interests justifying race or sex discrimination. In any event, California's empirical support for the quota requirements is extraordinarily weak, and on some points non-existent. California's findings, moreover, are contradicted by robust empirical analyses showing that the "diversity" California seeks to require has, at best, no impact on corporate performance and may even *hurt* investors.

8. While the benefits are illusory, the harms are not. On the most general level, allowing the government to categorize people by race is wrong in and of itself. "Racial classifications are antithetical to the Fourteenth Amendment, whose 'central purpose' was 'to eliminate racial discrimination emanating from official sources in the States.'" *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people." *Rice v. Cayetano,* 528 U.S. 495, 517 (2000) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

9. Distinctions between the sexes, by contrast, are not inherently wrong. But differences between men and women are often used as a stalking horse to conceal unfair treatment grounded in mere sex stereotypes. As the late Justice Ruth Bader Ginsburg explained for the Supreme Court, while there are "'[i]nherent differences' between men and women," these differences cannot justify the "denigration of the members of either sex" nor can they support the imposition of "artificial constraints on an individual's opportunity." *United States v. Virginia*, 518 U.S. 515, 533 (1996). Thus, while states may use sex classifications in limited circumstances, the state "must not"—as SB 826 does—"rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *Id.*

10. The effect of SB 826 and AB 979 on those who do not fall within California's preferred racial and sexual identities is unequivocally harmful. For example, Plaintiff Alliance for Fair Board Recruitment is an organization whose membership includes a former corporate board director who was ousted from his position not because of a lack of skills, judgment, connections, integrity, or talent, but because he is not a woman and does not self-identify as an underrepresented minority. He is now deprived of an equal playing field on which to compete for board positions at corporations headquartered in California.

11. Finally, California's statutes are also harmful because they trample on the sovereign rights of other states to regulate corporate governance for entities incorporated under their laws. SB 826 and AB 979 apply to all corporations headquartered in California, even if the corporation in question is incorporated under the laws of a different state. This policy is illegal because California lacks jurisdiction to regulate the internal affairs of entities incorporated under the laws of other states.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction over these claims under 28 U.S.C. § 1331 (federal question) and § 1343(a)(3)–(4) (civil rights violations) because the claims arise under federal law and allege violations of Plaintiff's members' civil rights:

42 U.S.C. §§ 1983, 1981 (alleging violations of the Fourteenth Amendment Equal Protection Clause and Plaintiff's members' equal right to contract) and the federal internal affairs doctrine. Declaratory and injunctive relief is available under 28 U.S.C. §§ 2201, 2202.

13. Venue is proper under 28 U.S.C. § 1391(b)(2), as the events giving rise to Plaintiff's members' causes of action arose or exist in this District in which the action is brought. For example, Plaintiff's members include shareholders of corporations headquartered in this District, who are now forced to comply with California's discriminatory quotas when exercising their contractual rights to elect their corporate directors.

14. Venue is also proper under 28 U.S.C. § 1391(b)(1), because the Secretary of State maintains an office in this District and therefore resides here. Further, California law specifically permits actions against state officers such as Defendant to be filed in Los Angeles (and thus within this District) because the Attorney General and California Department of Justice maintain an office in that city. *See* Cal. Code of Civ. Pro. § 401(1). This likewise establishes that Defendant resides within this District. *See* 28 U.S.C. § 1391(b)(1).

15. Last, venue is proper under 28 U.S.C. § 1391(b)(1) because a suit against an officer in his or her official capacity is a suit against the official's office. *Brandon v. Holt,* 469 U.S. 464, 471 (1985). "As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71(1989). Venue in this District is therefore appropriate because venue over a state is proper in any district within that state. *See California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018) ("A state is ubiquitous throughout its sovereign borders. [Therefore,] . . . a state with multiple judicial districts 'resides' in every district within its borders.").

## PARTIES

16. Plaintiff Alliance for Fair Board Recruitment is a Texas non-profit membership association that seeks to defend the civil rights of director candidates and shareholders, including by advocating for their right to equal protection under the law. Plaintiff's members include persons who are seeking employment as corporate directors as well as shareholders of publicly traded companies headquartered in California and therefore subject to SB 826 and AB 979.

17. Defendant Dr. Shirley N. Weber is the Secretary of State of the state of California. She is a constitutional officer of the state. *See* Cal. Const. art. V, § 11. In her official capacity as Secretary of State, she is charged with administering and enforcing SB 826 and AB 979. She is being sued in her official capacity under *Ex Parte Young*, 209 U.S. 123, 189 (1908), and 42 U.S.C. §§ 1981 and 1983, which supply causes of action against state officers.

## STANDING

18. A plaintiff has standing to bring a claim if he or she has suffered an injury that is fairly traceable to the defendant's challenged conduct and this injury is redressable by the court.

19. Plaintiff's members include biological males who do not self-identify as women or underrepresented minorities as defined in AB 979 and are actively seeking corporate director positions. Because of California's laws, they are unable to compete on an equal footing for positions on the boards of directors of corporations headquartered in California, in violation of the Fourteenth Amendment and 42 U.S.C. § 1981.

20. California's race and sex quota mandates for corporate boards also violate the constitutional internal affairs doctrine, and this violation of the internal affairs doctrine has injured certain of Plaintiff's members by forcing them to compete on an unequal playing field for board of director positions of corporations headquartered in California.

21. The Plaintiff's members also include shareholders of publicly traded corporations headquartered in California. To achieve its quotas, both SB 826 and AB 979 necessarily impact and limit the behavior of voting shareholders.

22. As voting shareholders of these corporations, Plaintiff's members select who sits on these corporations' boards of directors. The only way in which a person can be elected to these corporations' boards of directors is if a plurality of shareholders vote in favor of a candidate at the annual shareholder meeting.

23. Plaintiff's members intend to vote on board member nominees at upcoming annual meetings.

24. SB 826's Woman Quota thus imposes a sex-based quota requirement directly on these members, who must now participate in and perpetuate sex-based discrimination. This impairs their right to vote for the director candidates of their choice, free from the threat of fines imposed on the corporation (which would reduce the value of their holdings).

25. AB 979's Minority Quota similarly injures Plaintiff's members by requiring them to discriminate against potential board candidates based their race, ethnicity, sexual orientation, or gender identity, which impairs these members' right to vote for the director candidates of their choice, free from the threat of fines imposed on the corporation (which would likewise reduce the value of their holdings).

26. A live controversy exists between Plaintiff's members and Defendant as to their respective legal rights and duties. Plaintiff alleges that the Woman Quota is a sex-based classification that violates the Fourteenth Amendment of the U.S. Constitution, that the Minority Quota unconstitutionally requires discrimination against members of certain racial and ethnic groups in violation of the Fourteenth Amendment and 42 U.S.C. § 1981, and that both SB 826 and AB 979 violate the internal affairs doctrine. Defendant disagrees with all of these allegations.

27. The injuries to Plaintiff's members alleged above are directly traceable to California's Woman and Minority Quotas and would be redressed by an order enjoining

enforcement of these laws. Plaintiff's injured members would thus have standing to bring this suit as individuals.

28.     Because at least one of Plaintiff's members has standing, and because the interests at stake are germane to Plaintiff's purpose, and neither the claim nor the relief requested requires participation of individual members, Plaintiff has associational standing. *United Food & Commercial Workers Union Local 751 v. Brown Grp. Inc.*, 517 U.S. 544, 552–53 (1996).

## STATEMENT OF FACTS

**SB 826 – The Woman Quota**

29.     In 2013, the California legislature passed a resolution urging California public corporations to increase the number of women on their boards of directors. *See* California Senate Concurrent Resolution No. 62 (Sept. 20, 2013). In 2018, dissatisfied with what it believed was the slow pace of voluntary adoption by California companies, the state legislature passed a more coercive measure: SB 826, which imposes a mandatory minimum number of female directors for each corporate board, enforceable by fine.

30.     Then-Governor Jerry Brown signed SB 826 into law on September 30, 2018. SB 826 added California Corporations Code Sections 301.3 and 2115.5, which require that, by December 31, 2021, public corporations headquartered in California must have a minimum number of female directors on their boards.

31.     The number of female directors required by SB 826 depends on the size of the corporation's board: a corporation with six or more directors must have at least three female directors, a corporation with five directors must have at least two female directors, and a corporation with four or fewer directors must have at least one female director. *See* Cal. Corp. Code § 301.3(b). The aim of these quotas is to achieve rough demographic balancing.

32.     The Woman Quota applies to any "publicly held domestic or foreign corporation whose principal executive offices . . . are located in California," including

companies incorporated outside of California, regardless of any contrary law in the state of incorporation. Cal. Corp. Code §§ 301.3(b), 2115.5.

33. A corporation that fails to comply with the Woman Quota is subject to significant penalties: a single violation carries a $100,000 fine, and a second violation carries a $300,000 fine. Each director seat required to be held by a woman, but which is not held by a woman for at least a portion of the calendar year, is considered a separate violation. Cal. Corp. Code § 301.3(e).

34. To justify its Woman Quota, the California legislature does not claim that California companies discriminate against female director candidates. Nor does it suggest that the quota is necessary to remedy specific, past instances of discrimination. Instead, the California legislature cites a handful of reports from investment firms, consultancies, and advocacy groups that claim that female directors may improve a corporation's financial performance or governance. Based on its selected reports, the legislature concluded that "[m]ore women directors serving on boards of directors of publicly held corporations will boost the California economy, improve opportunities for women in the workplace, and protect California taxpayers, shareholders, and retirees[.]" SB 826 §1(a).

35. But the sources the California legislature relies on are not credible. *See* SB 826 §1(c). None of the legislature's sources perform sound statistical analyses. Cited "studies" by investment firms MSCI and Credit Suisse and consulting firm McKinsey fail to report even basic statistical measures—like the "statistical significance" or the "p-value"—that are necessary to show that the observed differences do not arise by mere chance. All but one source (R. Kerlsley, et al., *The CS Gender 3000: Women in Senior Management*, Credit Suisse Research Institute (Sept. 2014)) fail to control for important variables—like the size of the firm, or the industry—that can bias results. The omission of these control variables makes it impossible to infer causation from the asserted correlations. Only one source (M. Torchia, et al., *Women Directors on Corporate Boards: From Tokenism to Critical Mass*, 102 J. Bus. Ethics 299 (2011)) was subject to peer review.

And that study, which found that having a "critical mass" of women on boards of Norwegian firms may increase a subjective measure of "organizational innovation," is irrelevant to the legislature's claim that female directors will improve the economic performance of California companies. *See id.*

36. Although many of the legislature's sources assert that more female directors *correlates* with better firm performance, not one study shows that the number of women on the board *causes* better performance, a necessary predicate for the legislature's claim that its woman-quota will benefit California companies. In fact, many of the sources relied on by California expressly warn that their results do not establish causation. *See, e.g.,* M. Eastman, et al., *The Tipping Point: Women on Boards and Financial Performance*, MSCI ESG Research 3 (Dec. 2016) ("As with the previous study, a causal link was not established."); R. Kerlsey, et al., *The CS Gender 3000: Women in Senior Management*, Credit Suisse Research Institute 16 (Sept. 2014) ("We do not seek to claim a causality"); R. Kerlsey, et al., *Gender diversity and corporate performance*, Credit Suisse Research Institute 15 (Aug. 2012) ("None of our analysis proves causality"); G. Desvaux, et al., *Women Matter: Gender diversity, a corporate performance driver*, McKinsey & Co. 14. (2007) ("[T]hese studies do not demonstrate a causal link"). As economist and University of Pennsylvania law professor Jonathan Klick concludes in his detailed critique of Nasdaq's similar proposed "board diversity" quota, "[t]here is no credible evidence that diversity requirements systematically improve firm performance." J. Klick, *Review of the Literature on Diversity on Corporate Boards*, Am. Enterprise Inst. 1 (Apr. 2021).

37. The California legislature also omits from its discussion the many rigorous, peer-reviewed studies that show that gender board diversity has no, or even a negative, effect on corporate performance. *See* J. Klick, *Review of the Literature on Diversity on Corporate Boards*, American Enterprise Institute 15–17 (Apr. 2021); J. Fried, *Will Nasdaq's Diversity Rules Harm Investors?,* European Corporate Governance Inst. Working Paper No. 579/2021, 4-6 (Apr. 2021). Two peer-reviewed meta-analyses, which examined the academic literature as a whole, found that the number of women

directors has no, or mixed, effects on corporate performance. J.L. Pletzer, et al., *Does Gender Matter? Female Representation on Corporate Boards and Firm Financial Performance – A Meta-Analysis*, 10 PLoS One 17 (2015) (observing that their results "show that a higher representation of females on corporate boards is neither related to a decrease, nor to an increase in firm financial performance"); C. Post and K. Byron, *Women on Boards and Firm Financial Performance: A Meta-Analysis*, 58 Acad. of Mgmt. J. 1546, 1563 (2015) (concluding that their "results suggest that board [gender] diversity is neither wholly detrimental nor wholly beneficial to firm financial performance"). And as economist and Harvard law professor Jesse Fried recounts, numerous studies have shown "that stock returns suffer when firms are pressured to hire new directors for diversity reasons." J. Fried, *supra* at 5-6. Additionally, the Woman Quota will also imposes significant compliance costs, including by forcing firms to either create new board positions and/or to replace experienced male directors for no other reason than that they are not women. *See id.*

**SB 826 – The Minority Quota**

38.     Seeking to further meddle in corporate internal affairs, Governor Gavin Newsom signed AB 979 into law on September 30, 2020. AB 979 adds California Corporations Code Sections 301.4 and 2115.6, which require that, by December 31, 2022, in addition to the specified number of female directors, public corporations headquartered in California must also have a minimum number of directors from "underrepresented communities." Cal. Corp. Code § 301.4(b). A director qualifies as being from an "underrepresented community" if the director "self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, [] Alaska Native, . . . gay, lesbian, bisexual, or transgender." *Id.* § 301.4 (e)(1).

39.     This definition of "underrepresented community" draws a number of mystifying distinctions. People of Spanish (and perhaps Portuguese) ancestry would presumably qualify as "Hispanic" and therefore "underrepresented," while Persians, Arabs, Armenians, Turkish, and many other minority ethnic groups would not.

Similarly, AB 979 does not give any preference to a number of non-heterosexual sexual identities that do not fall within the categories of gay, lesbian, bisexual, or transsexual. For example, the law gives no preference to persons who identify as gender non-conforming, intersex, or asexual.

40. Like SB 826, the number of directors from an "underrepresented community" required by AB 979 depends on the size of the corporation's board: a corporation with nine or more directors must have at least three directors from underrepresented communities, a corporation with five to eight directors must have at least two directors from underrepresented communities, and a corporation with four or fewer directors must have at least one director from an "underrepresented community." Cal. Corp. Code § 301.4(b). As with the Woman Quota, the Minority Quota is designed to achieve a rough racial balancing.

41. Also, like SB 826, AB 979 applies to publicly held corporations with principal offices located in California, regardless of where the company is incorporated and regardless of the laws of the state of incorporation. Cal. Corp. Code §§ 301.4(b), 2115.6. AB 979 also carries similarly stiff fines for failures to comply: $100,000 for a single violation and $300,000 for a subsequent violation. Cal Corp Code § 301.4(d).

42. In support of its "underrepresented community" director quota, the California legislature cites U.S. statistics showing that members of non-white racial classes holder fewer management and director positions, and hold fewer jobs in the high-tech industry. AB 979 §(1)(a)–(l). The legislature also cites two reports from consulting firms suggesting that racial diversity—on senior executive teams or in the general high tech workforce—may benefit corporate earnings. AB 979 §(m)-(n). But the legislature does not provide any evidence that racial diversity on corporate boards improves firm performance or governance, likely because academic studies have failed to establish that link. *See, e.g.,* D. Carter, et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance 396, 396 (2010) (failing to "find a significant relationship between the , . . . ethnic diversity of the board,

or important board committees, and financial performance for a sample of major US corporations"); D. Carter, et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 Fin. Rev. 33, 49–50 (2003) (finding no "statistically significant differences in value" between firms with high and low minority board representation when controlling for board size and industry).

43. The California legislature makes no findings and cites no studies related to directors who self-identify as gay, lesbian, bisexual, or transgender, likely because none exist. Even Nasdaq conceded in its similar "board diversity" proposal "that there is a lack of published research on the issue of LGBTQ+ representation on boards." 85 Fed. Reg. 80,472, 80,476 (Dec. 11, 2020).

\* \* \*

44. Legislative analyses of both SB 826 and AB 979 prepared before enactment highlight the significant risk of legal challenge to the laws. The California Assembly Floor Analysis of SB 826 observes that the Woman Quota "would likely be challenged on equal protection grounds," since it "creates an express gender classification, which subjects the proposed law to heightened scrutiny under the equal protection clause of the 14th Amendment[.] . . . The use of a quota-like system . . . may be difficult to defend." SB 826 Assembly Floor Analysis, 4 (2018). The Assembly Floor Analysis further notes that, in attempting to influence the governance of out-of-state corporations, the "bill may [also] conflict with the internal affairs doctrine . . . 'which recognizes that only one State should have the authority to regulate a corporation's internal affairs[.]'" *Id.* The California Senate Floor Analysis of AB 979 expresses similar concerns for the "underrepresented community" director quota. AB 979 Senate Floor Analysis, 6–7 (2020); *see also* Senate Committee on Banking and Financial Institutions Report on AB 979, 5–7 (2020).

# CAUSES OF ACTION

**I.    COUNT 1: The Woman Quota Violates the Equal Protection Clause of the 14th Amendment.**

45.   Plaintiffs incorporate herein by reference paragraphs 1 through 44 as if fully set forth herein.

46.   The Fourteenth Amendment's Equal Protection Clause prohibits unjustified discrimination based on sex. The discrimination here is stark: California's Woman Quota law explicitly bars men from consideration for specific numbers of board director positions.

47.   Under the Fourteenth Amendment, laws that discriminate based on sex are subject to heightened scrutiny, meaning they must substantially relate to achieving an important governmental interest. Any discrimination based on sex must establish "an exceedingly persuasive justification" for such action. *Virginia*, 518 U.S. at 524. That a state law discriminates against men rather than women does not reduce the level of scrutiny. *See Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689–90 (2017); *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 723–24 (1982).

48.   Under 42 U.S.C. § 1983, private citizens may sue state officers for depriving citizens of their constitutional rights "under color of law."

49.   California's Woman Quota, SB 826, deprives citizens of their constitutional right to equal protection of the laws under the Fourteenth Amendment because it serves no important government interest. To the contrary, it relies on improper gender stereotypes about women having unique "working styles" that will, it claims, improve corporate performance. Reliance on stereotypes about the capabilities or personalities of women is illegitimate and does not further an important government interest.

50.   Even if SB 826 did serve an important government interest, forcing corporations to reserve board seats for only female candidates is not sufficiently tailored to be substantially related to achieving this interest. As explained above, the

evidence relied on by California is not "extraordinarily persuasive," but is inconclusive, methodologically flawed, and contradicted by numerous academic studies of far greater scientific and statistical rigor.

## II. COUNT 2: The Minority Quota Violates the Equal Protection Clause of the Fourteenth Amendment.

51. Plaintiffs incorporate herein by reference paragraphs 1 through 50 as if fully set forth herein.

52. The Fourteenth Amendment's Equal Protection Clause prohibits discrimination based on race or ethnicity in all but the narrowest circumstances. Laws that discriminate based on race are subject to strict scrutiny, meaning they must be narrowly tailored to serve a compelling government interest.

53. AB 979 provides preferences based not only on race and ethnicity, but also sexual orientation and gender identity, uniting them under the label "underrepresented communit[ies]." But this combination does not change the level of scrutiny: "all racial classifications . . . must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995).

54. AB 979 classifies people on the basis of race and ethnicity and then requires corporations to give substantial preferences to board candidates who self-identify as members of these favored racial and ethnic groups. Candidates like certain of Plaintiff's members who do not self-identify as underrepresented minorities are "forced to compete in a race-based system that may prejudice" them. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007). As California's legislative record demonstrates, AB 979 is *designed* to work such prejudice in order to pursue the unconstitutional objective of racial balancing. Thus, at a minimum, AB 979 creates an unequal playing field for candidates who do not self-identify as members of California's favored racial and ethnic groups, which is itself a constitutional violation unless California can satisfy strict scrutiny. *Id.*

55. AB 979 fails on both prongs of the strict scrutiny test:

      a.    *Compelling State Interest.* The Supreme Court has recognized only two interests as sufficiently compelling to justify intentional racial discrimination: remedying past discrimination, *see United States v. Paradise*, 480 U.S. 149 (1987), and fostering the educational benefits of diversity in a college setting, *see Grutter v. Bollinger*, 539 U.S. 306 (2003). AB 979 addresses neither of these interests. Instead, California claims that mandating racial discrimination is an appropriate tool to increase "diversity" as a means of increasing the performance of corporations headquartered in California and, thus, increasing the state's wealth. This is insufficient.

      b.    *Narrow Tailoring*. Even if these goals were compelling—and they are not—there is nothing in the legislative record of AB 979, or in the broader corpus of social science, to support narrow tailoring. California has not endeavored to show that race-neutral policies are insufficient to create greater "diversity" or to boost corporate performance. And California has also not come forward with any evidence that its race-based strictures will not outlast the claimed problems it seeks to address. More fundamentally, California does not provide any convincing evidence that requiring corporations to engage in racial discrimination will in fact achieve its goal of improving firm performance. As explained previously, the available social science research shows that there is at most *no* correlation between the racial makeup of corporate boards and the firm's performance, let alone any causal relationships.

### III.   COUNT 3: The Minority Quota 42 U.S.C. § 1981.

56.    Plaintiffs incorporate herein by reference paragraphs 1 through 55 as if fully set forth herein.

57.    42 U.S.C. § 1981 forbids discriminating on the basis of race in the making and enforcing contracts. Like the Fourteenth Amendment, § 1981 prohibits

discrimination that would prevent a plaintiff from competing on an equal footing for a contract because of his or her race or ethnicity.

58. AB 979 violates 42 U.S.C. § 1981 by discriminating based on race and ethnicity by hindering those who do not identify as members of California's favored "underrepresented communit[ies]" from securing contracts for board of director positions at corporations headquartered in California. This unlawfully deprives candidates who do not identify as members of these "underrepresented communit[ies]" of the opportunity to compete on an equal playing field for board positions. Similarly, AB 979 violates § 1981 by requiring shareholders to discriminate based on race when enforcing their contractual rights to vote for director candidates.

### IV. COUNT 4: Both Quotas Violate the Internal Affairs Doctrine.

59. Plaintiffs incorporate herein by reference paragraphs 1 through 58 as if fully set forth herein.

60. The internal affairs doctrine provides that internal matters of corporate governance are governed by the law of the state of incorporation. Matters concerning the number, qualifications, and election of directors have historically been viewed as subject to the internal affairs doctrine.

61. The Supreme Court has held that the internal affairs doctrine is mandated by constitutional principles, except in the rarest situations, such as when the law of the state of incorporation conflicts with a national policy on foreign or interstate commerce.

62. California's race and gender quota laws expressly apply "to the exclusion" of the laws of the state of incorporation. Cal. Corp. Code §§ 2115.5(a), 2115.6(a). In other words, these board laws assert that they override other states' laws governing corporations incorporated in their own states. Therefore, California's "diversity" laws violate the internal affairs doctrine.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant Dr. Shirley Weber, in her official capacity as California Secretary of State, as follows:

1. For declaratory relief adjudging that SB 826 violates the Equal Protection Clause of the Fourteenth Amendment;
2. For declaratory relief adjudging that AB 979 violates the Equal Protection Clause of the Fourteenth Amendment;
3. For declaratory relief adjudging that AB 979 violates 42 U.S.C. § 1981;
4. For declaratory relief adjudging that SB 826 and AB 979 are unconstitutional because they interfere with the sovereignty of California's sister states by intruding on the internal affairs of corporations incorporated under the laws of those other states;
5. For declaratory and injunctive relief permanently enjoining Defendant in her official capacity as well as any and all of her subordinate officers, agents, servants, employees, or any other persons working in active concert or participation with Defendant who receive actual notice of the injunction, from enforcement or application of SB 826 and AB 979;
6. For costs of suit, including attorney fees and costs under 42 U.S.C. § 1988 and any other applicable law; and
7. For any and all further relief to which Plaintiff may be justly entitled.

Dated:  July 12, 2021                Respectfully submitted,

BENBROOK LAW GROUP, PC

By  s/ Bradley A. Benbrook
        BRADLEY A. BENBROOK

BOYDEN GRAY & ASSOCIATES PLLC

By  s/ Jonathan Berry
        JONATHAN BERRY

Attorneys for Plaintiff