BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

BOYDEN GRAY & ASSOCIATES PLLC
C. BOYDEN GRAY, Admitted *Pro Hac Vice*
JONATHAN BERRY, Admitted *Pro Hac Vice*
MICHAEL BUSCHBACHER, Admitted *Pro Hac Vice*
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
berry@boydengrayassociates.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLIANCE FOR FAIR BOARD RECRUITMENT,<br><br>            Plaintiff,<br><br>   v.<br><br>SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,<br><br>            Defendant. | Case No.: 2:21-cv-01951-JAM-AC<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF ALLIANCE FOR FAIR BOARD RECRUITMENT'S MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Statement of Facts .......................................................................................4

    A. The Requirements of AB 979 .............................................................4

    B. Legislative Background ........................................................................5

    C. California's Recognition of Constitutional Infirmities.....................8

Procedural Background..................................................................................9

Legal Standard .............................................................................................10

Argument ......................................................................................................11

    I.     AB 979 is a "Facially Invalid" Race-Based Quota.....................11

    II.    AB 979 Fails Strict Scrutiny in Any Event................................12

          a.  AB 979 Does Not Serve a Compelling State Interest............12

          b.  AB 979's Quota System is Not Narrowly Tailored ...............15

    III.   AB 979 Violates 42 U.S.C. § 1981.................................................21

    IV.   The Alliance Has Standing ...........................................................21

          A. Shareholders of Corporations Regulated by AB 979............21

          B. Disadvantaged Director Candidates.....................................22

Conclusion ...................................................................................................23

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995) ...................................2, 4, 10

*Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147
    (9th Cir. 2019) ...................................................................................................21

*Assoc. Gen. Contractors of Cal., Inc. v. City & Cty. of San Francisco*, 813 F.2d 922 (9th
    Cir. 1987*)* ...................................................................................14, 15, 16, 20

*Bras v. California Pub. Utilities Comm'n*, 59 F.3d 869 (9th Cir. 1995) ....................22

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ..............2, 3, 14, 15, 16, 19

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ......................................................10

*Coal. for Econ. Equity v. Wilson*, 122 F.3d 692 (9th Cir. 1997) .................................10

*Coral Const. Co. v. King Cty.*, 941 F.2d 910 (9th Cir. 1991)......................................16

*CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987) .........................................17

*Fisher v. Univ. of Texas at Austin*, 570 U.S. 297 (2013) ......................................13, 14

*Fisher v. Univ. of Texas at Austin*, 136 S. Ct. 2198 (2016) .......................................11

*Fullilove v. Klutznick*, 448 U.S. 448 (1980) .............................................................2, 14

*Gratz v. Bollinger,* 539 U.S. 244 (2003) ...........................................................15, 21, 22

*Grutter v. Bollinger*, 539 U.S. 306 (2003) .........................................1, 2, 11, 13, 16, 18

*Heckler v. Mathews*, 465 U.S. 728 (1984) ...............................................................18

*Hirabayashi v. United States*, 320 U.S. 81 (1943) ...................................................2

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ...........................1

*Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 (2011).................................7

*McLaughlin v. Florida*, 379 U.S. 184, 192 (1964*)* ................................................1

*Meland v. Weber*, 2 F.4th 838 (9th Cir. 2021) ....................................................21, 22

*Meland v. Weber*, 2021 WL 6118651, at *3 (E.D. Cal. Dec. 27, 2021)..2, 13, 18, 19, 22

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997)..............................10, 11

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of*
     *Jacksonville, Fla.*, 508 U.S. 656 (1993) ........................................................ 11, 22

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701
     (2007) ........................................................................................................ 2, 13, 15

*Regents of Univ. California v. Bakke*, 438 U.S. 265 (1978) ................. 4, 11, 12, 16, 18

*Schuette v. BAMN*, 572 U.S. 291, 308 (2014) ............................................................ 2

*Shaw v. Hunt*, 517 U.S. 899 (1996) ................................................... 1, 3, 10, 14, 15, 20

*Shaw v. Reno*, 509 U.S. 630 (1993) ........................................................................... 2

*Smith v. Univ. of Washington*, 392 F.3d 367 (9th Cir. 2004) ................................... 16

*United States v. Virginia*, 518 U.S. 515 (1996) ....................................................... 10

*W. States Paving Co. v. Washington State Dep't of Transp.*, 407 F.3d 983 (9th Cir.
     2005) ................................................................................................................ 16, 19

*Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267 (1986) ....................... 10, 15, 16, 19, 20

**STATUTES AND REGULATIONS**

42 U.S.C. § 1981 ........................................................................................................ 21

86 Fed. Reg. 44,424 (Aug. 12, 2021) ......................................................................... 8

Cal. Corp. Code § 212 .............................................................................................. 17

Cal. Corp. Code § 301 .......................................................................................... 1, 4, 5

Cal. Corp. Code § 2115 ............................................................................................. 4

**COURT RULES**

Fed. R. Civ. P. 56 ..................................................................................................... 10

**OTHER AUTHORITIES**

Order Granting Motion to Seal, Alliance for Fair Board Recruitment v. Securities and
     Exchange Commission, No. 21-60626 (5th Cir. Nov. 18, 2021) ....................... 23

David A. Carter, et al., *Corporate Governance, Board Diversity, and Firm Value*, 38
     Fin. Rev. 33 (2003) ........................................................................................... 7

David A. Carter, et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance 396 (2010)............................................................................................................7

Jesse M. Fried, *Will Nasdaq's Diversity Rules Harm Investors*, 12 Harv. Bus. L. Rev. Online art. 1 (2021)............................................................................................8

Vivian Hunt et al., *Diversity Matters*, McKinsey & Company (Feb. 2015) .................7

Andria Thomas, et al., *Decoding Diversity: the Financial and Economic Returns to Diversity in Tech*, Dalberg Advisors (June 23, 2016) .............................................7

# INTRODUCTION

"It is a sordid business, this divvying us up by race." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 511 (2006) (Roberts, C.J., concurring in part). But California embraces racial sorting with gusto. Under AB 979, publicly traded corporations headquartered in the state must have on their boards a certain minimum number of directors from "underrepresented communities." Cal. Corp. Code § 301.4(b).[1] A director qualifies as hailing from an "underrepresented community" if he or she "self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, [] Alaska Native, . . . gay, lesbian, bisexual, or transgender." *Id.* § 301.4(e)(1). The apparent purpose of the law is to increase racial diversity on boards, which California claims will boost corporate performance.

This is a paradigmatic violation of the Fourteenth Amendment's equal protection clause. "Racial classifications are antithetical to the Fourteenth Amendment, whose 'central purpose' was 'to eliminate racial discrimination emanating from official sources in the States.'" *Shaw v. Hunt*, 517 U.S. 899, 907 (1996) (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)). As this Court explained at its January 11, 2022 hearing on Defendant California Secretary of State Shirley Weber's ("California") Motion to Dismiss, AB 979 is thus "unconstitutional" because it "encourages race-based discrimination"; thus, "it is no defense that AB 979 combines two distinct groups, racial minorities and LGBTQ." Ex. B, Trans. of Hearing on Mot. to Dismiss 29:10, 14–17 (Jan. 11, 2022) ("Tr."). Indeed, because it works by requiring set-asides, AB 979 is "a race-based law, and it is in every aspect, at least in the Supreme Court's view, a quota." *Id.* 25:11–12; *accord Grutter v. Bollinger*, 539 U.S. 306, 335 (2003) ("Properly understood, a 'quota' is a program in which a *certain fixed number* or proportion of opportunities are 'reserved exclusively for certain minority groups.'" (emphasis added; citation omitted)). This conclusion is as true at summary judgment as it was at the motion to dismiss

---

[1] A true and correct copy of AB 979 is attached hereto as Exhibit A.

1  stage. Quotas, set-asides, and other means of racial balancing are always "patently

2  unconstitutional." *Grutter*, 539 U.S. at 330.

3      Of course, California will claim that—*this time*—the racial discrimination is

4  good. Not so. There are no "benign" racial classifications that get as special pass; such

5  distinctions "are by their very nature odious to a free people whose institutions are

6  founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 642, 643 (1993)

7  (quoting *Hirabayashi v. United States,* 320 U.S. 81, 100 (1943)). Race-based laws "per-

8  petuat[e] the very racial divisions the polity seeks to transcend." *Schuette v. BAMN*,

9  572 U.S. 291, 308 (2014) (plurality opinion). "They threaten to stigmatize individuals

10  by reason of their membership in a racial group and to incite racial hostility." *Shaw v.*

11  *Reno*, 509 U.S. at 643. Thus, "race-based action" can be countenanced only if it "is nec-

12  essary to further a compelling interest" and "satisfies the 'narrow tailoring' test."

13  *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 237 (1995).

14      AB 979 falls far short on both prongs. As this Court recently held, diversity is a

15  compelling interest only in the "special niche" of higher education. *Meland v. Weber*,

16  2021 WL 6118651, at *5 (E.D. Cal. Dec. 27, 2021) ("*Meland II*") (quoting *Parents In-*

17  *volved in Community Schools v. Seattle School Dist. No. 1*, 551 U.S. 701, 724 (2007)).

18  It has no applicability in the context of corporate boards. *Id.* California may argue that

19  AB 979 is also designed to remedy past racial discrimination—but this is not a reason

20  AB 979 itself gives, nor can it be raised now, as the law's purpose must at the outset

21  "be clearly identified and unquestionably legitimate." *City of Richmond v. J.A. Croson*

22  *Co.*, 488 U.S. 469, 505 (1989) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 535

23  (1980) (Stevens, J., dissenting)).

24      Stray comments in this litigation and in California's legislative analysis memos

25  about past discrimination, moreover, suggest that any remedial purpose was targeted

26  at so-called "systemic" or "structural" discrimination. Def.'s Mem. in support of Mot. to

27  Dismiss, ECF No. 41-1, at 3 (Oct. 4, 2021) (hereinafter, "MTD"). But the Supreme Court

28  has repeatedly held that alleviating "the effects of societal discrimination is not a

compelling interest." *Shaw v. Hunt*, 517 U.S. at 909–10. Rather, the discrimination at issue must be specifically "identified discrimination," *id.*, that the government itself had a hand in perpetrating, *Croson*, 488 U.S. at 504.

Nor is AB 979 narrowly tailored. It is a quota that sets aside a minimum number of seats for every publicly held corporation headquartered in California, regardless of a corporation's current board makeup or whether it has any history of discrimination. AB 979 also does not allow for individualized treatment—if you don't meet California's preferred criteria, those seats are flatly off limits. AB 979's findings also do not explain why race-neutral alternatives were insufficient, and the law has no time limit or sunset provision.

AB 979's definition of "underrepresented community" is also an ill-considered grab-bag of thirteen different groups, all of which AB 979 treats as interchangeable, despite California's own data showing widely divergent participation rates on corporate boards between many of the groups. For many other "underrepresented communities," AB 979 does not include *any* findings. "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination" is incompatible with narrow tailoring. *Croson*, 488 U.S. at 506.

\*     \*     \*

One of AB 979's authors defended the need for its quota system thus: "since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long-term structural change." Statement ¶ 5. That "long-term structural change," the author implied, had to come from state lawmakers.

There are many big-picture changes that lawmakers can undertake to help realize the Constitution's promise of equal treatment and equal opportunity. But not AB 979's ham-fisted and scattershot use of race-based quotas. Indeed, AB 989 does not work a structural change at all; it is structural *regression*, a return to the "odious"

racial categories and paternalism of our nation's past. Those structures failed then and, if allowed to be resurrected, would fail again. As Justice Thomas observed decades ago: "Government cannot make us equal; it can only recognize, respect, and protect us as equal before the law." *Adarand*, 515 U.S. at 240 (1995) (Thomas, J., concurring in part and concurring in the judgment) (cleaned up).

AB 979 is "facially invalid." *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 307 (1978) (controlling opinion of Powell, J.). And it cannot satisfy strict scrutiny. This Court should therefore grant Plaintiff's motion for summary judgment without delay.

## STATEMENT OF FACTS

### A. The Requirements of AB 979

Governor Gavin Newsom signed AB 979 into law on September 30, 2020. The law adds California Corporations Code §§ 301.4 and 2115.6, which require that, by December 31, 2022, publicly traded corporations headquartered in California must have a minimum number of directors from "underrepresented communities." Cal. Corp. Code § 301.4(b). A director qualifies as being from an "underrepresented community" if the director "self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, [] Alaska Native, . . . gay, lesbian, bisexual, or transgender." *Id.* § 301.4(e)(1). The minimum number of directors from an "underrepresented community" required by AB 979 depends on the size of the corporation's board: a corporation with nine or more directors must have at least three directors from underrepresented communities; a corporation with five to eight directors must have at least two directors; and a corporation with four or fewer directors must have at least one. *Id.* § 301.4(b).

AB 979 authorizes stiff fines for failures to comply: $100,000 for a single violation and $300,000 for any subsequent violation. *Id.* § 301.4(d). The California Secretary of State must also publish annually a report documenting covered corporations' compliance. *Id.* § 301.4(c).

The law has no expiration date or sunset provision.

**B. Legislative Background**

AB 979 does not state what its purpose is, but it appears to be aimed at increasing minority representation and diversity both for its own sake and as a means of boosting corporate performance. *See generally* AB 979 § 1. An analysis drafted by California's legislative counsel expands on this, stating that "[t]his bill is sponsored by the author to help address the ethnic pay gap, facilitate employment and outreach opportunities for underrepresented communities, promote board diversification, establish pipeline creation and upward mobility of diverse technical talent, and facilitate retention of that talent through company culture and development." Statement ¶ 6.

Notably, AB 979 does not claim to remedy past racial discrimination—indeed, the only mention of discrimination in the law is a generalized finding that Title VII of the Civil Rights Act of 1964 "[d]irectly permits the imposition of affirmative action plans to address past discrimination and patterns of discrimination." AB 979 § 1(q)(1). AB 979 also does not make any actual findings of racial or ethnic underrepresentation on corporate boards, as it does not adduce any data about the racial and ethnic makeup of the relevant labor pool (presumably existing board members and experienced senior executives in California). Even more striking is the fact that the law includes no findings whatever about a majority of AB 979's thirteen "underrepresented communities"; namely, Native Americans, Native Hawaiians, Alaska Natives, or those who self-identify as gay, lesbian, bisexual, or transgender.

The only legislative "find[ings] and declaration[s]" about board makeup are a handful of generalized demographic studies showing the racial and ethnic composition of corporate boards of Fortune 500 companies as well as publicly traded corporations in California. *See id.* § 1(b), (c), (d), (e). The law also refers more broadly to racial and ethnic representation within the American and Californian tech sectors and with respect to CEO positions and "management, professional, and related occupations" generally. *Id.* § 1(a), (f), (g), (h), (i), (j), (k), (*l*). The only finding in AB 979 that gives

percentage values for board participation by different racial and ethnic groups is a citation to a report by Deloitte and the Alliance for Board Diversity, which found that "the percentages of Fortune 500 company board seats held by people identified as African American/Black, Hispanic/Latino(a), and Asian/Pacific Islander were 8.6 percent, 3.8 percent, and 3.7 percent, respectively." *Id.* § 1(b).

The data cited in AB 979 also show wide divergences among the various "underrepresented communities." For example, one study of publicly traded corporations headquartered in California found that, while "only 13 percent have at least one Latino board member [and] 16 percent have at least one African American board member, 42 percent have at least one Asian board member." *Id.* § 1(e). The law's findings also note "that compared to overall private industry, the high tech sector employed a larger share of Whites (63.5 percent to 68.5 percent), Asian Americans (5.8 percent to 14 percent), and a smaller share of African Americans (14.4 percent to 7.4 percent), Hispanics (13.9 percent to 8 percent)." *Id.* § 1(i).

Despite these vast differences, the law treats all members of "underrepresented communities" as interchangeable. It also draws mystifying lines that exclude from its benefits many minority groups. As the Alliance explained in its Complaint: "People of Spanish (and perhaps Portuguese) ancestry would presumably qualify as 'Hispanic' and therefore 'underrepresented,' while Persians, Arabs, Armenians, Turkish, and many other minority ethnic groups would not." ECF No. 1 ¶ 39.

Further, because all one must do to qualify as a member of an "underrepresented community" is to "self-identify" as such, AB 979 also affords its benefits to people who would not ordinarily be viewed as members of those communities, such as Senator Elizabeth Warren (a white woman who has self-identified as Native American), former NAACP chapter president Rachel Dolezal (a white woman who self-identified as black), and Hilaria Baldwin (a minor American celebrity of English, French-Canadian, German, Irish, and Slovak descent who adopted a Spanish persona). *See* Statement ¶¶ 18–20.

With respect to corporate performance, AB 979 cites a pair of glossy-paged marketing papers prepared by consulting firms suggesting that racial diversity on senior executive teams or in the general tech workforce may benefit corporate earnings. AB 979 § 1(m) (citing Vivian Hunt et al., *Diversity Matters*, McKinsey & Company (Feb. 2015)) & (n) (citing Andria Thomas, et al., *Decoding Diversity: the Financial and Economic Returns to Diversity in Tech*, Dalberg Advisors 17 (June 23, 2016)); *see also* Statement ¶¶ 1–2, 3–4. These reports were not subject to peer review, and both explicitly caution that they did not establish that racial diversity *causes* any increase in corporate earnings. *See* Hunt, *supra*, at 1; Thomas, *supra*, at 15; *accord* Statement ¶¶ 1, 3–4. In fact, the Dalberg report noted that "links between African American representation" and firm performance at tech companies "did not show statistical significance." Thomas, *supra*, at 15; *accord* Statement ¶ 4. In other words, it did not even show that the correlation observed was not the result of chance or random error. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40 n.6 (2011) (a "study that is statistically significant has results that are unlikely to be the result of random error" (quoting Federal Judicial Center, *Reference Manual on Scientific Evidence* 354 (2d ed. 2000)).

AB 979 also says nothing about much more rigorous studies that were unable to find *any* statistically significant link between racial diversity and firm performance. *See, e.g.* David A. Carter, et al., *The Gender and Ethnic Diversity of US Boards and Board Committees and Firm Financial Performance*, 18 Corp. Governance 396, 396 (2010) (failing to "find a significant relationship between the . . . ethnic diversity of the board, or important board committees, and financial performance for a sample of major US corporations"); David A. Carter, et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 Fin. Rev. 33, 49–50 (2003) (finding no "statistically significant differences in value" between firms with high and low minority board representation when controlling for board size and industry).

As Harvard economist and law professor Jesse Fried recently noted in his review of the research, those pushing for board diversity mandates "cannot cite any high-

quality study showing that board gender or ethnic diversity boosts returns, because there has been none.": "In fact, there is a sizeable body of academic work reporting the opposite result: diversifying boards can harm financial performance." Jesse M. Fried, *Will Nasdaq's Diversity Rules Harm Investors*, 12 Harv. Bus. L. Rev. Online art. 1, at 5 (2021). Many of these studies were published before AB 979 was passed, but the law says nothing about them. Doing so would have required the legislature to face the reality that, as the SEC recently conceded when approving a similar board-diversity rule for Nasdaq-listed companies, the social science held out in support of the supposed causal link between demographic diversity and corporate performance is "generally inconclusive" and (at best) "mixed." 86 Fed. Reg. 44,424, 44,431–2 (Aug. 12, 2021).

## C. California's Recognition of Constitutional Infirmities

As part of the California legislature's deliberative process, its counsel prepared at least three legislative analysis memos, two of which include discussions of AB 979's constitutionality. *See* Statement ¶¶ 7, 18. The memos acknowledge that AB 979's use of race and ethnicity "implicates" the Fourteenth Amendment's equal protection clause, and it must therefore meet the "notoriously high bar" of strict scrutiny. *Id.* ¶¶ 7–9. "Remedying past discrimination can be a sufficiently compelling government interest to withstand strict scrutiny," but "the existence of general societal discrimination will not ordinarily satisfy the courts. Instead, courts conducting strict scrutiny review typically require some showing of specific discrimination that the statute remedies." *Id.* ¶ 9. Further, "[t]o show that a statute is sufficiently narrowly-tailored to survive strict scrutiny review, the government must prove that the interest in question cannot be achieved through less-discriminatory means." *Id.* ¶ 10. In other words, "the government usually must prove that the interest in question cannot be achieved through a different method that does not require drawing distinctions based on race and ethnicity to the same degree." *Id.* ¶ 14.

The memos do not opine about AB 979's ultimate constitutionality, but the memo dated July 28, 2020, strongly implies that the bill's author should have included more

than generalized "findings and declarations regarding the absence of racial and ethnic diversity in the corporate workforce and in corporate leadership," as the memo pressed the bill's author "to provide greater detail regarding . . . specific discrimination" and to "include additional information in the findings and declarations about why other approaches to diversifying corporate boards have not been, or would not be, sufficiently effective." *Id.* ¶¶ 11–12.

These recommendations were not followed.

## PROCEDURAL BACKGROUND

Plaintiff the Alliance for Fair Board Recruitment ("the Alliance") filed this suit on July 12, 2021. ECF No. 1. In addition to the equal protection and 42 U.S.C. § 1981 challenges (Counts II and III) at issue here, the Alliance also alleged that AB 979 violated the constitutional internal affairs doctrine (Count IV) and that a similar statute, SB 826, which imposes gender diversity quotas, violated the equal protection clause (Count I) and the internal affairs doctrine (Count IV). *See id.*

At the January 11 hearing, this Court dismissed the Alliance's facial challenge to SB 826 and both internal affairs claims, but allowed the Alliance's Equal Protection and § 1981 challenges to AB 979 to go forward, explaining that the Alliance had properly pled that AB 979 is "unconstitutional" on its face because it "encourages race-based discrimination," and it is thus "no defense that AB 979 combines two distinct groups, racial minorities and LGBTQ." Tr. 29:10, 14–17. Indeed, the Court noted that AB 979 is a "a race-based law, and it is in every aspect, at least in the Supreme Court's view, a quota." Tr. 25:11–12.

The Alliance elected to stand on its complaint as pled, and California filed its answer on February 16, 2022. *See* ECF No. 74. Then, on March 7, 2022, California moved to stay this case; that motion is not yet fully briefed and is set for a hearing on April 18, 2022.

The Alliance now moves for summary judgment. *See* Fed. R. Civ. P. 56(b) ("Unless a different time is set by local rule or the court orders otherwise, a party may file

1  a motion for summary judgment at any time until 30 days after the close of all discov-

2  ery.").

3  **LEGAL STANDARD**

4      Summary judgment is proper if the moving party shows that there is no genuine

5  dispute as to any material fact and the moving party is entitled to judgment as a matter

6  of law. *See* Fed. R. Civ. Proc. 56(a). The moving party must first make a *prima facie*

7  showing that summary judgment is appropriate under Rule 56; the burden then shifts

8  to the non-moving party to show that a genuine issue of material fact remains for the

9  fact finder to resolve. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

10      Further, because "[a]ny governmental action that classifies persons by race is

11  presumptively unconstitutional and subject to the most exacting judicial scrutiny,"

12  *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 702 (9th Cir. 1997), "the burden of jus-

13  tifying different treatment by ethnicity . . . is always on the government," *Monterey*

14  *Mech. Co. v. Wilson*, 125 F.3d 702, 713 (9th Cir. 1997). "[A]ny person, of whatever race,

15  has the right to demand that any governmental actor subject to the Constitution justify

16  any racial classification subjecting that person to unequal treatment under the strict-

17  est judicial scrutiny." *Adarand,* 515 U.S. at 224. In meeting its equal protection burden,

18  the government must rely only on justifications that are "genuine, not hypothesized or

19  invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533

20  (1996). And it must show that it had a "strong basis in evidence to conclude that reme-

21  dial action was necessary, '*before* it embark[ed] on an affirmative-action pro-

22  gram.'" *Shaw v. Hunt*, 517 U.S. at 910 (quoting *Wygant v. Jackson Bd. of Educ.*, 476

23  U.S. 267, 277 (1986) (plurality opinion)).

24  **ARGUMENT**

25  **I.**    **AB 979 is a "Facially Invalid" Race-Based Quota.**

26      As California's own lawyers have explained, AB 979 imposes racial classifica-

27  tions and "set[s] minimum diversity requirements for California's largest and most in-

28  fluential companies." MTD, ECF No. 41-1, at 1. AB 979 works by taking a set number

1   seats off the table and reserving them for certain minority groups. As this Court noted,

2   it is therefore a "race-based . . . quota." Tr. 25:11–12.

3       Such quotas are *per se* unconstitutional. *See Fisher v. Univ. of Texas at Austin*,

4   136 S. Ct. 2198, 2208 (2016) (government "cannot impose a fixed quota") ("*Fisher II*");

5   *Grutter*, 539 U.S. at 330 (quotas and similar forms of "racial balancing" are "patently

6   unconstitutional"); *Bakke*, 438 U.S. at 307 (controlling opinion of Powell, J.) (race-based

7   quotas are "facially invalid"). And "because [AB 979] encourages [racial] discrimina-

8   tion, it's unconstitutional regardless of whether discrimination is actually required in

9   every instance . . . . it is no defense that AB 979 combines two distinct groups, racial

10  minorities and LGBTQ." Tr. at 29:10–11, 15–16; *see also Ne. Fla. Chapter of Assoc. Gen.*

11  *Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656 (1993); *Monterey*, 125 F.3d

12  at 710–11.

13      California has tried to distinguish these cases, maintaining that AB 979 does

14  not impose "a rigid numerical or proportional quota," but only "a flexible floor for board

15  diversity." MTD, ECF No. 41-1, at 2, 10. No: a "minimum diversity requirement," *id.*

16  at 2, is by definition both rigid and numerical. "Properly understood," AB 979 is "a

17  quota" because it is "a program in which a *certain fixed number* or proportion of oppor-

18  tunities are 'reserved exclusively for certain minority groups.'" *Grutter*, 539 U.S. at 335

19  (emphasis added; citation omitted); *see also Fisher II*, 136 S. Ct. at 2210 (The govern-

20  ment "is prohibited from seeking a particular number or quota of minority stu-

21  dents . . . ."). This Court has accordingly explained that "you can try to convince me

22  that [AB 979 is] not a quota, in the race area, but this is a quota," so California "can't

23  split hairs the way [it is] trying to split hairs. It's a race-based law, and it is in every

24  aspect, at least in the Supreme Court's view, a quota." Tr. 25:5–12.

25      This is correct. As in *Bakke*, it is irrelevant that AB 979's quota is a minimum

26  seat set-aside rather than a fixed percentage, a difference that Justice Powell's control-

27  ling opinion dismissed as a mere "semantic distinction" that was "beside the point." 438

28  U.S. at 289 (controlling opinion of Powell, J.). What mattered in *Bakke* was that the

policy disqualified individuals of certain races from competing for a certain number of seats. Like that policy, AB 979 tells candidates for board positions who do not identify as members of "underrepresented communities" that "[n]o matter how strong their qualifications . . . including their own potential for contribution to . . . diversity, they are never afforded the chance to compete with applicants from the preferred groups" for purposes of the reserved seats. *Id.* at 319.

AB 979's quotas are thus a "facially invalid" set-aside, *id.* at 307, obviating the need for further analysis.

## II.   AB 979 Fails Strict Scrutiny in Any Event.

### A. AB 979 Does Not Serve a Compelling State Interest.

#### 1.   Representation and Diversity are Not Compelling State Interests.

While AB 979 does not clearly state what its purpose is, its structure and findings suggest that it is designed to increase diversity, and—in particular—racial diversity on corporate boards, both as an end in itself and to boost corporate performance. This is underscored by California's characterizations of the law as "setting minimum diversity requirements" and being a "board diversity statute[]," MTD, ECF No. 41-1, at 1, as well as a number of statements in the legislative analysis memos about representation and diversity.

None of these sources, however, identify board diversity as a *compelling* interest. If the California Legislature cannot even bring itself to find that diversity is a compelling state interest, there is no reason for this Court to do so. As this Court recently explained, the only context in which the Supreme Court has recognized diversity as a compelling state interest is when it serves the educational mission of an institution of higher learning. *Meland II*, 2021 WL 6118651, at *5 (citing *Grutter*, 539 U.S. 306). *Grutter*'s rationale does not extend to corporate boards both because "the Supreme Court's recognition of the diversity rationale turned upon the special context of higher

education" and because "the Supreme Court has declined to extend the diversity rationale to other contexts, even highly similar ones." *Id.*

Even in the context of higher education, moreover, the goal of achieving representation for its own sake is not permitted. "Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'" *Fisher v. Univ. of Texas at Austin*, 570 U.S. 297, 311 (2013) ("*Fisher I*") (quoting *Parents Involved*, 551 U.S. at 732). Nor is the Alliance aware of any case that has even suggested that boosting corporate performance could be a compelling interest that justifies racial discrimination.[2] If the constitutional right to equal treatment means anything, it means that private moneymaking is an unacceptable basis for dividing people by race. "Our nation's history is all the evidence one needs to see that a policy of wealth-through-discrimination has been tried and found profoundly wanting." Compl., ECF No. 1, ¶ 5.

### 2. AB 979 Does Not Serve a Compelling Remedial Purpose.

AB 979 does not assert that it is designed to remedy any past racial or ethnic discrimination; nor does it identify even a single instance or pattern of racial or ethnic discrimination in corporate board appointments (or anywhere else). The only mention of discrimination in AB 979's findings is an observation that Title VII "permits the imposition of affirmative action plans to address past discrimination and patterns of discrimination." AB 979 § 1(q)(1). Notably, it makes no findings whatever with respect to participation of Native Americans, Native Hawaiians, and Alaska Natives on corporate boards. It also includes no statistics about the demographics of the relevant labor pool. *See Croson*, 488 U.S. at 507 (it is "completely unrealistic" to assume that groups "will choose a particular trade in lockstep proportion to their representation in the local

---

[2] Such a rule would open the door to obviously absurd results. States could order companies' boards to comprise exclusively white men so long as some specious study showed that companies with such boards performed better.

population"); *Assoc. Gen. Contractors of Cal., Inc. v. City & Cty. of San Francisco*, 813 F.2d 922, 933–34 (9th Cir. 1987).

This lack of clearly articulated remedial purpose is dispositive. "Because racial characteristics so seldom provide a relevant basis for disparate treatment, and because classifications based on race are potentially so harmful to the entire body politic, it is especially important that the reasons for any such classification be clearly identified and unquestionably legitimate." *Croson*, 488 U.S. at 505 (quoting *Fullilove*, 448 U.S. at 535 (Stevens, J., dissenting)) (cleaned up); *Fisher I*, 570 U.S. at 310 (same).

As the Supreme Court has explained, the discrimination a law seeks to redress "must be identified discrimination" to qualify as a compelling interest. *Shaw v. Hunt*, 517 U.S. at 909 (citation omitted). And the state must have a "strong basis in evidence" that identifies "that discrimination, public or private, with some specificity *before* [it] may use race-conscious relief." *Id.* at 909 (emphasis added; internal quotation marks omitted). This evidence must also show that the state itself participated in the identified past discrimination. *Croson*, 488 U.S. at 492 (plurality opinion); *id.,* at 520–521 (Scalia, J., concurring in judgment); *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 931–32.

Nothing in AB 979 or in the legislative analyses even comes close to meeting this standard. Remarks about discrimination are unsubstantiated and generalized and do not implicate any participation by California itself, whether active or passive. Discussions of discrimination in the legislative memos, for example, discuss only "systemic discrimination and bias that affects so many facets of our society – housing, education, criminal justice, and employment," and that "Black and Brown communities have historically faced barriers to education, have been subject to bias in hiring practices, and been excluded from access to start-up capital and small business loans." Statement ¶ 13. Similarly, in this litigation, California has described AB 979 as being a response to "structural and systemic" discrimination—*i.e.*, the sorts of disparate impacts that are said to arise from societal forces, structures, and implicit biases, rather than

1  intentional discrimination or animus, let alone discrimination by the state itself. MTD,

2  ECF No. 41-1, at 3.

3  Such vague and generalized assertions of a "remedial" purpose cannot justify

4  racial discrimination. As noted, "an effort to alleviate the effects of societal discrimina-

5  tion is not a compelling interest." *Shaw v. Hunt*, 517 U.S. at 910. Nor can a "generalized

6  assertion that there has been past discrimination in an entire industry" suffice. *Croson*,

7  488 U.S. at 498. Even if this were not the case, there is nothing here to suggest any

8  government involvement. *See Assoc. Gen. Contractors of Cal.*, 813 F.2d at 931 ("Most

9  significantly, there is no finding of 'prior discrimination by the governmental unit in-

10  volved.'" (quoting *Wygant*, 476 U.S. at 274 (plurality opinion)).

11  \*

12  California cannot assert a compelling state interest, and there is thus no need

13  to move on to the next step of whether AB 979 is narrowly tailored, which it fails in

14  any event, as explained below.

15  **B. AB 979's Quota System is Not Narrowly Tailored.**

16  "Racial classifications are simply too pernicious to permit any but the most exact

17  connection between justification and classification." *Gratz v. Bollinger*, 539 U.S. 244,

18  270 (2003) (cleaned up). This "narrow tailoring" requirement thus demands proof that

19  the law's racial classifications are "necessary" to achieve the compelling interest—that

20  race was a "last resort." *Parents Involved*, 551 U.S. at 734–35 (quoting *Croson,* 488

21  U.S., at 519 (Kennedy, J., concurring in part and concurring in judgment)). And the

22  policy must actually *work*; courts have "always expected that the legislative action

23  would substantially address, if not achieve, the avowed purpose." *Shaw v. Hunt*, 517

24  U.S. at 915. In achieving its goals, moreover, a race-based law cannot be either under-

25  or over-inclusive. *See, e.g.*, *Croson*, 488 U.S. at 506; *Assoc. Gen. Contractors of Cal.*, 813

26  F.2d at 941. "This means that the classification adopted must fit with greater precision

27  than any alternative means." *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 935 (quoting

28  *Wygant,* 476 U.S. 267, 280 n.6 (plurality opinion)) (cleaned up).

In performing this assessment, the Ninth Circuit has identified five 'hallmarks' of narrow tailoring in the Supreme Court's affirmative action jurisprudence: "(1) the absence of quotas; (2) individualized consideration . . . ; (3) serious, good-faith consideration of race-neutral alternatives . . . ; (4) that no member of any racial group was unduly harmed; and (5) that the program had a sunset provision or some other end point." *Smith v. Univ. of Washington*, 392 F.3d 367, 373 (9th Cir. 2004); *see also W. States Paving Co. v. Washington State Dep't of Transp.*, 407 F.3d 983, 993 (9th Cir. 2005).

AB 979 fails on all counts and then some.

***The Absence of Quotas***. As explained above, this Court rightly concluded that AB 979 is "a race-based . . . quota." Tr. 25:11–12. It is therefore not narrowly tailored. *See, e.g.*, *Grutter*, 539 U.S. at 334 ("To be narrowly tailored, a race-conscious . . . program cannot use a quota system—it cannot 'insulate each category of applicants with certain desired qualifications from competition with all other applicants." (quoting *Bakke,* 438 U.S., at 315 (controlling opinion of Powell, J.) (cleaned up)).

***Individualized Consideration***. One of the reasons quotas are so obviously unconstitutional is because they are incompatible with individualized consideration. "[I]ndividualized procedures insure that the beneficiaries of such preferential treatment are those who truly have suffered the effects of prior discrimination," rather than providing "windfalls for otherwise successful minority [candidates] who have either overcome or otherwise not felt the sting of discrimination in the relevant locality." *Coral Const. Co. v. King Cty.*, 941 F.2d 910, 924 (9th Cir. 1991) (internal quotation marks and citation omitted)).

California has suggested that individualized assessments may still be possible if a company expands its board size. *See, e.g.*, MTD, ECF No. 41-1, at 9–10. There are three problems with this. First, much like in *Bakke*, no matter how large a board is, AB 979 always requires corporations to have board seats that can never be occupied by

those who do not self-identify as members of an "underrepresented community." For those seats there can never be any individualized consideration.

The second problem is that, in many instances, changing the size of a board is not the simple task that California suggests. Under the California Corporate Code, the decision to change the number of board seats must be made by the shareholders, Cal. Corp. Code § 212(a), which, for the publicly held corporations covered by AB 979, means complying with costly and time-consuming federal proxy rules. Thus, the notion that corporations can simply add seats in real time and that no one qualified will lose out does not reflect the realities of corporate law.[3]

Finally, the size of a board is not some random thing—corporations and their shareholders chose how large a board will be with the goal of making a body that will make decisions with the right balance of decisiveness, deliberation, and the need for different talents that, in their business judgment, they believe is most likely to maximize performance.

**_Race-Neutral Alternatives_**. As noted above, California's legislative counsel in vain urged state lawmakers to "include additional information in the findings and declarations about why other approaches to diversifying corporate boards have not been, or would not be, sufficiently effective." _See_ Statement ¶ 12. As this suggests, California did not seriously consider race-neutral alternatives like requiring directors with different educational backgrounds, political affiliations, or socioeconomic statuses.

**_Undue Harm to Others_**. AB 979 does not have any societal benefits, but it certainly has costs. One of the Alliance's members lost his board position at a publicly held corporation solely because he is a man. _See_ Statement ¶ 27. Since then, this former director was considered, and ultimately not selected, for a board position at a publicly held corporation headquartered in California. _Id._ ¶ 28. After he was rejected, a

---

[3] With respect to foreign corporations headquartered in California, California simply has no authority to change the corporate law of those other states. _See, e.g._, _CTS Corp. v. Dynamics Corp. of Am._, 481 U.S. 69, 89 (1987). This is true regardless of whether a law can be directly challenged on this basis.

director at that corporation explained in an email that, "given new CA board diversity requirements, future board members over the next several years will be women and/or minorities." *Id.*

AB 979 also harms its intended beneficiaries. As the Supreme Court has noted, "discrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious non-economic injuries[.]" *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984) (internal citation and quotation marks omitted). This is particularly egregious in the context of race discrimination: "preferential programs may only reinforce common stereotypes holding that certain groups are unable to achieve success without special protection based on a factor having no relation to individual worth." *Bakke,* 438 U.S. at 298 (controlling opinion of Powell, J.). As Justice Thomas has pointed out, even questioning whether someone has received a benefit because of his or her race is itself stigmatizing "because either racial discrimination did play a role, in which case the person may be deemed 'otherwise unqualified,' or it did not, in which case asking the question itself unfairly marks those blacks who would succeed without discrimination." *Grutter*, 539 U.S. at 373 (Thomas, J., concurring in part and dissenting in part).

**Sunset Provision**. AB 979 does not have a sunset provision or other deadline for expiration or reevaluation. This too is fatal to the narrow tailoring requirement. *See id.* at 342 ("Enshrining a permanent justification for racial preferences would offend [the Fourteenth Amendment's] fundamental equal protection principle.").

**Other Examples of Over- and Under-Inclusiveness**. AB 979 is riddled with other arbitrary distinctions. California's choice of who qualifies as an "underrepresented community" reads like it was copied and pasted from the U.S. census form (of course, with "white" removed), and its categories are undefined and unexplained. As noted above, for a majority of the groups favored by AB 979, the California legislature did not even bother including any findings that they were underrepresented or had

suffered discrimination. "The random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination, suggests that perhaps the [state's] purpose was not in fact to remedy past discrimination." *Croson*, 488 U.S. at 478; *see also Wygant,* 476 U.S. at 284 n.13 (plurality op. of Powell, J.). This defect is yet another sufficient reason for concluding that AB 979 is not narrowly tailored. *See W. States Paving Co.*, 407 F.3d at 998.

For those groups that AB 979 does make findings about, the evidence of disparate outcomes does not actually show discrimination or underrepresentation, and the outcomes between groups are too divergent to justify treating them as interchangeable. Nor is the number of set-asides for different board sizes (three seats for corporations with nine or more directors; two seats for corporations with five to eight directors; one seat for corporations with four or fewer directors) narrowly tailored. *Cf. Meland II*, 2021 WL 6118651, at *7 (E.D. Cal. Dec. 27, 2021) (holding that SB 826's similar quota requirements survived intermediate scrutiny, but noting that the plaintiff's argument in that case "might carry the day for strict scrutiny review" of a racial classification).

AB 979 is also over-inclusive because it applies to all publicly traded corporations headquartered in California, regardless of any history of discrimination, current board composition, or the history of the industry in which it operates. As California's own data show, when AB 979 was passed, the number of members of many of the law's favored "underrepresented communities" varied greatly from corporation to corporation. *See* AB 979 § 1 (d) & (e). These important differences go entirely ignored by AB 979's sledgehammer approach to promoting diversity.

Indeed, it is hard to see what sort of "diversity" California actually wants to promote. In addition to the apparently random inclusion of LGBT categories, many of the racial and ethnic categories AB 979 uses are arbitrary and irrational. Afghans, Iraqis, and Tunisians, for example, presumably do not receive any benefits from AB 979, while Spaniards, Pakistanis, and Indians presumably do. Nothing in AB 979 even attempts to provide an explanation for these distinctions.

\*

The Constitution requires that all racial classifications that a state "adopt[s] must fit with greater precision than any alternative means." *Assoc. Gen. Contractors of Cal.*, 813 F.2d at 935 (quoting *Wygant,* 476 U.S. 267, 280 n.6 (plurality opinion)) (cleaned up). In addition to its many other flaws, AB 979 falls far short of this requirement and is therefore unconstitutional.

## III.   AB 979 Violates 42 U.S.C. § 1981.

California has conceded that "purposeful discrimination that violates the Equal Protection Clause of the Fourteenth Amendment will also violate § 1981" and that the Alliance's claim under that statute (Count III) is therefore "coextensive with [its] race-based challenge under the Equal Protection Clause." MTD, ECF No. 41-1, at 9 n.7 (quoting *Gratz*, 539 U.S. at 276 n.23 (2003)). This is correct, and the Court should therefore grant summary judgment in favor of the Alliance's § 1981 claim for the same reasons explained above regarding the Fourteenth Amendment.

## IV.   The Alliance Has Standing.

The Court noted that *Meland v. Weber*, 2 F.4th 838 (9th Cir. 2021) ("*Meland I*"), "put to rest any standing arguments the state might raise and told me that [the Alliance for Fair Board Recruitment] clearly ha[s] standing" to sue on behalf of its shareholder members. Tr. 18:15–18. Nevertheless, to avoid any doubts about the Court's jurisdiction, the Alliance submits declarations from two of its members demonstrating standing. *See* Statement ¶¶ 26–29. Putting an end to these members' ongoing injuries undoubtedly is "germane" to the Alliance's purpose of ensuring fair and equal rights for corporate board members and candidates. *See* Statement ¶ 23. *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019).

### A. Shareholders of Corporations Regulated by AB 979

The Alliance has members who, like the plaintiff in *Meland*, own shares of publicly traded companies subject to AB 979 and who intend to vote for director candidates at those companies and object to the way that AB 979 encourages or requires them to

take race and ethnicity into account in voting. *See* Statement ¶ 25–26. AB 979 causes these members an equal-protection injury because it "encourages race-based discrimination" by shareholders. Tr. at 29:14–15. A "reasonable shareholder deciding how to vote could not assume that other shareholders would vote to elect the requisite number of [minority] board members. Therefore, each shareholder would understand that a failure to vote for a [minority] would contribute to the risk of putting the corporation in violation of [law] and exposing it to sanctions." *Meland I*, 2 F.4th at 846. That was the entire purpose of the law in *Meland I*, as it is here: "if each individual shareholder felt free to vote for a male [or non-minority] board member, [the laws] could not achieve [their] goal[s]." *Id.*

It is irrelevant whether a single shareholder has enough shares to swing the outcome of a board election: each shareholder "remains 'encouraged' to 'discriminate on the basis of [race]' regardless of how few shares he has or how he has voted in the past"; any "newly discovered evidence concerning [a corporation's] election process and Plaintiff's voting history [would] not alter the Ninth Circuit's prior analysis." *Meland II*, 2021 WL 6118651, at *3.

**B. Disadvantaged Director Candidates.**

Petitioner's members also include candidates for director positions who are at a competitive disadvantage for corporate board positions for companies covered by AB 979 because they do not identify as one of California's preferred groups. *See* Statement ¶¶ 24, 29. These candidates have backgrounds that qualify them for board positions at publicly traded companies headquartered in California. *See id* ¶¶ 24, 27, 29. They are thus "able and ready" to apply for such positions, but AB 979  "prevents them from doing so on an equal basis." *Gratz*, 539 U.S. at 262. As noted, one is a white man who previously served as a board member for a publicly held company, but was (1) replaced by a woman as a result of pressure to increase the number of women on the board and (2) was told that his race and sex precluded his being considered for a board position at a publicly held corporation headquartered in California, *see id.* ¶¶ 27–28, but that

is not a requirement. The Alliance's candidate members do not need to prove that they "would have obtained the benefit but for the barrier in order to establish standing." *City of Jacksonville*, 508 U.S. at 666. Rather, the "injury in fact" in such a case "is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*; *accord Bras v. California Pub. Utilities Comm'n*, 59 F.3d 869, 875 (9th Cir. 1995). These members are denied a level playing field by AB 979 and therefore have standing to challenge it.

\*

While the evidence discussed above is more than sufficient to establish associational standing, the Alliance notes that other members of its organization have signed similar declarations in support of standing, but were willing to submit those only if their identities are protected from public disclosure. In light of the Court's denial of the Alliance's earlier request to seal, ECF No. 84, the Alliance has not submitted these members' declarations. To preserve its rights, however, the Alliance respectfully submits that the Court's ruling was incorrect, as demonstrated by the fact that the Fifth Circuit granted a motion to seal substantially the same documents in a different case. *See* Order Granting Motion to Seal, *Alliance for Fair Board Recruitment v. Securities and Exchange Commission*, No. 21-60626 (5th Cir. Nov. 18, 2021). Again, however, this point is of no practical or legal import here, as two of members of the Alliance have submitted standing declarations in their own names and on the public docket, clearly establishing associational standing.

## CONCLUSION

For these reasons, the Court should grant summary judgment in the Alliance's favor on both of its remaining claims, Counts II and III.

Respectfully submitted,                    BOYDEN GRAY & ASSOCIATES PLLC

Dated: March 30, 2022                      By:  Michael Buschbacher
                                           *Counsel for the Alliance for*
                                               *Fair Board Recruitment*
                                           C. Boyden Gray, Admitted *Pro Hac Vice*

Jonathan Berry, Admitted *Pro Hac Vice*
Michael Buschbacher, Admitted *Pro Hac Vice*
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
buschbacher@boydengrayassociates.com