BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

BOYDEN GRAY & ASSOCIATES PLLC
C. BOYDEN GRAY, Admitted Pro Hac Vice
JONATHAN BERRY, Admitted Pro Hac Vice
MICHAEL BUSCHBACHER, Admitted Pro Hac Vice
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
berry@boydengrayassociates.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| ALLIANCE FOR FAIR BOARD RECRUITMENT, | Case No.: 2:21-cv-01951-JAM-AC |
| Plaintiff, | **EXHIBIT LIST IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California, | |
| Defendant. | |

## EXHIBIT LIST IN SUPPORT OF MOTION FOR SUMMARY JUDGEMENT INDEX

| EXHIBIT NO. | DOCUMENT TITLE |
| --- | --- |
| A | Declaration of Edward Blum as President of the Alliance for Fair Board Recruitment. Attached are: (1) excerpts from the Alliance for Fair Board Recruitment's bylaws and board Resolutions; and (2) an IRS determiniation letter. |
| B | Declaration of Edward Blum. |
| C | Declaration of Robert Morris. Attached are: (1) an email exchange; and (2) his curriculum vitae. |
| D | Vivian Hunt et. al, *Diversity Matters*, McKinsey & Company (Feb. 2015). |
| E | Andria Thomas, et. al., *Decoding Diversity: the Financial and Economic Returns to Diversity in Tech*, Dalberg Advisors (June 23, 2016). |
| F | AB 979 Legislative Analysis for California Senate Rules Committee (Aug. 25, 2020) |
| G | AB 979 Legislative Analysis for California Senate Committee on Banking and Financial Institutions (July 28, 2020). |
| H | AB 979 Assembly Floor Analysis (Aug. 20, 2020). |

Exhibit A

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

BOYDEN GRAY & ASSOCIATES PLLC
C. BOYDEN GRAY, Admitted Pro Hac Vice
JONATHAN BERRY, Admitted Pro Hac Vice
MICHAEL BUSCHBACHER, Admitted Pro Hac Vice
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
berry@boydengrayassociates.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLIANCE FOR FAIR BOARD RECRUITMENT,<br><br>    Plaintiff,<br><br>    v.<br><br>SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,<br><br>    Defendant. | Case No.: 2:21-cv-01951-JAM-AC<br><br>**DECLARATION OF EDWARD BLUM, PRESIDENT OF THE ALLIANCE FOR FAIR BOARD RECRUITMENT, IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

# **DECLARATION OF EDWARD BLUM**

1.   My name is Edward Blum. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge.

2.   I am the President of the Alliance for Fair Board Recruitment ("AFBR"), a non-profit registered in Texas. *See* Attachment 1, *Excerpts from AFBR Bylaws and Board Resolutions*.

3.   AFBR was founded on February 26, 2021 and has principle office 3571 Far West Boulevard #17, Austin, Texas 78731. Attachment 1, *Excerpts from AFBR Bylaws and Board Resolutions* at 6. AFBR's board members are Edward Blum, Richard Fisher, and Pamela Pfenninger. *See id.* AFBR has held all meetings required by its bylaws.

4.   AFBR exists for the purpose of defending human and civil rights secured by law, including the right of individual to equal protection under the law and in particular with the goal of ending discrimination on the basis of race, sex, or sexual orientation in corporate board recruitment. *Id.*

5.   AFBR is an IRS approved 501(c)(3) organization. *See* Attachment 2, *AFBR IRS Determination Letter*.

6.   AFBR has 22 members. Many are candidates for directorships whose ability to compete for director positions at publicly traded corporations who have been denied a level playing field by like AB 979. Many of these members fear personal or professional retaliation if they sued under their own names due to the sensitive nature of racial and sexual discrimination.

7.   AFBR believes it is important to protect our members' anonymity because of the retaliation and harassment that stems from participating in antidiscrimination lawsuits.

8.   I am also the President of Students for Fair Admission, Inc. ("SFFA"), which is a nonprofit association with thousands of members, committed to defending human and civil rights secured by law. SFFA has brought lawsuits challenging discriminatory admissions policies at multiple colleges, including Harvard and the University of North Carolina.

9.   The potential for retaliation and harassment are real. Numerous articles, internet blog posts, and social media campaigns have described SFFA as a racist, manipulative organization. The lead plaintiff of one lawsuit—Abigail Fisher—was persistently harassed and targeted.

10.   I have also suffered immense personal hostility because of my involvement with groups like AFBR and SFFA, and my advocacy efforts generally. I routinely receive hate mail and threats, including multiple death threats, and at one point I was even compelled to hire an off-duty law enforcement officer because of the threats. I frequently receive vile emails, phone calls, and text messages. Those messages have called me a "racist bigot" and an "asshole," and they have maligned my Jewish heritage in derogatory terms. I have also been the target of numerous highly critical news publications and internet postings impugning my character. *See, e.g.*, Clark, *Meet the Suspected White Supremacists Who Are Financing Abigail Fisher*, Melanoid Nation (Dec. 14, 2015).

11.   Based on my experiences interacting with prospective and current members of both AFBR and SFFA, I believe that fewer members would join AFBR if it were known that the organizations might be compelled to disclose their members' identities involuntarily. It is also likely that many current members would limit their participation or withdraw their membership entirely under such circumstances.

12.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 23, 2022

_____
Edward Blum

# Attachment 1: AFBR Bylaws and Board Resolutions

**ALLIANCE FOR FAIR BOARD RECRUITMENT**

**BOARD OF DIRECTORS RESOLUTIONS**

**IN LIEU OF ORGANIZATIONAL MEETING**

### Resolution 1

BE IT RESOLVED, that the following individuals are hereby elected to serve as the permanent directors of the Corporation:

Edward Blum
Pamela Pfenninger
Richard Fisher

### Resolution 2

BE IT RESOLVED, that the following individuals be, and hereby are, elected as officers of the Corporation, to serve at the pleasure of the Board of Directors, and until their successor(s) have been elected and qualified, or until their earlier resignation or removal:

President: Edward Blum
Secretary: Pamela Pfenninger
Treasurer: Richard Fisher

### Resolution 3

BE IT RESOLVED, that the Board of Directors ratifies all actions of the Incorporator with regard to filing a Certificate of Formation with the Texas Secretary of State and all such actions to form the corporation are approved by the Directors.

### Resolution 4

BE IT RESOLVED, that the Corporation hereby adopts in their entirety the Bylaws of the Corporation, attached hereto.

### Resolution 5

WHEREAS, it is necessary and in the best interest of the Corporation to obtain recognition from the IRS to conduct itself as an entity organized exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt

organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code

BE IT RESOLVED, the President of the Corporation or his designees are hereby authorized, empowered and directed, for and on behalf of the Corporation, to do and perform, or cause to be done and performed, all such acts and things and to execute, acknowledge, deliver and file, or cause to be executed, acknowledged, delivered and filed, all such certificates, instruments, and other documents that they shall determine are necessary or appropriate to attempt to obtain such designation.

### Resolution 6

WHEREAS, the Corporation must enter into certain contracts with other entities and individuals and write checks in order to achieve its purposes and objectives,

BE IT RESOLVED, that the President of the Corporation and his designees are authorized to open a bank account and to write checks as necessary to conduct the business affairs of the Corporation;

BE IT FURTHER RESOLVED, that the President of the Corporation and his designees are authorized to enter into contracts that further the mission of the Corporation on behalf of the Corporation.

### Resolution 7

BE IT RESOLVED, that the Board of Directors of the Corporation hereby adopts in their entirety the following policies, attached hereto.

1. Document Retention Policy and Schedule
2. Whistleblower Policy

### Resolution 8

BE IT RESOLVED, that the Secretary of the Corporation shall be authorized to make such technical corrections to the resolutions as deemed necessary.

**WE THE UNDERSIGNED,** constituting all of the duly qualified Board Members of the Alliance for Fair Board Recruitment and by unanimous written consent in lieu of a meeting in accordance with all applicable laws, approve and adopt the foregoing resolutions.

This action may be executed in counterparts and each such counterpart shall be considered an original and all counterparts together shall be considered one document. Facsimile, scanned signatures, or digital signatures are binding and considered to be original signatures.

The effective date of the above resolution is February 26, 2021 irrespective of the date of signing.

| **Name** | **Title** | **Signature** | **Date** |
|---|---|---|---|
| Edward Blum | President | | 3-10-21 |
| Pamela Pfenninger | Secretary | | |
| Richard Fisher | Treasurer | | |

**WE THE UNDERSIGNED,** constituting all of the duly qualified Board Members of the Alliance for Fair Board Recruitment and by unanimous written consent in lieu of a meeting in accordance with all applicable laws, approve and adopt the foregoing resolutions.

This action may be executed in counterparts and each such counterpart shall be considered an original and all counterparts together shall be considered one document. Facsimile, scanned signatures, or digital signatures are binding and considered to be original signatures.

The effective date of the above resolution is February 26, 2021 irrespective of the date of signing.

| Name | Title | Signature | Date |
|------|-------|-----------|------|
| Edward Blum | President | | |
| Pamela Pfenninger | Secretary | _Pamela B_ | 3/10/2020 |
| Richard Fisher | Treasurer | | |

**WE THE UNDERSIGNED,** constituting all of the duly qualified Board Members of the Alliance for Fair Board Recruitment and by unanimous written consent in lieu of a meeting in accordance with all applicable laws, approve and adopt the foregoing resolutions.

This action may be executed in counterparts and each such counterpart shall be considered an original and all counterparts together shall be considered one document. Facsimile, scanned signatures, or digital signatures are binding and considered to be original signatures.

The effective date of the above resolution is February 26, 2021 irrespective of the date of signing.

| Name | Title | Signature | Date |
|------|-------|-----------|------|
| Edward Blum | President | | |
| Pamela Pfenninger | Secretary | | |
| Richard Fisher | Treasurer | _Richard Fisher_ | 3-10-2021 |

AFFBR ORGANIZATIONAL RESOLUTIONS

Page 3 of 3

# BYLAWS

*of*

# ALLIANCE FOR FAIR BOARD RECRUITMENT

(Formed under the Texas Business Organizations Code)

Adopted February 26, 2021

## ARTICLE I
*Name and Location*

Section 1.01    Name. The name of the corporation is Alliance for Fair Board Recruitment (the "Corporation").

Section 1.02    Location. The principal office of the Corporation shall be located at 3571 Far West Boulevard #17, Austin, Texas 78731, or at any other place approved by the Board of Directors.

Section 1.03    Registered Office and Agent. The Corporation shall continuously maintain a registered office and agent within Texas at such place as may be designated by the Board of Directors. The Corporation's initial registered office and agent are set forth in the Certificate of Formation.

## ARTICLE II
*Purposes*

The Corporation is organized and shall be operated exclusively for charitable, religious, scientific, literary, educational and other purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code of 1986, as now in effect or as hereafter may be amended (the "Code"). The purposes for which the Corporation is formed are to defend human and civil rights secured by law, including the right of individuals to equal protection under the law, through litigation and any other lawful means, and to engage in any lawful act or activity for which corporations may be organized under the Texas Business Organizations Code ("the Code"). Included in such purposes is the goal to end discrimination on the basis of race, sex, or sexual orientation in corporate board recruitment.

No part of the net earnings of The Corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in the purpose clause hereof.

Notwithstanding any other provision of this document, the corporation shall not carry on any other activities not permitted to be carried on (a) by any organization exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, corresponding section of any future federal tax code, or (b) by an organization, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or corresponding section of any future federal tax code. No substantial part of the corporation's activities shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene (including the publishing or

distribution of statements) in any political campaign on behalf of or in opposition to any candidate for public office.

Notwithstanding any other provision of these Articles, the corporation shall not carry on any activities not permitted to be carried on (I) by a corporation exempt from federal income tax as an organization described by Section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (II) by a corporation, contributions to which are deductible under Section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

## ARTICLE III
### *Membership*

Section 3.01     Members. The Corporation shall have one class of members, referred to as Affiliate Members.

Section 3.02     Affiliate Members. Any individual who seeks to support the purposes and mission of the Corporation, pays membership dues as may be prescribed by the Board of Directors, and meets any additional standards that may be prescribed from time to time by the Board of Directors shall be eligible to become an Affiliate Member. Affiliate Members shall have the right to vote for one (1) Member-Elected Director.

Section 3.03     Suspension; Revocation; Resignation. The membership of any Affiliate Member shall be automatically suspended for failure to pay any membership dues as may be prescribed by the Board of Directors. The Board of Directors may revoke the membership of any Affiliate Member on the grounds that the Affiliate Member has engaged or is engaging in activities which are, in the sole discretion of the Board of Directors, contrary to the purposes of the Corporation. An Affiliate Member may resign at any time upon written notice to the Corporation.

## ARTICLE IV
### *Board of Directors*

Section 4.01     Management by Board of Directors. The business and affairs of the Corporation shall be managed by the Board of Directors.

Section 4.02     Number of Directors. The number of directors of the Corporation shall be three (3), and shall consist of two (2) Board-Elected Directors and one (1) Member-Elected Director.

Section 4.03     Qualifications. All directors must be Affiliate Members of the Corporation.

Section 4.04     Election and Term of Directors.

(a)     Initial Board of Directors. The Board of Directors at the time of formation of the corporation is composed of three (3) initial directors. By an affirmative vote of a majority of the directors then in office, such Directors may elect their successors at the organizational board meeting to serve terms of terms of one (1) year from the date of their election, and each shall continue in office until his or her successor is elected or qualified, or until his or her prior death, resignation, or removal.

(b)     Board-Elected Directors. Beginning the second year of the Corporation's existence, there shall be two (2) Board-Elected Directors. Board-Elected Directors shall be elected at the annual meeting of the Board of Directors by an affirmative vote of a majority of the directors then in office, to serve for terms of one (1) year from the date of their election, and each shall continue in office until his or her successor is elected or qualified, or until his or her prior death, resignation, or removal.

(c)     Member-Elected Director. Beginning the second year of the Corporation's existence, there shall be one (1) Member-Elected Director. The Member-Elected Director shall be elected in conjunction with the annual meeting of the Board of Directors by an affirmative vote of a majority of the Affiliate Members, to serve for a term of one year from the date of such director's election, and such director shall continue in office until his or her successor is elected or qualified, or until his or her prior death, resignation, or removal. The time, method, manner, and eligibility of voting for the Member-Elected Director shall be determined by the Board of Directors. Neither cumulative nor proxy voting shall be allowed in such elections. The candidate receiving the highest number of votes shall be elected.

Section 4.05     Vacancies. A vacancy of a Board-Elected Directorship may be filled by a majority vote of the directors then in office although less than a quorum, or by a sole remaining director. A vacancy of a Member-Elected Directorship shall be filled by an affirmative majority vote of the Affiliate Members. Such election shall be held within sixty (60) days of the Member-Elected Directorship becoming vacant. A director elected to fill a vacancy shall be elected for the unexpired term of his or predecessor in office and until his or her successor is elected and qualified.

Section 4.06     Removal. Any director may be removed with or without cause at any time by action of the Board. A director may be removed only at a meeting called for that purpose (together with other purposes, if any).

Section 4.07     Resignations. Any director may resign at any time upon written notice to the Corporation. Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 4.08     Quorum of the Board of Directors and Action of the Board of Directors. Unless a greater proportion is required by law or by these Bylaws for adoption of a particular action, a majority of the directors shall constitute a quorum for the transaction of business and, except as otherwise provided by law or by the Certificate of Formation or these Bylaws, the vote of a majority of the directors present at the meeting at which a quorum is present shall be the act of the Board of Directors.

Section 4.09     Meetings of the Board of Directors. An annual meeting of the Board of Directors shall be held each year at such time and place as shall be fixed by the Board of Directors, for the election of officers and directors and for the transaction of such other business as may properly come before the meeting. Regular meetings of the Board of Directors shall be held at such times as may be fixed by the Board of Directors. Special meetings of the Board of Directors may be held at any time whenever called by a majority of the directors then in office. Notice of all special meetings shall be delivered in writing to all directors and shall specify the matters to be addressed at such meeting. Meetings of the Board of Directors may be held at such places as may be fixed by the Board of Directors for annual and regular meetings and in the notice of meeting for special meetings.

Section 4.10    Action by the Board of Directors in Writing in Lieu of Meeting. Unless otherwise restricted by the Certificate of Formation or these Bylaws, any action required or permitted to be taken by the Board of Directors may be taken without a meeting if all directors consent in writing to the adoption of a resolution authorizing the action. The resolution and the written consents thereto by the directors shall be filed with the records of the Corporation. A written consent and the signing thereof may be accomplished by one or more electronic transmissions, including a signed email message from the applicable director.

Section 4.11    Meetings by Conference Telephone. Any one or more members of the Board of Directors may participate in a meeting of such Board of Directors by means of conference telephone, video conferencing, or similar communications equipment by means of which all persons participating in the meeting can communicate with one another. Participation in a meeting by such means shall constitute presence in person at the meeting.

Section 4.12    Presumption of Assent. A director who is present at any meeting of the Board of Directors at which action on any Corporation matter is taken will be presumed to have assented to the action unless his or her dissent is entered in the minutes of the meeting or unless that director files his or her written dissent to such action with the person acting as secretary of the meeting before the adjournment thereof or forwards any dissent by certified or registered mail to the Secretary immediately after the adjournment of the meeting. Such right to dissent does not apply to a director who voted in favor of such action.

Section 4.13    Compensation of Directors. The Corporation may not pay any compensation to directors for services rendered, except that directors may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors.

## ARTICLE V
### *Committees*

Section 5.01    General Provisions. A majority of the Board of Directors may create one or more committees and appoint members of the Board of Directors to serve on them. To the extent specified by the Board of Directors, each committee may exercise the authority of the Board of Directors, except that a committee may not exercise authority prohibited by law.

Section 5.02    Committee Rules. Requirements for the Board of Directors set forth herein or, if applicable, in Sections 22.218 through 22.219 of the Code as now in effect or as may hereafter be amended, or any other statutory provision, governing meetings, action without meetings, notice and waiver of notice, and quorum and voting requirements shall apply to committees and their members as well.

**ARTICLE VI**
*Officers, Agents, and Employees*

Section 6.01   <u>Officers</u>. The Board of Directors shall elect or appoint a President, and Secretary, and may, if it so determines, appoint a Treasurer, one or more Vice Presidents, Assistant Secretaries, Assistant Treasurers, and other officers and may give any of them such further designation or alternate titles as it considers desirable. The same individual may simultaneously hold more than one office in the Corporation, except that the individual serving as President may not serve as Secretary or vice versa.

Section 6.02   <u>Term of Office, Vacancies and Removal</u>. Each officer shall hold office for the term for which he or she is elected or appointed and until his or her successor is elected or appointed and qualified, or until his or her earlier death, resignation or removal. Unless otherwise specified in the motion or resolution appointing such officer, all officers shall serve a term set to expire at the next annual meeting. All officers shall be elected or appointed at the annual meeting of the Board of Directors, except in the case of initial officers and vacancies resulting from any resignation or removal, which may be filled by the Board of Directors as needed. An officer appointed or elected to fill a vacancy shall hold office for the unexpired term of his or her predecessor in office, and until his or her successor is elected and qualified. Any officer may be removed by the Board of Directors with or without cause at any time.

Section 6.03   <u>Resignation</u>. Any officer may resign at any time by giving written notice to the Corporation. Unless otherwise specified in the written notice, the resignation shall be effective upon delivery to the Corporation.

Section 6.04   <u>Powers and Duties of Officers</u>. Subject to the control of the Board of Directors, all officers as between themselves and the Corporation shall have such authority and perform such duties in the management of the Corporation as may be provided by the Board of Directors and, to the extent not so provided, as generally pertain to their respective offices.

*President.* The President shall serve as the chief executive officer of the Corporation and preside at all meetings of the Board of Directors. The President shall supervise and control all of the affairs of the Corporation and oversee the management of the Corporation in accordance with policies and directives approved by the Board of Directors, including appointing assistants and hiring employees as necessary to ensure orderly operations.

*Secretary.* The Secretary shall be responsible for the keeping of an accurate record of the proceedings of all meetings of the Board of Directors, shall give or cause to be given all notices in accordance with these Bylaws or as required by law, and shall perform all duties customary to the office of Secretary.

*Treasurer.* The Treasurer, if any, shall have the custody of, and be responsible for, all funds and securities of the Corporation. He or she shall keep or cause to be kept complete and accurate accounts of receipts and disbursements of the Corporation, and shall deposit all monies and other valuable property of the Corporation in the name and to the credit of the Corporation in such banks or depositories as the Board of Directors may designate. Whenever required by the Board of Directors, the Treasurer shall render a statement of accounts. He or she shall at all reasonable times exhibit the books and accounts to any officer or director of the Corporation, and shall perform all duties incident to the office of Treasurer, subject to the supervision of the Board of Directors, and

such other duties as shall from time to time be assigned by the Board of Directors. If no Treasurer is appointed, the President shall execute the duties of the Treasurer.

Section 6.05    Agents and Employees. The Board of Directors may appoint agents and employees who shall have such authority and perform such duties as may be prescribed by the Board of Directors. The Board of Directors may remove any agent or employee at any time with or without cause. Removal without cause shall be without prejudice to such person's contract rights, if any, and the appointment of such person shall not itself create contract rights.

Section 6.06    Compensation of Officers, Agents and Employees. The Corporation may pay compensation to officers for services rendered to the Corporation in their capacity as officers, and officers may be reimbursed for expenses incurred in the performance of their duties to the Corporation, in reasonable amounts as approved by a majority of the entire Board of Directors. The Corporation may pay compensation in reasonable amounts to agents and employees for services rendered, such amounts to be fixed by the Board of Directors or, if the Board of Directors delegates power to any officer or officers, then by such officer or officers. The Board of Directors may require officers, agents or employees to give security for the faithful performance of their duties.

## ARTICLE VII
### *Miscellaneous*

Section 7.01    Fiscal Year. The fiscal year of the Corporation shall be the calendar year or such other period as may be fixed by the Board of Directors.

Section 7.02    Corporate Seal. The corporate seal, if any, shall be circular in form, shall have the name of the Corporation inscribed thereon and shall contain the words "Corporate Seal" and "Texas" and the year the Corporation was formed in the center, or shall be in such form as may be approved from time to time by the Board of Directors.

Section 7.03    Checks, Notes, Contracts. The Board of Directors shall determine who shall be authorized from time to time on the Corporation's behalf to: (A) sign checks, drafts, or other orders for payment of money; (B) to sign acceptances, notes, or other evidences of indebtedness; (C) to enter into contracts; and (D) to execute and deliver other documents and instruments.

Section 7.04    Books and Records. The Corporation shall keep correct and complete books and records of account, the activities and transactions of the Corporation, minutes of the proceedings of the Board of Directors and any committee of the Corporation, a current list of the directors and officers of the Corporation, their business addresses and the Corporation's most recent annual report. Any of the books, minutes, and records of the Corporation may be in written form or in any other form capable of being converted into written form within a reasonable time.

Section 7.05    Amendment of Certificate of Formation and Bylaws. The Certificate of Formation or Bylaws of the Corporation may be amended in whole or in part by a majority vote of the directors then in office and upon the taking of any other actions required under the Code.

Section 7.06    Limitation of Liability. To the fullest extent permitted by Texas law, no director of the Corporation shall be personally liable to the Corporation for monetary damages for any act or omission

in the director's capacity as a director the liability of a director to the extent the director is found liable for:

(a)    an intentional breach of a director's duty of loyalty to the Corporation;

(b)    an act or omission not in good faith that constitutes a breach of the director's duties to the Corporation;

(c)    an act or omission that involves intentional misconduct or a knowing violation of the law;

(d)    a transaction from which a director knowingly received an improper benefit, whether or not the benefit resulted from an action taken within the scope of the director's duties; or

(e)    an act or omission for which the liability of a director is expressly provided by an applicable statute.

The foregoing elimination of liability to the Corporation shall not be deemed exclusive of any other rights, limitations of liability or indemnity to which a director may be entitled under any other provision of the Bylaws of the Corporation, contract or agreement, vote of the Board of Directors, principle of law or otherwise. Any repeal or amendment of this limitation of liability shall be prospective only and shall not adversely affect any limitation on the personal liability or alleged liability of a director of the Corporation existing at the time of such repeal or amendment.

In addition to the foregoing provisions, if the Texas Business Organizations Code is amended to further eliminate or limit the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the full extent permitted by the Code, as so amended. Any repeal or modification of those provisions of the Code that concern the limitation of director liability shall not be construed to affect adversely any right or protection of a director of the Corporation existing at the time of such repeal or modification unless such adverse construction is required by law.

Section 7.07   Indemnification and Insurance. The Corporation shall indemnify any director, any former director, any person who while a director of the Corporation may have served at its request as a director, officer, partner, trustee, employee, or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or other enterprise, and may, by resolution of the Board of Directors, indemnify any officer, employee, or agent against any and all expenses and liabilities actually and necessarily incurred by him or her or imposed on him or her in connection with any claim, action, suit, or proceeding (whether actual or threatened, civil, criminal, administrative, or investigative, including appeals) to which he or she may be or is made a party by reason of being or having been such director, officer, employee or agent; subject to the limitation, however, that there shall be no indemnification in relation to matters unless such person: (1) conducted himself or herself in good faith; (2) believed in the case of conduct in his or her official capacity with the Corporation that his or her conduct was in the best interest of the Corporation; and in all other cases that his or her conduct was at least not opposed to the best interests of the Corporation; or (3) in the case of any criminal proceeding, he or she had no reasonable cause to believe that his or her conduct was unlawful. Further, there shall be no indemnification in connection with a proceeding (A) by or in the right of the Corporation in which the director, officer, employee or agent was judged liable to the Corporation, or (B) in which improper personal benefit is charged.

The Corporation shall upon order of a court of competent jurisdiction indemnify a director who entirely prevails in the defense of any proceeding to which he or she was a party because he or she is or was a director of the Corporation, for reasonable expenses incurred by him or her in connection with the proceeding.

Amounts paid in indemnification of expenses and liabilities may include, but shall not be limited to, attorneys' fees and other fees; costs and disbursements; judgments, fines, and penalties against, and amounts paid in settlement by, such director, officer, employee or agent. The Corporation may pay for or reimburse the reasonable expenses in advance of final disposition of the proceeding provided that the requirements of the Code are met.

The provisions of this Article shall be applicable to claims, actions, suits, or proceedings made or commenced after the adoption hereof, whether arising from acts or omissions to act occurring before or after adoption hereof.

The indemnification provided by this Article shall not be deemed exclusive of any other rights to which such director, officer, or employee may be entitled under any statute, bylaw, agreement, vote of the Board of Directors, or otherwise and shall not restrict the power of the Corporation to make any indemnification permitted by law.

The Board of Directors may authorize the purchase of and maintain insurance on behalf of any director, officer, employee or agent of the Corporation against any liability asserted against or incurred by him or her which arises out of such person's status in such capacity or who is or was serving at the request of the Corporation as a director, officer, employee or agent of another foreign or domestic corporation, partnership, joint venture, trust, employee benefit plan or otherwise, or out of acts taken in such capacity, whether or not the Corporation would have the power to indemnify the person against that liability under law.

If any part of this Section shall be found in any action, suit or proceeding to be invalid or ineffective, the validity and the effectiveness of the remaining parts shall not be affected.

Section 7.08   <u>Conflicts of Interest and Contracts or Agreements Involving Directors or Officers</u>. Subject to the limitations of this Section, members of the Board of Directors and officers of the Corporation shall be permitted to maintain a direct or indirect interest in any contract relating to or incidental to the operations of the Corporation, and may freely make contracts, enter into transactions or otherwise act for and on behalf of the Corporation notwithstanding that at such time they also may be acting as individuals or as trustees, beneficiaries or advisers of trusts, or as members, associates, agents, shareholders, officers or directors, of other persons or corporations or may be interested in the same matter as shareholders, directors, officers or otherwise; provided, however, that no contract or agreement may be entered into by and between the Corporation and any of the following:

a)      a director, officer, committee member, or employee of the Corporation (hereinafter an "Insider"); or

b)      any corporation, partnership, trust, sole proprietorship or any other entity (hereinafter an "Entity") in which an interest is owned or held, directly or indirectly, by or for the benefit of an Insider, unless

i.       the transaction is approved in accordance with Section 22.230 of the Code as specified herein; and

ii.       if one or more of the parties to the contract or transaction is a "disqualified person" with respect to the Corporation within the meaning of Section 4958 of the Internal Revenue Code, either (x) such transaction is reviewed and approved in accordance with the "rebuttable presumption of reasonableness safe harbor" provisions set forth in the Treasury regulations promulgated under Section 4958 of the Internal Revenue Code and the Intermediate Sanctions Policy of the Corporation; or (y) the Board of Directors or any committee thereof determines that such procedures are not necessary for the transaction involved and records its specific findings for making such determination.

Section 22.230 of the Code requires that prior to consummating any contract, transaction or action taken on behalf of the Corporation involving any matter in which a director or officer is personally interested as a shareholder, director, officer, trustee or beneficiary or advisor of a trust, or otherwise has a relationship, that contract, transaction or action must be authorized and approved in good faith and with ordinary care by a vote of a majority of the number of directors in attendance at a meeting at which a quorum is present, without counting the vote(s) of any interested director(s), and only after the disinterested directors are provided with knowledge of the material facts concerning the contract or transaction and each interested director's or officer's relationship or interest in the transaction, and only if the entering into of such contract or transaction is not violative of those provisions of the Code that prohibit the Corporation's use or application of its funds for private benefit. Any interested director may be counted in determining the presence of a quorum at a meeting of the Board of Directors at which a contract or transaction described in this section is authorized, but the interested director must leave the meeting during the discussion of, and the vote on, such contract or transaction.

The minutes of any such meeting must include

a)       the names of the interested directors who disclosed any possible direct or indirect interest, a description of the nature of the alleged interest or relationship and whether the Board of Directors determined a conflict of interest did in fact exist,

b)       the names of the directors who were present for discussions relating to the proposed contract or transaction, the content of those discussions, including any alternatives to the proposed contract or transaction and a record of the vote, and

c)       such other information as maybe required by the Intermediate Sanctions Policy of the Corporation. Notwithstanding any provision contained in this section, no contract, transaction or act shall be entered into or performed on behalf of the Corporation if such contract, transaction or act would result in the loss of the Corporation's exemption from federal income tax. In no event, however, shall any person or entity dealing with the Board of Directors or the officers of the Corporation be obligated to inquire into the authority of the Board of Directors or the officers so authorized to enter into or consummate any contract or to take any other action on behalf of the Corporation.

Section 7.09   <u>Dissolution</u>. The Corporation may be dissolved at any time by majority vote of the directors then in office and upon the taking of any other actions required under the Code. In the event of

dissolution or final liquidation of the Corporation, all of the remaining assets of the Corporation shall, after paying or making provision for the payment of all of the liabilities and obligations of the Corporation and for necessary expenses thereof, be distributed as determined by the Board of Directors in accordance with the Certificate of Formation and applicable law. In no event, however, shall such distribution (i) inure to any person who has a personal and private interest in the activities of the Corporation, or (ii) be made that would cause the Corporation to fail to qualify as an organization described in section 501(c)(3) of the Internal Revenue Code, a corporation organized exclusively for charitable, religious, educational, and scientific purposes.

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Ruth R. Hughs
Secretary of State

Case 2:21-cv-01951-JAM-AC   Document 88-5   Filed 03/30/22   Page 23 of 145

# Office of the Secretary of State

## CERTIFICATE OF FILING
## OF

### Alliance for Fair Board Recruitment
File Number: 803946052

The undersigned, as Secretary of State of Texas, hereby certifies that a Certificate of Formation for the above named Domestic Nonprofit Corporation has been received in this office and has been found to conform to the applicable provisions of law.

ACCORDINGLY, the undersigned, as Secretary of State, and by virtue of the authority vested in the secretary by law, hereby issues this certificate evidencing filing effective on the date shown below.

The issuance of this certificate does not authorize the use of a name in this state in violation of the rights of another under the federal Trademark Act of 1946, the Texas trademark law, the Assumed Business or Professional Name Act, or the common law.

Dated: 02/22/2021

Effective: 02/22/2021



Ruth R. Hughs
Secretary of State

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555
Prepared by: Kika Garza

Fax: (512) 463-5709
TID: 10306

Dial: 7-1-1 for Relay Services
Document: 1029366890002

| **Form 202** | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $25 | <br><br>**Certificate of Formation<br>Nonprofit Corporation** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 803946052 02/22/2021<br>Document #: 1029366890002<br>Image Generated Electronically<br>for Web Filing** |

### Article 1 - Corporate Name

The filing entity formed is a nonprofit corporation. The name of the entity is :

**<u>Alliance for Fair Board Recruitment</u>**

### Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

**Name:**

**Richard    Fisher**

C. The business address of the registered agent and the registered office address is:

**Street Address:**

**922 Bent Creek Court    Richmond  TX  77406**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

### Article 3 - Management

☐ A. Management of the affairs of the corporation is to be vested solely in the members of the corporation.

**OR**

☑ B. Management of the affairs of the corporation is to be vested in its board of directors. The number of directors, which must be a minimum of three, that constitutes the initial board of directors and the names and addresses of the persons who are to serve as directors until the first annual meeting or until their successors are elected and qualified are set forth below.

| Director 1: **Edward    Blum** | Title: **Director** |
|---|---|
| Address: **3571 Far West Boulevard #17    Austin TX, USA 78731** | |
| Director 2: **Pamela    Pfenninger** | Title: **Director** |
| Address: **3571 Far West Boulevard #17    Austin TX, USA 78731** | |
| Director 3: **Richard    Fisher** | Title: **Director** |
| Address: **3571 Far West Boulevard #17    Austin TX, USA 78731** | |

### Article 4 - Organization Structure

☑ A. The corporation will have members.

or

☐ B. The corporation will not have members.

### Article 5 - Purpose

The corporation is organized for the following purpose or purposes:

**The corporation is organized exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under**

section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future tax code. Included in such purposes is the goal to end discrimination on the basis of race, gender, or sexual orientation in corporate board recruitment.

## Supplemental Provisions / Information

**Article 6 - No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in this document. No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these articles, the corporation shall not carry on any other activities not permitted to be carried on (a) by a corporation exempt from federal income tax under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or (b) by a corporation, contributions to which are deductible under section 170(c)(2) of the Internal Revenue Code, or the corresponding section of any future federal tax code.**

**Article 7 - Upon the dissolution of the corporation, assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a Court of Competent Jurisdiction of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.**

[The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Organizer

The name and address of the organizer are set forth below.

**Edward Blum        3571 Far West Boulevard #17, Austin, TX 78731**

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Edward Blum**

Signature of organizer.

**FILING OFFICE COPY**

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Ruth R. Hughs
Secretary of State



# Office of the Secretary of State

February 25, 2021

Attn: Tony Keith McDonald

Tony Keith McDonald
1501 Leander Dr., Bldg B, Suite 2
Leander, TX 78641 USA

RE: Alliance for Fair Board Recruitment
File Number: 803946052

----

It has been our pleasure to file the certificate of formation and issue the enclosed certificate of filing evidencing the existence of the newly created nonprofit corporation.

Nonprofit corporations do not automatically qualify for an exemption from federal and state taxes. Shortly, the Comptroller of Public Accounts will be contacting the corporation at its registered office for information that will assist the Comptroller in setting up the franchise tax account for the corporation. Information about franchise tax, and contact information for the Comptroller's office, is available on their web site at https://window.state.tx.us/taxinfo/franchise/index.html. For information on state tax exemption, including applications and publications, visit the Comptroller's Exempt Organizations web site at https://window.state.tx.us/taxinfo/exempt/index.html. Information on exemption from federal taxes is available from the Internal Revenue Service web site at https://www.irs.gov.

Nonprofit corporations do not file annual reports with the Secretary of State, but do file a report not more often than once every four years as requested by the Secretary. It is important for the corporation to continuously maintain a registered agent and office in Texas as this is the address to which the Secretary of State will send a request to file a periodic report. Failure to maintain a registered agent or office in Texas, failure to file a change to the agent or office information, or failure to file a report when requested may result in the involuntary termination of the corporation. Additionally, a nonprofit corporation will file documents with the Secretary of State if the corporation needs to amend one of the provisions in its certificate of formation. If we can be of further service at any time, please let us know.

Sincerely,

Corporations Section
Business & Public Filings Division
(512) 463-5555
Enclosure

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555                    Fax: (512) 463-5709                    Dial: 7-1-1 for Relay Services
Prepared by: Kika Garza               TID: 10286               Document: 1029366890002

# Attachment 2: IRS Determination Letter

**Department of the Treasury**
**Internal Revenue Service**
**Tax Exempt and Government Entities**
P.O. Box 2508
Cincinnati, OH 45201

**IRS**

**Date:**
11/09/2021
**Employer ID number:**
86-2415093
**Person to contact:**
Name: Will Schroder
ID number: 31694
Telephone: 877-829-5500
**Accounting period ending:**
December 31
**Public charity status:**
170(b)(1)(A)(vi)
**Form 990 / 990-EZ / 990-N required:**
Yes
**Effective date of exemption:**
February 22, 2021
**Contribution deductibility:**
Yes
**Addendum applies:**
No
**DLN:**
26053491005061

ALLIANCE FOR FAIR BOARD RECRUITMENT
3571 FAR WEST BLVD STE 17
AUSTIN, TX 78731

Dear Applicant:

We're pleased to tell you we determined you're exempt from federal income tax under Internal Revenue Code
(IRC) Section 501(c)(3). Donors can deduct contributions they make to you under IRC Section 170. You're also
qualified to receive tax deductible bequests, devises, transfers or gifts under Sections 2055, 2106, or 2522. This
letter could help resolve questions on your exempt status. Please keep it for your records.

Organizations exempt under IRC Section 501(c)(3) are further classified as either public charities or private
foundations. We determined you're a public charity under the IRC Section listed at the top of this letter.

If we indicated at the top of this letter that you're required to file Form 990/990-EZ/990-N, our records show
you're required to file an annual information return (Form 990 or Form 990-EZ) or electronic notice (Form
990-N, the e-Postcard). If you don't file a required return or notice for three consecutive years, your exempt
status will be automatically revoked.

If we indicated at the top of this letter that an addendum applies, the enclosed addendum is an integral part of
this letter.

For important information about your responsibilities as a tax-exempt organization, go to www.irs.gov/charities.
Enter "4221-PC" in the search bar to view Publication 4221-PC, Compliance Guide for 501(c)(3) Public
Charities, which describes your recordkeeping, reporting, and disclosure requirements.

Sincerely,

*Stephen a. martin*

Stephen A. Martin
Director, Exempt Organizations
Rulings and Agreements

**Letter 947 (Rev. 2-2020)**
Catalog Number 35152P

Exhibit B

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA  95814
Telephone: (916) 447-4900
Facsimile:  (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

BOYDEN GRAY & ASSOCIATES PLLC
C. BOYDEN GRAY, Admitted Pro Hac Vice
JONATHAN BERRY, Admitted Pro Hac Vice
MICHAEL BUSCHBACHER, Admitted Pro Hac Vice
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
berry@boydengrayassociates.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLIANCE FOR FAIR BOARD RECRUITMENT, <br><br>                   Plaintiff, <br><br>      v. <br><br> SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California, <br><br>                   Defendant. | Case No.: 2:21-cv-01951-JAM-AC <br><br> **DECLARATION OF EDWARD BLUM IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

## **DECLARATION OF EDWARD BLUM**

1.   My name is Edward Blum. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge and are submitted solely in my own capacity.

2.   I am a dues-paying member of the Alliance for Fair Board Recruitment.

3.   I am morally committed to the principle that the law should be color-blind, believing that all persons are created equal and should therefore be subject to equal treatment under law. I vigorously oppose classification and discrimination on the basis of race, ethnicity, and national origin, as well as classification and discrimination on the basis of sex stereotypes.

4.   As a shareholder of publicly traded corporations, I also believe that trying to engineer a board's racial, ethnic, sex, or sexual orientation composition is an empty and wasteful distraction that puts virtue signaling over hiring the best available talent. I believe that discriminatory policies in board hiring will harm my share value in the long run.

5.   I am a shareholder of record of Beyond Meat, a public corporation headquartered, and with its principal place of business, in California. I own voting-eligible common stock, and intend to participate in voting on, and potentially nominating, board candidates.

6.   My understanding is that Beyond Meat's board of directors consists of nine directors. 2021 Beyond Meat Proxy Statement 8.[1]

7.   My understanding is that Beyond Meat's certificate of incorporation and bylaws authorize shareholders to vote at annual shareholder meetings. Beyond Meat's Certificate of Incorporation § 4;[2] Beyond Meat's Bylaws §§ 1.5, 1.7.[3]

8.   My understanding is that the only way a person can be elected to Beyond Meat's board is if a plurality of shareholders votes in favor of the nominee at an annual shareholder meeting. Beyond Meat's Bylaws § 1.7.

9.   My understanding is that Beyond Meat's bylaws allow shareholders to nominate director candidates. Beyond Meat's Bylaws § 1.11; 2021 Beyond Meat Proxy Statement 8–9.

---

[1] https://investors.beyondmeat.com/static-files/5f5c3b6e-8397-43e7-b6f0-b112b638ec0e.

[2] https://www.sec.gov/Archives/edgar/data/1655210/000165521019000053/byndarcert_incorpex-31.htm.

[3] https://www.sec.gov/Archives/edgar/data/1655210/000165521019000053/byndarbylawsex-32.htm.

10. My understanding is that Beyond Meat must include shareholder nominations in its proxy statement if they comply with the Exchange Act's regulations governing shareholder proposals. 17 CFR § 240.14a-8.

11. My understanding is that Beyond Meat's directors serve staggered three-year terms and are therefore regularly subject to elections. 2021 Beyond Meat Proxy Statement 8.

12. For example, my understanding is that, on May 19, 2021, Beyond Meat held an annual shareholder meeting and considered the election of three directors to serve until the 2024 annual meeting. One was an incumbent director, and two were new directors. 2021 Beyond Meat Proxy Statement 10.

13. I believe that in selecting board members, Beyond Meat's shareholders have discriminated on the basis of gender, race, and ethnicity. *Id.* Beyond Meat boasts that, after the latest election, a third of its board members currently qualify as "female" and that a third now also self-identifies as non-white, including one self-described "African American" director and two self-described "Asian/Pacific islander" directors. *Id.* at 11.

14. I believe they did this because Beyond Meat's "diverse" composition is dictated by California laws.

15. In 2018, California signed into law SB 826. SB 826 requires that by December 31, 2019, public corporations headquartered in California must have at least one female on the board. Cal. Corp. Code § 301.3(a). Further, the law requires that by December 31, 2021, if a public corporation has six or more directors on its board, then a minimum of three directors must be female; if a public corporation has five directors on its board, then a minimum of two directors must be female; and if a public corporation has four or fewer directors on its board, then a minimum of one director must be female. *Id.* § 301.3(b). Companies that fail to comply are subject to up to $300,000 in penalties per violation. *See id.* § 301.3(e).

16. In 2020, California signed into law AB 979. AB 979 requires that by December 31, 2022, public corporations headquartered in California must have a minimum number of directors from "underrepresented communities." Cal. Corp. Code § 301.4(b). A director qualifies as being from an "underrepresented community" if the director "self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, [] Alaska Native, . . . gay, lesbian, bisexual, or transgender." *Id.* § 301.4 (e)(1). A public corporation with nine or more directors must have at least three directors from underrepresented communities, a public corporation with five to eight directors must have at least two directors from underrepresented communities, and a public corporation with four or fewer directors must have at

least one director from an "underrepresented community." *Id.* § 301.4(b). AB 979 also authorizes similarly stiff fines for failures to comply: $100,000 for a single violation and $300,000 for a subsequent violation. *Id.* § 301.4(d).

17.   The California board diversity laws injure me because I believe they encourage and force me to discriminate on the basis of race and sex when voting for director candidates for positions at Beyond Meat in annual meetings.

18.   I believe that AB 979 necessarily requires me to discriminate on the basis of race. It encourages me to vote for board members in "underrepresented communities" and prohibits or discourages me from proposing or voting for directors who are straight (or who do not publicly announce their sexual orientation or gender identity) and/or white directors (as well as those who do not publicly announce their membership in a favored racial or ethnic group). I believe and agree with the Ninth Circuit's *Meland* decision that a reasonable shareholder deciding how to vote could not assume that other shareholders would vote to elect the requisite number of underrepresented minority board members. Therefore, each shareholder would understand that a failure to vote for a qualifying director would contribute to the risk of putting the corporation in violation of state law and exposing it to sanctions. At a minimum, therefore, I believe that AB 979 encourages me to vote in a way that would support corporate compliance with legal requirements. And I agree with the Ninth Circuit's decision in *Meland* that the California Legislature must have concluded that AB 979 would have such an effect on individual shareholders; otherwise, if each individual shareholder felt free to vote for straight and white board members, AB 979 could not achieve its goal of increasing underrepresented minority directors.

19.   AB 979 therefore injures me by requiring or at least strongly encouraging me to discriminate on the basis of race and ethnicity, sexual orientation, and sex when making voting decisions.

20.   I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March 23, 2022

Edward Blum

Exhibit C

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
400 Capitol Mall, Suite 2530
Sacramento, CA 95814
Telephone: (916) 447-4900
Facsimile: (916) 447-4904
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

BOYDEN GRAY & ASSOCIATES PLLC
C. BOYDEN GRAY, Admitted Pro Hac Vice
JONATHAN BERRY, Admitted Pro Hac Vice
MICHAEL BUSCHBACHER, Admitted Pro Hac Vice
801 17th Street NW, Suite 350
Washington, DC 20006
Telephone: (202) 955-0620
berry@boydengrayassociates.com

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLIANCE FOR FAIR BOARD RECRUITMENT, | Case No.: 2:21-cv-01951-JAM-AC |
| Plaintiff, | **DECLARATION OF ROBERT MORRIS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT** |
| v. | |
| SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California, | |
| Defendant. | |

## **DECLARATION OF ROBERT MORRIS**

1.      My name is Robert Morris. I am over the age of 18 and am competent to make this declaration. The facts set forth in this declaration are based on my personal knowledge and are submitted solely in my individual capacity.

2.      I am a dues-paying member of the Alliance for Fair Board Recruitment ("AFBR"). I joined the AFBR prior to the filing of this suit.

3.      I have an active interest in being recruited as an independent director by one or more corporate boards.

4.      I have extensive professional experience as an independent director, having served as a director and the chairperson of the auditing committee of a large publicly traded company for 14 years.

5.      In particular, in 2006, I was appointed to the board of Willis Lease Finance Corporation ("Willis Lease" or "Company") as an independent director. In that capacity, I was appointed by the board to the company's audit committee and designated as audit committee chairperson.

6.      Willis Lease is a publicly traded company listed on The Nasdaq Stock Market, LLC ("Nasdaq") stock exchange.

7.      Willis Lease is a provider of aviation services, specializing in leasing spare commercial aircraft engines and other aircraft-related equipment to commercial airlines, aircraft engine manufacturers, and maintenance, repair, and overhaul facilities worldwide.

8.      In 2019, the last full year that I served as a director, Willis Lease had a total lease portfolio consisting of 263 engines and related equipment, 12 aircraft, 10 other leased parts and equipment and one marine vessel, with 85 lessees in 41 countries and an aggregate net book value of approximately $1.65 billion. In addition to its owned portfolio Willis Lease managed a total lease portfolio of 450 engines, aircraft, and related equipment for other parties. The company had over $400 million in revenues, and over $60 million in net income.[1]

9.      As member and chairperson of the audit committee at Willis Lease, my duties included representing the board in discharging its oversight responsibilities generally relating to:

---

[1] Willis Lease Finance Corp. 2019 Annual Report, https://www.willislease.com/pdf/annual-reports/Annual%20Report%202019.pdf.

a.  the accounting and financial processes of the Company and its subsidiaries, and the audits of the Company's financial statements, including the integrity of the Company's financial statements;

b.  the administration and financial controls and the Company's compliance with legal and regulatory requirements;

c.  the hiring of outside auditors with proper qualifications and independence;

d.  the establishment of procedures for handling complaints regarding accounting, internal accounting controls and auditing matters, including procedures for confidential, anonymous submission of concerns by employees regarding accounting and auditing matters; and

e.  the preparation of the report required by the rules of the Securities and Exchange Commission to be included in the Company's annual proxy statement.

10.  A more detailed account of the specific duties of the audit committee can be found in the Willis Lease Audit Committee Charter.[2]

11.  During my tenure at Willis Lease, the company implemented robust internal controls and had no reported violations of any law or regulation relating to auditing.

12.  In 2018, California signed into law SB 826. SB 826 requires that by December 31, 2019, publicly held corporations headquartered in California must have at least one female on the board. Cal. Corp. Code § 301.3(a). Further, the law requires that by December 31, 2021, if a publicly held corporation covered by the law has six or more directors on its board, then a minimum of three directors must be female; if it has five directors on its board, then a minimum of two directors must be female; and if it has four or fewer directors on its board, then a minimum of one director must be female. Cal. Corp. Code § 301.3(b). Publicly held corporations covered by SB 826 that fail to comply may be fined to up to $100,000 for a first violation and $300,000 in penalties per subsequent violation. *See* Cal. Corp. Code § 301.3(e).

13.  In 2020, California signed into law AB 979. AB 979 requires that by December 31, 2022, in addition to the specified number of female directors, publicly held corporations headquartered in California must also have a minimum number of directors from "underrepresented communities." Cal. Corp. Code § 301.4(b).

---

[2] Willis Lease Finance Corp., Audit Committee Charter, https://www.willislease.com/userfiles/files/Audit_Committee_Charter-10-31-19.pdf.

A director qualifies as being from an "underrepresented community" if the director "self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, [] Alaska Native, . . . gay, lesbian, bisexual, or transgender." *Id.* § 301.4 (e)(1).  Like SB 826, the number of directors from an "underrepresented community" required by AB 979 depends on the size of the publicly held corporations's board: a publicly held corporation covered by AB 979 with nine or more directors must have at least three directors from underrepresented communities, those with five to eight directors must have at least two directors from underrepresented communities, and those with four or fewer directors must have at least one director from an "underrepresented community." *Id.* § 301.4(b). AB 979 also authorizes similarly stiff fines for failures to comply: $100,000 for a single violation and $300,000 for a subsequent violation. *Id.* § 301.4(d).

14.   While Willis Lease for many years had its principal offices in California, in 2019 it moved its principal offices to Florida.

15.   In 2020, I was discharged from my position as an independent director at Willis Lease. The Chief Executive Officer and Chairman of Willis Lease, Charles F. Willis, IV, informed me orally that it was because of "this woman thing." By that, I understood him to mean the increased legal and investor pressure to recruit women to boards. Given the challenges of the COVID-19 pandemic to the aircraft engine leasing business, the firm was in no position to expand the board of directors to accommodate compensation for an additional director.

16.   I was replaced with Rae Ann McKeating, who is a woman.

17.   I continue to be interested in being hired as an independent director, particularly for a corporation headquartered in California, where I reside.

18.   Even before my departure from Willis Lease, I pursued opportunities to work as an independent director at several other corporations.

19.   I recently was considered as an independent-director candidate by CAI, a publicly held intermodal container leasing and sales company established in 1989 and headquartered in San Francisco, California. However, I was not ultimately recruited to the board. The company instead selected a woman. The company said via an e-mail to me (attached to this declaration as Exhibit 1) that given California's diversity laws, any future vacancies would be filled by women or underrepresented minorities.

20.   This has discouraged me from seeking positions at firms subject to SB 826 and AB 979. I would continue applying to firms in California if California's board diversity quota requirements were removed or enjoined.

21.  I am a male, and I do not self-identify as lesbian, gay, bisexual, or transgender. I also do not identify as Black or African American, Hispanic or Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native.

22.  Because I am a male and do not self-identify as any of the "underrepresented communities" favored by California's board diversity quotas, I believe that these quotas put me at a significant competitive disadvantage compared to other candidates who do satisfy one or more of these mandated identity characteristics.

23.  Under California's board quotas, I believe based on my experience that the share of positions available at covered corporations to males that do not self-identify as belonging to an underrepresented community will further shrink, significantly reducing my ability to compete on an even playing field in the market for independent directors within the state of California. California's quotas mean I will never be able to compete fairly for a board seat at any publicly held corporation headquartered in California again.

24.  Based on my personal experience and knowledge of California's market for independent directors, I believe that California's quotas injure me because they limit my ability to compete in the marketplace and are very likely to deprive me of monetary compensation and opportunities associated with being a corporate director at a publicly held corporation headquartered in California.

25.  California's quota requirements deprive me of the dignity and opportunity of being fairly considered on my individual merits for such directorships positions, and unfairly stigmatize me based on my identity characteristics.

26.  A true and correct copy of my curriculum vitae, detailing my educational and professional experience, is attached as Exhibit 2 to this declaration.

27.  I declare under penalty of perjury that the foregoing is true and correct.

Executed on: March **30**, 2022

_____
Robert Morris

# Attachment 1: Email Exchange

**From:** Dave Remington <dave.remington@outlook.com>
**Date:** Monday, January 18, 2021 at 14:48
**To:** Robert Morris <flyfishbobtrout@gmail.com>
**Cc:** Gary Sawka <garysawka@hotmail.com>
**Subject:** RE: Perspective

Bob,

Thanks.

Although it might appear that we have a board vacancy, we do not as the open slot is reserved for a new permanent CEO.  In addition, given new CA board diversity requirements, future board members over the next several years will be women and/or minorities.

Take care,

Dave

**From:** Robert Morris <flyfishbobtrout@gmail.com>
**Sent:** Sunday, January 17, 2021 8:15 PM
**To:** Dave Remington <dave.remington@outlook.com>
**Cc:** Gary Sawka <garysawka@hotmail.com>
**Subject:** Perspective

Hi, David. Welcome to 202!

Early last year, you mentioned you had some items to attend to and obviously at least one of them - I know have that you did; management change.  I do not know the facts and circumstances, but certainly have an opinion.

I'm copying Gary Sawka, since I spent two (2) days last week on a zoom cast with him. Inspiring group of people, but I can't say I can rationalize the SPAC's…

I'm sending you - like I did, Gary - this article that I read today out at our Point Reyes National Seashore in the Economist.  I don't know your dates from graduating from HBS, but mine from graduate school for international finance was 1975 and I've faithfully read the Economist there since; yea several others, too.

Whether as a person, household, company, country or the world, we must find perspective to find the best answers of the time.  I enjoyed this article and hope you do, too!

Enjoy 202!, vaccine and a returning world economy!

https://econ.st/38EgPuV

I do think with - other than almost 15 years as board member and audit committee chairman of a publicly traded international engine leasing company,  I could assist you, but obviously, your call!

Best wishes,

Bob

Robert Morris

Cellular number: 415.717.3456

This electronic mail message (including attachments, if any) may contain confidential and privileged information. Any use, disclosure, dissemination or copying is prohibited except by or on behalf of the intended recipient(s). If you have received this electronic mail message in error, please notify sender by telephone or reply electronic mail message immediately and permanently delete this communication from your system.

# Attachment 2: Curriculum Vitae

# ROBERT MORRIS

Resume

- Born in Philadelphia, PA on January 29, 1949;
- Went to Abington Township public schools through high school;
- Attended and graduated University of Denver 1968 – 1972.  My major was called an "area" major in history, political science and economics, the components that later in my working life became important to understand country and company risks;
- Considered Villanova law school, but my number in the draft's lottery was very high, so taught skiing in Aspen, Colorado for the 1972 – 1973 season;
- Attended and graduated from (what was then called) the American School of International Management (known as "Thunderbird," but now part of Arizona State University) from 1974 – 1975;
- Wells Fargo Bank, 1975 – 1979. Worked in the international department in various roles, but most related to credit and risk analysis, then moved to its Toronto, Ontario office for business development and all aspects of running a "foreign" office;
- Itel Corporation, 1979;
- GATX Leasing, 1979 – 1983. Worked as Assistant Treasurer, Credit, then for the head of international;
- Bank of Montreal, 1983 – 1988. Worked as Corporate Banker, specializing in leasing companies;
- First Security Leasing, 1988 - 1990.  Worked to develop equipment leases outside the Utah bank's footprint;
- Bank of San Francisco, 1990 – 1995. Created an equipment leasing department and stayed on as Budget Director when the bank became close to insolvent;
- Robert Morris & Company 1995 – 2001.  Brokered equipment leasing deals to banks.
- Union Bank of California, 2002 – 2006.  President of Union Bank of California Leasing subsidiary and built a middle market equipment leasing department, using the bankers as my sourcing department
- Willis Lease Finance Corporation, 2006 – 2020.  Board of Directors and Audit Committee Chairman.

Exhibit D

McKinsey&Company



# Diversity Matters

Vivian Hunt
Dennis Layton
Sara Prince

February 2, 2015

# *Contents*

Executive summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The "Diversity Matters" project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      *Box:* Using the normalised Herfindahl–Hirschman index

1 The relationship between diversity and performance. . . . . . . . . . . . . . . . 3

      Aspects of the diversity–performance relationship

      *Box:* Diversity as indicator: Some revealing details

      One programme does not fit all groups

2 Why do more diverse companies perform better? . . . . . . . . . . . . . . . . . . 9

      The advantage in talent recruitment

      Improved customer orientation

      Greater employee satisfaction

      Better decision making and innovation

3 How can companies become more diverse? . . . . . . . . . . . . . . . . . . . . . . 14

      *Box:* Lessons from behavioural economics and social psychology

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Authors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# *Executive summary*

Our "Diversity Matters" research looked at the relationship between the level of diversity (defined as a greater share of women and a more mixed ethnic/racial composition in the leadership of large companies) and company financial performance (measured as average EBIT 2010–2013). The research is based on financial data and leadership demographics compiled for this purpose from hundreds of organisations and thousands of executives in the United Kingdom, Canada, Latin America, and the United States. The size of the dataset allows for results that are statistically significant and the analysis is the first that we are aware of that measures how much the relationship between diversity and performance is worth in terms of increased profitability.

The analysis found a statistically significant relationship between a more diverse leadership team and better financial performance. The companies in the top quartile of gender diversity were 15 percent more likely to have financial returns that were above their national industry median. Companies in the top quartile of racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median. Companies in the bottom quartile for both gender and ethnicity/race were statistically less likely to achieve above-average financial returns than the average companies in the dataset (that is, they were not just not leading, they were lagging). The results varied by country and industry. Companies with 10 percent higher gender and ethnic/racial diversity on management teams and boards in the US, for instance, had EBIT that was 1.1 percent higher; in the UK, companies with the same diversity level had EBIT that was 5.8 percent higher. Moreover, the unequal performance across companies in the same industry and same country implies that diversity is a competitive differentiator that shifts market share towards more diverse companies.

Variations by country show that the bar for competitive differentiation continues to rise. For example, in the US there continues to be a linear relationship between ethnic/racial diversity and better financial performance. In fact, in the US, ethnic/racial diversity has a stronger impact on financial performance than gender diversity, with earlier pushes to increase women's representation in the top levels of business having already yielded positive results. By contrast, in the UK, increased gender diversity on the executive team corresponded to the highest performance uplift in the global dataset. From an industry perspective, certain industries perform better on gender diversity and others on ethnic/racial diversity. No industry or company was in the top quartile for both dimensions.

The relationship between diversity and performance highlighted in the research is a correlation, not a causal link. This is an important distinction, but the findings nonetheless permit reasonable hypotheses on what is driving improved performance by companies with diverse executive teams and boards. It stands to reason—and has been demonstrated in other studies, as we indicate—that more diverse companies are better able to win top talent, and improve their customer orientation, employee satisfaction, and decision making, leading to a virtuous cycle of increasing returns. That in turn suggests that diversity beyond gender and ethnicity/race (such as diversity in age and sexual orientation) as well diversity of experience (such as a global mindset and cultural fluency) are also likely to bring some level of competitive advantage for firms that are able to attract and retain such diverse talent.

Moving the needle on diversity is harder than completing a typical transformation due to barriers like unconscious bias. This makes it even more important that companies have a robust transformation programme that explicitly addresses unconscious bias, and that there is visible commitment from the leadership team. This may require challenge from within or beyond the company: data-driven diversity programmes can often highlight unconscious biases that impair the exercise of good judgement throughout the organisation, even when best practices are systematically followed and best intentions are assumed and exercised. However, case studies from the emerging field of behavioural economics and what is known as "nudge theory", as well as our own experience in working with clients, provide evidence that such change is possible.

Diversity matters because we increasingly live in a global world that has become deeply interconnected. It should come as no surprise that more diverse companies and institutions are achieving better performance. Most organisations, including McKinsey, have work to do in taking full advantage of the opportunity that a more diverse leadership team represents, and, in particular, more work to do on the talent pipeline: attracting, developing, mentoring, sponsoring, and retaining the next generations of global leaders at all levels of the organisation. Given the increasing returns that diversity is expected to bring, it is better to invest now, as winners will pull further ahead and laggards will fall further behind.

# The "Diversity Matters" project

For several years McKinsey & Company has been developing research and initiatives on the topic of diversity in the workplace. The first report, "Women Matter", published in 2007, identified a positive relationship between corporate performance and elevated presence of women in the workplace in several Western European countries, including the UK, France, and Germany. McKinsey has since expanded the focus of its research on the relationship between performance and diversity to include diversity in race and ethnicity and sexual orientation as well as gender.

The research proceeded through the creation of proprietary datasets for 366 public companies across a range of industries in the United Kingdom, Canada, the United States, and Latin America. The data collected included the composition of top management and boards in 2014 and financial data, earnings before interest and tax (EBIT), for the years 2010 to 2013.[1]

In addition to capturing gender information, the dataset also included ethnic and/or racial information from publicly available sources.[2] We measured the relationship between leadership diversity and financial performance with the aid of the Herfindahl–Hirschman Index (HHI), a tool used for decades by economists to determine the level of competitiveness within markets and industries. By adapting the index, the Diversity Matters team was able to recognise a company that, for example, has two board members from two different ethnic minorities as being more diverse than a company with the same size board that has two board members from the same ethnic minority (see box). The size of the dataset allowed for results that were statistically significant and enabled the value of the relationship to be quantified in terms of the observed uplift in EBIT relative to the diversity of the leadership teams analysed.

## Using the normalised Herfindahl–Hirschman index for diversity

| | |
|---|---|
| **What is the normalised Herfindahl–Hirschman index?** | ▪ The Herfindahl–Hirschman index (HHI) is a measure of market concentration and competition within an industry, measuring the size of a firm in relation to its industry<br>▪ The standard HHI is defined as the sum of the squares of the market shares of the largest firms within the industry, where the market shares are expressed as fractions.<br>Formula: $HHI = \sum_{i=1}^{N}(s_i^2)$ where $s_i$ is the market share of firm $i$ in the market, and $N$ is the number of firms<br>▪ This result is normalised to ensure a result between 0 and 1:<br>Formula: $NHHI = (HHI - 1/N)/(1 - 1/N)$ |
| **How is it used to measure diversity?** | ▪ We used the HHI formula to differentiate diversity in companies that had the same number of executives outside the majority group, but where one executive team included a greater range of ethnic backgrounds<br>▪ For example, if one company had 8 white and 2 Asian executives and another company had 8 white, 1 Asian, and 1 black executive, using the HHI formula allowed us to credit the second company as having a more diverse executive team:<br><br>$HHI_1 = 0.68 = (\frac{8}{10})^2 + (\frac{2}{10})^2$ $\qquad$ $HHI_2 = 0.66 = (\frac{8}{10})^2 + (\frac{1}{10})^2 + (\frac{1}{10})^2$<br><br>▪ An HHI of 1.0 indicates a team where everyone has the same race or gender. Increases in the HHI indicate a decrease in diversity. Decreases in the index indicate an increase in diversity<br>▪ For the normalisation, N is always 7, the number of ethnic groups used in the categorisation, even if that group is not represented in the team, and has a share of 0 |

---

1   Companies were classified into seven groups: finance, insurance, and professional services; heavy industry; healthcare and pharmaceuticals; telecom, media, and technology; consumer goods and retail; transportation, logistics, and tourism; and energy and basic materials. Top management teams were as defined in company websites, and included positions from the C-suite to senior vice presidents. Almost 5,000 leaders were included in the research.

2   Ethnic and racial categories used were African ancestry, European ancestry, Near Eastern, East Asian, South Asian, Latino, Native American, other.

# 1 The relationship between diversity and performance

Analysis of the data from the group of 366 companies revealed a statistically significant connection between diversity and financial performance. The companies in the top quartile for gender diversity were 15 percent more likely to have financial returns that were above their national industry median, and the companies in the top quartile for racial/ethnic diversity were 35 percent more likely to have financial returns above their national industry median (Exhibit 1). This correlation does not prove that the relationship is causal—that greater gender and ethnic diversity in corporate leadership automatically translates into more profit—but rather indicates that companies that commit to diverse leadership are more successful. The existence of the relationship is statistically significant and consistently present in the data.

Exhibit 1

## How diversity correlates with better financial performance



SOURCE: McKinsey Diversity Database

The reverse is also true, companies in the bottom quartile in both gender and ethnicity underperformed the other three quartiles (Exhibit 2).

Exhibit 2

## How low gender and ethnic diversity correlates with poorer financial performance



SOURCE: McKinsey Diversity Database

## ASPECTS OF THE DIVERSITY–PERFORMANCE RELATIONSHIP

The analysis of the data revealed a positive relationship between financial performance and greater diversity in leadership. The strength and significance of that relationship varied by type of diversity (gender or ethnicity), country, and industry (Exhibit 3).



Exhibit 3

**Strength and statistical significance of the relationship between financial performance and diversity**

1 P-values of 0.1 and under were considered statistically significant (90%).

SOURCE: McKinsey Diversity Database

### *Nuances in gender and ethnic diversity*

Closer inspection of the analysis revealed many interesting, non-intuitive findings. In the United States, for example, companies have made efforts in recent years to increase the number of women on executive teams and boards. Although representation is still limited, there has been measurable progress (Exhibit 4).

At the same time, the data appears to show that less attention has been given to the attainment of racial and ethnic diversity. By this measure it becomes apparent that US companies would need to make a dedicated effort to achieve a diversity of leadership that reflects the demographic composition of the country's labour force and population (Exhibit 5).

Interestingly, the US dataset shows no statistically significant correlation between gender diversity and performance until women constitute at least 22 percent of a senior executive team. From that point, the correlation observed for US companies is that for every 10 percent increase in gender diversity there is an increase of 0.3 percent in EBIT margin.

In the UK the relationship between gender diversity and performance is much more apparent and powerful. The correlated benefit is an increase of 3.5 percent in EBIT for every 10 percent increase in gender diversity in the senior executive team (and 1.4 percent for the board). That is, UK companies experience more than ten times the impact for their efforts in gender diversity than US companies do, even after reaching the 22 percent tipping point.

Exhibit 4

## Women are still underrepresented at the top of corporations globally



1 Number of companies = 107 for UK, 186 for US, 67 for Brazil

SOURCE: US Census Bureau, McKinsey Diversity Database

Exhibit 5

## Compared with other countries, the UK is doing a better job in racial diversity, though it still faces challenges



1 Number of companies = 107 for UK, 186 for US, 67 for Brazil
2 Undocumented labour force, largely Latino, estimated at 6 to 8 million (Bloomberg, Pew), has not been included in the breakdown
3 Other includes mixed race, African ancestry, native

SOURCE: Companies websites, McKinsey Diversity Database

For every 10 percent elevation in ethnic diversity in the executive leadership of US companies, there was a 0.8 percent improvement in EBIT. Cumulatively, more racially diverse companies had better financial performance: companies in the top quartile for ethnic diversity in leadership roles had a higher probability of above-average performance than those in the bottom quartile (Exhibit 6).

Exhibit 6

### Relationship between ethnic diversity and performance by quartile



SOURCE: McKinsey Diversity Database

Above-median financial performance was achieved by a higher percentage of companies in the top quartile than the bottom quartile for ethnic diversity in all the countries and regions we investigated (Exhibit 7).

Exhibit 7

### Percentage of companies with EBIT above national median by quartile

| Region | Top quartile ethnic diversity | Bottom quartile ethnic diversity |
|---|---|---|
| Overall | ▪ 58% | ▪ 43% |
| United Kingdom | ▪ 61% | ▪ 45% |
| United States & Canada | ▪ 61% | ▪ 41% |
| Latin America | ▪ 53% | ▪ 47% |

NOTE: Includes 186 organisations in United States and Canada, 107 in the United Kingdom, and 73 organisation in Latin America (67 from Brazil)

SOURCE: McKinsey Diversity Database

## Diversity as indicator: Some revealing details

A number of trends in the countries and industries reviewed suggest that the relationship between diversity and performance is likely to grow in importance. For instance:

- **Demographics.** In the United Kingdom approximately 30 percent of births in 2011 were to parents of non-European ancestry.[*]

- **Talent shortage.** In Europe the acquisition of talent has been identified as a significant management challenge for the next five years. The ethnic composition of the UK labour force is now about 10 percent non-white, up from 6 percent in 1991. However, little more than 20 percent of UK companies attain 10 percent ethnic diversity on their top management teams.[†]

- **Purchasing power.** As customers, women are involved in 80 percent of consumer goods purchases in the UK. Gay and lesbian households increasingly represent a mainstream and sizable consumer segment.[‡]

- **Legal requirements.** Regulators in some European countries have introduced diversity targets for boards, such as those set out in the UK Equality Act 2010.

As a result of these trends, the relationship between diversity and performance will become more pronounced throughout these markets, and not just in particular segments.

---

[*] David Coleman, *Immigration, Population, and Ethnicity: The UK in international perspective,* The Migration Observatory, 17 April 2013.

[†] "Facing a skills shortage? Fix it yourself", McKinsey & Company, 2013; McKinsey Diversity Database.

[‡] *Women Matter: Moving corporate culture, moving boundaries,* McKinsey & Company, 2013; *The Power of "Out" 2.0: LGBT in the workplace,* Center for Talent Innovation, 1 February 2013; *African-American Consumers: Still vital, still growing,* Nielsen, 21 September 2013.

# ONE PROGRAMME DOES NOT FIT ALL GROUPS

A glance at consumer industries in the UK reveals that some companies have made progress in leadership diversity in ethnicity or gender, but none has managed to lead by both measures (Exhibit 8).

**Exhibit 8**

## No companies perform well on both gender and ethnic diversity

Example: consumer industries



SOURCE: McKinsey Diversity Database, companies websites

The approach of many companies has been to adopt a single diversity programme to cover all action groups: racial/ethnic, gender, and sexual orientation. Yet the data suggests that such an approach is insufficient, resulting in a focus on a particular category rather than the issue as a whole. Tailored programmes and dedicated efforts are needed to ensure relevance to business and to make progress on any dimension.

# 2  Why do more diverse companies perform better?

The Diversity Matters research revealed that more diverse companies perform better, but the data did not indicate why this is so. To understand causation it was necessary to consult additional evidence, including other McKinsey research on diversity. This material allowed reasonable hypotheses to be made concerning the factors driving better performance by companies with diverse executive teams and boards. The most important drivers identified were advantages in recruiting the best talent, stronger customer orientation, increased employee satisfaction, and improved decision making.

Exhibit 9

**Diversity has a positive impact on many key aspects of organisational performance**

| Diversity management helps to… | Rationale |
|---|---|
| …win the war for talent | • A strong focus on women and ethnic minorities increases the sourcing talent pool, a particular issue in Europe. In a 2012 survey, 40% of companies said skill shortages were the top reason for vacancies in entry-level jobs |
| …strengthen customer orientation | • Women and minority groups are key consumer decision makers: for example, women make 80% of consumer purchases in the UK<br>• Gay men and women have average household incomes that are almost 80% higher than average |
| …increase employee satisfaction | • Diversity increases employee satisfaction and reduces conflicts between groups, improving collaboration and loyalty |
| …improve decision making | • Diversity fosters innovation and creativity through a greater variety of problem-solving approaches, perspectives, and ideas. Academic research has shown that diverse groups often outperform experts. |
| …enhance the company's image | • Social responsibility is becoming increasingly important<br>• Many countries have legal requirements for diversity (e.g., UK Equality Act 2010) |

SOURCE: *Women Matter,* McKinsey & Company, 2007, 2008, 2010, 2012, 2013; Thomas Barta, Markus Kleiner, and Tilo Neumann, "Is there a payoff from top-team diversity?", *McKinsey Quarterly,* April 2012; Martin Dewhurst, Matthew Pettigrew, and Ramesh Srinivasan, "How multinationals can attract the talent they need", *McKinsey Quarterly,* June 2012; *Diversity wins!,* McKinsey & Company, November 2011; McKinsey qualitative survey; *The War for Diverse Talent,* Green Park, September 2010; Scott E. Page, *The Difference: How the power of diversity creates better groups, firms, schools, and societies,* Princeton University Press, 2007; McKinsey analysis

## THE ADVANTAGE IN TALENT RECRUITMENT

In the decade before the financial crisis, it became apparent that demographic pressures and economic growth would intensify competition for qualified leaders and experts in the advanced knowledge economies. McKinsey's 1997 research paper "The war for talent" demonstrated that better talent translates into better financial performance and concluded that companies could gain competitive advantage through superior talent management practices. A deliberate approach to talent management could yield measurably higher financial returns and create a powerful business-enhancing virtuous cycle.

Since the 1990s, the dynamics that defined this talent crunch have expanded in scope and power. Talent has become scarcer and pricier in emerging as well as developed markets, and the competition to recruit and retain talented employees has consequently intensified. Diversity in leadership can help a company secure access to more sources of talent, gain a competitive recruitment advantage, and improve its global relevance.

## *Today's talent recruitment terrain*

**Scarce top talent.** The pool of skilled experts and leaders has not kept pace with demand. More than a third of employers surveyed by McKinsey in 2012 said that the skills gap caused "significant problems in terms of cost, quality, and time".[3] In years to come society will need to address the educational and socioeconomic issues underlying these skills gaps; in the meantime, employers must continue to compete for scarce talent while building skills within their organisations. In a survey of 2,700 employers, only 31 percent believed they were doing a good job in recruiting and retaining young talent.[4]

**Scarce "interaction" talent.** It is widely recognized that technological changes have transformed job requirements in developed countries, but less well known that employment is growing fastest in positions requiring extensive human interaction, from legal and health professionals to frontline customer service staff in banking and retail.[5] This employment category already accounts for a large proportion of jobs: 41 percent in the US, 37 percent in Germany, and 26 percent in Brazil, for example. Leading companies are exploring new and better approaches to how, where, and by whom interaction work is performed.

**Scarce emerging-market talent.** Competition for talent is intensifying in emerging markets. Ambitious local companies are moving fast to hire and retain local talent, while companies in developed markets are thinking twice before making offshore commitments.[6]

**Geographic mismatches.** There are variations in the supply of and demand for talent from country to country, but differences in national systems of professional certification as well as language and cultural barriers make it difficult for skilled workers to move from market to market.

## *Reflecting social change*

Diversity management is one important means of addressing talent shortages. Diversity programmes give companies an advantage in competing for the best talent—an advantage that is growing as workforces in many advanced economies become more ethnically diverse as a result of immigration and birth-rate demographics. For example, in the US, half of all infants under the age of 1 in 2010 were members of a racial or ethnic minority group. In the UK, the percentage of workers of European ancestry within the total workforce has fallen by almost 10 percentage points in the past decade. In both the US and the UK, women make up almost half the workforce.

A recent Gallup poll found that only 13 percent of employees were actively engaged at work, and that the management behaviour most likely to affect engagement was "demonstrates strong commitment to diversity".[7] Level of engagement are lowest for the cohort born after 1980, and multiple surveys have indicated that diversity is particularly important to Generation Y or the Millennials, as they are known.

Because they are underrepresented, the groups targeted by diversity efforts are often good sources of desirable talent. A recent study found that on average, lesbian, gay, bisexual, and transgender (LGBT) recruits were more highly skilled and more likely to have advanced degrees.[8]

---

3   "Facing a skills shortage? Fix it yourself", McKinsey & Company, 2013.
4   "Facing a skills shortage? Fix it yourself", McKinsey & Company, 2013.
5   Susan Lund, James Manyika, and Sree Ramaswamy, "Preparing for a new era of work", *McKinsey Quarterly*, November 2012.
6   Susan Lund, James Manyika, and Sree Ramaswamy, "Preparing for a new era of work", *McKinsey Quarterly*, November 2012; "Facing a skills shortage? Fix it yourself", McKinsey & Company, 2013.
7   *State of the Global Workplace,* 2013, Gallup, Inc.
8   *The Power of "Out" 2.0: LGBT in the workplace,* Center for Talent Innovation, 1 February 2013.

## IMPROVED CUSTOMER ORIENTATION

By committing to diversity as a strategic imperative, companies align their own organisation more closely with an increasingly heterogeneous customer base. This enables them to forge stronger bonds with customers in two respects: reaching key purchasing decision makers and taking a customer perspective.

### Reaching key decision makers

Diversity groups represent the majority of the general population and an emphatic majority where purchasing decisions are concerned. In the UK, for example, 80 percent of purchasing decisions are made by women. By 2025, women are expected to own 60 percent of all personal wealth and control £400 million more per week in expenditures than men.[9] In the United States, estimates of buying power indicate that LGBT individuals controlled $790 billion in 2012, and African Americans are expected to control $1.1 trillion by 2015.[10] A top team that reflects these powerful demographic groups will have a better understanding of their market decision behaviour and how to impact.

### Taking a customer perspective

Corporate leaders with a customer perspective are able to respond to market developments more quickly and creatively. Diversity helps companies react more effectively to market shifts and new customer needs.[11] A senior executive at a global company in Asia stated an obvious if difficult truth when he said, "In our top-100 executive meetings we spend more than half of our time speaking about Asia. But if I look around the room I hardly see anybody with an Asian background". Fortunately, CEOs from many different industries are increasingly adopting the view that "it is crucial for a company's employees to reflect the people they serve".[12]

Many companies have put theory into practice in more closely reflecting their customer base. Coca-Cola, for example, has ensured that 38 percent of new US hires are people of colour and instituted mentoring programs to support the progression and retention of individuals from minority backgrounds. Walmart conducted benchmarking to understand the demographics of every country it operates in, and encouraged each country to create its own diversity and inclusion plan to reflect local needs.

## GREATER EMPLOYEE SATISFACTION

Diversity increases employee satisfaction and fosters positive attitudes and behaviours in the workplace. Workplace diversity increases job and life satisfaction for women and members of minority groups provided the workforce is diverse *enough*. For minority workers, for example, the boost in satisfaction kicks in when representation exceeds 15 percent of the workforce. Where diversity recruitment is a token effort, psychological outcomes are poorer.[13]

It is hardly surprising that workers from ethnic minorities report higher job and life satisfaction in more diverse workplaces. The presence of sufficient numbers of minority-group members (or women in traditionally male-dominated environments) boosts individuals' confidence and self-esteem, while breaking down the

---

9   *Women Matter: Moving corporate culture, moving boundaries,* McKinsey & Company, 2013.

10  *The Power of "Out" 2.0: LGBT in the workplace,* Center for Talent Innovation, 1 February 2013; *African-American Consumers: Still vital, still growing,* Nielsen, 21 September 2013.

11  *Diversity wins!,* McKinsey & Company, November 2011.

12  Boris Groysberg and Katherine Connolly, "Great leaders who make the mix work", *Harvard Business Review,* September 2013, pp. 68–76.

13  Noemí Enchautegui-de-Jesús, Diane Hughes, Kristen E. Johnson, and Hyun Joo Oh, "Well-being in the context of workplace diversity", *Journal of Community Psychology,* 2006, volume 34, number 2, pp. 211–23.

prejudices that led to exclusion in the first place. Similarly, research has shown that gay employees in a diverse workplace feel more secure and positive about their employers and jobs than those in a less diverse environment.[14] A supportive culture among colleagues and supervisors is more important than the presence of a non-discrimination policy, necessary though such a foundations is.[15]

# BETTER DECISION MAKING AND INNOVATION

Managers working on tough problems have often assembled diverse teams of thinkers to challenge one another and improve the quality of their answers. A diversity of informed views enables objections and alternatives to be explored more efficiently and solutions to emerge more readily and be adopted with greater confidence. Research by Scott Page indicates that the presence of women and minority members on a leadership team enhances problem solving in the same way, since they add perspectives from their different experiences.[16] Ethnically and gender-diverse top teams offer companies more problem-solving tools, broader thinking, and better solutions.

This finding has resonated with leaders of top companies for inclusivity. For instance, Paul Block, CEO of US sweetener manufacturer Merisant, commented "People with different lifestyles and different backgrounds challenge each other more. Diversity creates dissent, and you need that. Without it, you're not going to get any deep inquiry or breakthroughs".[17]

Page's research was based on professional rather than demographic diversity—having an engineer and a lawyer on an executive team, for example. He understood that benefits derived from one form of diversity would not necessarily be derived from others, but believed that professional and demographic diversity often went hand in hand.

## *Innovation, diversity, and market growth*

A recent article reporting research by the Center for Talent Innovation (CTI) provided further support for Page's research on the correlation between diversity and better decision making, and stressed the importance of inclusive leadership in maximising the benefits of diversity.[18] It identified two forms of diversity:

- **Innate diversity.** Teams that reflect the composition of a company's customer base in terms of gender, ethnicity, culture, sexual orientation, and age are better positioned to understand its changing needs and develop winning innovations.

- **Acquired diversity.** Diversity at leadership level breaks down insular biases through personal experience, making the organisation more likely to act inclusively, foster a communicative culture, and create an environment where workers are free to voice unorthodox views and suggest creative solutions.

14  C. S. Munoz, "A multi-level examination of career barriers for sexual minority employees", unpublished doctoral dissertation, 2005; C. R. Waldo, "Working in a majority context", *Journal of Counseling Psychology,* 2006, volume 46, pp. 218–32. The studies focused on lesbian, gay, and bisexual workers as they found insufficient data on transgendered employees.

15  Ann H. Huffman, Kristen M. Watrous-Rodriguez, and Eden B. King, "Supporting a diverse workforce: What type of support is most meaningful for lesbian and gay employees?", *Human Resource Management,* 2008, volume 47, issue 2, pp. 237–53.

16  Scott E. Page, *The Difference: How the power of diversity creates better groups, firms, schools, and societies,* Princeton University Press, 2007.

17  Boris Groysberg and Katherine Connolly, "Great leaders who make the mix work", *Harvard Business Review,* September 2013, pp. 68–76.

18  Sylvia Ann Hewlett, Melinda Marshall, and Laura Sherbin, "How diversity can drive innovation", *Harvard Business Review,* December 2013.

The CTI concluded that when leadership lacks innate or acquired diversity or fails to foster a "speak-up" culture, fewer promising ideas make it to market. Ideas from women, ethnic minorities, LGBT individuals, and members of Generation Y are less likely to win the endorsement they need to go forward because 56 percent of leaders don't value ideas they don't personally see a need for. This thinking can exert a stranglehold on an organization if its leaders are predominantly white, male, and heterosexual, for example, or come from similar educational and socioeconomic backgrounds. In short, the data strongly suggests that homogeneity stifles innovation.[19] This finding is supported by a new study that found that if a market is dominated by any one ethnicity, it tends to make worse decisions.[20]

---

19  Sylvia Ann Hewlett, Melinda Marshall, and Laura Sherbin with Tara Gonsalves,  *Innovation, Diversity, and Market Growth,* Center for Talent Innovation, 2013.

20  Sheen S. Levine, Evan P. Apfelbaum, Mark Bernard, Valerie L. Bartelt, Edward J. Zajac, and David Stark, "Ethnic diversity deflates price bubbles", *PNAS,* 17 November 2014.

# 3  How can companies become more diverse?

As the data shows, winning companies have achieved some success in attaining gender or other forms of diversity in their leadership groups. However, many companies have had mixed experience in attaining levels of diversity that make a difference. Progress is undeniable, but slow and incremental. One of the most important lessons is that diversity does not simply happen—it does not come from a memo or end with the recruitment of a few individuals from target groups. Rather, diversity in the top team and indeed at all levels of an organisation is best achieved through dedicated programmes that focus on specific goals.

Diversity programmes are in essence a form of change programme: they seek to alter the composition of leadership teams or staff and to disrupt old habits and routines. However, research into change management has found that change programmes have a high failure rate of about 70 percent.[21] Most efforts stall because those involved—management and employees—do not believe in them or make them a priority.

Successful diversity programmes have clear objectives and are led from the top (not just the CEO, but the entire top team). They foster active involvement from the wider organization and require the infrastructure to actively manage against targets (not quotas) to hold individuals accountable for outcomes. Exhibit 10 sets out questions for leaders to ask when planning a change programme and suggestions to help organizations reach their diversity goals.

Exhibit 10

**Key steps for successful diversity programmes**

| | | Diversity |
|---|---|---|
| 1 | **Aspire** Where do we want to go? | **Define a clear value proposition** | • Create a **clear value proposition** for having a diverse and inclusive culture<br>• Set a **few clear targets** (not quotas) that balance complexity with cohesiveness |
| 2 | **Assess** How ready are we to go there? | **Establish a fact base** | • Understand the **current situation** in terms of **statistics** and **mindsets** and learn from external best practices. Understand root causes and underlying mindsets |
| 3 | **Architect** What do we need to do to get there? | **Create targeted initiatives** | • **Differentiate initiatives by diversity group,** for example, gender initiatives do not always resonate with other minorities. Lead from the top |
| 4 | **Act** How do we manage the journey? | **Define the governance model** | • Define the **rollout strategy** for all initiatives. Launch 1-2 highly visible **flagship projects** at the beginning of the effort. **Monitor rigorously** |
| 5 | **Advance** How do we keep moving forward? | **Build inclusion** | • Continuously **address potential mindset barriers** through systematic **change management**. Link diversity to other change management efforts |

SOURCE: Scott Keller and Colin Price, *Beyond Performance: How great organizations build ultimate competitive advantage,* Wiley, 2011

---

21  Scott Keller and Colin Price, *Beyond Performance: How great organizations build ultimate competitive advantage,* Wiley, 2011.

Diversity programmes designed to raise the representation of women and minorities in organisations face particular challenges with resistance and inertia arising from unconscious (and sometimes overt) biases that can be deeply engrained in an organisation's culture and unknowingly practised by individuals.[22] Applying best practices in change management will be necessary but may not be sufficient to enable the organisation to attain meaningful diversity goals.

In addition to individual biases, there may be barriers in the composition of leadership teams and in the structure of the organisation as a whole. These barriers can have many causes and hinder progress even when companies are implementing other best practices. For instance, research by Groysberg and Connolly on creating diverse and inclusive organisations identified persistent institutional barriers to the recruitment of women such as exclusion from networks that open doors to development and unexamined assumptions about the tension between family demands and job requirements.[23]

McKinsey's own research found a number of additional and equally important barriers to the recruitment of all diversity groups: the lack of a clear and consistent mandate with visible support from leadership; inadequate collection and use of data on the advantages of more diverse organisations; and training that was limited and exclusive in its content and audience, rather than covering people inside and outside target groups. All these barriers can be overcome, but must first be identified and understood, and then addressed individually as part of a many-sided approach to inclusiveness.

## Lessons from behavioural economics and social psychology

Recent developments in the fields of behavioural economics and social psychology help to explain why diversity is lacking in organizations, and what methods can be used to increase it.

### 1. Underlying reasons for bias

A body of research in cognitive psychology and behavioral economics over the past 40 years has established that human behaviour is heavily influenced by subconscious, instinctive, and emotional "System 1" responses, rather than being under the exclusive control of rational, deliberate "System 2" thinking.* As a result, behaviour and attitudes in the workplace are influenced by an array of cognitive biases that affect decision making. The most relevant for diversity are:

- **Implicit stereotypes (sometimes referred to as "subconscious bias"):** the association of groups of people with certain traits or activities, such as men with science and mathematics and women with arts and languages.† Without our being aware of it, these associations can powerfully influence decisions such as which candidate to hire.

- **Ingroup favouritism:** a preference for people who are like us, so that an individual might choose to work with someone of the same nationality, gender, and race.‡

- **Outgroup homogenity bias:** the tendency for an individual to think that the group of people they belong to (their "ingroup") is more diverse, while their "outgroup" is more homogeneous, with members who appear alike or even interchangeable.‡

---

22  Allen R. McConnell and Jill M. Leibold, "Relations among the implicit association test, discriminatory behavior, and explicit measures of racial attitudes", *Journal of Experimental Social Psychology,* 2001, volume 37, pp. 435–442.

23  Boris Groysberg and Katherine Connolly, "Great leaders who make the mix work", *Harvard Business Review,* September 2013, pp. 68–76.

## *2. Techniques for overcoming bias*

Behavioural insights can be harnessed to increase diversity in three main ways: by training and educating people to reduce personal biases, by changing organisational processes to take bias out of decision making; and by incorporating behavioural principles in the design of programmes and communications to spur action.

### Educating and training people to reduce personal biases
Key success factors for raising awareness and building capability include:

- Tailoring delivery to the audience. For example, one engineering company used a computer simulation to show how a systematic 1 percent bias against women in performance evaluation scores caused women to be underrepresented in top positions.

- Getting people to experience bias personally. At Google, for instance, staff are encouraged to take a test that measures biases.

- Reminding people about biases at key moments, such as before reviews.

- Helping people to focus on differences to reduce homogeneity bias and stereotyping. In one experiment, French students discriminated against potential employers who were Arabs, but stopped doing so if asked to describe differences between their photos.[‡]

- Fostering empathy training and taking the side of the target group—a practice proven to reduce prejudice and discrimination. Simply asking "How would I feel in this situation?" can be enough to have a positive effect.[‡]

### Changing processes and structures to reduce bias in decision making
Another way to increase diversity is to introduce techniques to minimise the influence of individual biases on key decisions. These techniques can take several forms:

- **Analytical.** One approach to reduce bias in recruitment is to define scoring criteria for each candidate and use an algorithm rather than human judgement to make decisions based on the criteria. Daniel Kahneman has applied this technique to improve the assessment of candidates for the Israeli army.[*] Modified versions of the technique have been used by a variety of companies, including McKinsey.

- **Debate.** One effective way to identify bias in decision making is to institute a "pre-mortem" by asking people to imagine what could go wrong if a particular decision is taken.[§] Another technique is to nominate an individual to act as devil's advocate and challenge assumptions behind decisions, such as implicit stereotypes. A number of studies have shown that this approach leads to better decisions.[‖]

- **Organisational.** Companies can, for example, create a decision challenge team.

### Applying behavioural economics principles to diversity efforts
McKinsey has identified seven ways to apply behavioural principles: use information about peers, use people's natural reflexes, make sure information comes from a credible origin, provide strategic context, trigger an emotional response, make information salient, and appeal to an individual's self-image. Many of these techniques can be used to enhance the effectiveness of diversity programmes; for instance:

- **Peers: highlight the positive achievements of peers.** This has been shown to be one of the most effective ways to influence people. For example, informing taxpayers that others pay their tax significantly increased tax contributions, whereas reminders of prosecution or how tax is used did not.¶ A company could use internal statistics from other departments or business units that are more advanced in achieving diversity, as well as external data on highly regarded competitors. Telling employees about their peers' contributions to diversity is another effective technique.

- **Reflexes: prime people with images and words that discourage biases.** A striking example of the effects of priming—or introducing subliminal clues—was provided by research that showed that when Asian women were reminded about their gender, they performed significantly worse in a maths test than when they were reminded about their ethnicity.** Companies can use priming techniques strategically to reduce bias, for example by displaying pictures of well-known powerful women.

- **Origin: make sure that diversity messages come from trusted opinion leaders** within the organization, whether they are line workers or managers, rather than from a diversity group that may be seen as an outsider.††

*    Daniel Kahneman, *Thinking, Fast and Slow,* Allen Lane, 2011.
†    Brian A. Nosek, Mahzarin R. Banaji, and Antony G. Greenwald, "Math = male, me = female, therefore math ≠ me", *Journal of Personality and Social Psychology,* 2002, volume 83, number 1, pp. 44-59.
‡    Scott Plous, editor, *Understanding prejudice and discrimination,* McGraw-Hill, 2003.
§    Gary Klein, "Performing a project pre-mortem", *Harvard Business Review,* September 2007.
‖    Ryan T. Hartwig, "Facilitating problem solving: A case study using the devil's advocacy technique", *Group Facilitation,* number 10, 2010.
¶    Richard H. Thaler and Cass R. Sunstein, *Nudge: Improving decisions about health, wealth, and happiness,* Yale University Press, 2008.
**   Clayton M. Christensen, Stephen P. Kaufman, and Willy C. Shih, "Innovation killers: How financial tools destroy your capacity to do new things", *Harvard Business Review,* January 2008.
††   Robert B. Cialdini, *Influence: The psychology of persuasion,* HarperCollins, 2007.

# *Conclusion*

Diversity matters. In a world that is both diverse and deeply interconnected, companies and institutions with greater levels of diversity are achieving better performance. Most organisations, including McKinsey, have more work to do to take full advantage of the opportunity presented by a more diverse leadership team. Organisations also have more work to do on their talent pipeline to attract, develop, mentor, sponsor, and retain the next generations of diverse leaders at all levels. But with the rewards of diversity set to increase, investing now is the best plan. Winners will pull further ahead and laggards will fall further behind.

# *Authors*



## Vivian Hunt

Vivian is a director in McKinsey's London office and the managing partner for its United Kingdom and Ireland office. She has a 20-year career driving performance transformation and organizational development in healthcare and other sectors. She serves as a trustee for Action on Addiction and as chair of the Black British Powerlist, and is a member of British American Business Association Board, CBI London Council, and other UK business groups. Within McKinsey, she is the global lead for the Black Client Service Staff network.



## Dennis Layton

Dennis is a principal in McKinsey's London office. He is a leader of McKinsey's work on performance transformation in Europe and of its Organisation Practice in the UK and Ireland. He has written several articles on rapid cost reduction, performance transformation, and the relationship between management practices and performance outcomes. He is also the leader of McKinsey's work on UK healthcare payors' operations and organisation. Dennis sits on the steering committee for McKinsey's LGBT network and is a member of the leadership committee for Out Leadership.



## Sara Prince

Sara is a principal in McKinsey's Atlanta office and leads McKinsey's marketing and sales capability-building efforts in North America. She focuses on driving commercial transformation in consumer and travel, transport, and logistics industries. She is chair of McKinsey's Black Client Service Staff professional development programs in North America.

# *Additional contributors*

**Andrea Alexander, associate principal, Atlanta**

**Mauricio Arnau, engagement manager, London**

**Lori Dobeus, global senior manager of diversity, London**

**Kirill Dushkin, associate, London**

**Lauren Miller, associate, Atlanta**

**Katie Smith, engagement manager, Atlanta**

The authors would like to thank the following senior colleagues for their commitment to pursuing our understanding of this topic: Karen Tanner and Sandrine Devillard. They would also like to thank Margaret Brooks, Richard Bucci, Bryan Culleny, Valerie Ford, Kelvin Low, and Matthew Moore.

November 2014
Designed by US Design Center
Copyright © McKinsey & Company

Exhibit E



# DECODING DIVERSITY

**The Financial And Economic Returns to Diversity in Tech**

# FOREWORD

Data is powerful.  It allows us to be results-driven, to understand issues at their root cause, to find out what is working and what is not, and use that information to drive decisions more effectively. In the diversity & inclusion space, data is critically important, but often under-utilized. As we continue on our journey to reach full representation of women and underrepresented minorities at Intel by 2020, data is integral to our strategy.  We use it to objectively set goals, track our progress, identify where the challenges are and shift actions when needed.

Data can be used to build a case and rationale for why something is worth investing in. There have been studies in the past showing the importance of diversity & inclusion to business.  We wanted to better understand what that looked like specifically for the technology industry and the unique attributes of our sector, where the representation of women and underrepresented minorities is a challenge. We wanted data on the unique financial and economic impact of diversity in the tech sector, and further new analysis on evidence-based actions the tech industry can take to encourage and accelerate diversity goals. This can help the tech sector, as well as governments around the world, better size the opportunity diversity and inclusion brings not only to business, but to the economy at large.

This study presents the first-of-its-kind analysis of the economic impact of improving diversity in the technology sector, based on diversity data from nearly 170 companies. The study shows correlations between more diverse tech company workforces and higher revenues, profits, and market value. We see this outcome as a tool that can be used to foster dialogue, discussion and tactical strategies with key stakeholders.  We hope it will lead to the investment in strategies to improve diversity & inclusion in the technology industry. At Intel, we see significant opportunities and value to improving the representation of women and underrepresented minorities, increasing the diversity of our overall workforce, and making our workplace more inclusive for all employees. We hope that together we can drive more collaboration around diversity & inclusion in tech, new thinking, and new ways to inspire disruption for accelerated diversity outcomes.



**Danielle Brown, Chief Diversity & Inclusion Officer and Vice President, Intel Corporation**



**Barbara Whye, Deputy Director, Diversity in Tech Initiative**

"The (tech) industry is at that moment where we're starting to wake up. We, as a Nation, must challenge every CEO, every company, and every investor to think about what they can do to ensure that they are tapping into all of our Nation's talent so that their workforces and investment portfolios look like America"

- Megan Smith, United States Chief Technology Officer



# TABLE OF CONTENTS

I.   Overview

II.  Hidden Barriers

III. More Diversity, Better Performance

IV.  More Evidence, More Diversity

V.   Opportunities

VI.  Diversity in the Global Context

# EXECUTIVE SUMMARY

**Improving ethnic and gender diversity in the U.S. technology workforce represents a massive economic opportunity, one that could create $470 – $570Bn in new value for the tech industry, and could add 1.2 – 1.6% to national GDP.**
Growth on this scale would have major implications for both the labor and consumer markets, supporting job creation and better products. And yet, the tech industry is not drawing upon the full pool of available talent.

**While it is no secret that women and racial/ethnic minorities are underrepresented at tech companies—by 19 percentage points for women compared to their presence in the US labor force; by 16 – 18 percentage points for Hispanics, African Americans, and Native Americans—it may come as a surprise to learn how little these figures have changed in the last 15 years.**
For technical roles, female representation falls to 12 percent—far short of the proportion of women working in many other occupations traditionally viewed as male-dominated (to name a handful: oil drilling, metal forging, and investment management). Tech leaders recognize this gap and are investing to shrink it, yet racial/ethnic minority representation has only improved by 1 – 2 percentage points over fifteen years, and female representation has fallen by one percentage point.

**This report offers first-of-its-kind analysis of the economic impact of improving diversity in the tech sector, based on diversity data from nearly 170 companies.**
These findings indicate clear correlations – though not necessarily causation – between more diverse tech company workforces and higher revenues, profits, and market value. The data show that every incremental percentage point in African American and Hispanic representation is linked with a three-percentage-point increase in revenues, meaning that the sector could generate an additional $300 – $370Bn each year if the racial/ethnic diversity

of the technology workforce matched that of the talent pool. Similarly, closing the gap in female leadership representation could boost enterprise value by $320 – $390Bn across the sector. This analysis is only now possible because a number of tech companies—including such leading firms as Apple, Yahoo, and Facebook among others—have committed to publicly releasing diversity data.

**This analysis is based on regression analyses which use a data set of over 170 tech companies that have published, released, or publically discussed their top-line diversity figures.**
The Dalberg research team collected gender and racial/ethnic diversity data on these companies, and then performed regression analysis to understand the relationship between gender diversity, racial diversity and financial success. This analysis controlled for a range of other variables (including employee count and company age) and yielded several statistically significant results. Dalberg applied these results to the domestic technology companies listed on the NASDAQ to estimate the industry-wide effects on revenues, market value, and operating margin. This methodology is detailed in full in the report annex. While correlation does not equal causation, initial indicators are positive and suggest that more research on linkages between performance and diversity in tech is warranted.



**Improving diversity in the tech workforce also supports national productivity, with potential growth on the order of 1.2 – 1.6% if the industry can close the gap in representation of women and racial/ethnic minorities.**

The technology sector contributes approximately 7% to the nation's annual GDP, meaning that a surge in tech sector performance would have significant impact on the US economy. Assuming that closing this gap requires at least five years, this equates to an annual 0.2 – 0.3 percentage point boost in national economic growth, over recent average annual growth of 2.2 – 2.4%.

**Deeper analysis on the linkages between racial/ethnic diversity and business performance yields several other new insights:**

• Every incremental percentage point in African American and Hispanic representation is linked with a three-percentage-point increase in revenues at NASDAQ-listed tech companies

• Every one-percentage-point increase in racial/ethnic diversity is linked with a 0.3 – 0.4-percentage-point increase in operating margins. By extension, levels of racial/ethnic diversity that reflect the talent marketplace would be linked with a $6 – 7Bn increase in operating earnings industry-wide.

Technology companies with racial/ethnic diversity above the median are 14 – 17 percent more likely to generate revenues above industry medians.

**Put another way: if two companies are identical in every way except for racial/ethnic diversity and female representation in leadership, the more diverse company will, in all likelihood, have higher revenues, be more profitable, and have a higher market value.**

Analysis of the linkage between diversity and financial performance controlled for factors like employee count, years of operation, and depending on the analysis, market cap, revenues, and/or profits (full methodology detailed in annex).



**At small tech companies and startups, diversity's dividend could also be high:**

- Small tech companies are, on average, 25 – 30 percent less diverse than large tech companies, but small changes can make a big difference: at a small tech company with $10Mn in annual operating profits, increasing minority representation by five percentage points would be associated an annual profit boost of $1.5 – $2Mn.

- The estimated returns to racial/ethnic diversity could add as much as 15 – 20 percent to an early-stage startup's valuation, providing these companies with a longer runway to test ideas, innovate, and grow.

**Beyond effects within the U.S., closing the global tech industry's female leadership gap could add between 0.5 – 0.6 percent to global GDP.**
This equates to a $430Bn – $530Bn boost in global productivity, roughly equivalent to a new economy the size of Norway or Taiwan. Accomplishing this will be a challenge—for example, roughly 60 – 70% of women working in STEM in China, India, and Brazil report experiencing regular sexual harassment (compared to an already disturbing 52% who report such behavior in the United States)—but the payoff could be tremendous.

**Bottom line: Advancing diversity in tech is good citizenship, good for business, and good for the national and international marketplace.**

***This report urgently calls on tech companies to commit to a goal of "Five in Five"—that is, increasing representation of ethnic minorities and women in technical and leadership roles by five percentage points in five years.***
The tech industry has made an estimated $0.8-1.2Bn investment in diversity over the past five years. The size of the investment and the level of commitment are laudable. Yet this report finds that amplifying returns on these and future investments depends on three types of action: <u>sharing more data</u>, <u>collecting better evidence</u>, and <u>investing in what demonstrably works</u>.

- Implement and publish company-specific goals to recruit, retain, and advance diverse technology talent, and operationalize concrete measures to create and sustain an inclusive culture;

- Annually publish data and progress metrics on the diversity of our technology workforce across functional areas and seniority levels;

- Invest in partnerships to build a diverse pipeline of technology talent to increase our ability to recognize, develop and support talent from all backgrounds.

**These three actions are some of the most important steps to achieve the tech industry's diversity goals. Several other actions can build on these and accelerate progress, each supported by robust evidence emerging from years of rigorous study. Companies can consider:**

- Using metrics to hold line managers accountable for diversity goals, which is more effective than mentorship or training

- Formalizing sponsorship programs, which are more effective than mentorship alone

- Integrating race/ethnicity/gender-blind recruitment tracking systems, which are more effective than non-blinded systems

**By committing to 'five in five'—and to the evidence-based actions needed to reach this goal—the tech industry will make significant strides toward capturing the full range of available talent. Doing so, this report concludes, will bring tremendous financial, economic, and social benefits.**

# CHAPTER 1: OVERVIEW

**Improving racial/ethnic and gender diversity in the U.S. tech workforce represents a massive opportunity waiting to be claimed, on the order of $300 – $370Bn  for racial/ethnic diversity, and $320 – $390Bn for gender diversity.** This report will explain why, and what can be done to encourage a more representative and more equitable workforce that can lead to significant economic returns.

**Thanks to a surge of mass media attention and commitments to transparency on the part of large tech companies, we now have a clearer picture of the state of diversity in the tech industry.**
There is work to do, and companies are rising to the challenge by taking concrete action. The benefits to society of an increasingly diverse tech sector will be significant—but so will the benefits to the industry itself.

This report presents new-to-the-world analysis quantifying the unique financial and economic impact of diversity in the tech sector, and further new analysis on evidence-based actions the industry can take to encourage diversity. Bottom line: In tech, advancing diversity is good for business, good citizenship, and good for the national marketplace.

## Who is missing?

**A million women are missing from the US tech sector.**
Women represent just 28 percent of the tech workforce, including both those in technical and non-technical roles.[1] This reflects a shortfall of 900,000 – 1Mn women in the tech sector compared to the 50.8 percent ratio of women in the U.S. population, or over 700,000 women, compared to the 46.8 percent ratio of women in the general U.S. labor force.[2] Women also make up just 19 – 20 percent of C-suite executives, and of C-suite line roles (e.g., CEO, CMO) only 13 – 14 percent.[3]

**Exhibit: Overview of Diversity in the US Tech Workforce**



**The gap is particularly wide for technical roles.**
According to the National Center for Women & Information Technology, women hold only about 25 percent of IT-related jobs in all sectors. According to one survey of roughly 250 Silicon Valley startups, women account for just 12 percent of engineers.[4] The numbers are much worse for women from underrepresented minorities; for example, Hispanic women make up only two percent of the computing workforce, despite making up roughly eight percent of the general population.

**The pipeline of candidates reflects a similar disparity.**
Women earn about 12 percent of computer science degrees. The trend has gotten notably worse over time: women made up 37 percent of computer science majors in the mid-1980s.[5] The beginning of this decline roughly corresponds with the rise of the personal computer, and one new theory points to the widespread perception (and marketing reality) that the PC was a toy for boys.[6]

"White and Asian males have a computer culture that embraces them: video games, science fiction, and so on.
If we want women and underrepresented groups to belong, we have to expand that culture."

-Maria Klawe, computer scientist and President of Harvey Mudd College

**The tech sector is also missing half a million racial/ethnic minorities.**
African American, Hispanic, and Native American employees make up only 12 – 15 percent of the overall tech workforce (including both technical and non-technical roles) compared to 31 percent of the general labor force.[7] This represents a shortfall of nearly 550,000 people of color. The picture is even starker when it comes to racial/ethnic minorities in technical roles—Hispanics, African Americans, and Native Americans hold only 7 – 9 percent of these positions.[8]

**What changes are happening?**

**The past few years have brought a very public change in the way Silicon Valley has addressed this challenge.** CEOs are beginning to use their platforms to acknowledge the industry's short-comings and confront diversity issues head on. Many leading tech companies are taking bold steps toward transparency, setting ambitious goals and specific targets, and openly committing to creating a more inclusive future.

**Over the past five years, tech companies have invested an estimated $0.8 – $1.2Bn in a range of initiatives** that aim to build pipelines of female and racial/ethnic minority applicants, recruit them more effectively, retain them for longer, and support their rise once they come on board.

**Since 2014, several companies have taken the bold step of making their diversity goals explicit and public.** Pinterest plans to hire 30 percent women and 8 percent underrepresented minorities in 2016.[9] Salesforce has announced the "aggressive goal" of employing equal numbers of men and women within five years, and, further, will be reviewing all employee salaries to ensure that women and men are paid the same for the same role.[10]

1   Dalberg Diversity in Tech Database
2   Census, U.S. Bureau of Labor Statistics
3   Estimates calculated based on sub- sample of technology companies. Source: Molla, Rani and Renee Lightner. "Diversity in Tech," Wall Street Journal. Nov  2015; Lee, Wendy. "Women rarely reach top in tech, despite signs that diversity pays," SF Chronicle. Dec 2015; McKinsey, "Women in the Workplace," 2015; EEO-1 of companies; Dalberg analysis
4   Data available at https://github.com/triketora/women-in-software-eng
5   Camp, Tracy. "Women in Computer Sciences: Reversing the Trend," Colorado School of Mines, Aug 2001.
6   Leonard, Andrew. "A new explanation for tech's pathetic gender diversity: The personal computer," Salon. Aug 2014.

"To achieve sustainable workforce diversity, we need to move our thinking and approach to inclusion and diversity from a cost center to a revenue generator view. This position building and maintaining inclusive corporate cultures on the same level as profit, growth and innovation - where it belongs."

-Ruthe Farmer, Cheif Growth and Strategy Officer, NCWIT.org

**Several industry giants have committed to supporting diversity in primary and secondary education.**
Facebook, for example, has provided financial support to education programs that teach coding skills to underrepresented communities. Intel too has increased its engagement with primary education programs that focus on STEM, in underserved areas.

**These tech industry efforts to bolster primary education will dovetail with the White House's new Computer Science for All (CSA) initiative.**
CSA will provide states with $4Bn in funding, and will send another $100Mn directly to school districts to improve computer science education in grades K – 12 through teacher training, increased access to up-to-date, high-quality teaching materials, and new partnerships.

**Google's $150Mn commitment to diversity will include embedding engineers as teachers and curriculum advisors at a handful of historically Black Universities (HBCU).**
Apple's $50Mn commitment also targets young adults. The company is partnering with HBCUs, as well as the National Center for Women and Information Technology, to provide scholarships, college training programs, and paid internships that will help women and minorities land jobs in the tech sector.

**Tech companies are also committing to support minority tech entrepreneurs.**
African Americans and Hispanics currently represent less than one percent of all startup founders.[11] The Google NextWave program aims to financially and professionally support entrepreneurs from underrepresented communities. Its first project is the CODE2040 Residency, which, in partnership with tech hubs across the country, provides one-year residency fellowships to African American and Hispanic founders. Meanwhile, over the next five years, the Intel Capital Diversity Fund will be investing $125Mn in minority-led startups.

**To help create a hiring pipeline of female and underrepresented engineers, companies are investing in education and revisiting their recruiting approaches. For example, Intel's $300Mn investment in diversity over five years will** support, among other projects, the Hispanics in Technology Scholarship Initiative—comprising 125 scholarships for Hispanic college students studying science, technology, math, or engineering; Next generation of Native American Coders—enhanced computer science curriculum, tutoring, and mentoring at three Arizona high school in the Navajo Nation; a $5Mn partnership with the Georgia Institute of Technology to support over a thousand minority students over the next five years; and a five-year $5Mn initiative to enhance computer science education in high schools within the Oakland Unified School District, district composed of 65% African American and Hispanic students.[12][13] Facebook is also taking steps to widen the pool of candidates from which it hires—a pilot program requires managers to interview at least one qualified candidate from an underrepresented group



(Twitter has a similar pilot). Meanwhile, Google has devoted considerable resources to testing the fairness of its own hiring, promotion, performance-evaluation, and compensation programs. For example, Google's people analytics team found that women in technical and product management jobs were less likely to self-nominate for promotion than men, and so began circulating emails that explained promotion statistics by gender and level. Soon after, they saw an increase in women promoting themselves, and attribute that boost to the data-driven email to staff.[14]

**Hiring is one piece of the puzzle; promoting a path to leadership for minority employees is another challenge the industry has begun to address.**
Cisco Systems invested in executive development by creating a "007 team" of high potential leaders responsible for bringing serial innovations to market. The team is picked from a highly diverse pool of international talent that specifically includes women and African Americans. Cisco has also introduced strategies to address the shortfall of qualified women and people of color in its vice-presidential pipeline by scrutinizing the company's pool of directors for candidates that maximize cohort diversity.

**Investments in diversity within tech are beginning to recognize the scale of the challenge facing the industry, and also identifying the many ways in which diversity drives bottom-line performance.**
There are a range of barriers facing efforts to advance diversity in tech, some of which have received more attention than others. The next chapter reviews these barriers briefly, and highlights two where tech companies have an opportunity to make rapid progress.

"We are absolutely resolute in our belief that diversity and inclusion are key to Intel's evolution and driving forces for our continued relevancy and growth as a company."

-Danielle Brown, Chief Diversity & Inclusion Officer, Intel

[12] "Intel Collaborates with Georgia Tech to Boost Diverse Tech Pipeline," Intel Newsroom. Aug 2015.
[13] Guynn, Jessica. "Intel pilots $5 million 'scholars' program in Oakland, Calif. Schools," USA Today. May 2015.
[14] Rafter, Michelle. "Laszlo Bock: Just Google Him," Workforce. Mar 2015.

# CHAPTER 2. BARRIERS

**Diversity levels for the tech industry have hardly changed since the early 2000s, suggesting more investment and a different approach may be necessary.**

Women comprised 27 percent of the computing workforce in 2001 (the earliest year in which comparable data appears to be available) and 28 percent in 2014. African Americans and Hispanics: 13 percent in 2001, 14 percent in 2014.[15]

**Several oft-cited barriers to diversity in tech keep these figures low.**

Underrepresented minorities working in tech cite unsupportive work environments, intermittent harassment, and a lack of relatable role models. In the university pipeline, oft-cited reasons for women and racial/ethnic minority underrepresentation in computer science and engineering are covert stereotyping, low expectations among teachers, and unequal access to classes and facilities. Many that do aim to work at a tech company are not graduating from colleges popular for recruiting among tech companies, and some cite bias in the interview and resume review processes.

**Two important barriers have received less attention: limited data and evidence.**

We do not have a clear understanding of i) which tech companies are making progress toward their diversity goals, and in what ways, due to a lack of data sharing by most companies, and 2) why some companies are improving, in comparison to the past and/or others, due to a lack of rigorous, peer-reviewed evidence on the effectiveness of diversity advancement activities.

**Making industry-wide progress on diversity will require gathering and sharing more and better diversity data.**

Granular data – e.g., on exit rates and rationale among underrepresented minorities – will help decision makers within a company track progress over time,make course corrections as needed, and identify which initiatives have driven success over the long term. In addition, sharing more and better data presents an opportunity to establish a diversity baseline, which is crucial to both establishing industry-wide accountability and pinpointing the best returns on investments in diversity. While sharing data can be hard, the risks can be mitigated while still allowing for the necessary analyses.

**As of March 2016, nineteen tech companies had shared topline diversity statistics via their EEO-1 forms.**

With a few notable exceptions, they tend to be the largest tech companies in the U.S., concentrated in Silicon Valley. This is a fine start, yet the U.S. tech industry includes a long tail of companies whose brands are less familiar but who collectively employ more people. These companies have a great opportunity to contribute their own data on diversity and inclusion—and thereby help create an accurate baseline against which industry progress can be measured.

**Exhibit: Ratio of Tech Companies Reporting Topline Diversity Data**



Ratio of tech companies reporting workforce diversity data

COMPANIES REPORTING DIVERSITY DATA — 10%

COMPANIES NOT REPORTING — 90%

**61%** OF U.S. TECH EMPLOYEES ARE IN COMPANIES THAT DO NOT REPORT DATA

Note: 1) Figures reflect publicly traded technology companies only; 2) Companies in the "U.S. tech companies" sample set defined as those companies with a U.S. presence listed on the NASDAQ tech sector index; 3) "Disclosure" defined as reporting statistics that at least share overall % female and non-white employees at the company; Source: Company reports, EEO-1 forms, NASDAQ, Dalberg analysis

---

7   Dalberg Diversity in Tech Database
8   Workforce diversity reports from 11 major tech firms. (Apple, Cisco, eBay, Facebook, Google, HP, Intel, LinkedIn, Microsoft, Twitter, Yahoo).
9   "Our plan for a more diverse Pinterest," Pinterest Blog. Jul 2015.
10  Robbins, Cindy. "Working Toward a More Diverse Salesforce Future," Salesforce Blog. Sep 2015.
15  It is worth noting that that these numbers apply to computing jobs in all sectors; data on diversity specific to major tech companies is only available for shorter timeframes. However, interviews suggest these numbers are an accurate reflection of the long-term progress on diversity at most tech companies.

**While there are official industry-wide diversity reporting mechanisms already in place, their quality and utility are subject to debate.**
The structure of the EEO-1—the government's primary tool to enforce reporting of company diversity—is controversial. The government is currently proposing improvements to this data collection tool, such as including data on pay by gender, race, and ethnicity. However, these changes still will not capture the detailed data the sector needs to drive progress. For individual companies, clear disaggregated data, such as diversity recruitment targets and outcomes, exit rates and reasons, promotions, and ratios of underrepresented minorities in technical versus non-technical roles, can most help company leadership understand where to invest and how. Opportunities to expand the EEO-1 to fit the needs of tech companies is further detailed in section 5: "Opportunities."

### Evidence shortfall[16]

**So far, few rigorous studies have looked at the tech industry's efforts to increase diversity.**
In other words, few studies tackle the question of which approaches work within tech companies and in the tech sector as a whole—and which do not—in a manner that is hypothesis-driven and peer-reviewed, draws on a large sample size, and uses statistical tech-niques appropriate to the study's design. In the absence of these data, company leaders rely on a feeling of what seems to be working for their teams, and invest in a portfolio of activities, using their experience and intuition to achieve positive outcomes. Even these experienced, seasoned diversity leaders could be even more effective when armed with best-in-class evidence.

**When rigorous study is undertaken, the results can be surprising.**
For example, a longitudinal study of over 700 U.S. companies found that annual diversity training for managers - sessions designed to provide information on where bias exists and specifies behaviors to avoid - "have no positive effects in the average workplace," and may even decrease representation of African American women.[17]

Without such research, companies may continue to put resources into ineffective trainings, rather than question their design or invest in other activities.

**Tech companies can accelerate progress toward their diversity goals by compiling evidence on what works well to foster diversity in their organizations.**
At the educational and pipeline development levels, we already see a growing body of evidence. For example, organizations such as Change the Equation have created large databases to house evaluations of education programs. Evidence on what works that companies can implement now is discussed in Chapter 5.

**These efforts are essential because improving workforce diversity takes *time.***
Workforce diversity is achieved and sustained through an extended period of good decisions. This almost certainly requires that decision-makers have the ability to see gaps, trace the processes of differ-ent activities and programs, and measure their impacts over time.

"The first and most important barrier was about creating awareness on the need for gender equality. Companies are sharing data, but they can do more."

-Terri McCullough, Director of No Ceilings: The Full Participation Project at the Clinton Foundation

[16] "Google & Diversity: a Lady Googler's Perspective," Medium.com. May 2014.
[17] Kaley, Alexandra, Frank Dobbin, and Erin Kelly. "Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies," American Sociological Review. Vol 71(4), Aug 2006, 589-617.

# CHAPTER 3. MORE DIVERSITY, BETTER PERFORMANCE

**For tech companies, the most compelling case for advancing diversity may be the business case.**
Studies and research reports on the returns to diversity in a corporate context generally are widely available in a range of other sources (some of which are cited below). However, almost none of these studies have been specific to the tech sector. This has been a missed opportunity: tech companies work on unconventional questions that require creative problem-solving, and diverse groups have been shown to outperform on precisely these types of problems. Innovation, creativity, contrarian thinking, and competing points of view have long been the keys to success in the tech industry. This section will describe how gender and racial/ethnic diversity helps to support all of these throughout a tech organization, and how they drive financial performance through these pathways. The data drive home the point. Put simply, companies that are more diverse in race/ethnicity and gender are more successful financially. Both racial/ethnic and gender diversity are linked to significant economic impacts.

## Summary Findings

**Achieving representational racial/ethnic diversity could help the tech sector generate an additional $300-$370Bn in revenue annually; achieving representational gender diversity in leadership could help drive $320-$390Bn in increased market value. Combined, these could reflect 1.2 – 1.6% growth in national GDP.**
In addition to the business growth and value that could be created by a more diverse technology workforce, employment in the technology sector is a gateway to higher incomes and more productive work for many women and racial/ ethnic minorities. Tech is one of the United States' most productive sectors, and shifting people into tech from jobs in other sectors could help these individuals produce gains for their communities, regions, and nation.

GDP growth by calculating the boost in tech sector valuations that could result from achieving female and racial/ethnic representation, benchmarking the relationship between market valuations and national productivity, and relating growth estimates to the total portion of US GDP the technology sector represents. For more details on how this number is estimated, please see the methodology in the annex.

**This is new analysis of the financial and economic impact of diversity in the tech sector, which this report presents as an invitation to build upon findings further research and analysis.**
Researchers have extensively studied other sectors and corporate environments in general for diversity's gains. This report cites many of those studies below. This report's findings signal that investing in research to estimate the relationship between diversity and performance in technology are worthwhile undertakings, using alternative methods to those used here. This report shares these findings not as the "definitive word" on the relationship between diversity and financial performance in tech, but rather as a stepping stone for others to use to advance research in this space.



**A natural next step for this research is to confirm the direction of the relationship between diversity and performance.**

While there are clear correlations between diversity and performance in tech, further research is needed to definitively prove *causation*: i.e., that diversity drives performance, and not the other way around. In future research it is possible to resolve this question with a range of study designs that control for endogeneity, and reverse causality in particular. However, these studies require investment of time and resources. The findings in this report signal that these may be worthwhile investments.

### Economic Returns on Racial/Ethnic Diversity
*Financial Impact: Mid-sized and Large Tech Companies*

**The correlation between workforce racial/ethnic diversity and financial performance is sizable and clear.**

This report finds that every incremental percentage point in African American and Hispanic representation at NASDAQ-listed tech companies linked with a three-percentage-point increase in revenues.[18] If the racial/ethnic diversity of tech companies' workforces reflected that of the engineering talent pool, the sector at large could generate a 20 – 22 percent increase in revenue—an additional $300 – $370Bn each year.

**This correlation between revenues and diversity holds when broken down to the level of Hispanic representation in the workforce.**

Companies with above-median Hispanic representation (currently standing at roughly 5 – 6 percent of the technical workforce) are linked with annual revenues that are 40 percent higher than companies that fall below the median in Hispanic representation.[19] The links between African American representation and revenues were also positive, yet did not show statistical significance. These findings are likely to apply to mid-sized and large tech companies; this analysis was performed on a sample of tech companies that range in size from 1,500 to 150,000 employees. Further analysis on the impact of racial/ethnic diversity at startups and small tech companies is noted later in this section.

**There is also a linkage between racial/ethnic diversity and operating margins: every one percentage point increase in racial/ethnic diversity at a tech company is linked with 0.3 – 0.4 percentage point increase in operating margins**.

Extrapolating to the tech sector as a whole, achieving levels of racial/ethnic diversity that reflect the talent marketplace would be linked with $6 – 7Bn in additional operating earnings industry-wide, or roughly a 2 – 3 percent increase in total industry earnings.[20]

**Exhibit: Estimated Returns to Minority Representation**



"Diversity is linked to financial performance through multiple methods of competitive action, and we found that context matters…in companies, higher heterogeneity in the management is associated with higher performance. We also found that a heterogeneous management is more likely to experience greater performance than a homogenous one in munificent environments benefit from a diverse human capital pool."

-Orlando C. Richard, PhD, Diversity Reasearcher and Associate Professor of Organizations, Strategy, and International Management, UT Dallas

**Taken as a group, tech companies that are below the median in racial/ethnic diversity are 17 – 20 percent more likely to fall short of median revenue levels.**

The reverse is also true: companies with racial/ethnic minority diversity above the median are 14 – 17 percent more likely to produce revenue above the industry median. The extremes are even more illuminating. Tech companies that fall in the top 10 percent of racial/ethnic diversity are, on average, 59 – 72 percent more likely to earn more revenue than those that fall in the bottom 10 percent. Similar effects hold for profitability: companies with very low levels of racial/ethnic diversity are 18 - 22 percent more likely to fall short of median operating margins.[21]

**Financial Impact: Small and Startup Tech Companies**

**For small tech companies (under 6,000 employees), the potential "diversity dividend" is even greater.**

Small tech companies are, on average, 25 – 30 percent less racially/ethnically diverse than large tech companies. However, incremental changes can make a big difference at a small firm.

For example, at a tech company with $10Mn in operating profits per year, boosting minority representation by five percentage points would be associated with roughly $2 – 3Mn in additional annual operating profit.

**It is essential that younger tech companies move quickly to claim this diversity dividend: more mature companies have a head start.**

Companies that are over ten years of age have workforce representation of African Americans that is over 2x that of companies below ten years of age, and 1.4x the representation of Hispanics. Older tech companies tend to be more racially/ethnically diverse, and are therefore more likely to be reaping the revenue and profit gains that come with that diversity.

[18] Technology companies listed on the NASDAQ were selected as the basis for our analysis as the NASDAQ is commonly followed as an indicator of the performance of technology companies as a group

[19] Company EEO-1 disclosures, can be downloaded from opendiversitydata.org

[20] Dalberg Diversity in Tech Database; Dalberg analysis. Full methodology detailed in annex.

[21] Ibid.

[22] All other analyses controlled for age when assessing how diversity explains the variation in company revenues and profitability; while it is true that older technology companies tend to have higher revenues and margins, diversity's impact on financial performance holds true regardless of the company's age.

**Startups take note: the estimated returns to racial/ethnic diversity hold regardless of company size, and could add 15–20 percent to early-stage valuations.**

This analysis drew from a database of 167 companies; the largest was 25x as large as the smallest. Although the data available does not reach down to the level of 5 – 100 person startups, due to a lack of reporting, the robustness of these results indicates that startups with racially/ethnically diverse founding teams are more likely to see financial success. Specifically, startups that succeed in boosting their racial/ethnic diversity by just five employees out of a hundred could expect to see annual revenue growth of 15 - 20 percentage points. Assuming a consistent valuation multiple - 7x – 10x forward revenues being roughly typical for early stage startups – this could equate to a 15 – 20 percent boost in valuation.[23]

**What's more, smaller and leaner companies may be better positioned than their larger counterparts to champion diversity.**

In interviews, tech startups frequently highlight their ability to pivot to new policies and organizational norms. This same nimbleness should make it that much easier for startups to more quickly change the operational and cultural norms that drive a lack of diversity.[24]

**Correlation, of course, does not prove cause and effect;** the analyses above do not tell us if racial/ethnic diversity is a driver, a direct result, or a byproduct of financial success. Hiring more racial/ethnic minorities will not automatically guarantee a company's immediate financial growth. What these linkages do indicate, however, is that, as measured by profits, tech companies that achieve racial/ethnic diversity in their workforces are simply more successful than their peers. The reasons why this might be true are outlined below.

**These links between diversity and financial performance are not unique to the tech industry—a range of studies conducted in other industries support them.**

For instance, research published in the American Sociological Review found that firms with high levels of racial/ethnic diversity have more than 98 percent higher sales revenue, serve over 54 percent more customers, are roughly 33 percent more likely to have above-average market share, and are nearly 30 percent more likely to have above-average profitability than their less diverse competitors.[25] Another study, this one in the Academy Management Journal, suggests that highly diverse firms with a "growth strategy"—like most tech companies—will see more than twice the marginal mean productivity than those that are less diverse.[26]



A third study, by McKinsey & Company, that was neither specific to the tech industry nor to U.S.-based firms, yet it, too, found that the financial returns of companies in the top quartile of diversity exceeded the national industry median 35 percent more of the time than did those of companies in the other three quartiles.[27]

**The picture might be a little more nuanced, however—at least when it comes to fundraising.**
Another study showed a potentially important link between a company's reputation as a "diversity leader" and the ability to raise capital more cheaply than others. However, the effects of racial/ethnic diversity on firm performance were only positive after reaching a particular threshold—in this study, after 22 percent minority representation (including African Americans, Hispanics, Native Americans, and Asians).[28]

**Yet the evidence that racial/ethnic diversity pushes companies to innovate is clear.**
Researchers looking at data on white-collar employees found that the ethnic diversity of a firm's workforce correlated positively with i) the likelihood that the firm had applied for any patents, ii) a greater number of total patent applications, and iii) a wider spectrum of technological fields in which the company had applied for patents.

Another study of innovation's drivers found that across 20 European countries, the presence of diverse skilled workers from migrant populations positively impacted the host country's published article citations and patent applications, as well as the productivity of native workers.[30]

"There's a lot of research coming out now supporting the argument that diverse teams make better choices in complex situations, and I can think of multiple instances in my career in which the lack of diversity contributed to poor decision making. For example, I observed a company of mostly white, affluent iPhone users delay shipping on Android because Android users reportedly earn less money, and later regretting the choice after discovering their Android users are more engaged…If these teams were more diverse, especially among the leadership, I doubt the same choices would have been made."

- Wallace Leighton. "A black engineer's take on why diversity matters at startups," Lever. Mar 2016

23 Wallace, Leighton. "A black engineer's take on why diversity matters at startups," Lever. Mar 2016.

24 Dishman, Lydia. "How Two Startups Are Working To Change The Diversity Gap In FinTech," Fast Company. Aug 2015.

25 Herring, Cedric. "Does Diversity Pay?: Race, Gender, and the Business Case for Diversity," American Sociological Review. Vol 74(2), Apr 2009, 208-224.

26 Orlando Richard, "Racial Diversity, Business Strategy, and Firm Performance: A Resource-Based View." The Academy of Management Journal. Vol 43(2), Apr 2000, 164-177. This study also found a tradeoff to diversity that warrants mention: the productivity impact of diversity is negative in companies that are downsizing or otherwise aiming to control costs. Other research suggests this may be linked to the increased costs required to coordinate and maintain a diverse workforce.

27 McKinsey, "Diversity Matters," Nov 2014.

28 Roberson , Quinetta and Hyeon Jeong Park. "Examining the Link Between Diversity and Firm Performance: The Effects of Diversity Reputation and Leader Racial Diversity," CAHRS Working Paper Series. Cornell University Center for Advanced Human Resource Studies. Apr 2006.

29 Parrotta, Pierpaolo, Dario Pozzoli, and Mariola Pytlikova. "The Nexus Between Labor Diversity and Firm's Innovation," Discussion Paper Series. Institute for the Study of Labor. Oct 2012.

**A positive climate on racial/ethnic diversity may also help companies retain talent.**
This, at least, was the conclusion of researchers who demonstrated robust statistical links between a positive perception of a firm's "diversity climate" and decreased turnover intentions. The effect extended to all employees, regardless of race/ethnicity or gender.[31]  A second study found that African American employees, in particular, were least likely to express turnover intentions at a place of work they perceived to be pro-diversity. Researchers tested employee perceptions of the diversity climate using a survey instrument containing questions like "do you believe the company recruits from diverse sources," and "do you believe top leaders are visibly committed to diversity?" Caucasian employees appeared to be more positively influenced by this pro-diversity climate than were Hispanic employees. This study found that perceptions of how diverse a company is accounts for up to 15 percent of turnover intentions within a given company.[32]

**One question the analyses could not answer: the financial impact of racially/ethnically diverse leadership teams—those with titles of SVP and above—on tech company performance.**
Unfortunately—and in contrast with the analysis on gender diversity—the sample sizes were too small to draw meaningful conclusions about racially/ethnically diverse leadership.



African Americans make up roughly 1 – 3 percent of leadership at U.S. tech companies, Hispanics, 3 – 4 percent.[33] The picture is even starker among new tech companies: African Americans and Hispanics make up less than one percent of venture-backed tech company leaders.

## Methods of Action

**There may be several reasons for the relative success of diverse groups, whether in the boardroom, the lab, or the HR department.**
A body of research—first popularized in James Surowiecki's 2004 book The Wisdom of Crowds and expanded upon in later books such as Clay Shirky's 2011 Cognitive Surplus, and Lior Zoref's 2015 Mindsharing —demonstrates the ways in which diverse groups can be smarter than the smartest person in them, and how they process information faster and more reliably than panels of expert deliberators. Diversity of opinion and perspective seem to have an intrinsic value for many kinds of tasks. And while any group of people will contain some variety of outlook and experience, socially diverse groups make it easier for individuals to voice dissenting opinions, while homogeneous groups, particularly small ones, are more likely to fall victim to groupthink.[34]

In other contexts—for instance, **on creative or technical teams such as those common in the tech world—diversity of expertise has essential (and fairly self-evident) benefits.**
But there is also evidence to suggest that organization-wide racial/ethnic diversity drives innovation. For example, a 2003 survey of executives at 177 national banks in the U.S. found that a racially/ethnically diverse workforce improved the financial performance of banks that pursued an innovation strategy.

**Homogenous groups are more likely to share certain assumptions and perspectives and less likely to identify their knowledge gaps**—they often don't know what it is they don't know (and need to learn). Racially/ethnically diverse teams, in contrast, are likely less susceptible to this bias.

Yet there is another, more subtle factor at work, as Katherine W. Phillips explained in a 2014 review of the literature on diversity in organizations, **"Simply adding social diversity to a group makes people believe that differences of perspective might exist among them and that belief makes people change their behavior."** One study showed that all-white juries share a narrower range of information with each other than do diverse juries. Another demonstrated that people who were told to convince a partner of a dissenting opinion put more effort into persuading that partner when they believed the person belonged to a different political party. *"When disagreement comes from a socially different person, we are prompted to work harder,"* Phillips writes.[35] *"Diversity jolts us into cognitive action in ways that homogeneity simply does not."*[36]

**For the Millennial generation of workers, a diverse workplace is neither a luxury nor an aspiration—it's an expectation.** Millennials are 38 percent more likely to feel engaged and 28 percent more likely to feel empowered when they are working in an organization that they believe fosters inclusivity. An overwhelming majority of Millennials prefer not to work at organizations they see as unsupportive of innovation, and 40 percent of these same Millennials see a lack of gender and racial/ethnic diversity as a major barrier to innovation.[37] This should come as no surprise. Millennials are, themselves, the most diverse generation in U.S. history.[38]

More broadly, a 2014 Glassdoor survey found that 66 percent of those polled indicated that workplace diversity was a key factor when choosing among job offers. Fifty-seven percent of the respondents in the same survey expressed dissatisfaction with what their company was doing to increase diversity in its workforce.[39]

### Exhibit: Advantages of Diversity



**ADVANTAGES OF DIVERSE TEAMS**

**FASTER INNOVATION**
Employees at diverse firms are 60% more likely than their peers at non-diverse firms to see their ideas developed or prototyped, and 75% more likely to see their innovation implemented or deployed.

**BETTER CUSTOMER INSIGHT**
Employees at diverse firms are 60% more likely than their peers at non-diverse firms to see their ideas developed or prototyped, and 75% more likely to see their innovation implemented or deployed

**MORE PRODUCTIVE TEAMS**
Research suggest that highly diverse firms with a growth strategy see 2.2-2.3x marginal mean productivity than those that are less diverse.

**BETTER USE OF AVAILABLE TALENT**
A recent survey highlighted that 66% of employees said that diversity was important to them when evaluating companies and job offers. Millennials are 38% more likely to feel engaged when they are working in an organization that fosters inclusivity.

**GREATER FINANCIAL RETURNS**
Firms with high levels of racial diversity have more customers and above-average profitability. 1ppt increase in share of underrepresented minorities in associated with 3ppt increase in revenue, and 0.35ppt in EBIT at tech companies.

**LOWER TURNOVER**
Studies suggest that a pro-diversity work climate is correlated with lower turnover intentions overall, and especially among African American employees.

**EASIER TO RAISE CAPITAL**
Companies that have a reputation of being "diversity leaders" are able to raise capital more cheaply than others. Female representation at the C-suite level is associated with 15% higher valuations, after controlling for other factors.

**GREATER MARKET SHARE**
Companies with above-average diversity are 70% more likely to report capturing a new market in the past 12 months, and 45% more likely to report improving market share than their less diverse peers.

30  Bosetti , Valentina, Cristina Cattaneo, and Elena Verdolini. "Migration, Cultural Diversity and Innovation: A European Perspective," Innocenzo Gasparini Institute for Economic Research. Dec 2012.

31  Kaplan, David M., Jack W. Wiley, and Carl P. Maertz Jr. "The Role of Calculative Attachment in the Relationship Between Diversity Climate and Retention," Human Resource Management. Vol 50(2), 2011.

32  McKay, Patrick F., et. al. "Racial Differences in Employee Retention: Are Diversity Climate Perceptions The Key?," Personnel Psychology. Vol 60(1), 2007.

33  Corporate EEO-1 disclosures; Dalberg analysis

34  "The Wisdom of Crowds," James Surowecki. Anchor: August 2005.

35  Richard, Orlando, et al. "Employing an Innovation Strategy in Racially Diverse Workforces," Group and Organization Management, Vol 28(1), Mar 2013. Interestingly, the same study found that for banks that did not prize innovation, performance declined with greater diversity.

36  Phillips, Katherine W. "How Diversity Makes Us Smarter," Scientific American. Oct 2014.

37  "Mind the Gaps: The 2015 Deloitte Millennial Survey," Deloitte. 2015.

38  "Millennials in Adulthood," Pew Research Center. Mar 2014.

39  "Two-thirds of People Consider Diversity Important When Deciding Where to Work, Glassdoor Survey," Glassdoor. Nov 2014.

**The idea that cultural knowledge plays an essential role in building products that minority communities embrace is well documented and widely accepted.**
Yet, today the markets that tech companies serve are twice as racially/ethnically diverse as tech company workforces. Moreover, the design firms that advise tech companies are even less diverse; they are, on average, 86 percent Caucasian.[40]

**Key markets are becoming more diverse while tech companies are remaining static.**
Thirty-one large metropolitan areas in the U.S. are "majority minorities" among under-18 children, including New York, Chicago, and Washington DC.[41]  As we look toward the next generation, one thing seems clear: there are significant untapped opportunities to build products that are better at acquiring users among minority communities. Minority consumers spend an estimated $50 – 55Bn on tech hardware annually, representing approximately 20 percent of the market.[42]
By every measure of value, it is well worth it for the tech industry to pay more—and better—attention to underrepresented minorities.

## Economic Returns on Gender Diversity

The clearest evidence for linkages between company performance and gender diversity is at the leadership level.

## Financial Impact: Mid-sized and Large Tech Companies

**The business case for gender diversity in the leadership of the tech industry is strong,** and the opportunity is of a similar scale to that presented by achieving racial/ethnic diversity. This report finds that representation at the leadership level (defined as one woman at the senior vice president level or higher) correlates with 13 – 16 percent higher enterprise value controlling for company revenues, profitability, size, and age.[43]  Among U.S. tech companies, however, just over 30 percent boast any female representation on the leadership team. Globally, across all sectors, an average of 50 percent of companies have at least one female on their leadership team.[44]

If NASDAQ-listed companies were to close this gap, it would correlate with a boost in enterprise value of $320 – $390Bn across the sector.

**Exhibit: Estimated Returns to Female Representation in Leadership**



**With other key metrics—such as revenues and profitability—however, efforts to isolate the impact of female leadership were inconclusive.**
The lack of conclusive findings in this specific case suggests that further analysis is needed in order to definitely understand the complex effects of gender diversity in leadership on financial performance. Studies in other sectors, however, indicate that female leadership can be linked to higher returns on sales, equity, and invested capital.

---

[40] Carroll, Antoinette. "Diversity and Inclusion in Design: Why Do They Matter?" The Professional Association for Design. 2016.
[41] U.S. Bureau of Labor Statistics; Dalberg analysis
[42] Selig Center for Economic Growth; Nielsen; Dalberg analysis
[43] Dalberg Research in Tech Database; Dalberg analysis. "Market value" defined as market capitalization, drawn from Compustat data, 2014. Full methodology detailed in annex.
[44] Noland, Marcus, Tyler Moran, and Barabara Kotschwar, "Is Gender Diversity Profitable? Evidence from a Global Survey," Peterson Institute for International Economics. Feb 2016.

# Financial Impact: Small and Startup Tech Companies

**Greater gender diversity could make the most profound impact in the startup world.**
Y Combinator, a leading startup incubator, released data highlighting that just 19.5 percent of the startups it funded have women on the founding team, and only 10 percent of YC-funded companies now worth over $100Mn are run by women. While Y Combinator itself has made laudable efforts to drive diversity among its startups—the organization has four full-time female partners, holds women-focused events, and has publically declared that it is investing in tackling this issue—these data suggest that start-ups as a category have an opportunity to grow their market value more quickly by including women in their founding team.[45]

**The report also finds that female inclusion on a startup founding team could represents, for an average startup (valued at $4.2Mn as of March 2016), roughly half a million dollars in higher valuation** given the link between female executive representation and an approximate 15 percent increase in market value.[46] This has significant implications for a growing company aiming to attract desperately needed capital to fund hiring and infrastructure. From a strictly financial standpoint, founding teams with female representation are worthy of a closer look from angels and venture capitalists. Likewise, entrepreneurs can consider working with women early in the idea generation and product conceptualization process in order to claim some of this diversity dividend.

**Research of this nature on the economic impact of women in the tech industry is limited – this is a first of a kind analysis – and reflects an opportunity for industry leaders to fund more analysis to build the case.**
However, global studies and research on gender diversity in other sectors are much more prevalent, and support the finding that "women at the top" foster greater value creation than do all-male boards and executive teams. It's worth highlighting a few of these findings and how they trace the impact of female leadership across a range of metrics.

**One study from 2007 found that firms with a high proportion of female officers generated six percent higher return on investment over a three-year period,** so long as those firms were operating in what the authors deemed "complex environments"—meaning environments characterized by high volatility in valuations, high market-to-book valuation ratios, and widely divergent forecasts amongst analysts. These factors all apply to the tech industry: volatile, richly-valued, and unpredictable, and it is an ideal environment for women's leadership abilities to drive financial returns.[47]

**Companies with three or more women on the board** earn 60 percent higher return on invested capital, 60 percent higher return on equity, and 84 percent higher return on sales than do companies led by all-male boards. The study that found these results did not control for a range of potentially confounding factors (for instance, larger, more mature firms may be more likely to have female board members and also realize a higher return on equity by virtue of their size and maturity); however, the size and statistical significance of the results suggests that commitment to diversity among corporate leadership is linked to high performance across a range of financial metrics.[48]

**The trend holds with venture-backed firms.**
A 2012 Dow Jones study of venture-backed companies over the fifteen-year period ending 2011 labeled as "successful" those that went public or were acquired. Across the companies deemed "successful," women made up 7.1 percent of executives, compared to 3.1 percent female executives at unsuccessful firms. (However, the study does not investigate the reasons for companies' success or failure, nor does it identify a linkage between success and a specific female-held executive positions.)[49]

45  Altman, Sam. "Diversity and Startups," Y Combinator Blog, Jul 2015.
46  Data used from the AngelList Startup Valuation Data Browser, accessed Mar 2016.
47  Francoeur, Claude, Real Labelle, and Bernard Sinclair-Desgagne. "Gender Diversity in Corporate Governance and Top Management," Journal of Business Ethics. Vol 81, Jul 2008.

**These empirical findings backed by the large body of evidence on the causal chain behind these positive outcomes.**
Research has long supported the assertion that as organizational leaders, women show valued leadership traits more frequently and consistently than men. As this angle has been well covered in media, this report will simply touch on a few relevant highlights.

**Women score better than men on leadership qualities.**
The 2012 *Harvard Business Review* article, "Are Women Better Leaders Than Men?" reported the results of a survey of 7,280 leaders' evaluations from peers, bosses, and direct reports. Women were rated higher than men in 12 of the 16 competencies associated with exceptional leadership. These advantages reached beyond those traditionally viewed as women's strengths. For example, women were, as a group, rated significantly higher in "taking initiative" and "driving for results," two qualities that are particularly prized at small and growing tech companies.[50]

**New research continues to reinforce the idea that women exhibit stronger leadership styles.**
In a comprehensive 2014 review of gender-based leadership differences, Florida International University's Samantha Paustian-Underdahl found that women were rated significantly higher than men in business leadership (men rated higher in government), and that although men self-rated more highly, women were rated significantly higher than men in leadership strength.[51]

**However, gender prejudice may play a role in shaping these results.**
Studies highlight that women who reach the executive and board level, in tech and other industries, are consistently held to higher standards than their male peers.[52] Despite the fact that women earn 18 percent of all computer science degrees and 37 percent of all MBAs, only 14 percent of tech companies have women in any chief executive role.[53] In practice, this means that women who reach leadership positions in tech companies have been "preselected" for exceptional capacities.

**Leadership is not the only aspect of gender diversity that can provide companies a distinct advantage.**
In other sectors, it isn't particularly controversial to point out that women are often better equipped to design products that women will want to use. There is evidence that this holds true in tech as well. Tech companies building new products are more likely to reach bigger markets if women are helping to design them.



# CHAPTER 4: MORE EVIDENCE, MORE DIVERSITY

*The Search for Root Causes*

**Tech companies have invested between $0.8 – 1.2Bn in diversity initiatives over the past five years,[54] and some firms can point to slow but steady improvements.**
Yet there is still much progress to make toward achieving diversity that reflects the pool of available talent, aligns with the makeup of the populations the industry serves, and realizes the dividends in productivity and innovation associated with more inclusive workspaces.

**Exhibit: Long-term Changes in Diversity at Leading Tech Companies**



**Until now, most of the debate surrounding this lack of progress has focused on identifying a root cause,** the implication being that only by isolating this cause could the industry collectively identify the "right" solution. Three candidates have repeatedly surfaced as the potential root cause: "visibility," "pipeline," and "culture."

**Exhibit: Root Causes of Diversity Challenges in Tech**



Despite the scale of investment and investigation, however, the picture is far from clear. Each of these three elements is backed by evidence supporting its major role in hindering diversity in the tech workforce.
This report does not aim to resolve this debate. Interviews with diversity experts across the corporate and public sectors suggest that lack of diversity is driven by a combination of these three, and that tech's diversity challenges are too complex to be traced to a single root.

**More importantly, the extended debate over these root causes has not achieved the results that companies urgently seek.**
One of the main reasons is a shortage of proven approaches. What this report aims to demonstrate is that no matter what the "true" root cause might be, change is possible by using, replicating, and scaling data-based approaches.

**Actions that we know to be effective, beyond a shadow of a doubt, are still few and far between—**again, despite widespread investment and experimentation. But the potential remains for specific activities that advance diversity and are founded on a solid body of rigorous evidence. To understand the impact that evidence-based approaches to diversity can have, it's instructive to study the lessons that have emerged from another community of practice: evidence-based management.

### Evidence-Based Management

**Evidence-based management is, in short, the belief that managerial decisions should be based on confirmed knowledge of what is effective.**
In recent years, evidence-based approaches to management have completely overhauled our understanding of what it takes to be a great manager of people. From the analytical, "sabermetric" approach to baseball team-building chronicled in Michael Lewis's Moneyball to Lazlo Bock's Work Rules, an ever-increasing body of research is helping managers to discard outmoded approaches and implement data-driven practices that are shown to be effective.

based on a mix of theory, instinct, and partial information passed along through networks, not dissimilar to how investments in diversity advancement are made today.

**For example, numerous studies have shown that team performance improves with time, continuity, and deepening cooperation.**
This evidence argues against adopting a "forced-ranking approach" to reviewing employees.[55] A wide body of evidence also highlights the tendency of well-rated managers to rely more heavily on people skills than technical skills.[56] Yet many companies continue to "rank and yank" their employees using a bell curve system, and many weigh technical abilities at the same level as interpersonal skills when considering staff for promotion to manager.

**The reasons why managers don't use the evidence contain lessons that are applicable to advancing data-based diversity approaches in tech.**
Often companies have plenty of evidence, but lack a method of separating the good evidence from the bad or useless. In addition, conflicting incentives are built into the way companies engage experts and advisors to train managers. Managers themselves are susceptible to confirmation biases, in some cases rewarding the qualities they favor in an employee, regardless of whether or not those traits are most effective. Finally, anecdote- or metaphor-driven management philosophy has one big advantage on evidence-based management: human beings tend to be more naturally persuaded by narrative than by data.

**By investing now in the effective collection and sharing of evidence on how to advance diversity effectively, the tech industry has a crucial opportunity to improve its approach in the future.**
A handful of organizations are sponsoring efforts to collect rigorous evidence on diversity advancement approaches in tech, and have begun to unearth some surprising findings.

**Diversity training turns out to be the least effective of several approaches to improving diversity and eliminating managerial bias.**
In fact, a systemic analysis of 708 companies from 1971 – 2002 found that diversity training produced "no positive effects in the average workplace." Addressing isolation through mentoring and networking were only modestly effectively, and creating structures to establish responsibility among line managers—affirmative action plans, targets, and oversight committees—were most effective. In short, managerial responsibility trumps training, networking, and mentoring.[57]

**Yet mentoring does help.**
For minority employees (racial/ethnic and gender), having a sponsor who not only provides support and mentorship as a role model but also proactively advocates on their behalf makes protégés feel more connected to their company, and reduces workplace stress. This mentorship is most effective if and when it evolves to sponsorship.[58] The key differences between a mentor and a sponsor? A sponsor advocates for someone to be more visible, more recognized, and engaged in a way that suits their unique skills. A mentor provides guidance, advice, and wisdom, but does not necessarily advocate on one's behalf.

**Research by CTI shows that sponsors make a difference in three key areas: pay raises, high-visibility assignments, and promotions:**

- Just thirty percent of women will confront their boss to ask for a raise. With the support of a sponsor, however, that figure jumps to 38 percent. Separate findings from focus groups suggest that these women will get the raises they request.

- Just 36 percent of unsponsored women will ask their manager to be assigned to a high-profile team or a highly desirable project; with a sponsor in their corner, 44 percent will ask.

Sixty-eight percent of women with sponsors are satisfied with the pace of their progress at their company, compared to 57 percent of women without sponsors—a 19 percent "sponsor effect." Even more striking: 85 percent of sponsored, full-time employee mothers maintain their path toward career advancement, compared to just 58 percent of those mothers without sponsorship—a 27 percent sponsor effect.

Yet, although 72 percent of executives and C-suite leaders say they're looking for protégés who assume responsibility and are self-directed, only 14 percent of women in tech can say with conviction that they have a sponsor at their workplace.

**Another finding: eliminating "fit" criteria in the hiring process reduces opportunities for bias**
Several randomized control experiments of women and racial/ethnic minorities in tech have tested reactions to candidates with resumes in every respect except the name at the top—male or female, and seemingly Caucasian, African American, or Hispanic. The bias is real: results consistently show that the "female" and "minority" applicants are rated significantly lower for competence, hire-ability, and whether they are of interest for mentorship. "Fit" is a nebulous qualification that is open to subtle—even unconscious—prejudice.[60][61]

[48] Carter, Nancy, et. al. "The Bottom Line: Corporate Performance and Women's Representation on Boards," Catalyst. Oct 2007.
[49] Tozzi, John. "Women Help Startups Succeed. When Will VCs Take Notice?" Bloomberg Business. Oct 2012.
[50] Zenger, Jack and Joseph Folkman. "Are Women Better Leaders Than Men?" Harvard Business Review, Mar 2012.
[51] Paustian-Underdahl, Samantha C., Lisa Slattery Walker, and David J. Woehr. "Gender and Perceptions of Leadership Effectiveness: A Meta-Analysis of Contextual Moderators," Journal of Applied Psychology. Vol 99(6), 2014, 1129-1145.
[55] Pfeffer, Jeffrey, and Robert Sutton, "Hard Facts, Dangerous Half-Truths and Total Nonsense: Profiting from Evidence-Based Management," Harvard Business School Press. 2006.
[56] Lee-Kelley, Liz and Kin Leong, "Turner's five-functions of project-based management and situational leadership in IT services projects," International Journal of Project Management. Vol 21(8), Nov 2003.
[57] Kalev, Alexandra, Frank Dobbin, and Erin Kelly, "Best Practices or Best Guesses? Assessing the Efficacy of Affirmative Action and Diversity Policies," American Sociological Review. Vol 71, 2006, 589-671.
[58] Ibid.
[59] Hewlett, "Innovation, Diversity, and Market Growth," CTI. 2013.

**Finally, word choice matters in job listings**

A series of recent studies highlight the fact that job listings for positions in engineering and other predominantly male professions tend to use more masculine words such as "dominant," and "competitive." Women are statistically less interested in applying to these roles, even if they believe they are qualified for the position.

**Intel's Diversity in Technology Initiative**

Intel has gained significant attention for its ambitious goal of being the first high technology company to reach full representation of women and underrepresented minorities in its US workforce by 2020. The company has committed $300Mn to achieving this goal, and has invested in efforts across its value chain to advance diversity and inclusion. Some of Intel's notable initiatives include:

• Expanding the STEM Pipeline:

  • Latinos in Technology Scholarship Initiative: A pledge of $3.75Mn over five years to support 125 scholarships for Latino college students who have chosen a science, technology, engineering, or math major, in partnership with the Hispanic Foundation of Silicon Valley.

  • Next generation of Native American Coders: An investment of $750,000 over the next three years to implement a comprehensive education transformation at three Arizona high schools in the Navajo Nation.

  • Georgia Tech: A $5Mn partnership with Georgia Tech to support approximately 1,100 underrepresented minorities over the next five years, including scholarship support and peer-to-peer tutoring.

  • Oakland Unified School District: A commitment of $5Mn over five years to strengthen the computer science and engineering pathway curriculum at two of OUSD's high schools.

designed to invest $125Mn over five years in a broad spectrum of innovative companies with founders/CEOs—or at least three members of the senior management team—who are women and/or underrepresented minorities.

• Increasing Supplier Diversity: A commitment to spend $1Bn annually with diverse-owned businesses

• Inclusion in Gaming: Sponsorship of Indiecade and GaymerX to support the work of independent and diverse game developers, partnership with Drexel University on a nationwide game design contest with a focus on engaging middle school girls, the Intel challenge – a tournament for the world's top women's gaming teams – and leadership in an industry wide campaign called #HackHarassment focused on united tech community to provide safer, more inclusive online experiences.



[60] Bouton, Katie. "Recruiting for Cultural Fit," Harvard Business Review. Jul 2015.
[61] Yurkiewicz, Ilana. "Study shows gender bias in science is real. Here's why it matters," Scientific American. Sep 2012.
[62] Gaucher, D., J. Friesen, and A. C. Kay. "Evidence That Gendered Wording in Job Advertisements Exists and Sustains Gender Inequality," Journal of Personality and Social Psychology. Mar 2011.

**Substantive improvements in the design of college curricula matter, as does extracurricular support.**

Harvey Mudd College in Southern California has found success in with several initiatives to interest more female students in computer science:

• Redesigning and renaming introductory courses to highlight the ways in which computer science can offer solutions to real-life challenges across a range of fields, from transportation to politics to medicine to entertainment. For example, the introductory CS course changed from "Introduction to Programming in Java" to "Creative Approaches to Problem Solving in Science and Engineering Using Python."[63]

• Instituting simple rules to improve the social climate within classrooms, such as working with instructors to actively encourage young women in the class to speak, while downplaying input from students that could intimidate others.

• Hiring additional female CS faculty, and ensuring they all make contributions to teaching introductory-level courses.

• Encouraging networks of faculty and peer support.

• Taking students to the Grace Hopper Celebration of Women in Computing conferences to help students see the broader community they are a part of, link up with recruiters, and identify potential role models.

As a result, the number of women taking computer science courses at Harvey Mudd increased from 13 in 2010 to 117 in 2015.[64]

**Harvey Mudd is not alone in making significant progress on this front.**

At Stanford University, for example, computer science became the major of choice for women in 2015.[65] Since the late 1990s, meanwhile, Carnegie Mellon University, has been developing initiatives such as its big sister / little sister program, which paired upper-class tech students with freshmen, and shifting admissions criteria from those that favor past programming experience to those that value demonstrated potential (e.g., a combination of math, science, and leadership aptitude). In 2014, 40 percent of the incoming class in Carnegie Mellon's computer science program was female.

**Class descriptions also matter.**

If you want to engage underrepresented students, and improve the hiring pipeline for tech companies, even small changes in the way a school communicates course content can have an impact. Take the case of the University of California Berkeley. During the spring 2014 semester, an introductory computer science course formerly called "Introduction to Symbolic Programming" was renamed "Beauty and the Joy of Computing." Female enrollment increased by 50 percent; for the first time more women than men enrolled in the class.[66]





63  Interview with Dr. Maria Klawe, President, Harvey Mudd College
64  Ibid.
65  Chang, Lulu. Stanford women set to reclaim their place in the field of computer science," Digital Trends. Oct 2015.
66  Female enrollment exceeded male enrollment for the first time since the school kept records. "Tech shift: More women in computer science classes," SF Chronicle. Feb 2014.



# CHAPTER 5. OPPORTUNITIES

**Major investments made by leading tech companies—together with actions taken by government, schools, and NGOs—have begun to weaken barriers to racial/ethnic and gender diversity within the tech workforce.**
As these leading tech companies fulfill their commitments to invest in diversity over the coming years, and as other companies hopefully match and exceed these commitments, it will be critical to ensure that these resources go to support activities based in robust evidence. It will also be essential that these efforts lead to industry-wide learning on how to maximize diversity gains and create a more inclusive workforce.

**The opportunities for tech companies to take action on diversity fall into three broad categories: (1) collaboration and knowledge exchange, (2) new research, and (3) evidence-backed investments that can be made right now to improve workforce diversity.**
Many tech companies are already funding some of these types of investments—for these firms, the opportunities discussed below can serve as guideposts to help ensure that diversity officers are investing in the full range of potentially impactful activities, and as the basis for collaboration among multiple stakeholders. For companies that have not yet considered focusing or investing in these areas, these opportunities can serve as inspiration for action.

### (1) Opportunities for Collaboration and Knowledge Exchange

**Investments to improve diversity will be much more effective when tech companies collaborate with their partners and suppliers, civic and educational organizations, and government agencies.**
Each of these stakeholders has a vested interest in expanding the participation of women and underrepresented racial/ethnic minorities in tech careers that will nurture and reward their talents. Without coordination, opportunities will be missed to learn from successes and failures, stakeholders will duplicate efforts, and a shared accountability will be difficult for the industry to establish. The efforts already made by industry leaders on diversity are worth celebrating, but the opportunity exists to multiply these efforts many times over through deeper collaboration.

**Gathering and sharing benchmarking data is an essential first step toward better understanding the nature of the diversity gap—**as well as pinpointing where, and why, the industry is making progress. Sharing these figures will not only improve accountability on inclusion, but can also reinforce the status of a company as an industry leader seriously committed to advancing diversity, with the benefits that entails for recruitment, retention, and raising capital. Sharing EEO-1 data is a good start, but tech companies can signal an even stronger commitment to diversity goals by collecting and sharing a more nuanced and thorough dataset.

Beyond what is already available through the EEO-1, companies could track and share the proportion of underrepresented minorities[67]

- at the company level and business unit level,

- in product development compared to non-development tracks,

- in promotion and retention figures,

- by employment tenure, and

- in executive development and leadership programs.

**In addition to data on representation, it would be helpful to better understand the kind of work that women and other underrepresented groups are doing.**
Do their roles allow them to take ownership or innovate projects? To apply for patents? To what extent are they represented among leadership, or in key technical and creative roles

**Just as illuminating would be any shared insight into why underrepresented minorities decide to leave a company,** as well as the rationale for when and why they are promoted, chosen or rejected from interview pools, and chosen or rejected through résumé screenings.

**Collecting and sharing diversity data also enables a company to better analyze and address gaps in its workforce.**
For example, predictive analytics can help HR directors get ahead of the curve and develop strategies to improve the work conditions of those employees that are at greatest risk of leaving.

**Exhibit: EEO-1, Section D: Current Structure and Possible Additions**

**Companies can also invest in building a more robust evidence base by funding new studies, drawing on input from researchers who focus on diversity interventions.**
The approaches laid out in the next section of this chapter are well established, but experimentation with other lines of inquiry could yield new insights on achieving tech equity and inclusion. For example, there have been promising experiments in unconscious bias training, building norms around soliciting input from minority group members, shifting recruitment budgets to HBCUs, and doing business with suppliers led by underrepresented minorities. Sharing rigorous data on the outcomes (and costs) of new experimental approaches can help the sector improve the effectiveness of its investments in diversity. New research can catalyze more innovation and accelerate progress—a pattern the tech industry knows well.

**Studies on a range of other diversity advancement strategies would be useful, including:**

- What are effective approaches to making managers accountable for diversity goals, whether through internal transparency, performance reviews, or even compensation?

- How do various strategies to slowing minority turnover rank in terms of effectiveness? Which is most likely to be effective? Least likely?

- How can discussions of "fit" in the interview process be redesigned or reimagined to avoid confirmation bias?

- What are the most effective changes companies can make to employee performance criteria in order to control bias?

- What is the ROI on shifting recruiting budgets to fund activities at colleges and universities with higher proportions of underrepresented minorities?

- How successful are minority-focused coding boot camps at driving diversity among full-time tech employees?

- How is diversity impacted when companies set up offices outside of Silicon Valley?

- Are there other effective ways to credential applicants for entry-level tech jobs than the traditional review of college(s) attended, classes taken, and internships completed?

**(3) Opportunities to make evidence-backed investments**

**The following eight interventions are activities that some business leaders are already undertaking—and that others can choose to adopt—in order to advance diversity in the tech workforce.**
The first of these interventions is the most likely to advance diversity at the most tech companies—the weight of evidence behind it, in particular, is undeniable. The evidence bases supporting the other seven opportunities are not as robust, yet still send clear signals that these are approaches with the potential to move the needle on diversity in tech.





## 1. Hold business managers accountable for diversity goals.

In one of the most comprehensive studies of the effectiveness of diversity practices, sociologists Alexandra Kalev, Frank Dobbin, and Erin Kelly analyzed workforce data of 708 companies over 31 years, and found the key ingredient for successful diversity initiatives: accountability. Companies that outperform their peers in improving diversity typically empower a council of business leaders from departments across the organization (not just HR staff) to implement inclusionary initiatives. Once they've developed metrics to track progress toward inclusion goals, company leaders can establish clear systems of accountability that incentivize managers to identify and nurture underrepresented talent.

This could involve creating real-time dashboards (as some companies have done) with linkages to performance review and executive compensation. While bias training, support programs, affinity groups can work well to improve workforce diversity, making managers responsible for outcomes on their teams is the best way to ensure that approaches are calibrated and progress is realized.

[67] The "Industry Change Model," developed by the National Center for Women and Information Technology (NCWIT), can help tech companies track and share these data.

[68] Kalev, Dobbin, and Kelly write: "...organizations that establish responsibility see better effects from diversity training and evaluations, networking, and mentoring." Also: "Structures that embed accountability, authority, and expertise (affirmative action plans, diversity committees and taskforces, diversity managers and departments) are the most effective means of increasing the proportions of white women, black women, and black men in private sector management." Kalev, "Best Practices or Best Guesses?" 2006.



## 2. Build toolkits that attract women and underrepresented ethnic minorities into the recruitment pool. Companies can work to:

i. Reevaluate job post descriptions. Language matters, and gendered wording can attract or repel candidates.  Even small changes like replacing "hacker" with "developer" or "strong" with "proficient" can make a big difference. There is, of course, no universal "right answer" for the best way to word a job listing, but as a useful starting point, companies can pay particular attention to avoiding aggressive, masculine language as well as lists of "nice-to-have" qualifications that are not strictly necessary as a prerequisite for the job.   If the goal is to bring people from diverse backgrounds into the interview room, the more a job description sounds like an invitation to apply (and the less it can be construed as an effort to weed out applicants), the better.

ii. Establish recruiting programs at colleges that have not been traditional pipelines to the tech indus try, such as women's colleges and HSBUs; link up with vocational training programs such as coding schools that have a higher share of underrepresented candidates than the conventional top tech universities. Google's "Google in Residence" program at Howard University, in which a software engineer teaches computer science classes, has begun to pay dividends, with Google hiring two Howard students after graduation—the first candidates Google has hired from an HSBU.

iii. Make interviews as inclusive as possible. In practice, this might include a) ensuring interviewees are made aware of their potential unconscious biases, b) ensuring that the interview panel is more racially/ethnically diverse and consistently includes women, and c) avoiding bias toward those who are more upfront about their accomplishments by having interviewers take longer and more detailed notes during initial phone interviews.

The evidence points to the effects of each of these actions. For example, a 2013 analysis of behavior change in hundreds of sports referees conducted by the National Bureau of Economic Research highlighted that making these officials aware of their unconscious racial/ethnic biases eliminated those biases almost completely. Moreover, a 2015 meta-analysis in the Journal of Applied Psychology, across a sample size of 22,348 individuals, highlights that gender bias is reduced when interviewers are provided additional information that indicates applicants' high degree of competence.[73]

iv. Consider gender- and race/ethnicity-blind applicant tracking systems. Although these data can and be monitored and aggregated for the purposes of diversity reporting, there is evidence to suggest that a "blind" applicant tracking process has the potential to increase the number of diverse candidates by eliminating biases. For example, a study published in BioScience highlighted what happened when administrative staff redacting names, pronouns, fellowship information, and awards that might reveal gender or racial/ethnic information. Once this information was redacted, résumé readers were no better at guessing each applicant's gender or race/ethnicity than random chance, eliminating the possibility of unconscious bias seeping into the selection process.[74]

**3. Build on existing mentorship programs to formalize sponsorship programs for talented and qualified individuals from underrepresented groups**.
Sponsorship goes beyond the teaching and nurturing; it requires that sponsors publicly take on the role of advocates for their protégés and their protégés' work. Research shows that women and ethnic minorities who can identify at least one sponsor within the company are more likely to remain with the firm—and more likely to advance.[75] The effects of mentorship alone are less clear. Programs that focus on leadership development can also offer underrepresented employees insight into the unwritten rules that guide the tech workplace. To make the most of the talent of their workforces, companies can create well-structured talent development programs with a focus on key diversity gaps.

Some tech companies have recently launched internal sponsorship initiatives to help facilitate women's advancement internally, which not only tap talented minorities and women but also engage Caucasian men as advocates and sponsors. These initiatives provide links to senior leaders who can help open doors and can guide up-and-comers through development plans and mentorship.

**4. Put affinity group promotion and expansion on the executive agenda.**
In practice, this means management takes steps to provide affinity groups visibility in the overall company by promoting them in the company's internal communications, dedicating resources to them for the long term, and empowering them to make decisions and organize activities. Fifty-eight percent of HR and diversity and inclusion (D&I) leaders claim that affinity groups (also called employee resource groups, or ERGs) at their company contribute to driving inclusion and engagement.[76] Social science research also demonstrates that networking programs, typically intended as a remedy for social isolation, can also help increase gender diversity at the managerial level, although the effect is modest.[77] One of these studies, drawing on a sample size of 16,265 annual observations of diversity at private companies across the U.S., found that affinity groups improve the chances at any given company that Caucasian and African American women will be heavily represented.[78]

69  Gaucher, "Evidence That Gendered Wording," Mar 2011.
70  For further suggestions, see NPM, Inc's recruitment guidelines, found here: http://seldo.tumblr.com/post/122974308830/exc erpt-from-npms-recruitment-guidelines
71  "Google Looks to Black Universities for Diversity," VOA News. Mar 2016.
72  Pope, Devin, Joseph Price, and Justin Wolfers. "Awareness Reduces Racial Bias," NBER Working Paper. Dec 2013.
73  Koch, Amanda J., Susan D'Mello, and Paul Sackett. "A meta-analysis of gender stereotypes and bias in experimental simulations of employment decision making," Journal of Applied Psychology. Vol 100(1), Jan 2015, 128–161.
74  Jones, Cynthia and Mark Urban. "Promise and Pitfalls of a Gender-Blind Faculty Search," BioScience. Vol 63(8), 2013, 611-612.
75  Hewlett, Sylvia Ann and Laura Sherbin. "Athena Factor 2.0: Accelerating Female Talent in Science, Engineering & Technology". Center for Talent Innovation. 2014.

## 5. Recognize meritocracy while establishing basic guidelines for interaction that counter unconscious bias.

The culture of Silicon Valley is rooted in a belief in meritocracy distinct from credentials, connections, or lineage: some people have greater abilities and ideas than others; those who do will claim the greater responsibility and reap the rewards commensurate with their talent and effort. Yet even while embracing what is best in this credo, it's also important to recognize that as human beings, we all carry a set of biases and subjective opinions about the world. As a result, two equally competent and well-trained tech executives can differ on what constitutes "better" when examining a team member's abilities. Complicating the picture, a growing body of research points to the likelihood that some of these biases are unconscious—they shape our behavior even when we are unaware of their existence

**Meetings and informal workplace interactions are by no means exempt from unconscious biases, however unintentional.** Yet a host of evidence supports the idea that unconscious bias damages workplace diversity and reduces employee job satisfaction.[79] There are, however, a number of fairly unobtrusive steps that leaders and colleagues alike can take to improve the workplace for all team members.

such as ensuring that all team members have an opportunity to speak, actively seeking the opinions of more reticent employees, and taking pains to guarantee that the credit for good ideas and good work is given to deserving individuals (and not necessarily the most outspoken). Incorporating such guidelines as a best practice helps develop a comfortable "speak-up" culture that mitigates biases and make the most of employees' contributions. Approximately 20 percent of large U.S. companies offer unconscious bias training today, and diversity consultants expect that ratio to grow to 50 percent by 2020.[80] It is important to distinguish this training from traditional "diversity training," which has been demonstrated to be largely ineffective. The latter focuses on making people conscious and accepting of differences between themselves and others. The former focuses on making people conscious of the implicit beliefs they have about others, which often cause them to perceive "differences" that do not exist in reality. A good place to start is with managers. By helping managers identify and address the biases that may be guiding the way their decisions shape the environment in which their employees work, companies can make significant progress toward changing a work culture too often criticized for rewarding brash or insensitive behavior.



## "Almost all women in the tech industry don't believe it's a meritocracy. That's a real myth."

–Dr. Telle Whitney, CEO of the Anita Borg Institute

76  Catalyst ERG Survey 2015
77  Kaley, "Best Practices or Best Guesses?" 2006.
78  Ibid.
79  McCormick, Horace. "The Real Effects of Unconscious Bias in the Workplace," UNC. 2015. Lund, Daulatram B. "Organizational culture and job satisfaction," Journal of Business & Industrial Marketing. Vol 18(3), 2003, 219-236. Pritchard, Robert D., Bernard W. Karasick. "The effects of organizational climate on managerial job performance and job satisfaction," Organizational Behavior and Human Performance. Vol 9(1), Feb 1973, 126-146. Yiing, Lee Huey and Kamarul Zaman Bin Ahmad. "The moderating effects of organizational culture on the relationships between leadership behavior and organizational commitment and between organizational commitment and job satisfaction and performance," Leadership and Organization Development Journal. Vol 30(1), 2009.

## 6. Eliminate covert or subtle repercussions for staff taking advantage of flexible work programs.

Research suggests that workplace flexibility enhances employee engagement and leads to longer job tenure.[81] For example, a 2013 meta-analysis of 57 studies in the Journal of Applied Psychology confirmed that the availability and use of work-life support policies had modest positive relationships with intentions to stay on the job, commitment to the job, and satisfaction.[82] Companies can strive to create a flexible work environment by instituting policies that ensure adequate time off, provide and support career flexibility (especially for new parents), offer support for personal responsibilities such as caring for a family member, and accommodate cultural and religious needs. While much of this is well known, and the official work policies of many companies are quite flexible, the reality is that many employees risk the disapproval of their managers and/or peers for availing themselves of such policies. Companies can combat this tendency by actively encouraging both men and women to use the flexibility guaranteed by company policies, and by looking into performance evaluation and promotion processes to make sure there is no pattern of bias against those employees who choose to exercise their rights.

## 7. Use influence to motivate action among partners.

Apart from the internal initiatives tech leaders can sponsor, they also have the opportunity to extend their influence as stewards of the sector to help their peers and partners advance diversity in their respective organizations. Industry leaders can use their intellectual, social, and financial capital to encourage partner action in a number of ways:

i. Convene and participate in CEO summits. Dozens of larger tech companies have already made public commitments to diversity; if hundreds of small tech firms can follow suit, the effect will by multiplied many times over.

CEOs of companies already making this move can help clarify to their counterparts across the industry the importance of having women and minorities in tech, document what their presence bring to the industry, and share best practices in attracting and retaining them. These leaders also have the ability to organize regular forums and roundtables on such specific challenges as improving the pipeline, executive development, mitigating bias, developing accountability, improving workforce metrics, and other topics in which they can coach their peers and partners on how most effectively to take positive steps toward greater inclusion.

ii. Support the appointment of women and minorities to the boards of other tech companies. Interviews with tech CEOs indicate that tech leaders can expand their influence by sharing with their peers and mentees the opportunity to advise smaller companies. Across all U.S. business sectors, the tech sector currently ranks lowest in the percentage of women serving on boards.[83] Tapping promising women and underrepresented talent to respond to requests for board positions or mentorship at startups has the effect of prioritizing diversity and inclusion in new companies from their very inception.

iii. Invest in companies and contract suppliers led by women and people of color. Tech leaders can use their influence as investors or clients to lift up businesses that value diversity and take strong steps toward inclusion. Adding diversity of founders and management teams as a metric to the scorecard for guiding investment would help increase the amount of funding available to these businesses, dramatically improving the business case for tech company suppliers to improve their internal diversity.

---

[81] Richman, Amy L., et al. "The relationship of perceived flexibility, supportive work–life policies, and use of formal flexible arrangements and occasional flexibility to employee engagement and expected retention," Community, Work & Family. Vol 11(2), 2008.

[82] The effect sizes were small but significant, with work-life support policies explaining roughly 20% of the variation in these factors. Butts, Marcus, Wendy Casper, and Tae Seok Yang. "How Important Are Work-Family Support Policies? A Meta-Analytic Investigation of Their Effects on Employee Outcomes," Journal of Applied Psychology . Vol 98(1), 2013, 1-12.

[83] "Tech Companies Lag in Gender Diversity on Boards of Directors," Equilar. Nov 2015.

**8. Tap into the work of partner organizations to prepare the workforce of the future.**

The educational bottleneck for diverse talent appears to be centered on the high school and early college years—this is when underrepresented minorities tend to leave the a path toward a college degree in a field relevant to a tech career. It may take five to ten years, then, to see the fruits of today's efforts to support computer science and engineering skills among underrepresented minorities. Over the long haul, however, investments in improving the pipeline are essential to sustaining greater workforce diversity.

Fortunately, tech companies can invest in a wide array of evidence-based approaches to pipeline improvement, ranging from education to infrastructure to mentorship. Too many of these programs have been designed and studied even to summarize here, but organizations such as Change the Equation's STEMWorks have reviewed and vetted a great number of investment-ready education initiatives for tech companies to choose from—STEMWorks recommends 77 of them at last count.

## Call to Action, Toward a More Diverse Future

**Today there are almost one million missing women in the US tech sector, and half a million missing African Americans, Hispanics, and Native Americans.**
The untapped talent within these communities has the potential to drive technological change on a massive scale.

**This is a crucible moment for the tech sector.**
It is committed to change; and yet, the change it seeks has proved elusive. This report calls on tech companies to commit to a shared goal in order to focus their investment and improve their chances of near-term success with the crucial challenges of diversity and inclusion. It's time to rally around sustained coordinated action; the tech sector's goal should be to work with peers and colleagues to quickly usher the industry into a future that is diverse, inclusive, and representative of the pool of talent—and ultimately of the broader population.

**This shared goal can be ambitious yet still achievable given marketplace constraints.**
For these reasons, this report calls on tech companies to commit to a goal of "Five in Five"—that is, increasing representation of racial/ethnic minorities and women in technical and leadership roles by five percentage points in five years. Achieving this goal would bring the representation of racial/ethnic minorities at large tech companies close to their representation in the talent marketplace, and lift the representation of women employees closer to the same benchmark.

**By committing to the "Five in Five" goal and investing in the actions described above, tech companies have the opportunity not only to make the sector more inclusive and equitable but also to drive bottom-line growth.**
Over time, this approach could expand to other dimensions of diversity, such as gender identity, age, diverse abilities, veterans status or professional background, and extend the promise of a career in high tech to other historically excluded groups.

**Data-driven problem solving, continuous learning, and bold targets are how tech companies tackle their greatest challenges; it's part of their DNA.**
The challenge of diversity and inclusion should be no different. It's time to commit to a realistic but aggressive set of goals both by driving accountability from the top and learning and adapting approaches along the way. The tech industry has been driving Moore's law for the past fifty years, transforming the world in the process. A group of innovators, engineers, and creators that are capable of creating change at this scale are capable of solving the tech industry's diversity challenges. It's time to disrupt the industry once again through data, investment, and ingenuity.

# CHAPTER 6. DIVERSITY IN THE GLOBAL CONTEXT

**Tech companies are, of course, no longer bound by national borders.**
Most leading U.S. tech companies sell to a broad pool of overseas customers, source their components internationally, and maintain a range of international offices. In other words, the challenges and opportunities of diversity for U.S. tech firms extend beyond the nation's borders. Examining diversity only in the U.S. risks overlooking critical workforce issues overseas, where roughly two-thirds of global tech spending originates and growth, in several large markets, is outpacing the United States.[84]

**There are many ways to define diversity in a global context.**
Gender, race, ethnicity, and tribal affiliation all come into play. Yet what constitutes a racial, ethnic minority, and/or tribal minority varies wildly across national lines. "Global" also reflects a massive collection of countries, some of which are more interesting and useful to analyze for the purposes of this report than others.

**This chapter uses a very specific working definition of diversity in the global context.**
This analysis focuses exclusively on emerging markets outside of the U.S. and Western Europe, in order to examine how diversity challenges play out in different cultural contexts than those familiar to most readers of this report. Within these emerging markets, the analysis focuses on an issue of diversity common to all countries—gender—and sets country-specific questions of race and ethnicity to the side. Racial and ethnic diversity are usually highly specific to a given country or region. The relationships between majorities and underrepresented minorities in each country are extraordinarily complex, informed by long cultural and political histories. This deep complexity makes it impossible to analyze the effects of a "racially/ethnically diverse workforce" at a global level, or to speak about common approaches across countries.

**Two critical questions emerge in this discussion:** first, what are the financial returns on gender diversity outside of the United States? And second, provided the returns are good, how can a US-based company encourage diversity in its global workforce?



**In brief, the potential returns on diversity at the global level are tremendous.**

Increasing global female representation in the tech workforce to levels proportionate to the general population could add between 0.5 – 0.6 percent to global GDP.  While such gains may appear modest, this equates to an $430Bn to $530Bn boost in global productivity, roughly equivalent to the entire economy of Norway or Taiwan.[86] The section aims to dive deeper into why these global returns matter to U.S.-based tech companies, the barriers to diversity in the global tech industry, and the specific set of actions U.S.-based companies can take.

## Why Global Diversity Matters

When its customers and researchers are fully taken into account, **almost every tech company is a global company** and can benefit from the potential returns on increasing the diversity of the global tech industry.

**U.S. companies with international operations require qualified technical staff worldwide, yet there is a serious and growing technical skills gap in most countries where companies have plants or offices.**

Although there has been some debate as to whether or not the U.S.'s tech talent shortage is a "myth," job openings at leading tech companies speak for themselves.[87] As of March 2016, Amazon, for example, listed 16,252 open job positions worldwide; Google, 2,200; and Intel, 1,438. Across the globe, there are positions that need to be filled now. Yet, as with the United States, the development of technical talent is not keeping pace with these gaps in emerging markets either. To cite just one example, in India, 48 percent of companies say they struggle to recruit qualified engineers, IT staff, and technicians.[88]  Bringing untapped, underrepresented groups into the tech workforce in these markets has the potential to bridge the labor supply gap in this growing sector.

And, as has been well-discussed elsewhere, **regardless of where their offices are located, tech companies' customer bases are increasingly global—often, Asian—and diverse international employees and partners are essential to understanding this range of markets.**

In 2014, more than half of the revenue (59 percent) of tech companies among the S&P 500 flowed from overseas sales.  Yet these markets are extraordinarily complex. As pointed out by the founder of a startup in Southeast Asia: "Asia is home to 52 widely spoken languages…numerous cultures, religions, legal systems…and many more nuances…"   Hiring and partnering with diverse top quality people is essential to understanding, and ultimately, succeeding in these markets.

## Diversity Gap

**The gender gap facing women in the tech workforce tends to vary globally at the entry-level and mid-level in tech careers, but is consistently poor at the senior levels.**

Twenty-two percent of all roles in the Indian tech industry are filled by women, according to India's leading IT-BPM association, compared to 28 percent in the U.S.  However, the Czech Republic, Estonia, and Bulgaria all reported over 50 percent of the people employed in high tech manufacturing in their countries were women.  At the leadership levels, only 11 percent of chief information officers are women in Asia and Africa versus 18 percent in the United States.

84  Forrester: Global Tech Market Outlook 2016-2017
85  Based on an analysis of female representation in technology sectors across a sample of 26 countries across multiple continents. Dalberg analysis
86  IMF World Outlook, UCTAD, WISAT, UNITE-IT, Dalberg analysis
87  Charette, Robert N. "The STEM Crisis is a Myth," IEEE Spectrum, Aug 2013.
88  "A new vision for growth: Key trends in human capital 2014," PwC. 2014.
89  Clark, Don. "Strong Dollar Batters Earnings for U.S. Tech Firms," Wall Street Journal. Jan 2016.
90  Clayton, Thomas. "Ready to expand your startup into Asia? Read this," The Next Web. 2014.
91  "Diversity in action: NASSCOM Corporate Awards for Excellence in Diversity and Inclusion 2011," PwC. 2011.
92  Eurostat's High-Tech Statistics. Feb 2016.
93  Emia, Vanna. "China's Tech Industry Opening Up Female Techies," Yibada. Jun 2015.



**Global CIO roles occupied by women % 2014**

11.2%

11.5%

18.1%

13.4%

11.2%

Source: Gartner, 2014

## Barriers

**Addressing global diversity in tech requires a nuanced understanding of how barriers manifest across the globe.**
These sizeable, longstanding barriers often begin in the school system and proceed into the workforce, leading to lower numbers of women in computer science and engineering careers. According to CTI surveys, for example, between 60 – 70 percent of women across science, engineering, and technology fields in Brazil, China, and India experience regular sexual harassment (compared to 52 percent in the U.S.).[94][95]

**Women and girls in emerging markets who seek qualifications in technical skills face serious challenges that can be more difficult than those in the U.S.**
A Pew survey that looked at global gender equality found that around 50 percent of respondents in Egypt and China believe that a university education is more important for a boy than a girl, compared to 15 percent in the United States.

**One factor that also differs considerably from country to country is the degree of exposure women have to the Internet,** as well as the familiarity with technology that comes with that exposure. Across emerging markets, women are on average roughly 50 percent less likely than men to be connected to the Internet.  Intel and Dalberg's Women and the Web report found that one in five women in India and Egypt believe the Internet is not "appropriate" for them.[96]  Such limitations on basic access, in turn, affect the likelihood of employment in the ICT sector down the line. It is worth noting, however, that there are notable exceptions – the gender gap between men and women in Mexico was only 10 percent, with 37 percent of Mexican women having used the Internet for over five years.[97]

[94]  Kärkkäinen, Outi. "Women and Work in Egypt: Tourism and ICT Sectors," ETF. October 2010.
[95]  Collins, Terry. "Women in tech don't get the same respect as men, survey says," CNET. May 2015.
[96]  "Women and the Web," Intel and Dalberg. 2012.
[97]  Ibid.

**Despite these considerable barriers, there is reason for hope.**

A high percentage of women surveyed in notable tech hubs around the world note that they enjoy their work and are committed to advancing their careers in tech (see exhibit below). This passion and energy for technology can be cultivated and harnessed, and used to fuel growth and innovation across international tech companies' workforces. The next section describes what companies are doing to facilitate these women's aspirations to engage more fully, and in greater numbers, in the tech workforce.

### Current Interventions

**Despite these considerable barriers, there is reason for hope.**

A high percentage of women surveyed in notable tech hubs around the world note that they enjoy their work and are committed to advancing their careers in tech (see exhibit below). This passion and energy for technology can be cultivated and harnessed, and used to fuel growth and innovation across international tech companies' workforces. The next section describes what companies are doing to facilitate these women's aspirations to engage more fully, and in greater numbers, in the tech workforce.

**Andela case study**

Andela was founded in 2014 to link talented people who lack access to high-tech careers with the countless companies that lack the resources to find, hire, and retain top software engineers. To address this problem, Andela built campuses in Lagos, Nigeria, and Nairobi, Kenya, and designed a four-year, post-graduate technical leadership program with leading global tech companies. The program covers necessary technical, business, and interpersonal skills and places students as full-time, distributed software engineers with top global tech companies, ranging from startups such as Udacity to industry leaders including IBM and Microsoft.

Since May 2014, over 30,000 people from 12 countries across sub-Saharan Africa have applied. Andela accepts the top 0.7 percent into its program. While some tech companies in the U.S. with 100 or more software engineers struggle to employ 10 – 15 percent women in technical positions, Andela currently reports 18 percent female engineers in its program—despite substantial cultural and resource barriers to women across the continent.

**Exhibit: Perceptions by Women in Science, Engineering, and Technology**



Source: Sylvia Ann Hewlett and Laura Sherbin. Athena Factor 2.0: Accelerating Female Talent in Science, Engineering & Technology. Center for Talent Innovation, 2014.

**EDUCATION**

**WeTech Seed Funding for Women + Girls in Computer Science** provided 35 grants to computer science training and empowerment organizations across sex African countries in 2013. 77% of these organizations reported this funding resulted in a stronger network for girls and women in tech, and 35% reported increases in women pursuing CS degrees and/or securing work in tech.

**RECRUITMENT**

**Tech Mahindra,** an Indian IT and BPO firm, has instituted twice-annual "women only" recruiting drives in an effort to improvve gender diversity within its company, eliminating possiblities of bias against women by restricting the applicant pool. It has set a target of 30% women in technical roles, and reports that it is making progress toward that goal.

**RETENTION**

**Tech Women,** an initiative sponsored by the State Department's Bureau of Educational and Cultural Affairs, brings women leaders in tech from around the world to Silicon Valley, for networking and mentorship. Graduates of the program self-report increased self-confidence, attaining promotions in tech jobs more quickly, and increased involvement in entrepreneurial initiatives in their home countries.

**ENTREPRENEURSHIP**

**SheLeadsAfrica** is a community aimed at helping "young African women achieve their professional dreams," and holds workshops across Sub Saharan Africa on tech entrepreneur-ships for young women. The organization has seen success - for example, it sent eight women-led tech startups to "Diaspora Demo Day," the largest gathering of African startups and angel investors outside the continent.

**Common diversity challenges tend to emerge across countries and subpopulations, as do common strategies for addressing them, yet solutions ultimately must be tailored to each country's unique context.**
India presents a helpful case study, illuminating how company leaders can best approach encouraging diversity throughout their global workforce.

### CALLOUT CASE STUDY: GENDER DIVERSITY IN THE INDIAN WORKFORCE

**India's tech sector is known worldwide for its size, pace of growth, and increasingly, its high levels of gender diversity in IT at the university and recruitment stages.**
In 2015, the Indian tech industry reached $150Bn in revenues and contributed 7.5 percent to GDP. Tech directly employs more than 3.5Mn Indians and indirectly over 10Mn; in the past year alone it generated approximately 230,000 new jobs.[98]  Of university graduates, 38 percent of IT entry-level recruits were women (compared to 37 percent in the U.S.).[99] [100]

### India: Isolating challenges

**India's talent pipeline is successful at attracting women at the university level, yet faces challenges retaining women at the mid-career stage.**
In 2011, women received 42 percent of computer science and engineering undergraduate degrees (compared to just 12 percent of computer science degrees and 18 percent of engineering degrees in the U.S.); computer science is generally understood to be a "woman-friendly field" in the country.[101] Despite this very promising start, the tech industry's gender gap emerges over time as female retention falls.  NASSCOM reports that women made up just 7 percent of executive officer positions (compared to U.S.'s 22 – 23 percent)—a 90 percent drop from these same companies' pipeline positions.[102]  Survey data from the Center for Talent Innovation shows that nearly 70 percent of women in India in these fields experience sexual harassment and 50 percent perceive bias in performance evaluation, compared to 50 percent and 35 percent in the United States, respectively.[103]

**Many companies have risen to the challenge of low retention rates through multi-pronged, holistic approaches to retaining women.**

On the one hand, companies are creating policies and support structures that respond to women's needs through extended maternity leave, flexible work schedules, child support, and sabbaticals during critical points in a child's life (e.g., college qualifying exams).[104] [105]

**Companies are also creating processes aimed at overcoming unconscious biases that prevent women from taking on critical line roles or easily re-integrating post-maternity leave.**

For example, well-intentioned bosses may select a male employee to travel over a female employee without checking first if she indeed needs to stay at home to care for her family. To counter this, some companies have begun asking their employees explicitly every quarter whether they are willing to travel, circumventing assumptions that a female's supervisor may make.[106]

**Spotlight: Wipro**

Wipro, an information technology consulting company headquartered in Bangalore, has taken on a number of activities to increase representation of women in its company. New mothers are given an additional six months of maternity leave on top of the statutory three months. Near the end of maternity leave, Wipro's HR department reaches out to the employee to facilitate a smooth return. Women of Wipro's mentoring program, in which high-potential mid-management women are linked up with organizational leaders have seen higher rates of promotions (18 percent compared to 5 percent in the company overall).[107] Wipro is also part of a consortium of 10 – 12 companies that discusses progress on their initiatives and host a speaker series for women in tech.[108]

**The same fundamental strategies used to promote diversity in the U.S. context can work globally, with country-specific adaptations.**

Companies are pursuing core strategies all over the world that include activating the technology education pipeline for previously overlooked groups, reaching for diversity in the recruitment process, and developing programs that help retain diverse staff.

**Examples are plentiful.**

Within education, for instance, Google provides annual RISE awards to organizations that focus on computer science education throughout the world, with particular attention paid to girls and underrepresented minorities. As a recruitment strategy, Intel doubled its Employee Referral Program bonus globally for recommendations of female candidates in late 2015. To encourage retention, meanwhile, Cisco works with four other companies in Singapore to sponsor a monthly Mentoring Circle that brings together 8 – 10 mid-level women with a senior executive.[109] These examples are fairly young initiatives, but early anecdotal results demonstrate promise.

[98]  India IT-BPM Overview, NASSCOM. 2014.
[99]  "Diversity in action: NASSCOM Corporate Awards for Excellence in Diversity and Inclusion 2011," PwC. 2011.
[100]  Breaking down the gender challenge," McKinsey. Mar 2016.
[101]  Varma, Roli, and Deepak Kapur. "Decoding Femininity in Computer Science in India," Communications of the ACM. Association for Computing Machinery, vol. 58(5), May 2015, 56-62.
[102]  "India Inc.: From Intention to Impact," Catalyst, 2015.
[103]  Hewlett, "Athena Factor 2.0", 2014.
[104]  Interview with Namita Vyas, Leader for Technology & Diversity
[105]  Interview w Samir Gadgil, Vice President & HR Head, Wipro
[106]  Interview with Shachi Irde, Executive Director, Catalyst India
[107]  "Making diversity work: Key trends and practices in the Indian IT-BPM industry," NASSCOM and PwC. Mar 2016.
[108]  Ibid.

By leveraging the experience of local staff, data on gender gaps specific to the country, and investing in rigorous evaluations of interventions newly conceived or new to their particular context, tech companies can move the needle on global workforce diversity. For example:

| INITIATIVE | SUGGESTED ADAPTATION FOR THE GLOBAL CONTEXT |
|---|---|
| **Hold business managers accountable for diversity goals** | Ensure diversity goals are designed in consultation with both local leadership and local diversity experts, resulting in a clear and country-specific business case |
| **Build toolkits that attract women into the recruitment pool** | Work with local managers to identify country-specific coded biased language that may lurk in job postings, and remain conscious that gender- and race/ethnicity-blind applicant tracking systems may not be feasible given the heavy use of networks in some countries to get a job. |
| **Build on existing mentorship programs to formalize sponsorship programs for highly qualified underrepresented talent** | Test this approach in a similar manner to how it is done in the United States; select evidence suggests that "exporting" mentorship programs works |
| **Put affinity group promotion and expansion on the executive agenda.** | Proceed with caution; global and local chapters of female affinity groups are helpful, but race and ethnicity-based affinity groups abroad risk provoking social tensions |
| **Recognize meritocracy while establishing basic guidelines for interaction that counter unconscious bias** | Many countries feature both conscious and unconscious bias, both experienced more intensely by women than in the United States; clear, direct, broadly-messaged guidelines for interaction are essential |
| **Eliminate overt or subtle repercussions for staff taking advantage of flexible work programs, such as leave to care for a family member** | Test this approach in a similar manner to how it is done in the United States, keeping in mind that the concept of "family" in many regions extends beyond the nuclear |
| **Use influence to motivate action among partners** | Look to assemble multi-country consortiums on diversity, drawing on U.S. tech companies' unique role as industry leaders |
| **Tap into the work of partner organizations** | Rely even more heavily on partner organizations to provide deep local insight |

**Call to action**

There are large disparities in the global tech sector, with women making up as little as 11 percent of the tech industry in some regions.[110] Yet the financial returns on achieving a diverse global workforce are enormous, upwards of $1.1Tn. Tech companies in the U.S. can help their global offices reach their own "Five in Five"—a five percentage point increase of women in five years—to realize some of these gains. The specific rallying cry and the actions that follow will, of course, need to be adjusted to specific country contexts and owned by local offices; a balance will have to be struck between inspiration and feasibility. But given the current push for diversity among U.S. tech companies, and given the reach of their global networks, now is the right time to push for a global movement—one that will strive to ensure that the tech industry reflects the true diversity of the world's talent.

# METHODOLOGY

## Overview

The object of this report is to estimate the financial impact of increasing gender and race diversity in the tech industry. Dalberg's analysis relied on diversity data for 167 tech companies that had published, released, or publically discussed their top-line diversity figures. These companies included large, influential tech companies (Alphabet, Apple, Facebook) and a wide range of smaller players in the industry. Data collected on these companies included female representation in executive teams and distribution of the staff by gender and race/ethnicity (African American, Asian, Hispanic, Native American, and other). Dalberg then performed linear regression analysis using firm-level data to understand the effects of gender and race diversity on the financial success of tech firms. The analysis looked at total revenues, market value, and operating margin as measures of financial success.

Dalberg tested the financial effects of three variables independently: i) female representation among staff, ii) female representation among executive team, and iii) racial/ethnic minority (non-White and non-Asian) representation among staff. (The data on racial/ethnic minority representation in the executive team were insufficient for analysis.)

This linear regression analysis yielded several statistically significant regression coefficients, indicating that changes in the independent variable (e.g., racial/ethnic minority representation) are associated with changes in the dependent variable (e.g., revenues). Dalberg applied these results to the 497 domestic technology companies listed on the NASDAQ to estimate the industry-wide effects on revenues, market value, and operating margin. The research team performed this analysis by multiplying the effect of increasing diversity sufficiently to close the existing gap in the industry (that is, the delta between current diversity and "representational diversity") by 2014 industry revenues, market value, and operating margin, respectively. "Representational diversity" refers to the numbers cited on page 53 of Intel's 2015 Diversity Report.



Dalberg collected financial and diversity data from 167 US-based tech companies. These companies were selected because they had published, released, or publically discussed their top-line diversity figures. Sources for diversity data included EEO-1 forms (the U.S. Equal Employment Opportunity Commission's tool for gathering diversity data on the workforce of U.S. companies, using racial/ethnic definitions of the U.S. Census), company websites, annual reports, and press releases. Diversity variables included the following: number of female employees, number of females in executive team, number of racial minorities on executive teams, and distribution of employees by race/ethnicity: African American, Asian, Caucasian, Hispanic, Native American, and "other."

Sources for financial data included the Compustat database for public companies and PrivCo database for private companies. Financial variables included total revenue, earnings before interest and tax (EBIT), market value, net income, income taxes, and stockholders' equity.

## Dataset Overview

The 167 tech firms in the database showed representation similar to that reported elsewhere: majority Caucasian and Asian males. Of the 2,759,986 employees at the 167 companies in the dataset, 68% were male and 32% were female. Caucasians made up 63% of the workforce, followed by 22% Asian and 15% all other racial/ethnic groups combined. Among executives, 90% were men and 10% were women.

In aggregate, the 167 firms had revenues of $1,406 billion, with average revenue of $8.4 billion per firm. The total market value was $3,046 billion; average market value was $34.6 billion and average operating margin was 19%.

The average employee count was 25,716, although this average was skewed upwards by several extraordinarily large companies; the median was 7,200. The highest ratio of females on staff was 52%; the lowest was 8.8%. The highest ratio of racial minorities was 27%; the lowest was 1%. 39% of the companies in the dataset had at least one woman on their executive team.

## Firm Level Linear Regression and Industry–Wide Extrapolation

Dalberg performed firm-level linear regression analysis on the 167 companies and extrapolated the results to estimate industry wide effects. The research team measured "financial success" using three dependent variables: i) market value, ii) total revenue, and iii) operating margin; it measured "firm diversity" using three independent variables: i) share of female employees, ii) whether or not there was at least one female in the executive team, and iii) share of non-Asian minority employees (African American, Hispanic, Native America, and Other),[111] and iv) share of non-Asian minority employees.

These analyses controlled for company employee count, age of the firm, total revenue (when the dependent variable was market value), net income (when the dependent variable was market value or operating margin), stockholders' equity (when the dependent variable was market value or operating margin), and market value (when the dependent variable was total revenue or operating margin).

In order to estimate industry effects, Dalberg first multiplied the firm-level results by the existing diversity gap, measured as the delta between current diversity and representational diversity. "Representational diversity" refers to the numbers cited on page 53 of Intel's 2015 Diversity Report that describe racial and ethnic minority representation in the tech talent pool. The next step was to multiply these figures by the sector-wide revenues, market value, and operating margin, respectively, in order to estimate the potential effects of increasing diversity at the industry level.

**Dalberg examined the results using α = .10 as the bar for significance. The findings were as follows:**

- Female representation among staff: No statistically significant effects

- Female representation among executive team: Statistically significant effects on market value

- Racial minority representation among staff: Statistically significant effects on revenue and profitability

Dalberg also compared findings of statistical significance and effect sizes against those found in a range of peer-reviewed studies published in academic journals, and studies published by economics think tanks (e.g., *Academy of Management Journal, American Sociological Review, Center for Advanced Human Resource Studies @ Cornell, Human Resource Management, Group and Organization Management, Journal of Business Ethics, and Peterson Institute for International Economics)*.



The impact on GDP was estimated by translating the revenue gains associated with increases in tech sector racial/ethnic representation to an estimate of gains in sector-wide market valuations, using a constant price/sales ratio for US equities. These gains in market valuation were summed with the gains in market valuation associated with achieving representational gender diversity in tech company leadership. Dalberg then benchmarked the ratio of total market capitalization to national GDP for the past three years, and translated the increase in market valuation into an estimated GDP increase using this benchmarked number. These gains were then calibrated by the proportion of US GDP that the technology sector represents. This analysis is intended as an initial estimate, and not the final word on national productivity gains associated with increasing diversity in tech. One particularly promising pathway for further research would be a general equilibrium analysis of how movement of women and racial/ethnic minorities out of other economic sectors into tech impacts aggregate national labor productivity. The analysis featured in this report does not account for the changes in national productivity that might results from a loss of diversity in other sectors, nor does it account for the inherent gains of shifting individuals from working in lower-productivity sectors into the high-productivity technology sector. As noted earlier, this analysis is intended to break new ground in estimating the economic effects of tech workforce diversity, and invites other researchers to build upon these findings and invest in further analysis that expands our understanding of these complex dynamics.

[109] For more information on Google RISE Awards, go to: www.google.com/edu/resources/programs/google-rise-awards/
[110] Gartner data
[111] Building the Business Case for Diversity & Inclusion: Stories from Asia," Diversity & Inclusion In Asian Network and Community Business. Mar 2016.

# ACKNOWLEDGMENTS

Intel Corporation and Dalberg Global Development Advisors are grateful to the many individuals and organizations who have generously contributed to this study.

The following individuals shared with us their time and expertise for interviews, methodology verification, and case studies, and we deeply appreciate their support and insights:

Chelsea Barabas, Head of Social Innovation, Digital Current Initiative at MIT Media Lab

Dr. Iris Bohnet, Professor of Public Policy, Harvard University

Amber Boyle, Diversity and Inclusion Program Director, VMWare

Dr. Papia Debroy, Director of Employer Strategy and Partnerships, Opportunity@Work

Dr. Cristian Deszö, Associate Professor in Logistics, Business, and Public Policy, University of Maryland's Smith School of Business

Samir Gadgil, Vice President and HR Head at Wipro BPS, Global Diversity and Inclusion Head for Wipro Limited

Dr. Shikoh Gitau, Technology Innovation for Inclusive Growth Lead, AfDB

Ron Gonzales, President and CEO, Hispanic Foundation in Silicon Valley

Shachi Irde, Executive Director, Catalyst India WRC

Jesse Jackson, Sr., Founder and President, RainbowPUSH

Dr. Solomon Kinyanjui, Professor, Jomo Kenyatta University

Dr. Maria Klawe, President, Harvey Mudd College

Terri McCullough, Director, No Ceilings: The Full Participation Project at the Clinton Foundation

Nirmala Menon, Founder and CEO, Interweave Consulting

Jeff Merritt, Director of Innovation, City of New York

Carmen Niethammer, Employment Lead, Gender Secretariat at International Finance Corporation

Dr. Orlando Richard, Associate Professor of Organizations, Strategy, and International Management, The University of Texas at Dallas's Naveen Jindal School of Management

Dr. Karl Reid, Executive Director, National Society of Black Engineers

Deborah Rhode, Ernest W. McFarland Professor of Law and Director of the Program in Law and Social entrepreneurship, Stanford Law School

Dr. David Rock, Director, Neuroleadership Institute

Dr. Linda Rosen, CEO, Change the Equation

Juliana Rotich, Co-founder and Executive Director of Ushahidi and BRCK, Co-founder and Trustee of iHub

Lucy Sanders, CEO and Co-founder, National Council for Women and Information Technology

Adrienne Schmoeker, Senior Project Manager, NYC Mayor's Office of Tech and Innovation

Dr. Kimberly Scott, Associate Professor at Arizona State University, Founder and Executive Director of the Center for Gender Equity in Science and Technology, and Executive Director of CompuGirls

Jessica Singleton, Chief Digital Officer, City of New York

Sally Smythe, Director of Career Pathway Strategy and Partnerships, Opportunity@Work

Minerva Tantoco, Chief Technology Officer, City of New York

Dr. Telle Whitney, CEO and President, Anita Borg Institute for Women and Technology



This study was authored by Andria Thomas, Joe Dougherty, Scott Strand, Abhinav Nayar, and Maryam Janani of Dalberg Global Development Advisors, with the editorial expertise of Jesse Lichtenstein. Dr. Renee Wittemyer, Director of Policy, Innovation, and Research at Intel's Global Diversity & Inclusion Group,  Barbara Whye, Director of Strategy and External Alliances in the Diversity in Tech Initiative at Intel, and Danielle Brown, Chief Diversity and Inclusion Officer at Intel, provided leadership and advice throughout the drafting process. Design and layout of the report was developed by Corporate Visions.

Exhibit F

SENATE RULES COMMITTEE                                                    AB 979
Office of Senate Floor Analyses
(916) 651-1520    Fax: (916) 327-4478

---

### THIRD READING

---

Bill No:    AB 979
Author:     Holden (D) and Cristina Garcia (D), et al.
Amended:    8/20/20 in Senate
Vote:       21

---

PRIOR VOTES NOT RELEVANT

SENATE BANKING & F.I. COMMITTEE: 6-0, 8/13/20
AYES:  Bradford, Chang, Caballero, Durazo, Hueso, Portantino
NO VOTE RECORDED:  Dahle

SENATE APPROPRIATIONS COMMITTEE:  4-2, 8/20/20
AYES:  Portantino, Bradford, Hill, Leyva
NOES:  Bates, Jones
NO VOTE RECORDED:  Wieckowski

---

**SUBJECT:**  Corporations: boards of directors: underrepresented communities

**SOURCE:**   Author

---

**DIGEST:**   This bill requires publicly held corporations to fill their board seats with a minimum number of directors from underrepresented communities, as specified.

**ANALYSIS:**

Existing law:

1) Provides, for purposes of the requirements below, that "female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth, and that "publicly held corporation" means a corporation with outstanding shares listed on a major United States stock exchange (Corporations Code Section 301.3).

2) Requires, no later than the close of the 2019 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to have a minimum of one female director on its board and clarifies that a corporation may increase the number of directors on its board to comply with this requirement (Corporations Code Section 301.3).

3) Requires, no later than the close of the 2021 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to comply with the following (Corporations Code Section 301.3):

   a) If its number of directors is six or more, the corporation is required to have a minimum of three female directors.

   b) If its number of directors is five, the corporation is required to have a minimum of two female directors.

   c) If its number of directors is four or fewer, the corporation is required to have a minimum of one female director.

4) Requires the Secretary of State (SOS) to publish a report on its website by March 1, 2020, and annually thereafter, regarding all of the following, at a minimum (Corporations Code Section 301.3):

   a) The number of corporations subject to the aforementioned rules that were in compliance with the requirements of the rules during at least one point during the preceding calendar year.

   b) The number of publicly held corporations that moved their United States headquarters to California from another state or out of California into another state during the preceding calendar year.

   c) The number of publicly held corporations that were subject to the aforementioned rules during the preceding year, but are no longer publicly traded.

5) Authorizes the SOS to impose fines on corporations that violate the aforementioned provisions, as specified, and provides that, for purposes of determining whether a violation has occurred, each director seat that required to be held by a female, which is not held by a female during at least a portion of a

calendar year, counts as a violation (Corporations Code Section 301.3).

6) Applies the aforementioned rules in Corporations Code Section 301.3 to foreign corporations that are publicly held corporations to the exclusion of the laws of the jurisdictions in which those foreign corporations are incorporated (Corporations Code Section 2115.5).  Defines a publicly held corporation for purposes of this provision as a foreign corporation with outstanding shares listed on a major United States stock exchange.

This bill:

1) Adds two new sections to the Corporations Code that are virtually identical to Corporations Code Sections 301.3 and 2115.5 and applies these sections to directors from underrepresented communities.  Defines a director from an underrepresented community as an individual who self-identifies as Black, African-American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native or as gay, lesbian, bisexual, or transgender. Specifically,

   a) Contains extensive findings and declarations supporting the need for the bill.

   b) Requires, no later than the close of the 2021 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to have a minimum of one director from an underrepresented community on its board and clarifies that a corporation may increase the number of directors on its board to comply with this requirement.

   c) Requires, no later than the close of the 2022 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to comply with the following:

      i) If its number of directors is nine or more, the corporation is required to have a minimum of three directors from underrepresented communities.

      ii) If its number of directors is more than four but fewer than nine, the corporation is required to have a minimum of two directors from underrepresented communities.

    iii) If its number of directors is four or fewer, the corporation is required to have a minimum of one director from an underrepresented community.

d) Requires the SOS to publish a report on its website by March 1, 2022, and annually thereafter, regarding all of the following, at a minimum:

    i) The number of corporations subject to the aforementioned rules that were in compliance with the requirements of the rules during at least one point during the preceding calendar year.

    ii) The number of publicly held corporations that moved their United States headquarters to California from another state or out of California into another state during the preceding calendar year.

    iii) The number of publicly held corporations that were subject to the aforementioned rules during the preceding year, but are no longer publicly traded.

e) Requires the reports described in d) above to be included with the reports required by SB 826 (Jackson, Chapter 954, Statutes of 2018) (thus, rather than having to issue separate reports regarding women and underrepresented communities, the SOS will be able to issue a single report annually that includes data on both woman and underrepresented communities).

f) Authorizes the SOS to impose fines on corporations that violate the aforementioned provisions, as specified, and provides that, for purposes of determining whether a violation has occurred, each director seat that required to be held by a director from an underrepresented community, which is not held by a director from an underrepresented community during at least a portion of a calendar year, counts as a violation. Further clarifies that a director from an underrepresented community who holds a seat for at least a portion of the year does not represent a violation.

2) Applies all of the aforementioned rules to foreign corporations that are publicly held corporations to the exclusion of the laws of the jurisdictions in which those foreign corporations are incorporated.

## Background

According to the author's office, "since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long-term structural change. According to the USC Race and Equity Center, black employees in every industry tend to be concentrated in the lowest paying, least powerful positions... All of this strongly conveys to black professionals that their lives do not matter at work — hence their doubtful reactions to company statements about George Floyd. (https://www.washingtonpost.com/outlook/2020/06/16/corporations-say-they-support-black-lives-matter-their-employees-doubt-them/)"

Several reports provided by the author's office identify the relative lack of racial and ethnic diversity on corporate boards and support the value that diverse boards have to corporate performance. For example, the 2018 Board Diversity Census of Women and Minorities on Fortune 500 Boards (https://corpgov.law.harvard.edu/2019/02/05/missing-pieces-report-the-2018-board-diversity-census-of-women-and-minorities-on-fortune-500-boards/) found that 80% of the 1,033 available board seats in Fortune 500 companies were filled by white directors. Similarly, out of the 1,222 new board members of Fortune 100 companies, 77% were white.

A report in the Harvard Business Review (https://hbr.org/2020/06/how-diverse-is-your-board-really) concluded that a diverse board can contribute to better decision making, improve company governance, and can respond to market shifts more effectively. The McKinsey & Company Consulting Firm (https://www.mckinsey.com/business-functions/organization/our-insights/why-diversity-matters#) suggests that these benefits are not restricted to the board of directors, but can benefit entire companies; for example, McKinsey found that companies in the top quartile for racial and ethnic diversity are 35% more likely to have financial returns above their respective national industry medians.

## Comments

The provisions of this bill are based very closely on SB 826 (Jackson). That bill, which required publicly traded companies to place a minimum number of women on their boards of directors, has been the subject of at least two lawsuits challenging its constitutionality ("This state requires company boards to include women. A new lawsuit says that's unconstitutional," by Kayla Epstein,

Washington Post, November 14, 2019 and "California sued over law requiring women on corporate boards," by Levi Sumagaysay, San Jose Mercury News, August 10, 2019).

By adding the provisions of this bill to two new code sections rather than amending the existing code sections added by SB 826, this bill's author may avoid legal fallout that could result from court cases filed challenging the constitutionality of SB 826. Under this logic, even if a court were to enjoin enforcement of the provisions of SB 826 or find all or a portion of it unconstitutional, the provisions of AB 979 would remain in force. This protection would not shield AB 979 from future lawsuits or from amendments to existing lawsuits, but could prevent it from being struck down by a ruling specific to the provisions of SB 826.

Potential constitutional issues posed by this bill are discussed immediately below:

*Equal Protection analysis.* This bill requires certain corporations to appoint a certain number of directors who self-identify as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian or Alaskan Native. Both the federal constitution and the California state constitution contain Equal Protection clauses. (U.S. Const., Amend. XIV, § 1 ("No state shall … deny to any person within its jurisdiction the equal protection of the laws."); Cal. Const., art. I, § 7 ("A person may not be… denied equal protection of the laws.").) Under the current, prevailing judicial interpretation of both the federal and California constitutions' Equal Protection clauses, a statute that draws a distinction based upon race or ethnicity in this fashion – whether remedial or punitive in intent – is suspect and only passes constitutional muster if it can meet the strict scrutiny test: that the statute is narrowly drawn to meet a compelling government interest. (*Fisher v. Univ. of Tex.* (2013) 570 U.S. 297, 307-308; *Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315, 337.) By contrast, this bill would not be subject to the California constitution's absolute bar on consideration of race in public education, contracting, and employment (Cal. Const., art. I, § 31), even if California voters retain that bar this fall, because the bill only addresses private corporations, not public entities.

Strict scrutiny is a notoriously high bar to meet, but it is not insurmountable. Remedying past discrimination can be a sufficiently compelling government interest to withstand strict scrutiny. However, the existence of general societal discrimination will not ordinarily satisfy the courts. Instead, courts conducting strict scrutiny review typically require some showing of specific discrimination

that the statute remedies. (*See* Chemerinsky, Constitutional Law Principles and Policies (2nd ed. 2002), pp. 709-711.) To show that a statute is sufficiently narrowly-tailored to survive strict scrutiny review, the government usually must prove that the interest in question cannot be achieved through a different method that does not require drawing distinctions based on race and ethnicity to the same degree. (*Wygant v. Jackson Board of Education* (1986) 476 U.S. 267, 280 n. 6.).

*Internal Affairs Doctrine analysis.* This bill applies to corporations headquartered in California, even if they are incorporated under the laws of another state (typically, though not exclusively, Delaware). Some critics of this bill, and of SB 826, contend that such attempts by one state to impose board composition requirements on corporations incorporated in another state run afoul of the so-called "internal affairs doctrine" which emanates from the U.S Constitution's Commerce Clause. Under that doctrine, only the state of incorporation may dictate how a corporation conducts its internal affairs. Were it otherwise, the U.S. Supreme Court has explained, corporations might be subjected to conflicting rules coming from several different states at once. (*Edgar v. MITE Corp.* (1982) 457 U.S. 624). It is likely that, if enacted, this bill would, like SB 826, face legal challenges alleging that it violates the internal affairs doctrine. Supporters of SB 826 argued that there are limits to the internal affairs doctrine. They pointed out, among other things, that existing California law, Corporations Code § 2115, already imposes certain requirements on what are arguably the internal affairs of corporations incorporated in other states. Section 2115 was upheld by the California courts against a Commerce Clause challenge (*Wilson v. Louisiana-Pacific Res.* (1982) 138 Cal.App.3d 216, 225), though it should be noted that this ruling preceded the U.S. Supreme Court decision in *Edgar v. MITE Corp.* referenced above.

**Related/Prior Legislation**

AB 931 (Boerner-Horvath, Chapter 813, Statutes of 2019) required, on and after January 1, 2030, cities with populations of 50,000 or more to appoint individuals to local boards and commissions in a manner that ensures gender diversity, as specified.

SB 826 (Jackson, Chapter 954, Statutes of 2018) required domestic and foreign publicly traded corporations with their principal executive offices in California to have minimum numbers of women on their boards.

**FISCAL EFFECT:**   Appropriation:   No    Fiscal Com.:   Yes    Local:   No

According to the Senate Appropriations Committee, this bill will result in ongoing costs in the hundreds of thousands of dollars to gather demographic information and compile a report on this data on its internet website.

**SUPPORT:** (Verified  8/25/20)

State Controller Betty Yee
State Treasurer Fiona Ma
ActiveSGV
American Civil Liberties Union of California
Ascend
Asian American Bar Association of the Greater Bay Area
Asian American Unity Alliance
Asian Law Alliance
Asian Pacific American Leadership Institute
Asian Pacific Islander American Public Affairs Association
Association of Asian American Attorney and CPA Firms
Bay Area Asian American General Counsels
Bloom Energy
California Asian Pacific Islander Legislative Caucus
California Black Chamber of Commerce
California Employment Lawyers Association
California Hispanic Chambers of Commerce
Chinatown Community Development Center, San Francisco, CA
Chinese for Affirmative Action
Civic Leadership USA
Consumer Attorneys of California
Equal Rights Advocates
Greater Sacramento Urban League
HP Inc.
Insurance Commissioner Ricardo Lara
Japanese American Bar Association
League of California Cities Asian Pacific Islander Caucus
Minority Corporate Counsel Association
Monte Jade West
National Asian American United
National Asian Pacific American Bar Association
New America Alliance
Philippine American Bar Association
Sacramento Latina Leaders Network
Silicon Valley Leadership Group

Vietnamese American Bar Association of Northern California

**OPPOSITION:** (Verified  8/25/20)

One individual

**ARGUMENTS IN SUPPORT:**  A broad coalition of groups promoting Asian American inclusions writes, "The Harvard Business Review argues that a diverse board contributes to better decision making, improve company governance, and can respond to market shifts more effectively. These benefits are not restricted to the board of directors; the benefits of greater diversity contribute to the overall health of the company. A cultural shift in the boardroom cultivates an environment that values different perspectives and visibly signals a commitment to more equitably hire, retain, and promote women and minorities.

The California Hispanic Chambers of Commerce write, "We are pleased to support AB 979 because California company boards of directors do not reflect the diversity of our great state. A recent study by the Latino Corporate Directors Association determined that 233 of the 662 public-company boards in California have no ethnic or racial representation. Latinos, who make up 39.4% of the state of California, are severely underrepresented in the boardroom. Of the 662 public California companies, 571 corporations, or 87%, do not have a Latino on their board. These low numbers are in stark contrast to the size and economic strength of California's Latino population. California is home to 15.5 million Latinos with $320 billion in annual purchasing power, and 800,000 Latino business owners."

**ARGUMENTS IN OPPOSITION:** Keith Bishop, a corporate law attorney who previously serviced as Commissioner of Corporations, is opposed to the bill on grounds that it is unconstitutional and will adversely impact the participation of male and non-binary persons on the boards of directors of publicly held corporations. Observing that the provisions of AB 979 will layer on top of the provisions of SB 826, Mr. Bishop states, "publicly held corporations will be required to comply with both sets of quotas. Therefore, individuals who self-identify as both female and as African American, Hispanic, or Native American will undoubtedly be preferred as director candidates because they will satisfy both quotas. The easily predictable result of enactment of AB 979 would be a decrease

in the over-all number of directors on publicly held company boards who self-identify as male or non-binary and as being from an underrepresented community."

Prepared by:  Eileen Newhall / B. & F.I. / and Timothy Griffiths/Judiciary
8/25/20 14:26:35

**\*\*\*\* END \*\*\*\***

Exhibit G

**SENATE COMMITTEE ON**
**BANKING AND FINANCIAL INSTITUTIONS**
**Senator Steven Bradford, Chair**
**2019 - 2020 Regular**

| | | | |
|---|---|---|---|
| **Bill No:** | AB 979 | **Hearing Date:** | August 13, 2020 |
| **Author:** | Holden | | |
| **Version:** | July 28, 2020   Amended | | |
| **Urgency:** | No | **Fiscal:** | Yes |
| **Consultant:** | Eileen Newhall | | |

**Subject:** Corporations: boards of directors: underrepresented communities

**SUMMARY**  This bill requires publicly held corporations to fill their board seats with a minimum number of directors from underrepresented communities, as specified.

**EXISTING LAW**

1) Provides, for purposes of the requirements below, that "female" means an individual who self-identifies her gender as a woman, without regard to the individual's designated sex at birth, and that "publicly held corporation" means a corporation with outstanding shares listed on a major United States stock exchange (Corporations Code Section 301.3).

2) Requires, no later than the close of the 2019 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to have a minimum of one female director on its board and clarifies that a corporation may increase the number of directors on its board to comply with this requirement (Corporations Code Section 301.3).

3) Requires, no later than the close of the 2021 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to comply with the following (Corporations Code Section 301.3):

   a) If its number of directors is six or more, the corporation is required to have a minimum of three female directors.

   b) If its number of directors is five, the corporation is required to have a minimum of two female directors.

   c) If its number of directors is four or fewer, the corporation is required to have a minimum of one female director.

4) Requires the Secretary of State (SOS) to publish a report on its website by March 1, 2020, and annually thereafter, regarding all of the following, at a minimum (Corporations Code Section 301.3):

   a) The number of corporations subject to the aforementioned rules that were in compliance with the requirements of the rules during at least one point during the

preceding calendar year.

b) The number of publicly held corporations that moved their United States headquarters to California from another state or out of California into another state during the preceding calendar year.

c) The number of publicly held corporations that were subject to the aforementioned rules during the preceding year, but are no longer publicly traded.

5) Authorizes the SOS to impose fines on corporations that violate the aforementioned provisions, as specified, and provides that, for purposes of determining whether a violation has occurred, each director seat that required to be held by a female, which is not held by a female during at least a portion of a calendar year, counts as a violation (Corporations Code Section 301.3).

6) Applies the aforementioned rules in Corporations Code Section 301.3 to foreign corporations that are publicly held corporations to the exclusion of the laws of the jurisdictions in which those foreign corporations are incorporated (Corporations Code Section 2115.5). Defines a publicly held corporation for purposes of this provision as a foreign corporation with outstanding shares listed on a major United States stock exchange.

## THIS BILL

1) Adds two new sections to the Corporations Code that are virtually identical to Corporations Code Sections 301.3 and 2115.5 and applies these sections to directors from underrepresented communities. Defines a director from an underrepresented community as an individual who self-identifies as Black, African-American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native. Specifically,

a) Contains findings and declarations regarding the low percentage of African American/Black, Hispanic/Latino(a), and Asian/Pacific Islanders that hold Fortune 500 board seats, the high percentage of chief executives who are white, the low percentage of African-American and Latino computer science and engineering graduates hired by the high-tech sector, and the value of racial and ethnic diversity to corporate earnings.

b) Requires, no later than the close of the 2021 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to have a minimum of one director from an underrepresented community on its board and clarifies that a corporation may increase the number of directors on its board to comply with this requirement.

c) Requires, no later than the close of the 2022 calendar year, a publicly held domestic or foreign corporation whose principal executive offices are located in California to comply with the following:

      i)  If its number of directors is nine or more, the corporation is required to have a minimum of three directors from underrepresented communities.

      ii)  If its number of directors is more than four but fewer than nine, the corporation is required to have a minimum of two directors from underrepresented communities.

      iii) If its number of directors is four or fewer, the corporation is required to have a minimum of one director from an underrepresented community.

d)  Requires the SOS to publish a report on its website by July 1, 2021, documenting the number of domestic and foreign corporations whose principal executive offices, according to the corporation's SEC 10-K form, are located in California and who have at least one director from an underrepresented community.

e)  Requires the SOS to publish a report on its website by March 1, 2022, and annually thereafter, regarding all of the following, at a minimum:

      i)  The number of corporations subject to the aforementioned rules that were in compliance with the requirements of the rules during at least one point during the preceding calendar year.

      ii)  The number of publicly held corporations that moved their United States headquarters to California from another state or out of California into another state during the preceding calendar year.

      iii) The number of publicly held corporations that were subject to the aforementioned rules during the preceding year, but are no longer publicly traded.

f)  Requires the reports described in d) and e), above to be included with the reports required by SB 826 from 2018 (thus, rather than having to issue separate reports regarding women and underrepresented communities, the SOS will be able to issue a single report annually that includes data on both woman and underrepresented communities).

g)  Authorizes the SOS to impose fines on corporations that violate the aforementioned provisions, as specified, and provides that, for purposes of determining whether a violation has occurred, each director seat that required to be held by a director from an underrepresented community, which is not held by a director from an underrepresented community during at least a portion of a calendar year, counts as a violation. Further clarifies that a director from an underrepresented community who holds a seat for at least a portion of the year does not represent a violation.

2)  Applies all of the aforementioned rules to foreign corporations that are publicly held corporations to the exclusion of the laws of the jurisdictions in which those foreign corporations are incorporated.

## COMMENTS

1) <u>Purpose:</u>  This bill is sponsored by the author to help address the ethnic pay gap, facilitate employment and outreach opportunities for underrepresented communities, promote board diversification, establish pipeline creation and upward mobility of diverse technical talent, and facilitate retention of that talent through company culture and development.

2) <u>Background:</u>  According to the author's office, "since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long-term structural change. According to the USC Race and Equity Center, black employees in every industry tend to be concentrated in the lowest paying, least powerful positions… All of this strongly conveys to black professionals that their lives do not matter at work — hence their doubtful reactions to company statements about George Floyd. (https://www.washingtonpost.com/outlook/2020/06/16/corporations-say-they-support-black-lives-matter-their-employees-doubt-them/)"

Several reports provided by the author's office identify the relative lack of racial and ethnic diversity on corporate boards and support the value that diverse boards have to corporate performance.  For example, the 2018 Board Diversity Census of Women and Minorities on Fortune 500 Boards (https://corpgov.law.harvard.edu/2019/02/05/missing-pieces-report-the-2018-board-diversity-census-of-women-and-minorities-on-fortune-500-boards/) found that 80% of the 1,033 available board seats in Fortune 500 companies were filled by white directors. Similarly, out of the 1,222 new board members of Fortune 100 companies, 77% were white.

A report in the Harvard Business Review (https://hbr.org/2020/06/how-diverse-is-your-board-really) concluded that a diverse board can contribute to better decision making, improve company governance, and can respond to market shifts more effectively. The McKinsey & Company Consulting Firm (https://www.mckinsey.com/business-functions/organization/our-insights/why-diversity-matters#) suggests that these benefits are not restricted to the board of directors, but can benefit entire companies; for example, McKinsey found that companies in the top quartile for racial and ethnic diversity are 35% more likely to have financial returns above their respective national industry medians.

3) <u>Pending Litigation:</u> The provisions of this bill are based very closely on SB 826 (Jackson), Chapter 954, Statutes of 2018.  That measure, which required publicly traded companies to place a minimum number of women on their boards of directors, has been the subject of at least two lawsuits challenging its constitutionality ("This state requires company boards to include women. A new lawsuit says that's unconstitutional," by Kayla Epstein, Washington Post, November 14, 2019 and "California sued over law requiring women on corporate boards," by Levi Sumagaysay, San Jose Mercury News, August 10, 2019).

According to the cited articles, the first lawsuit was filed in August, 2019 by Judicial Watch, a Washington-based conservative activist group, and alleges that spending

taxpayer money to enforce the law is illegal under the California Constitution.  That case remains pending.

The second lawsuit, filed in November 2019 by the Pacific Legal Foundation, claimed that the state's mandate is unconstitutional and in violation of the equal protection clause of the U.S. Constitution, because it discriminates on the basis of sex.  The lawsuit alleges that requiring the plaintiff (shareholder Creighton Meland) to consider gender when voting to add members to OSI System's all-male, seven member board of directors forces him to discriminate. A federal District Court dismissed this case in April, 2020, on the basis that the plaintiff lacked standing to bring the action.  The court did not rule on the constitutionality of the provisions of SB 826.

By adding the provisions of this bill to two new code sections rather than amending the existing code sections added by SB 826, this bill's author may avoid legal fallout that could result from court cases filed challenging the constitutionality of SB 826. Under this logic, even if a court were to enjoin enforcement of the provisions of SB 826 or find all or a portion of it unconstitutional, the provisions of AB 979 would remain in force. This protection would not shield AB 979 from future lawsuits or from amendments to existing lawsuits, but could prevent it from being struck down by a ruling specific to the provisions of SB 826.

4) <u>Input from Senate Judiciary Committee Staff:</u> Due to the COVID-19 Pandemic and the unprecedented nature of the 2020 Legislative Session, all Senate policy committees are working under a compressed timeline. This timeline does not allow this bill to be referred to and heard by more than one committee, as a typical timeline would allow. In order to fully vet the contents of this measure for the benefit of Senators and the public, this analysis includes the following information from Senate Judiciary Committee staff:

This bill implicates the application of two constitutional principles that would ordinarily fall within the purview of the Senate Judiciary Committee: equal protection of the law and the internal affairs doctrine.

a) Equal Protection analysis

This bill requires certain corporations to appoint a certain number of directors who self-identify as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian or Alaskan Native. Both the federal constitution and the California state constitution contain Equal Protection clauses. (U.S. Const., Amend. XIV, § 1 ("No state shall … deny to any person within its jurisdiction the equal protection of the laws."); Cal. Const., art. I, § 7 ("A person may not be… denied equal protection of the laws.").) Under the current, prevailing judicial interpretation of both the federal and California constitutions' Equal Protection clauses, a statute that draws a distinction based upon race or ethnicity in this fashion – whether remedial or punitive in intent – is suspect and only passes constitutional muster if it can meet the strict scrutiny test: that the statute is narrowly drawn to meet a compelling government interest. (*Fisher v. Univ. of Tex.* (2013) 570 U.S. 297, 307-308; *Coral Construction, Inc. v. City and County of San* Francisco (2010) 50 Cal.4th 315, 337.) By contrast, this bill would not be subject to the California

constitution's absolute bar on consideration of race in public education, contracting, and employment (Cal. Const., art. I, § 31), even if California voters retain that bar this fall, because the bill only addresses private corporations, not public entities.

Strict scrutiny is a notoriously high bar to meet, but it is not insurmountable. Remedying past discrimination can be a sufficiently compelling government interest to withstand strict scrutiny. However, the existence of general societal discrimination will not ordinarily satisfy the courts. Instead, courts conducting strict scrutiny review typically require some showing of specific discrimination that the statute remedies. (*See* Chemerinsky, Constitutional Law Principles and Policies (2nd ed. 2002), pp. 709-711.) To show that a statute is sufficiently narrowly-tailored to survive strict scrutiny review, the government must prove that the interest in question cannot be achieved through less-discriminatory means. (*Wygant v. Jackson Board of Education* (1986) 476 U.S. 267, 280 n. 6.).

SB 826 (Jackson, Ch. 954, Stats. 2018), after which this bill is modelled, presented extensive findings regarding the dearth of women on corporate boards. That bill also set forth information about prior legislative attempts to address the problem of unequal access to the corporate boardroom. The court currently considering the constitutionality of SB 826 will presumably look to those findings when analyzing the bill under the strict scrutiny test. This bill also contains findings and declarations regarding the absence of racial and ethnic diversity in the corporate workforce and in corporate leadership. To further fortify the bill against an equal protection challenge, the author may wish to provide greater detail regarding the specific discrimination that has allowed white people to occupy corporate board seats in percentages that far exceed what would be expected if the opportunity to serve on corporate boards were genuinely available on an equal basis. For similar reasons, the author may wish to include additional information in the findings and declarations about why other approaches to diversifying corporate boards have not been, or would not be, sufficiently effective.

b) Internal Affairs Doctrine analysis

This bill would apply to corporations headquartered in California even if they are incorporated under the laws of another state (typically, though not exclusively, Delaware). Some critics of this bill, and of SB 826 (Jackson, Ch. 954, Stats. 2018) on which it is modeled, contend that such attempts by one state to impose board composition requirements on corporations incorporated in another state run afoul of the so-called "internal affairs doctrine" which emanates from the U.S Constitution's Commerce Clause. Under that doctrine, only the state of incorporation may dictate how a corporation conducts its internal affairs. Were it otherwise, the U.S. Supreme Court has explained, corporations might be subjected to conflicting rules coming from several different states at once. (*Edgar v. MITE Corp.* (1982) 457 U.S. 624). It is likely that, if enacted, this bill would, like SB 826, face legal challenges alleging that it violates the internal affairs doctrine. Supporters of SB 826 argued that there are limits to the internal affairs doctrine. They pointed out, among other things, that existing California law, Corporations Code § 2115, already imposes certain requirements on what are arguably the internal affairs of corporations incorporated in other states. Section 2115 was upheld by the California courts against a Commerce Clause challenge (*Wilson v. Louisiana-Pacific Res.* (1982) 138 Cal.App.3d 216,

225), though it should be noted that this ruling preceded the U.S. Supreme Court decision in *Edgar v. MITE Corp.* referenced above.

5) <u>Support:</u>

   a) This bill's author states, "Black and Brown communities have historically faced barriers to education, have been subject to bias in hiring practices, and been excluded from access to start-up capital and small business loans (https://www.bloomberg.com/news/articles/2018-04-23/4-ways-to-help-close-the-racial-startup-gap)  Without a diverse board it is increasingly difficult to attract diverse talent which then reinforces unconscious biases at the managerial and staff level. Even when staff from underrepresented communities are hired, the turnover rate is high due to feelings of isolation and prevalence of microaggressions. A culture shift in the boardroom cultivates an environment that values different perspectives and is more likely to hire and retain racial and gender minorities.

   b) HP writes that it "has the most diverse Board of Directors in the U.S. technology industry, with 54% minorities, 38% women, and 30% of members from underrepresented communities....While this demonstrates important progress, we also recognize that we have much more to do...At HP, we know that having a diverse board enables us to better serve our customers and position for future success. Even more broadly, fostering a culture of diversity and inclusion across our company enables us to attract, develop, and retain the talent we need to innovate."

   c) Chinese for Affirmative Action echoes the sentiments of several other supporters when it says that the "persistent lack of representation in corporate boardrooms needs continuous focus, oversight, and change.  CAA believes AB 979 creates a cultural shift in California's board seats towards that end."

6) <u>Opposition:</u>

   a) Keith Bishop, a corporate law attorney who previously serviced as Commissioner of Corporations, is opposed to the bill on grounds that it is unconstitutional and will adversely impact the participation of male and non-binary persons on the boards of directors of publicly held corporations. Observing that the provisions of AB 979 will layer on top of the provisions of SB 826, Mr. Bishop states, "publicly held corporations will be required to comply with both sets of quotas. Therefore, individuals who self-identify as both female and as African American, Hispanic, or Native American will undoubtedly be preferred as director candidates because they will satisfy both quotas. The easily predictable result of enactment of AB 979 would be a decrease in the over-all number of directors on publicly held company boards who self-identify as male or non-binary and as being from an underrepresented community."

   Mr. Bishop's letter of opposition also opines that the bill violates the Equal Protection Clauses of the California and U.S. Constitutions, the First Amendment to the U.S. Constitution, and the Commerce Clause of the U.S. Constitution.

7) <u>Amendments:</u>  At the request of the SOS, the author plans to present amendments in committee to delete the report due by July 1, 2021, documenting the number of domestic and foreign corporations whose principal executive offices are located in California and who have at least one board director from an underrepresented community (see This Bill 1d on page 3).

8) <u>Prior and Related Legislation:</u>

   a) SB 826 (Jackson), Chapter 954, Statutes of 2018 required domestic and foreign publicly traded corporations with their principal executive offices in California to have minimum numbers of women on their boards.

   b) AB 931 (Boerner-Horvath),  Chapter 813, Statutes of 2019 requires, on and after January 1, 2030, cities with populations of 50,000 or more to appoint individuals to local boards and commissions in a manner that ensures gender diversity, as specified.

## LIST OF REGISTERED SUPPORT/OPPOSITION

<u>Support</u>

ActiveSGV
American Civil Liberties Union of California
Bloom Energy
California Employment Lawyers Association
Chinese for Affirmative Action
Consumer Attorneys of California
Equal Rights Advocates
Greater Sacramento Urban League
HP Inc.
Insurance  Commissioner Ricardo Lara
League of California Cities Asian Pacific Islander  Caucus
New America Alliance

<u>Opposition</u>

Private individual

-- END --

Exhibit H

CONCURRENCE IN SENATE AMENDMENTS
AB 979 (Holden, et al. )
As Amended  August 20, 2020
Majority vote

## SUMMARY:

Requires each publicly held corporation whose principal executive offices are located in California to have a minimum number of directors from underrepresented communities on its board of directors, as specified.

**The Senate Amendments:**
Delete the Assembly version of this bill and replace with the following:

1) Defines "director from an underrepresented community" as an individual who self-identifies as Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Native, or who self-identifies as gay, lesbian, bisexual, or transgender.

2) Defines "publicly held corporation" as a corporation with outstanding shares listed on a major United States stock exchange.

3) By the end of calendar year 2021, requires each publicly held corporation whose principal executive offices are located in California to have a minimum of one director from an underrepresented community on its board. Clarifies that a corporation may increase the number of directors on its board to comply with this requirement.

4) By the end of calendar year 2022, requires each publicly held corporation whose principal executive offices are located in California to comply with the following:

   a) If its number of directors is nine or more, the corporation shall have a minimum of three directors from underrepresented communities.

   b) If its number of directors is more than four but fewer than nine, the corporation shall have a minimum of two directors from underrepresented communities.

   c) If its number of directors is four or fewer, the corporation shall have a minimum of one director from an underrepresented community.

5) Requires the Secretary of State to report on corporations subject to the requirements summarized in 3) and 4), above, and those corporations' compliance with the requirements.

6) Authorizes the Secretary of State to impose fines for violations of the requirements in 3) and 4), above, as specified.

7) Makes findings and declarations regarding the lack of racial and ethnic diversity on corporate boards of directors and the benefits of more equitable representation on corporate boards.

*Existing Law:*

Establishes nearly identical requirements as this bill related to the representation of women on corporate boards.

## COMMENTS:

As stated in the findings and declarations of the bill, according to 2018 data from Deloitte and the Alliance for Board Diversity, the percentages of Fortune 500 company board seats held by people identified as African American/Black, Hispanic/Latino(a), and Asian/Pacific Islander were 8.6%, 3.8%, and 3.7%, respectively.[1]  The same study showed that 84 % of board seats were held by people identified as white, which over-represents the group's share of the general population by 22 percentage points.

This relative lack of diversity may have consequences that negatively affect all stakeholders in a corporation, including workers, customers, and investors. Workers from communities that are not represented on the board may find limited opportunities for advancement through the executive ranks, as boards hire CEOs who look like themselves and CEOs surround themselves with other executives who also look like them. With a lack of diversity throughout the board and senior management, customers or potential customers from underrepresented communities may find that products or services offered by the corporation do not consider the preferences of their communities. A failure to capitalize on a diverse range of consumer preferences harms investors who would benefit from higher returns if corporations were meeting their full potential.

The lack of diversity in corporate America is not a product of happenstance; rather, it is a product of systemic discrimination and bias that affects so many facets of our society – housing, education, criminal justice, and employment. This bill seeks to remedy one specific discriminatory outcome by ensuring that corporate boards meet a minimum standard of diversity.

This bill is modeled after SB 826 (Jackson), Chapter 954, Statutes of 2018, which established similar requirements related to the representation of women on corporate boards. As that measure advanced through the Legislature, a variety of business groups opposed this bill and argued that provisions of the bill violated the California and United State (U.S.) Constitutions. Specific concerns focused on alleged violations of the Equal Protections clauses in both constitutions and the so-called "internal affairs doctrine" which emanates from the Commerce Clause of the U.S. Constitution. Subsequent to its enactment, the 2018 law has been challenged at least twice with one case being dismissed due to the plaintiff's lacking standing and the other case remains pending. If this bill is enacted, the pending lawsuit against the 2018 law will not directly affect the legitimacy of the contents of this bill, but the outcome in that case could set a precedent that would apply to a complaint alleging a similar constitutional violation related to this bill.

### According to the Author:
Since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long-term structural change. AB 979

---

[1] https://corpgov.law.harvard.edu/2019/02/05/missing-pieces-report-the-2018-board-diversity-census-of-women-and-minorities-on-fortune-500-boards/

will serve as a springboard to: address the ethnic pay gap, facilitate employment and outreach opportunities, promote board diversification, establish pipeline creation and upward mobility of diverse technical talent, and retention of that talent through company culture and development.

**Arguments in Support:**

The California Hispanic Chambers of Commerce writes:

> We are pleased to support AB 979 because California company boards of directors do not reflect the diversity of our great state. A recent study by the Latino Corporate Directors Association determined that 233 of the 662 public-company boards in California have no ethnic or racial representation… Latinos, who make up 39.4% of the state of California, are severely underrepresented in the boardroom. Of the 662 public California companies, 571 corporations, or 87%, do not have a Latino on their board… Greater boardroom equity that is inclusive of Latinos will lead to greater results for business and our state. I appreciate your consideration of these views.

Chinese for Affirmative Action writes:

> The Missing Pieces Report and multiple other research, document how Asian Americans are often an overlooked group for management and executive level positions and in representation at the corporate board of director's level. The Report demonstrates that Asians/Pacific Islander make up the lowest percentage of underrepresented groups in both Fortune 100 (3.8%) and Fortune 500 (3.7%) board of directors. This persistent lack of representation in corporate boardrooms needs continuous focus, oversight, and change. CAA believes AB 979 creates a cultural shift in California's board seats towards that end.

**Arguments in Opposition:**

Keith Bishop, a corporate law attorney, is opposed to the bill on grounds that it is unconstitutional and will adversely affect the participation of male and non-binary persons on the boards of directors of publicly held corporations. Observing that the provisions of AB 979 will layer on top of the provisions of SB 826, Mr. Bishop states.

Publicly held corporations will be required to comply with both sets of quotas. Therefore, individuals who self-identify as both female and as African American, Hispanic, or Native American will undoubtedly be preferred as director candidates because they will satisfy both quotas. The easily predictable result of enactment of AB 979 would be a decrease in the over-all number of directors on publicly held company boards who self-identify as male or non-binary and as being from an underrepresented community.

## FISCAL COMMENTS:

According to the Senate Appropriations Committee, this bill will result in ongoing costs in the hundreds of thousands of dollars to gather demographic information and compile a report on this data on its internet website.

## VOTES:

**ASM PUBLIC EMPLOYMENT AND RETIREMENT: 4-1-2**
**YES:** Rodriguez, Cooley, Cooper, Fong
**NO:** O'Donnell
**ABS, ABST OR NV:** Voepel, Cervantes

**ASM APPROPRIATIONS:  17-0-1**
**YES:**  Gonzalez,  Bigelow,  Bloom,  Bonta,  Brough,  Calderon,  Carrillo,  Chau,  Diep,  Eggman,
Fong,  Gabriel,  Eduardo Garcia,  Maienschein,  Petrie-Norris,  Quirk,  Robert Rivas
**ABS, ABST OR NV:**  Megan Dahle

**ASSEMBLY FLOOR:  73-0-7**
**YES:**  Aguiar-Curry,  Arambula,  Bauer-Kahan,  Berman,  Bigelow,  Bloom,  Boerner Horvath,
Bonta,  Brough,  Burke,  Calderon,  Carrillo,  Chau,  Chiu,  Chu,  Cooley,  Cooper,  Cunningham,
Daly,  Diep,  Eggman,  Flora,  Fong,  Frazier,  Friedman,  Gabriel,  Gallagher,  Cristina  Garcia,
Eduardo  Garcia,  Gipson,  Gloria,  Gonzalez,  Gray,  Grayson,  Holden,  Irwin,  Jones-Sawyer,  Kalra,
Kamlager,  Lackey,  Levine,  Limón,  Low,  Maienschein,  Mathis,  Mayes,  McCarty,  Medina,
Melendez,  Mullin,  Muratsuchi,  Nazarian,  O'Donnell,  Obernolte,  Petrie-Norris,  Quirk,  Quirk-
Silva,  Ramos,  Reyes,  Luz Rivas,  Robert Rivas,  Rodriguez,  Blanca Rubio,  Salas,  Santiago,  Smith,
Mark Stone,  Ting,  Voepel,  Waldron,  Weber,  Wicks,  Wood
**ABS, ABST OR NV:**  Cervantes,  Chen,  Choi,  Megan Dahle,  Kiley,  Patterson,  Rendon

**UPDATED:**

VERSION:  August  20, 2020

CONSULTANT:  Michael Burdick / B. & F. / (916) 319-3081          FN: 0003619