1  ROB BONTA, State Bar No. 202668
   Attorney General of California
2  MICHAEL L. NEWMAN, State Bar No. 222993
   Senior Assistant Attorney General
3  LAURA L. FAER, State Bar No. 233846
   Supervising Deputy Attorney General
4  HEIDI JOYA, State Bar No. 311747
   EDWARD NUGENT, State Bar No. 330479
5  JAMES E. RICHARDSON, State Bar No. 331958
   KENNETH J. SUGARMAN, State Bar No. 195098
6  DELBERT K. TRAN, State Bar No. 323993
   IRINA TRASOVAN, State Bar No. 290372
7  Deputy Attorneys General
    300 S. Spring Street, Suite 1702
8   Los Angeles, CA 90013
    Telephone:  (213) 269-6261
9   Fax:  (916) 731-2124
    E-mail:  Irina.Trasovan@doj.ca.gov
10 *Attorneys for California Secretary of State*

11              IN THE UNITED STATES DISTRICT COURT

12              FOR THE EASTERN DISTRICT OF CALIFORNIA

13                      SACRAMENTO DIVISION

14

15 | **ALLIANCE FOR FAIR BOARD RECRUITMENT,** | Case No. 2:21-cv-01951-JAM-AC |
|---|---|
16 | | **DECLARATION OF DARREN ROSENBLUM IN SUPPORT OF DEFENDANT CALIFORNIA SECRETARY OF STATE'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
   | Plaintiff, | |
17 | | |
   | v. | |
18 | | |
19 | **DR. SHIRLEY N. WEBER, in her official capacity as Secretary of State of the State of California,** | Date:<br>Time: 1:30pm<br>Courtroom: 6<br>Judge: The Honorable John A. Mendez<br>Trial Date: None Set<br>Action Filed: July 12, 2021 |
20 | | |
21 | Defendant. | |
22 | | |

1

1

## DECLARATION OF DARREN ROSENBLUM

2      I, Darren Rosenblum, declare:

3      1.      I am over the age of 18 years and a U.S. citizen. I know the following facts based on

4  my own personal knowledge, and, if called as a witness, I could and would testify competently to

5  the truth of the matters set forth herein.

6                                          **Introduction**

7      2.      Many scholars agree that discrimination is the cause of the stark underrepresentation

8  of people of color and lesbian, gay, bisexual, and transgender ("LGBT") people in corporate

9  leadership.  Members of these minority groups face significant barriers not only to being

10 appointed to corporate boards, but also to inclusion in the pipelines that provide board candidates

11 for future selection.

12     3.      Over 90% of Fortune 500 Chief Executive Officers ("CEOs") are heterosexual white

13 cisgender people, most of whom are men (hereinafter "straight cisgender white people"). Only

14 1% of Fortune 500 CEOs are Black.[1] Only 0.4% are LGBT, with two openly gay CEOs. While

15 lower ranked positions are more diverse and inclusive, straight cisgender white people dominate

16 the upper levels of the corporate world.

17     4.      There are more cisgender white men named John or James who occupy CEO

18 positions than all individual members of underrepresented groups combined.[2]  Any way you

19 analyze the data, members of underrepresented groups are starkly underrepresented on corporate

20 boards.

21     5.      These inequalities perpetuate structural discrimination, because former executives

22 typically become board members through selection processes in which executives hand-select

23 board directors most like them. This has led to significant underrepresentation of minority groups

24 at the board level, even though greater inclusion would improve governance.

25      [1] David Gura, *You Can Still Count The Number of Black CEOs on One Hand*, NPR (May 27, 2021),
26 https://www.npr.org/2021/05/27/1000814249/a-year-after-floyds-death-you-can-still-count-the-number-of-blackceos-
on-one-ha.
      [2] This comparison draws on data regarding women, but women CEOs vastly outnumber CEOs who are
27 members of all other underrepresented groups. *See* Claire Cain Miller et al., *The Top Jobs Where Women Are
Outnumbered by Men Named John*, N. Y. TIMES (Apr. 24, 2018),
28 https://www.nytimes.com/interactive/2018/04/24/upshot/women-and-men-named-john.html.

2

Declaration of Darren Rosenblum in Support of Defendant California Secretary of State's Opposition to Plaintiff's
Motion for Summary Judgment  (2:21-cv-01951-JAM-AC)

6. This Declaration will examine AB 979 within the context of international board diversity statutes and regulations, as well as the substantial social science data demonstrating the necessity of such legislative measures. AB 979 draws on past international successes in regulating diversity on corporate boards. Since Norway's enactment of the world's first board diversity measure in 2003, corporate board mandates have shared several characteristics: they focus on corporate law rather than anti-discrimination law; they target the board and not executive, middle, or upper management; and they mandate inclusion, but at a level below an underrepresented group's proportion in the population. AB 979 defines "underrepresented" more broadly than other board diversity mandates, and its lack of a strict percentage or numerical requirement accords additional flexibility to corporations.

7. Over the past two decades, 33 countries have enacted legislation to mandate women's representation on corporate boards, including seven of the world's top ten economies. AB 979 also focuses on the corporate board, which is central to governance but removed from the day-to-day operations.

8. Studies show that more diverse boards provide a number of benefits for corporate governance and performance. Diverse boards reduce costs associated with having one homogenous group making all of the corporation's key decisions. Decision-making from a board with a variety of identities is more likely to produce effective and well-considered decisions.

9. Diversity is also important because of the board's symbolic and strategic role in corporate governance and because diverse boards are more likely to select a diverse CEO.

10. Research shows that diverse boards also incentivize inclusion in other areas of the firm. A more diverse board may inspire or pressure a CEO—regardless of their identity—to hire a diverse management team. In short, board diversity mandates are a minor intervention with a substantial impact on improved governance and inclusion in corporate leadership.

11. This Declaration will proceed in four parts. First, it will describe the board's role in corporate governance, how it relates to the executive, and how boards select new members. Second, it will describe the entrenchment of current corporate leaders who are upholding a system that favors them over individuals of other identities like women, people of color, and

1   LGBT people. Third, the Declaration will examine the effects of demographic homogeneity and

2   the benefits of diversity for corporate governance and performance. Fourth, the Declaration will

3   contextually trace board diversity remedies from their origin in Norway to illustrate how AB

4   979's specific provisions align with other jurisdictions' successful remedies for inequality and

5   the disadvantages of homogeneity in teams. The Declaration will then conclude that AB 979 is a

6   well-designed and discrete remedy that will advance the governance of California's corporate

7   sector to benefit the State of California.

8                                 **Background and Experience**

9        12.    I have been a full-time law professor since 2004. Until recently, I was a professor at

10   Elisabeth Haub School of Law at Pace University, where I taught Contracts, Corporations, and

11   International Business Transactions. I also served as the Faculty Director of the Institute for

12   International and Commercial Law. I currently am a Full Professor at the Faculty of Law at

13   McGill University. Over the last 13 years, my research has focused on corporate governance,

14   diversity initiatives, and remedies for sex inequality.

15       13.    After attending law school at the University of Pennsylvania, I clerked for Judge José

16   A. Fusté in the U.S. District Court of Puerto Rico from 1996-98 and worked at two law firms

17   where I practiced litigation and international arbitration. While working as a lawyer, I began

18   studying various efforts to increase gender diversity for women at the CEO and corporate board

19   level.

20       14.    I joined the Pace University School of Law in a tenure track position in 2004. While

21   at Pace, I published an article entitled Parity/Disparity about France's political representation

22   quota (2006). Another article I published, Internalizing Gender (2007), analyzed how

23   international law affects the domestic adoption of measures like quotas for women's

24   representation. Since 2008, I have worked almost entirely on examining questions of gender

25   diversity and inclusion in corporate leadership. Initially, this work focused on a doctrinal and

26   theoretical analysis of Norway's pioneering quota for gender balance on corporate boards. In

27   Feminizing Capital: A Corporate Imperative (Berkeley Business Law Journal, 2009), I analyzed

28   Norway's corporate board quota, and in Loving Gender Balance (Fordham Law Review, 2008), I

4

Declaration of Darren Rosenblum in Support of Defendant California Secretary of State's Opposition to Plaintiff's
Motion for Summary Judgment  (2:21-cv-01951-JAM-AC)

1   compared Norway's quota with two other quotas: the U.S. rule on educational funding in Title

2   IX and France's parity law, which requires equal representation of women among candidates for

3   political office.

4       15.   In 2011, I served as a Fulbright Research Scholar in France. With this support, I

5   conducted extensive interviews with two dozen elite corporate board members and other

6   stakeholders. While in France, I also co-authored an article about France's quota with Véronique

7   Magnier, one of France's leading corporate scholars, entitled Quotas and the Transatlantic

8   Divergence of Corporate Governance (Northwestern Journal of International Business Law,

9   2012). Subsequently, I published the results of this study in an article co-authored with Daria

10  Roithmayr entitled More than a Woman (Indiana Law Review, 2014). In When Does Board

11  Diversity Benefit Firms? (University of Pennsylvania Journal of Business Law, 2018), I closely

12  analyze the business case for inclusion on corporate boards.

13      16.   I have continued to publish numerous articles on corporate board diversity measures,

14  including quotas. In Sex Quotas and Burkini Bans (Tulane Law Review, 2018), I analyzed

15  France's rigid corporate board quota from a political economic context, and subsequently

16  published a French version of this piece in the Ottawa Law Review.

17      17.   In addition, I have convened two conferences that have produced scholarly

18  publications on corporate diversity. The first, After Gender?: Examining International Justice

19  Enterprises, involved a day-long international conference featured in a 2011 edition of Pace Law

20  Review, for which I wrote an introduction. The second, Comparative Sex Regimes and Corporate

21  Governance, also involved a day-long international conference featured in a 2014 edition of Pace

22  International Law Review, for which I wrote an introduction. For 2022, I have been invited to

23  co-organize the prestigious Berle Symposium on Corporate Law and Society, which will involve

24  a conference of sixteen international and interdisciplinary scholars to be held at the McGill

25  University Faculty of Law. The Conference Board, a worldwide, non-profit, business

26  membership and research group, has published two of my studies: The Effect of Gender

27  Diversity on Board Decision-making: Interviews with Board Members (2017) and When Does

28  Gender Diversity on Boards Benefit Companies? (2018).

5

Declaration of Darren Rosenblum in Support of Defendant California Secretary of State's Opposition to Plaintiff's
Motion for Summary Judgment  (2:21-cv-01951-JAM-AC)

18.     I also have been a regular contributor to Forbes, featuring my work on diversity. In 2020, I published "California Pioneers New Quotas for People of Color & LGBT People," where I detailed California's commitment to diversity, inclusion, and removing structural discrimination.[3]

19.     I have served as a Visiting Professor at the University of Paris II Law School (2021–2022), Brooklyn Law School (2018), Sciences Po Law School (2015), University of Versailles Law School (2009–2015), American University School of Law (2014) and Seattle University School of Law (2011). I served as a Visiting Scholar at Columbia Law School (2019) and a Wainwright Fellow at McGill University (2018). I have also taught at the University of Pennsylvania Law School (2004) and at Fordham Law School (2003–2004, 2013).

20.     I am currently writing a book, with the working title of Unsex Big Business: Why and How to Desegregate Corporate Leadership. The book draws on my comparative and critical methods to argue for stronger remedies for sex inequality in the corporate sector.

21.     A true and correct copy of my current CV is attached as Exhibit 1.

**Methodology**

22.     I have studied gender diversity legislation for women's representation for two decades and gender diversity requirements in the corporate context since 2007. My research consistently relies on work involving racial equality, and often has also focused on LGBT issues. For this declaration, I rely on existing research in law, management studies, political science, and other areas of social science. I also rely on my own research and analysis, including two studies I undertook that involved qualitative, in-person interviews, discussed below at paragraph 73. The materials I rely on in forming my opinions herein are commonly and reasonably relied upon by social science, legal, and other experts in corporate governance and diversity.

23.     My study on Norway, originally published in Feminizing Capital, involved five non-anonymous interviews with key participants in the debate on whether to implement percentage

---

[3] I have referred to AB 979 as a "quota" in my previous published writing, because the scholarly literature on diversity requirements refers to SB 826 in that frame. In no way have I meant the term "quota" to relate to the meaning of that word in U.S. constitutional jurisprudence or the affirmative action context.

1   requirements for corporate boards. My study also draws on Dr. Aaron Dhir's more extensive

2   qualitative study conducted around the same time in Norway.

3       24.    For my study in France, conducted between October of 2011 and February of 2012, I

4   organized thirty-one interviews with CAC-40 (France's equivalent of the Dow Jones Industrial

5   Average) board members and thirty-six individual interviews of subjects who had knowledge

6   about corporate board decision-making in France, including former corporate board members,

7   industry experts, academics, and the principal sponsor of the statute, Marie-Jo Zimmermann,

8   who agreed to be interviewed without anonymity.

9                       **Part I: Corporate Boards and Their Renewal**

10      25.    As AB 979 is codified in the corporate statute of California, it is imperative to clarify

11  the role that boards play in running the corporation. While many perceive corporations to be a

12  natural phenomenon, firms are artificial persons. While some may view corporations as external

13  to the state, they are actually a construction of the state.[4] They only exist thanks to corporate

14  statutes in the jurisdiction in which they register or operate. States such as California expend

15  taxpayer funds to create the structures that permit corporations to exist. Corporations

16  nevertheless are provided by the state with the right to access the courts, to obtain due process

17  within the courts, to hold property, to seek assistance from the police to protect those property

18  rights—and even freedom of expression.

19      26.    Most importantly, corporations benefit from state recognition of their legal

20  personhood. When owners of a corporation register the firms with the state, the firm becomes a

21  legal person.[5] The state expends funds to provide for registration and such statutes protect firms'

22  owners—typically shareholders—from liability for the firm's misdeeds, which encourages

23  shareholder investment in corporations. The corporate form shields shareholders from liability,

24          [4] Ruth Gavison focuses on the external challenge to the many "senses" of the public/private distinction. Ruth
25  Gavison, *Feminism and the Public/Private Distinction*, 45 STAN. L. REV. 1, 6 (1992). In particular, she discusses (1)
    the private, unobservable and the public, observable; (2) the private freedom to act and the public state action; and (3)
26  individual versus group activity. *Id.* She asserts that it is helpful to use these distinctions for discussion purposes but
    that often they cluster together to define a more complex meaning for public versus private. *Id.* at 7. Gavison continues
27  her analysis through a normative/descriptive approach and seeks to determine the extent of distinctiveness or sameness
    in the terms. *Id.* at 7-10.
            [5] Jonathan R. Macey, The Limited Liability Company: Lessons for Corporate Law, 73 WASH. U. L.Q. 433
28  (1995).

which thus can only accrue to the owners (whether a single owner or multiple shareholders) if a court orders the extremely rare remedy of piercing the corporate veil. Any liability the firm may incur will generally affect only the firm itself, and the shareholders find themselves shielded from the firm's mistakes. This limited liability is the lynchpin of the entire private sector, investment markets in stocks and bonds, and, one might say, contemporary capitalism itself. If it were not for limited liability, investors would avoid risky investments entirely. Limited liability is single-handedly responsible for the depth of U.S. equity markets.

27.    In this sense, the entire private sector is the creation of the state. This is a quid pro quo. In exchange for limitations on liability, the ability to operate using the corporate form, and a broad range of rights and privileges, every state—inside and outside the United States—imposes rules on firms.[6] States impose these rules on firms within their jurisdiction. These can range from relatively simple rules to more significant and complex regulatory burdens. Most rules mandate processes of disclosure, governance, and accountability to shareholders. Universally, states impose rules to protect shareholders, to encourage accountability and to support other public purposes.[7] Other jurisdictions consider mandates far more onerous than AB 979 to fall neatly within the policy purposes of corporate law.  For example, many jurisdictions require labor representation on the board to ensure the firm accounts for worker interests.

28.    Many large firms with high levels of capital incorporate in jurisdictions that allow them to attain maximum flexibility in corporate governance, but such firms also must follow the rules of the jurisdictions in which they operate. Some jurisdictions allow firms to consider stakeholder interests instead of just the interests of shareholders.

---

[6] Darren Rosenblum, *Feminizing Capital: A Corporate* Imperative, 6 BERKELEY BUS. L.J. 55 (2009).

[7] However, Frances E. Olsen in  *International Law: Feminist Critiques of the Public/Private Distinction, in* RECONCEIVING REALITY: WOMEN AND INTERNATIONAL LAW 157 (Dorinda G. Dallmeyer ed., The American Society of International Law, 1993), articulates a critique of the public/private dichotomy based on the close interaction between the state and the market. State laws govern corporate formation and market investment structure, hence the line linking state and market. Conversely, the market is starting to exert power over the state in developing countries. Olsen further articulates the parallels between the classic arguments against intervention in the private sphere by the public sphere.

Declaration of Darren Rosenblum in Support of Defendant California Secretary of State's Opposition to Plaintiff's Motion for Summary Judgment  (2:21-cv-01951-JAM-AC)

29.    Corporate boards conduct their business—including board nomination and selection—in secret,[8] and this secrecy affects how government and industrial organizations regulate firm diversity. Secrecy within corporate leadership serves many purposes. It functions in any bureaucracy as a way "to conceal valuable knowledge for strategic reasons."[9] Secrecy works against both external competitive threats and any internal power structures.[10] How a board functions and the processes it pursues in making decisions are subject to extensive governance rules, but also left as a private matter for the firm to manage internally. This secrecy applies both to the decisions firms make and to the deliberations over who will make these decisions.

30.    While a firm's strategic decisions become public eventually, the substance and timing of the deliberation around these choices is crucial. If firms disclosed deliberations in real time or subsequent to meetings, it would prove immensely useful for competitor firms. It is partly for this reason that so many decisions within boards are unanimous, because dissent will draw public attention.

31.    This secrecy also applies to the choice of who will serve on the board. If a firm were to disclose the names—or even data—about candidates, it would eliminate many candidates who would fear that being considered by one organization could lead them to lose a position in their current employment situation. The prospect of any disloyalty justifies a firm to not only ask a corporate leader to leave, but also for the leader to face instantaneous exclusion from firm internet access and to be escorted out of the building.[11]

32.    As a result of the extensive secrecy in such corporate leadership contexts, the prospect of making the process more public through disclosure appears particularly fanciful to

---

[8] Since directors are privy to sensitive information and must maintain confidentiality as a part of their duty of loyalty, boards are secretive in nature regarding their deliberations. *See* STEPHEN M. BAINBRIDGE, THE NEW CORPORATE GOVERNANCE IN THEORY AND PRACTICE ch. 4 (2008). Boardrooms operate under a strict premise of confidentiality. *See* David A. Katz, *Boardroom Confidentiality Under Focus*, Harvard Law School Forum on Corporate Governance (Jan. 23, 2014), https://corpgov.law.harvard.edu/2014/01/23/boardroom-confidentiality-underfocus/ (discussing the duty of confidentiality and the need for and use of confidentiality policies). *See also* Constance E. Bagley & Karen L. Page, *The Devil Made Me Do It: Replacing Corporate Directors' Veil of Secrecy with the Mantle of Stewardship,* 36 SAN DIEGO L. REV. 897 (1999).

[9] JANA COSTAS & CHRISTOPHER GREY, SECRECY AT WORK: THE HIDDEN ARCHITECTURE OF ORGANIZATIONAL LIFE 20 (2016) (citing MAX WEBER, ECONOMY AND SOCIETY (1922)).

[10] *Id.*

[11] Olsen, *supra* note 7; Gavison, *supra* note 4.

9

corporate insiders. It would disrupt some of the most essential practices of their firms and their careers.[12]

33.     Disclosure-centered remedies form the core of much U.S. corporate regulation. Through extensive mandated disclosure, firms provide investors with information with which they make well-informed investment decisions. In this way, disclosure serves as its own regulation – the public buys and sells firm shares based on what they know, and investors do the work of regulators, by punishing firms for bad choices. As a result, regulators in government and industry find such remedies appealing: they bolster an efficient market economy, but they do not mandate specific action. Disclosure rules allow firms to decide for themselves.[13]  For this reason, organizations like NASDAQ have adopted disclosure-centered rules.[14]

34.     The problem, however, is that disclosure alone cannot remedy lack of diversity. Comply-or-explain mandates fail to log substantial improvements in inclusion.[15] Recent failures of the Rooney Rule also reveal why disclosure can fail to improve diversity.[16] It incentivizes the appearance of inclusion over real inclusion, and leads to tokenism.[17] Because of the secrecy that governs firm behavior, the only things that firms can feasibly reveal are the basic hard numbers involved in superficial box-ticking. While this disclosure practice may incentivize some

---

[12] *Id.*

[13] Shira Ovide, *Marty Lipton: Why I Invented the Poison Pill*, WALL ST. J. (Dec. 29, 2010), https://www.wsj.com/articles/BL-DLB-30356.

[14] Brian V. Breheny et al., *SEC Approves Nasdaq Board Diversity Listing Standards*, SKADDEN (Sep. 28, 2021), https://www.skadden.com/insights/publications/2021/09/quarterly-insights/sec-approves-nasdaq-board-diversity-listing.

[15] After implementing the requirements, these countries to date have the following percentages: in Canada, 20%; in the UK, the FTSE 250 grew to 33.2%; and in Ireland, 22.4%. CANADIAN SECURITIES ADMINISTRATORS, REPORT ON SIXTH STAFF REVIEW OF DISCLOSURE REGARDING WOMEN ON BOARDS AND IN EXECUTIVE OFFICER POSITIONS 2 (2021)**Error! Hyperlink reference not valid.**; The Economic Times, *Number of women on UK corporate boards rises 50% in 5 years*, 2021**Error! Hyperlink reference not valid.**; *Balance for Better Business: Second Report*, GOVERNMENT OF IRELAND (Nov. 2019).

[16] *The Rooney Rule*, NFL (2003), https://operations.nfl.com/inside-football-ops/diversity-inclusion/the-rooney-rule/.

[17] *NFL's Rooney Rule Creator Says Coach's Suit Exposes Hiring laws*, Bloomberg Law (Feb. 2, 2022), https://news.bloomberglaw.com/daily-labor-report/nfl-rooney-rule-creator-says-coachs-suit-exposes-hiring-flaws (discussing how recent controversy arose when the former head coach of the Miami Dolphins, Brian Flores, filed a class action lawsuit alleging racial bias in the NFL's hiring practices for head coach positions; the suit argues that the Rooney rule is ineffective due to it creating a stigma around Black candidates and it further argues that the head coach interviews were not being conducted in good faith).

1  inclusion and may help to set norms that favor inclusion, it is unlikely to alter how firms operate,

2  as the data on comply-or-explain regimes suggest.

3      35.   After selecting the CEO, the board often favors the executive's choices, to the point

4  of compromising the board's independence.[18] Extensive federal regulation recognizes that this

5  lack of independence may create conflicts of interest that allow executives—relying on

6  complacent board members exhibiting little oversight—to breach their corporate duties,

7  including the duty of oversight.[19]

8      36.   In short, states impose substantial requirements on firms regarding the board's

9  existence and functioning because of the board's legal, fiduciary, strategic, and oversight role in

10  firm governance.

**Part II: Straight Cisgender White People Dominate Corporate Elites**

12      37.   This section will begin by providing an overview of data demonstrating straight

13  cisgender white people's domination of the corporate leadership sector. Then, it will proceed to

14  analyze domination through two theoretical frameworks: corporate masculinity and capture

15  theory.

16    **A.  Overview of Data**

17      38.   Most corporate leaders in America are men.[20] As of March 2021, only 6% of Fortune

18  500 CEOs are women[21] and only a handful are women of color.[22] Data for a broader set of

---

[18] Macey argues that the capture of the board by executives is at the heart of corporate crises, including, notably, the Enron collapse. JONATHAN R. MACEY, CORPORATE GOVERNANCE: PROMISES KEPT, PROMISES BROKEN 52 (2008).

[19] Macey highlights one conflict of interest using the Oracle Corporation: lawsuits against corporations primarily list the board members as defendants, while also tasking these individuals to make a determination of whether the corporation is best served engaging in a lawsuit. *Id.* at 65. Courts solve this problem by calling the board to recommend a special litigation committee (SLC) comprised of independent directors; however, in the case of Oracle, the court found that the SLC was not sufficiently independent. *Id.* at 66.

[20] *See* DAVID F. LARCKER & BRIAN TAYAN, STANFORD UNIV., ROCK CENTER FOR CORP. GOVERNANCE, DIVERSITY IN THE C-SUITE: THE DISMAL STATE OF DIVERSITY AMONG FORTUNE 100 SENIOR EXECUTIVES 17–23 (2020).

[21] *See* Catalyst, *Women CEOs of the S&P 500* (2021), https://www.catalyst.org/research/women-ceos-ofthe-sp-500/; *see also* Alisha Ebrahimji, *Female Fortune 500 CEOs Reach an All-Time High, but It's Still a Small Percentage*, CNN BUSINESS (May 20, 2020), https://www.cnn.com/2020/05/20/us/fortune-500-women-ceostrnd/index.html; Emma Hinchliffe, *The Number of Female CEOs in the Fortune 500 Hits an All-Time Record*, FORTUNE (May 18, 2020), https://fortune.com/2020/05/18/women-ceos-fortune-500-2020/.

[22] *See* Maggie McGrath, *Breaking the 'Concrete' Ceiling: Roz Brewer to Become the S&P 500's Only Black Female CEO*, FORBES (Jan. 28, 2021), https://www.forbes.com/sites/maggiemcgrath/2021/01/28/breaking-

1   companies, the Russell 3000, shows that as of 2019, male CEOs outnumber female CEOs at a

2   rate of 17 to 1.[23]

3       39.    Most corporate leaders in America are also white. In 2018, only 0.6% of Fortune 500

4   CEOs were Black.[24]

5       40.    The still-dominant group of white cisgender heterosexual male corporate leaders has

6   systematically excluded underrepresented communities, including people of color and LGBT

7   people, from the board. Data speak volumes about this exclusion: as of 2020, Black and African

8   American people held only 8.7% of Fortune 500 board seats in 2020; Hispanic and Latino people

9   held only 4.1% of Fortune 500 board seats in 2020; and Asian and Pacific Islander people held

10  only 4.6% of Fortune 500 board seats in 2020; minority women held only 6.6%.[25]

11      41.    Within California, SB 826 became law in 2018. Since 2018, the number of women on

12  the boards of directors of public companies headquartered in California and subject to SB 826

13  increased. In 2018, 183 public companies headquartered in California and subject to SB 826 had

14  zero women on their boards of directors. In 2020, only 15 public companies headquartered in

15  California and subject to SB 826 had zero women on their boards of directors.[26] In 2018, 766

16  California public company board seats were held by women. By 2020, 1,275 were held by

17  women – an increase of 66.5%.[27]

18      42.    AB 979 became law in September 2020. By the first quarter of 2021, the number of

19  California companies operating with an all-white board dropped by 5.5% from just the previous

20  quarter.[28] In September 2020, more than one-third (36.8%) of California public boards lacked

21  any racial diversity.[29] As of December 31, 2021, the number of California public boards lacking

theconcrete-ceiling-roz-brewer-to-be-the-sps-only-black-female-ceo/?sh=2a9878bf667b.

[23] *See* Jackie Cook, *The Gender Gap in the C-Suite*, MORNINGSTAR (Feb. 17, 2021), https://www.morningstar.com/lp/gender-pay-gap.

[24] *Id.*

[25] DELOITTE, MISSING PIECES REPORT: THE BOARD DIVERSITY CENSUS OF WOMEN AND MINORITIES ON FORTUNE 500 BOARDS 19 (6th ed. 2021).

[26] CALIFORNIA PROJECT PARTNERS, CLAIM YOUR SEAT – A PROGRESS REPORT ON WOMEN'S REPRESENTATION ON CALIFORNIA CORPORATE BOARDS 7 (2020), https://www.calpartnersproject.org/claimyourseat2020.

[27] *Id.*

[28] *Id.*

[29] LATINO VOICES FOR BOARDROOM EQUITY, CALIFORNIA BOARDROOM EQUITY REPORT 5 (2022),

1　any racial diversity has fallen to less than 15%.[30] From September 2020 to December 31, 2021,

2　the percentage of company boards with an Asian director increased from 42% to 64%;

3　percentages of firms with a Black director increased from 16% to 35%, and those with a Latino

4　director increased from 13% to 21%.[31]

5　　　　43.　Even so, white people continue to occupy the majority of board seats within

6　California's public companies. In 2021, 81.2% of directors of California's public companies

7　were white.[32] White people also continued to dominate new board appointments for California

8　public company boards. From July 1, 2020 to December 31, 2021, white males accounted for

9　42.2% of new board appointments for California public company boards.[33] In the same period,

10　68.2% of all appointments for California public company boards went to white candidates.[34]

11　Meanwhile, in 2021, women of color held only 6.6% of California's public company board seats

12　even though they made up 32% of California's population.[35] And men of color held 12.1% of

13　California's public company board seats. In 2021, Latinas held only 1% of California's public

14　company board seats even though they made up 19% of California's population.[36]

15　　　　44.　The data regarding LGBT people atop corporate hierarchies is even more stark.

16　Openly LGBT people constitute less than 0.3% of directors,[37] twenty times lower than their 5.6%

17　representation in the total U.S. population.[38] The percentage of LGBT people in California is still

18　higher, so their underrepresentation in the state is even starker.[39] California is home to two of the

19　largest LGBT communities, San Francisco and Los Angeles, which would suggest that LGBT

20　board representation would be higher for California firms. Given this exclusion, people who are

---

https://www.latinocorporatedirectors.org/docs/LCDA_California_Boardroom_Equity_Report_May_2022.pdf.

[30] *Id.* at 5.

[31] *Id.* at 5.

[32] CALIFORNIA PROJECT PARTNERS, *supra* note 26, at 9.

[33] LATINO VOICES FOR BOARDROOM EQUITY, *supra* note 29, at 8.

[34] LATINO VOICES FOR BOARDROOM EQUITY, *supra* note 29, at 5.

[35] CALIFORNIA PROJECT PARTNERS, *supra* note 26, at 4.

[36] CALIFORNIA PROJECT PARTNERS, *supra* note 26, at 4.

[37] OUT LEADERSHIP, QUORUM 2 (2019), http://www.insurance.ca.gov/diversity/41-ISDGBD/GBDExternal/upload/Quorum-Template-Board-Diversity-Guidelines-2019-Mar.pdf.

[38] Jeffrey M. Jones, *LGBT Identification Rises to 5.6% in Latest U.S. Estimate*, GALLUP (Feb. 24, 2021), https://news.gallup.com/poll/329708/lgbt-identification-rises-latest-estimate.aspx.

[39] The Williams Institute, *LGBT Demographic Data Interactive,* UCLA SCH. OF L. (Jan. 2019), https://williamsinstitute.law.ucla.edu/visualization/lgbt-stats/?topic=LGBT&area=6#density.

1    transgender, non-binary, or gender-fluid are also likely excluded from elite positions—there is no

2    evidence of any member from these groups being a board or executive member of any Fortune

3    500 company.

4        45.    While societal LGBT acceptance has substantially increased, particularly since the

5    Supreme Court allowed LGBT people to marry, the demographics of corporate elites have not

6    changed much. The ranks of corporate leadership continue to structurally exclude LGBT people.

7    As with women and people of color, it is inevitable that boards without LGBT people will prove

8    reticent to name openly LGBT CEOs.[40] A lack of LGBT leadership at a firm perpetuates a cycle

9    of leaving LGBT people largely excluded from the board and from C-suite leadership.[41]

10       46.    In this world of seven-figure or greater salaries for corporate leaders, coming out is

11   practically unthinkable. This is highlighted by the presence of three gay and lesbian people

12   leading major corporations in the Fortune 500 companies. Beth Ford of Land O'Lakes and Jim

13   Fitterling of Dow were both openly gay when they became CEOs, both in 2018.[42] The other

14   CEO—Tim Cook, who held that role at Apple beginning in 2011—came out in 2014 when his

15   hand was forced by a Gawker article,[43] akin to what happened to Peter Thiel,[44] another

16   prominent corporate leader who only came out involuntarily in 2007.

17       47.    Both men were among the most powerful in the world at the time of their outing.

18   They managed firms and portfolios worth more than many entire nations. The fact that

19   individuals of this economic and political power were nonetheless too afraid to come out reveals

20   the power of anti-LGBT stigma in the corporate elite. Their stories expose the uniquely

21

22       [40] Darren Rosenblum, *Citibank's New Leader: Do Women On Boards Yield Diverse CEOs?*, FORBES (Sep. 11, 2020), https://www.forbes.com/sites/darrenrosenblum/2020/09/11/citibanks-new-leader-do-women-on-boardsyield-diverse-ceos/?sh=826f5744f026.

23       [41] By the C-Suite, I refer to the most senior executive positions at a firm, including, for instance, the Chief Executive Officer (CEO), Chief Operations Officer (COO), and Chief Financial Officer (CFO), among others.

24       [42] Karina Schroeder, *No One Should Be Afraid To Bring Their Whole Self To Work, Says Dow Chairman & CEO Jim Fitterling*, CATALYST (June 1, 2021), https://www.catalyst.org/2021/06/01/dow-ceo-jim-fitterling-comingout-workplace-inclusion/.

25

26       [43] Ben Smith, *Apple TV Was Making a Show About Gawker. Then Tim Cook Found Out*, N.Y. TIMES (Sept. 6, 2021), https://www.nytimes.com/2020/12/13/business/media/apple-gawker-tim-cook.html.

27       [44] Andrew Ross Sorkin, *Peter Thiel, Tech Billionaire, Reveals Secret War With Gawker*, N.Y. TIMES (May 25, 2016), https://www.nytimes.com/2016/05/26/business/dealbook/peter-thiel-tech-billionaire-reveals-secret-warwith-gawker.html.

28

conservative values and norms of elite corporate spaces, which remain defined by a level of exclusion most Americans assume to be extinct. Had they been women, Black, or held another underrepresented status, they would have been even less likely to come out or to rise the corporate ladder.[45] The sheer paucity of members of underrepresented groups among leaders points to extensive exclusion from leadership positions.

**B. Diversity and Inclusion Policies Fail to Prevent White, Cisgender Corporate Leaders from Excluding Members of Underrepresented Communities from the Corporate Pipeline and Board Selection Processes**

48.     The aforementioned data stands in stark contrast to the apparent diversity of the corporate world. Because most major companies officially encourage inclusion, some may presume that the stigma against being LGBT has diminished. Take any customer-facing organization. On the floor of any store, you see a range of diverse people of distinct colors, genders, and even sexual orientations.[46] Within large firms, diversity hiring practices at least formally preclude discrimination against people of color and LGBT people.

49.     But the straight cisgender white corporate elite in United States corporations adhere to extraordinarily exclusionary practices to prevent individuals from underrepresented communities from moving up within the corporation; these are practices that would not be recognized elsewhere in society. Publicly held corporations in California are no different.

50.     Homogeneity in leadership proves exclusionary, as nominating committees select people with traits similar to their own.[47] As firms recruit and promote people, "forces [exist] which lead the men who manage to reproduce themselves in kind."[48] Corporate leaders see themselves as the standard-bearers for the corporation's success; they believe their traits prove essential for the firm's continued profitability. These leaders, in turn, identify for promotion subordinates whose traits mirror their own.[49] They use their established networks to find these

---

[45] DELOITTE, *supra* note 25, at 19.
[46] *Inclusion & Diversity*, APPLE, https://www.apple.com/diversity/.
[47] *See* ROSABETH MOSS KANTER, THE MEN AND WOMEN OF THE CORPORATION vii (1977).
[48] *Id.*
[49] "The greater the tendency for a group of people to try to reproduce themselves, the more constraining becomes the emphasis on conformity." *Id.* at 68. *See also* Amanda K. Packel, *Government Intervention into Board*

1    people, which functionally creates a closed loop in which leaders find replacements who look

2    like them.[50] Thus, even in newer industries, such as those in Silicon Valley, straight cisgender

3    white people dominate leadership positions.

4        51.    Thirty-five percent of Black professionals, driven by isolation and workplace

5    hostility, intend to leave their United States corporation in the next two years.[51]

6        52.    Even though they are similarly qualified to non-Black professionals, research shows

7    that white board members often give C-suite Black professionals marketing or human resources

8    roles, instead of the profit-and-loss positions that more commonly serve as steps to sitting on the

9    board.[52]

10       53.    Indeed, research shows that corporations exhibit a form of "diversity doublespeak," in

11   which firms profess an avid support for inclusion but consistently exclude underrepresented

12   people from leadership.[53]

13       54.    It is no surprise then that a 2021 study found only a low correlation between talking

14   about racial diversity in proxy statements and actual racial diversity in the boardroom.[54]

15       55.    In other words, while many corporations have diversity and inclusion policies on the

16   books, they continue to engage in biased decision-making with respect to promotion practices

17   within the firm, particularly at the highest levels.

18

19

20   *Composition: Gender Quotas in Norway and Diversity Disclosures in the United States*, 21 STAN. J. L., BUS. & FIN.,

21   192, 199 (2016) (explaining that the board nomination process relies heavily on social networks, which tends to result in newly appointed directors with sociodemographic characteristics similar to those of existing directors);

22   DARIA ROITHMAYR, REPRODUCING RACISM: HOW EVERYDAY CHOICES LOCK IN WHITE ADVANTAGE (2014).
         [50] *Id.*

23       [51] COQUAL, BEING BLACK IN CORPORATE AMERICA: AN INTERSECTIONAL EXPLORATION 7 (Center for Talent and Innovation 2019).

24       [52] Te-Ping Chen, *Why Are There Still So Few Black CEOs?*, WALL STREET J. (Sept. 28, 2020), https://www.wsj.com/articles/why-are-there-still-so-few-black-ceos-11601302601 (discussing a Stanford Graduate

25   School of Business study that "found that in the Fortune 100, which are a mix of public and privately held companies, Black executives hold just 3% of the profit-and-loss positions in the C-suite that are key to company success and are often seen as a prerequisite to the top job").

26       [53] Cheryl L. Wade, *"We Are An Equal Opportunity Employer": Diversity Doublespeak*, 61 WASH. & LEE L. REV. 1541 (2004).

27       [54] Maksims Dzabarovs et al., *Boardroom Racial (In) Equality and Stock Returns: Evidence from the Black Lives Matter Protests* (European Corporate Governance Institute Finance Working Paper 789) (2021).

28

56.   Further, it has long been argued that discrimination is inefficient in that it prevents firms from selecting the most talented candidates.[55] This argument maintains that, because firms are driven by profits, they would include diverse people in order to hire the best applicants and that, over time, the market would eliminate discrimination. In the fifty years since this argument surfaced,[56] discrimination has diminished, but only somewhat and not at the corporate board level.

57.   Title VII has provided some assistance to those excluded from the lower rungs of corporations but has not been effective at changing substantially the composition of corporate boards and management, which remain filled nearly exclusively with straight cisgender white males, even when these corporations adopt a broad anti-discrimination mandate.[57]

58.   That firms openly support inclusion while failing to diversify their top corporate leadership, including their boards, demonstrates the market's inability to correct this discrimination.[58]

59.   In 2020, ample opportunities presented themselves for firms to improve diversity and break down the barriers and practices that kept qualified individuals from underrepresented communities off boards, but United States corporations still failed to take action on their own to address the discrimination.

60.   New Fortune 500 directors filled 974 board seats, yet white directors took 81% of those 974 positions. The percentage of Fortune 100 seats filled by white men *increased* from

---

[55] Over fifty years ago, Gary Becker argued that for firms, discrimination is inefficient. GARY BECKER, THE ECONOMICS OF DISCRIMINATION (2d ed. 1971). Critiques abound to undermine Becker's argument: if "the taste for discrimination is very widespread, its cost implications become trivial, and the market corrective never operates." Drucilla Cornell & William W. Bratton, *Deadweight Costs and Intrinsic Wrongs of Nativism: Economics Freedom and Legal Suppression of Spanish*, 84 CORNELL L. REV. 595, 641 (1999).

[56] *Id.*

[57] *See, e.g.,* Cheryl Harris, Kimberly West-Faulcon, *Reading Ricci: Whitening Discrimination, Racing Test Fairness,* 58 UCLA L. REV. 73 (2010).

[58] Maria Moats & Paul DeNicola, *You Say You Want a More Diverse Board. Here's How to Make It Happen,* HARVARD BUS. REV. (Mar. 11, 2021) (despite an outward expression of interest in diversity by many companies, only 34% of directors felt that racial/ethnic diversity was "very important" on their boards and only 47% felt gender diversity was "very important").

17

2018 to 2020,[59] while increases in the representation of men of color stalled.[60] Black men lost

five board seats in the Fortune 500 and one in the Fortune 100. Women of color fare worse,

being outnumbered by white women 3 to 1 for each newly occupied board seat.[61]

### C.  The Process and Maintenance of Domination

61.    How do straight cisgender white people achieve this level of domination? This

section sets forth two mechanisms through which straight cisgender white people have excluded

would-be leaders from underrepresented communities to obtain and maintain positions of great

power and wealth: corporate masculinity and capture theory. Each of these mechanisms involves

the use of stereotypes or other forms of bias related to racial, ethnic, sexual orientation, and

gender identities and result in different treatment of people based on those identities.

### i. Corporate Masculinity

62.    Much of the theory about difference in corporate leadership deals with gender, and

because half of the people aspiring to corporate leadership roles from underrepresented

communities are also women, it is necessary to consider male domination of the corporate sector

as a factor that also plays a role in the exclusion of people of underrepresented communities.

63.    Most companies ask their own directors for prospective board member

recommendations,[62] and, given the racial, gender, and sexual orientation homogeneity prevalent

among executives, "the network of individuals that are recommended to the board are fairly

limited and homogenous."[63] Board members recommend people they know, often coming from

the same university cohort or social or professional community. Masculinity norms[64] define

---

[59] DELOITTE, *supra* note 25, at 7 ("Of the directors new to the Fortune 100, 79.9% of board seats were filled by White directors, with 52.1% filled by White men, an increase from 51.1% in the last edition of the census (2018).").

[60] *Id.* at 6 ("[M]inority men show no substantive increase in their rate of representation in either the Fortune 100 (see left) or 500, which is concerning, as their rate of representation in the Fortune 500 has been growing at less than 0.5% per year since 2010.").

[61] *Id.* at 35.

[62] DELOITTE, PERSPECTIVE FROM THE BOARDROOM 7 (2014).

[63] Jason Wingard, *Diverse Boards Propel Successful Companies -- Three Strategies to Expand Pipelines*, FORBES (Feb. 21, 2019), https://www.forbes.com/sites/jasonwingard/2019/02/21/diverse-boards-propel-successful-companies-three-strategies-to-expand-pipelines/?sh=559e4838604c.

[64] For an overview of legal literature on masculinities, *see* Katharine T. Bartlett, *Gender Law: After Twenty-Five Years*, 27 DUKE J. GENDER L. & POL'Y 1, 16–19 (2020).

corporate power structures and hierarchies, preventing women from becoming executives and especially from becoming CEO.[65] These norms define both the necessary leadership attributes and the cultures of corporations.[66] These cultures exclude not only women, but people who find themselves feminized in this rarified context: LGBT people, and sometimes people of color, including men.[67]

64.   The nature of corporate masculinity clarifies how this rarified competition takes place. A significant body of research indicates various masculine-identified traits drive CEO decisions: hubris,[68] over-confidence,[69] narcissism,[70] a desire to build empires,[71] rivalry,[72] and envy (e.g., the desire to keep up with peer CEOs).[73] Studies suggest that these traits are more commonly expressed in men,[74] who face significant pressure to conform to masculinity norms.[75]

---

[65] *See, e.g.,* Naomi Cahn, June Carbone & Nancy Levit, *Gender and the Tournament: Reinventing Antidiscrimination Law in an Age of Inequality*, 96 TEX. L. REV. 425, 445–59 (2018); Jennifer Berdahl et al., *Work as a Masculinity Contest*, 74 J. SOC. ISSUES 422, 423–24 (2018).

[66] *See* Alice H. Eagly & Steven J. Karau, *Role Congruity Theory of Prejudice Toward Female Leaders*, 109 PSYCH. REV. 573 (2002); S. Alexander Haslam & Michelle K. Ryan, *The Road to the Glass Cliff: Differences in the Perceived Suitability of Men and Women for Leadership Positions in Succeeding and Failing Organizations*, 19 LEADERSHIP Q. 530 (2008).

[67] Coqual, *supra* note 51, at 3.

[68] *See* Mathew L. A. Hayward & Donald C. Hambrick, *Explaining the Premiums Paid for Large Acquisitions: Evidence of CEO Hubris*, 42 ADMIN. SCI. Q. 103, 103 (1997); Richard Roll, *The Hubris Hypothesis of Corporate Takeovers*, 59 J. BUS. 197, 212 (1986).

[69] *See* Ulrike Malmendier & Geoffrey Tate, *Who Makes Acquisitions? CEO Overconfidence and the Market's Reaction*, 89 J. FIN. 20, 20–21 (2008); Donald C. Langevoort, *Resetting the Corporate Thermostat: Lessons from the Recent Financial Scandals About Self-Deception, Deceiving Others and the Design of Internal Controls*, 93 GEO. L. J. 285, 288 (2004).

[70] *See* Arijit Chatterjee & Donald C. Hambrick, *It's All About Me: Narcissistic Chief Executive Officers and Their Effects on Company Strategy and Performance*, 52 ADMIN. SCI. Q. 351, 351–52 (2007).

[71] *See* Christopher Avery, Judith A. Chevalier & Scott Schaefer, *Why Do Managers Undertake Acquisitions? An Analysis of Internal and External Rewards for Acquisitiveness*, 14 J. L. ECON. & ORG. 24, 24–28 (1998); Bernard S. Black, *Bidder Overpayment in Takeovers*, 41 STAN. L. REV. 597, 627–28 (1989).

[72] *See, e.g.*, Deepak Malhotra, Gillian Ku & J. Keith Murnighan, *When Winning Is Everything*, HARV. BUS. REV. (May 2008) (identifying "three principal drivers of competitive arousal in business settings: rivalry, time pressure, and audience scrutiny").

[73] *See* Anand M. Goel & Anjan V. Thakor, *Do Envious CEOs Cause Merger Waves?* 23 REV. FIN. STUD. 487, 510 (2010); Wei Shi, Yan Zhang & Robert E. Hoskisson, *Ripple Effects of CEO Awards: Investigating the Acquisition Activities of Superstar CEOs' Competitors*, 38 STRATEGIC MGMT. J. 2080, 2081 (2017). For an overview in the M&A context, *see* Afra Afsharipour, *Bias, Identity and M&A*, 2020 WIS. L. REV. 469, 475–80 (2020); Afra Afsharipour, *A Shareholders' Put Option: Counteracting the Acquirer Overpayment Problem*, 96 MINN. L. REV. 1018, 1034–41 (2012). For an overview of research in behavioral corporate finance on CEO biases, see Marius Guenzel & Ulrike Malmendier, *Behavioral Corporate Finance: The Life Cycle of a CEO Career* (August 2020).

[74] *See, e.g.*, Jiekun Huang & Darren J. Kisgen, *Gender and Corporate Finance: Are Male Executives Overconfident Relative to Female Executives?*, 108 J. FIN. ECON. 822, 822–23 (2013).

[75] *See* Berdahl et al., *supra* note 65, 424–25.

19

1    Some industries, such as the technology sector, reward masculine leadership traits.[76] Studies

2    have found that overconfident executives have "a higher likelihood than a rational manager of

3    being…promoted to CEO."[77]

4        65.    Masculinity norms do not only influence who becomes CEO. Masculinity norms also

5    define the corporate ladder and affect people of different genders, sexualities, races, and

6    ethnicities.[78] Traditionally masculine traits, including dominance and assertiveness, are seen as

7    necessary for leadership. Yet when women or non-white cisgender men[79] exhibit such traits, they

8    are perceived as unlikable,[80] leading to double standards and "double binds."[81] This would

9    similarly plague anyone not expected to exhibit traditionally masculine traits, like LGBT people

10   and people of color.

11       66.    For example, "[w]orkplace consequences include the 'teddy bear effect,' whereby

12   Black men need to do extra 'identity work' to ensure that other White colleagues do not feel

13   threatened."[82]

14       67.    Carbone, Cahn, and Levit take the double bind concept further, describing how

15   masculinity contests in the workplace present women with a "triple bind":

16       [W]omen lose if they do not play by the same terms as the men, lose if they do try to
         play on the same terms by being disproportionately punished for displaying the self-
17       centered, rule-breaking behavior of the men, and over time become less likely to
         apply for such positions and thus more likely, individually and as a group, to be
18       perceived as lacking what it takes to succeed in such environments.[83]

19

20

---

[76] *See* Cahn, Carbone & Levit, *supra* note 65, at 465–67. *See also* Marleen O'Connor, *Women Executives in Gladiator Corporate Cultures: The Behavioral Dynamics of Gender, Ego, and Power*, 65 MD. L. REV. 465, 480 (2006) ("American firms are more masculine because they emphasize shareholder value and bottom-line norms to a greater degree.").

[77] *See* Anand M. Goel & Anjan V. Thakor, *Overconfidence, CEO Selection, and Corporate Governance*, 63 J. FIN. 2737, 2737 (2008).

[78] *See generally* Eagly & Karau, *supra* note 66 (describing how men are perceived better than women when demonstrating the same favorable leadership skills).

[79] Devon W. Carbado and Mitu Gulati, *Race to the Top of the Corporate Ladder: What Minorities Do When They Get There*, 61 WASH. & LEE L. REV. 1645, 1655–57 (2004).

[80] *See* CATALYST, THE DOUBLE-BIND DILEMMA FOR WOMEN IN LEADERSHIP (2018).

[81] DEBORAH L. RHODE, WOMEN AND LEADERSHIP 11 (2017).

[82] Berdahl, *supra* note 65, at 427.

[83] June Carbone, Naomi Cahn & Nancy Levit, *Women, Rule-Breaking, and the Triple Bind*, 87 GEO. WASH. L. REV. 1105, 1126–27 (2019).

1    In other words, women, and similarly people of color and LGBT people, are not able to engage in

2    competitive behaviors without facing reprisal. This creates an almost impossible situation for

3    members of underrepresented communities seeking to advance in the corporate hierarchy.

4    68.    Moreover, typically masculine traits for career advancement (when exhibited by

5    straight cisgender white men) prove effective for leaders. But these traits generally do not—on

6    their own—lead to effective leadership and do not represent the full range of traits recognized for

7    effective leadership and decision-making.[84] Excluding people on this basis constitutes

8    discrimination against people of color and LGBT people that does not correspond to any

9    recognized or demonstrated substantive corporate benefit.[85]

10    69.    Because of this exclusionary dynamic, which is infected by bias based on racial,

11    ethnic, and gender characteristics, people from underrepresented communities have yet to

12    substantially hold leadership positions, limiting their perceived qualifications for board

13    positions.[86] This exclusion from leadership positions, as well as perceived differences based on

14    identity, bars otherwise valuable employees from underrepresented groups from accessing the

15    networks through which directors are selected, denying them meaningful director experience and

16    further exacerbating the issue to create a self-perpetuating cycle.[87]

17    70.    In this way, straight cisgender white people have locked in their advantage in

18    corporate leadership to the exclusion of underrepresented groups.

19    **ii. Capture Theory**

20    71.    The term "capture" refers to a special interest co-opting and maintaining control over

21    a public good by manipulating public processes.[88] Disaggregated, individual corporate leadership

22    [84] *See* Tomas Chamorro-Premuzic & Cindy Gallop, *7 Leadership Lessons Men Can Learn from Women*,
HARV. BUS. REV. (Apr. 1, 2020); Jack Zenger & Joseph Folkman, *Research: Women Score Higher than Men in Most
Leadership Skills*, HARV. BUS. REV. (June 25, 2019). For a general discussion of the literature on leadership style and
gender, *see* Alice H. Eagly, *Women as Leaders: Leadership Style vs. Leaders' Values and Attitudes*, in HARVARD
BUSINESS SCHOOL RESEARCH SYMPOSIUM, GENDER & WORK: CHALLENGING CONVENTIONAL WISDOM (2013).

23    [85] Tomas Chamorro-Premuzic, *Why Do So Many Incompetent Men Become Leaders?*, HARV. BUS. REV.
(Aug. 22, 2013), https://hbr.org/2013/08/why-do-so-many-incompetent-men.

24    [86] *See* Lisa M. Fairfax, *Clogs in the Pipeline: The Mixed Data on Women Directors and Continued Barriers
to Their Advancement*, 65 MD. L. REV. 579, 599-600 (2006); *see* Deborah L. Rhode & Amanda K. Packel, *Diversity
on Corporate Boards: How Much Difference Does Difference Make?*, 39 DEL. J. CORP. L. 377, 402–03 (2014).

25    [87] Packel, *supra* note 49, at 199-200.

26    [88] *See, e.g.*, *Regulatory Capture*, INVESTOPEDIA,
https://www.investopedia.com/terms/r/regulatorycapture.asp.

21

positions are not necessarily a public good. But, taken collectively, who runs firms reflects a socio-political choice about what demographic should hold power. Most Americans presume that the corporate ladder functions as a meritocracy, reflecting a fair competition between market actors. The rules of this competition are based on corporate statutes and practices. But the market for elite corporate leadership positions, including board positions, operates with highly specialized actors and rules, which reproduce the status quo.

72.    Money, in the form of executive compensation packages, functions as the "public good" captured by individuals within this specific labor market. As Bebchuk and Fried have argued, executives—almost always straight cisgender white people—use their positions to extract extremely large compensation schemes from their firms.[89] The legitimate power granted to executives allows them to structure their role as seemingly essential to the firm, and once in power they may capture its resources.[90] Through this process, CEOs extract ever-higher salary packages out of the firms they "serve."[91] Over the past four decades, CEO-worker compensation ratios shifted radically: CEO compensation was 31 times higher than worker compensation in 1978, but it grew to 320 times higher in 2019.[92] Some argue that this ratio reflects a supply deficiency of adequate corporate executives—a "tightness" in the executive labor market.[93]

73.    There is a more plausible explanation: that the compensatory rewards of being CEO incentivize leaders to keep this labor market artificially tight. Excluding non-white, non-straight, and non-male persons who may otherwise be strong candidates helps achieve this. This exclusion may also explain why corporate leadership is slow to diversify, as the combination of low accountability and high deference in corporate governance prevents rapid improvements toward

---

[89] For a definition of managerial power-based rent, see Lucian Arye Bebchuk, Jesse M. Fried & David I. Walker, *Managerial Power and Rent Extraction in the Design of Executive Compensation*, 69 U. CHI. L. REV. 751, 754 (2002).

[90] *Id.* at 62.

[91] *See generally id.* (describing how CEO power is connected with higher compensation packages).

[92] *See* Lawrence Mishel & Jori Kandra, *CEO Compensation Surged 14% in 2019 to $21.3 Million 2–3*, ECON. POL'Y INST. (2020), https://www.epi.org/publication/ceo-compensation-surged-14-in-2019-to-21-3-millionceos-now-earn-320-times-as-much-as-a-typical-worker/.

[93] *See, e.g.,* Joseph E. Bachelder, *CEO Pay Ratios: What Do They Mean?*, HARV. L. SCH. F. ON CORP. GOVERNANCE (Nov. 13, 2017), https://corpgov.law.harvard.edu/2017/11/13/ceo-pay-ratios-what-do-they-mean/; Alex Edmans, *Why We Need to Stop Obsessing over CEO Pay Ratios,* HARV. BUS. REV. (Feb. 23, 2017), https://hbr.org/2017/02/why-we-need-to-stop-obsessing-over-ceo-pay-ratios.

1   including underrepresented people, whether they are women, LGBT individuals, or people of

2   color.

3       74.    Cisgender, straight, white male corporate leaders have captured executive positions in

4   the sense that they have taken and maintain control of the processes that determine who becomes

5   an executive, and in so doing they exclude women, LGBT people, and people of color. These

6   individuals holding existing corporate board and other elite positions exercise power to maintain

7   control over their replacements, making it difficult for people in underrepresented communities

8   to penetrate these exclusionary boards because of their homogeneity.

9             **Part III. Harms of Homogeneity in Relation to Groupthink and Benefits of Diversity**

10      75.    In most companies, the board of directors—including the CEO, who is also on the

11  board—hires the executives.[94] The executives make crucial strategic decisions and run the

12  corporation on a day-to-day basis.[95] Once the executives are in place, the board's purpose is to

13  consider and approve decisions made by the executives.[96] The board's main duty is to guarantee,

14  through oversight, that the corporation and its management comply with the law,[97] and to ensure

15  the soundness of "the strategic direction of the company and for overseeing the risks that the

16  company faces."[98] The board plays a central role, and it has nearly absolute power.

17      76.    One serious shortcoming of the domination by straight cisgender white people on

18  corporate boards in the United States is groupthink. This occurs when a specific demographic

19  group forms a decision-making body and only deliberates around the dominant group's thought

20  processes and points of view. Their perspectives dominate discussions and exclude other

21  perspectives. Diverse opinions from women, people of color, and LGBT people are rendered

22  voiceless and irrelevant, often to the firm's detriment. For example, homogenous boards only

23  focus on certain markets in their supply and distribution chains,[99] a routine choice that weakens

24  the firm from lack of deliberation.

---

[94] JONATHAN R. MACEY, CORPORATE GOVERNANCE: PROMISES KEPT, PROMISES BROKEN 161 (2008).

[95] *Id.* at 161–62.

[96] *Id.* at 161.

[97] BRUCE F. DRAVIS, THE ROLE OF INDEPENDENT DIRECTORS IN CORPORATE GOVERNANCE 55 (2010).

[98] *Id.* at 60.

[99] *See* David E. Cantor & John R. Macdonald, *Decision-Making in the Supply Chain: Examining Problem*

1

2

3

4

77.    Groupthink is harmful to corporate governance and can promote risky behavior.[100] It "compels individuals to conform to prevailing ways of thinking, organizational norms, and practices."[101] It negatively affects firms' ability to understand stakeholders and can weaken decision-making in crisis situations.[102]

5

6

7

8

9

78.    Homogenous groups often use linguistic and argumentative shortcuts to quicken decision-making, which can increase risks. By contrast, diverse groups are shown to increase the back-and-forth in the decision-making process, rendering it more deliberate.[103] This leads members of the group to ask each other simpler questions that carefully map a choice's reasoning.

10

11

12

13

14

79.    In sum, groupthink is a critical cost of the lack of diversity in corporate leadership. The domination of straight cisgender white people shrinks the pool of candidates and leads to less diverse decision-making, potentially increasing the chance of risky decisions. It can also yield unresponsive governance that ignores market changes like the rise of millennial investors who care about stakeholder issues surrounding the environment, diversity, and labor disputes.[104]

15

16

17

18

19

20

80.    By contrast, diversity improves decision-making. One problem from the capture and resulting groupthink described above is that homogenous board members will analyze situations similarly due to their similar backgrounds. Diversity solves this problem. This is particularly true for the kind of oversight, problem-solving, and strategic work that boards perform.[105] While repetitive work does not benefit much from diversity, problem solving and strategic prediction does.

21

22

23

24

25

26

27

28

*Solving Approaches and Information Availability*, 27 J. OPERATIONS MGMT. 220, 220 (2009).

[100] *See* Alexander Glebovskiy, *Criminogenic Isomorphism and Groupthink in the Business Context*, 22 INT'L J. ORG. THEORY & BEHAVIOR 22, 33–34 (2019).

[101] *Id.* at 38.

[102] Myungok Chris Yim & Hyun Soon Park, *The Effects of Corporate Elitism and Groupthink on Organizational Empathy in Crisis Situations*, PUB. RELS. REV., March 2021, at 8.

[103] *See generally,* Darren Rosenblum & Daria Roithmayr, *More Than a Woman*, 48 IND. LAW REV. 889 (2015).

[104] *See* Michal Barzuza, Quinn Curtis & David H. Webber*, Shareholder Value(s): Index Fund ESG Activism and the New Millennial Corporate Governance,* 93 S. CAL. L. REV. 1243 (2020).

[105] SCOTT E. PAGE, THE DIFFERENCE: HOW THE POWER OF DIVERSITY CREATES BETTER GROUPS, FIRMS, SCHOOLS, AND SOCIETIES 136 (2007) (incorporating various sources and aggregating other social science data on difference).

81.     The benefits of diversity depend more on the nature of the work itself than on the nature of the diversity. If the work involves creativity, a diverse group will more easily arrive at an effective result than one individual exercising their predictive powers. However, when the work is repetitive or involves implementation, diversity is less important. Problem solving uses different skills from completing routine tasks, and this distinction determines diversity's effectiveness.[106]

82.     Having multiple similar problem-solvers yields marginal returns compared to having one alone.[107] By contrast, differentiated experiences among its members improves a group's ability to solve problems, constituting a collective strength.[108] In this sense, diversity may matter more than ability.[109] In contrast, when the best problem solvers tended to be diverse, the group allows for more collective strength than a group of similarly minded folk.[110] Problem-solving involves distinct capacities from routine tasks, and that distinction is the one upon which diversity's import hinges.[111]

83.     This conclusion has been confirmed by various management consultancies.[112] In a study on diversity in the workforce, Ernst and Young found that more diverse groups performed better than homogeneous ones, even if the members of the homogeneous groups were substantially more capable.[113] The group's diversity mattered as much as their ability and brainpower, if not more.[114] Homogenous groups often "stake out extreme positions," and thus "limit [their] discussions to a small number of alternative courses of action without surveying the

[106] *Id.* at 324–25.

[107] *Id.* at 324–25. To test whether diversity helps problem solving, Page focused on one problem: "making the perfect cup of coffee," with two elements, the ideal level of cream and sugar for most people. Participants worked in groups "until no agent in the group could find a better cup of coffee." *Id.* at 135–36.

[108] *Id.*

[109] *Id.*

[110] *Id.*

[111] *Id.* at 324–25.

[112] ERNST AND YOUNG, GROUNDBREAKERS: USING THE STRENGTH OF WOMEN TO REBUILD THE WORLD ECONOMY (2009), http://advancingwomen.org/wp-content/uploads/2013/09/Groundbreakers-Using-the-strength-of-women-to-rebuild-the-world-economy-Report.pdf.

[113] ERNST AND YOUNG, GROUNDBREAKERS STUDY, DIVERSITY AND EQUATION FOR SUCCESS (2009), http://www.vitalvoices.org/sites/default/files/uploads/Groundbreakers.pdf.

[114] *Id.*

full range of alternatives."[115] Therefore, diversifying boards could mitigate a board's tendency to conform, prevent groupthink, and promote board scrutiny of their decision-making.[116]

84.     Firms and the broader economy rely on boards to problem-solve effectively, with board work ranging from monitoring to managing.[117] A monitoring board oversees the firm, a role magnified by Sarbanes-Oxley, Dodd-Frank, and market forces that have increased firm size and the oversight and compliance required of them.[118] A managerial board, by contrast, helps guide a firm's strategy. Whether the work is managerial or monitoring, diverse boards will function more effectively because their work is problem-solving and not mere repetition.

85.     Underrepresented groups are crucial to firm diversification efforts. As documented above, structural discrimination has left people of color and LGBT people outside of much of the country's corporate leadership.

86.     The diversity they can bring to boards would improve corporate governance, functioning, and efficacy given the widely-accepted social science data supporting such a conclusion.

### Part IV: AB 979

87.     Cognizant of the systematic exclusion of and discrimination against underrepresented groups in the corporate selection and pipeline to selection, California passed AB 979 into law.

88.     In this section, I analyze other efforts, including race-neutral ones, tried by countries throughout the world. I conclude that the approach chosen by California through enacting AB 979 is necessary to address the discrimination in California's publicly held corporation board selection process and pipeline.

---

[115] Lisa Nicholson, *Women and the "New" Corporate Governance: Making In-Roads to Corporate General Counsel Positions: It's Only a Matter of Time?*, 65 MD. L. REV. 625, 634 (2006).

[116] Steven A. Ramirez, *Diversity and the Boardroom*, 6 STAN. J.L. BUS. & FIN. 85, 99, 314 (2000).

[117] Jill E. Fisch, *Taking Boards Seriously*, 19 CARDOZO L. REV. 265, 268–72 (1997)

[118] *Id.* at 268; *see* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (2002) (enacted to protect shareholders and the general public from accounting errors and fraudulent practices in the corporate enterprise); Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) (enacted to prevent the excessive risk-taking that led to the 2008 financial crisis and improve accountability and transparency in the United States financial system).

89.     As of 2021, nine of the world's top ten economies have enacted mandates to address diversity on corporate boards (and in top leadership), and a total of thirty-three countries have measures to promote diversity.[119]

90.     While many countries started their regulation of inclusion with laws solely mandating disclosure, eventually they all adopted more stringent measures, from comply-or-explain rules to mandates imposing requirements for board inclusion.[120]

91.     Norway introduced one of the first laws regulating corporate board diversity. The law mandated hard percentages of women on corporate boards of public companies. Under this law, public companies[121] were required to populate their boards with a minimum of forty percent of each of the two principal sexes, depending on the corporation.[122]

92.     The law contained several notable elements. First, Norway enacted the quota under its corporate law statute rather than through anti-discrimination legislation.[123] This represented a marked departure from prior gender equality legislation. Second, the law focused on corporate boards, as opposed to other aspects of corporations. Third, the "business case" for gender diversity justified women's inclusion on corporate boards, with arguments focusing on the normative value of equality and on diversity's potential to improve firm performance, governance, and competitiveness.[124] Fourth, the Norwegian law only affected publicly traded corporations. Fifth, the law relied on the management and organizational theory of "critical

[119] This includes the United States due to California's SB 826 mandate. Japan's Tokyo Stock Exchange, on which all major Japanese companies are listed, has a comply-or-explain rule, so I have included this in the countries—nearly every large economy except China has a mandate.

[120] California Secretary of State, *Diversity on Boards, March 2022 Report, Corporations Code Sections 301.3 and 301.4* (Sacramento, CA: California Secretary of State).

[121] Norway Ministry of Trade, Industry and Fisheries, *Fact Sheet: The Legislation on Representation of Both Sexes in Boards,* GOVERNMENT.NO (Sep. 19, 2011), https://web.archive.org/web/20150921004531/https://www.regjeringen.no/en/dep/nfd/contact/press-centre/factsheets/fact-sheet-thelegislation-on-representa/id641431/.

[122] *See* Mari Teigen, *Gender Quotas on Corporate Boards: On the Diffusion of a Distinct National Policy Reform*, 29 COMP. SOC. RES. 115, 122 (2012).

[123] *See Norwegian Public Limited Liability Companies Act*, 13 June 1997 No. 45, § 6-11a**.**

[124] Hilde Bjørkhaug & Siri Øyslebø Sørensen, *Feminism without Gender? Arguments for Gender Quotas on Corporate Boards in Norway, in* FIRMS, BOARDS AND GENDER QUOTAS: COMPARATIVE PERSPECTIVES 185, 198-99 (Fredrik Engelstad & Mari Teigen eds., 2012); David A. Carter et al., *Corporate Governance, Board Diversity, and Firm Value*, 38 FIN. REV. 33 (2003); AARON DHIR, CHALLENGING BOARDROOM HOMOGENEITY: CORPORATE LAW, GOVERNANCE AND DIVERSITY (2015).

mass,"[125] which requires the addition of enough individuals to exercise an influence on the organization, as opposed to adding individual members of a minority group as mere tokens. Sixth, the Norwegian law imposed a strict penalty to ensure compliance. If a firm failed to meet the hard minimum of forty percent representation for either of the two sexes by January 1, 2008, it would see its stock delisted from the Oslo Stock Exchange.[126]

93.     As a result of these novel elements, Norway succeeded in diversifying its corporate boards and now leads the world in its percentage of female corporate board members.[127] Women comprise 44% of Norway's board members, meeting the critical mass threshold for women to find their voice in a boardroom context.[128] Furthermore, though corporate leaders initially complained of a lack of "qualified women" they could reasonably appoint to boards, firms had little trouble satisfying the requirements. Nearly all publicly traded firms complied with the law by the mandated date—January 1, 2008.[129]

94.     By contrast, several common law countries have adopted "comply-or-explain" rules or a mix of different requirements to address discrimination and increase corporate board diversity.[130] The comply-or explain mechanism requires corporate boards to either comply with a regulator's guidelines, such as attaining a certain percentage of female board directors or explain why they have not done so. Sanctions for corporate non-disclosure vary across jurisdictions, but typically they involve nominal fines. Most of these initiatives have not achieved the same results with respect to critical mass, diversity inclusion, or other benefits that mandates like Norway's have, and have only marginally improved board diversity.[131]

[125] Critical mass is the effect where a corporate board has a certain number or percentage of seats held by an outsider group so that its members are not undermined and can impact the board's decision making. *See* Vicki W. Kramer et al., *Executive Summary, Critical Mass on Corporate Boards: Why Three or More Women Enhance Governance*, 11 WELLESLEY CTRS. FOR WOMEN REP. 3 (2006).

[126] Darren Rosenblum, *supra* note 6, at 57.

[127] Stephanie Holmes *Smashing the Glass Ceiling*, BBC NEWS (Jan. 11, 2008), http://news.bbc.co.uk/2/hi/business/7176879.stm.

[128] *Diversity: 2020 Nordic Spencer Stuart Board Index*, SPENCER STUART, https://www.spencerstuart.com/research-and-insight/nordic-board-index/diversity.

[129] Interview with Siri Øyslebø Sørensen, (Oslo, Feb. 25, 2008) (interview transcript on file with author).

[130] DHIR, *supra* note 124, at 247–48.

[131] After implementing the requirements, these countries to date have the following percentages of women directors: in Canada, 20%; in the UK, the FTSE 250 grew to 33.2%; and in Ireland, 22.4%. CANADIAN SECURITIES ADMINISTRATORS, REPORT ON SIXTH STAFF REVIEW OF DISCLOSURE REGARDING WOMEN ON BOARDS AND IN

95.     Similarly, in Canada, overall percentages did not improve under Canada's comply-or-explain law until Quebec implemented a rigid quota; since then, the percentages of women on its boards have risen.[132] While several countries initiated their interventions on corporate boards with disclosure requirements, they have all moved toward comply-or-explain regimes or toward mandates or quotas.

96.     AB 979 reflects a turn to corporate law to counter the ongoing structural and systemic discrimination against specific groups. Despite the Civil Rights Act's enactment more than fifty years ago and its substantial effect in many sectors of the economy, existing CEOs and corporate board members continue to systematically exclude individuals from underrepresented communities from the corporate board and corporate board pipeline.

97.     By targeting the boards of California's publicly held corporations, AB 979 addresses this site where discrimination may flourish, but it stays out of the C-suite, where regulation might burden the day-to-day operations of the firm. While countries like Germany and France regulated corporate executive teams, AB 979 narrowly focuses on the board alone.

98.     However, AB 979 diverges from the Norwegian quota law in several key respects that facilitate its efficacy in addressing long-standing discrimination despite its relatively unimposing mandate. In particular, AB 979 adopts a level of flexibility that provides significant deference to corporations' governance choices and selection processes and imposes only a marginal requirement with respect to board composition. These components will allow AB 979 to counter discriminatory board hiring practices without unfairly burdening the firms affected by it.

99.     AB 979 gives firms flexibility. Firms can themselves determine how to structure their boards, and they can comply with AB 979 by adding additional board seats for more board members.

100.     AB 979 also gives firms greater flexibility in attaining critical mass than Norway did—it allows firms to create larger boards in which these individuals would form a minority

EXECUTIVE OFFICER POSITIONS 2 (2021); The Econ. Times, *Number of Women on UK Corporate Boards Rises 50% in 5 Years* (2021); *Balance for Better Business: Second Report*, GOVERNMENT OF IRELAND (Nov. 2019).
[132] CANADIAN SECURITIES ADMINISTRATORS, *supra* note 131, at 2.

Declaration of Darren Rosenblum in Support of Defendant California Secretary of State's Opposition to Plaintiff's
Motion for Summary Judgment  (2:21-cv-01951-JAM-AC)

large enough to avoid tokenization, without requiring a set percentage of directors from underrepresented communities.[133] When multiple underrepresented individuals appear on a board, reaching a "critical mass," insiders come to see these people as individuals and not as representing their identity, which empowers them to "influence the content and process of board discussions more substantially."[134] Even if outsiders are the only one on a board, they can coalesce with outsiders from different underrepresented groups to form a critical mass, yielding the benefits of having a distinct viewpoint respected by insiders.[135]

101.   Second, AB 979's flexibility provides firms with substantial deference in their searches for new board members. Firms can search for new board members in the same way they did before, with a focus on substantive expertise or different market exposures. AB 979 defers to boards to determine how they can include underrepresented groups. AB 979 simply mandates that some of these people must be from underrepresented communities.

102.   Much of this deference is accomplished through the breadth of individuals encompassed by the term "underrepresented communities" at the core of AB 979. The mandate gives firms several options to reduce in-group bias. It will break the capture of the board by opening the board up to individuals from underrepresented groups,[136] allowing boards to move beyond groupthink.

103.   Particularly when combined with the provisions of SB 826, AB 979 provides an additive element that ensures—in a different fashion—that the people who serve on these boards reflect the full range of human sex identity.

104.   By including a variety of underrepresented groups, AB 979 gives firms flexibility in how they comply. This flexibility is crucial in the current market for leaders, in which attracting

---

[133] *See generally* Rosabeth Moss Kanter, *Some Effects of Proportions on Group Life: Skewed Sex Ratios and Responses to Token Women*, 82 AM. J. SOC. 965, 966, 988 (1977). Kanter argued that only structural change in organizations might achieve real shifts in the allocation of power, and these structural changes would in turn change people as individuals, while changing the mere identity of individuals would not alter the corporation overall.

[134] *See* Vicki W. Kramer et al., *supra* note 125, at 3.

[135] Moreover, "minority members are potentially allies, can form coalitions, and can affect the culture of the group." Lissa Lamkin Broome, John M. Conley, & Kimberly D. Krawiec, *Does Critical Mass Matter? Views From the Boardroom*, 34 SEATTLE U. L. REV. 1049 (2011).

[136] Rosabeth Moss Kanter, *The Nasdaq Mandate Will Expand Diversity in Business — and That's Good for Business*, BOSTON GLOBE (Nov. 23, 2021), https://www.bostonglobe.com/2021/11/23/opinion/nasdaq-mandate-will-expand-diversity-business-thats-good-business/.

30

1    and retaining talent is challenging. Because the definition of "underrepresented groups" includes

2    such a broad range of communities, a board can implement the mandate without being forced to

3    select or exclude someone of a particular group.

4        105.   AB 979 signals to corporate nominating committees that inclusion is not about

5    identity but about breaking down barriers to participation in corporate leadership and preventing

6    groupthink. This flexibility will greatly facilitate firm compliance.

7        106.   Finally, AB 979 imposes a marginal burden. AB 979 does not impose a hard number

8    on firms. Its provision is subtle: it mandates one, two, or three board members from a variety of

9    underrepresented communities, depending on the board's size, and boards can increase their size

10   to whatever size they choose to accommodate all candidates. By contrast, Norway's mandate is

11   infinitely more onerous than that adopted by California in AB 979, requiring at least 40 percent

12   representation of each sex regardless of board size.

13       107.   Under AB 979, firms can include underrepresented groups while also adding board

14   seats to diminish the burden of compliance. Compliance will not prove challenging, particularly

15   in a diverse market such as California's.

16       108.   Indeed, in the brief time since AB 979 became law, a preliminary examination of the

17   Secretary of State's 2022 report shows that disclosure requirements combined with diversity

18   mandates in California appear to be effective in increasing representation on boards. Looking to

19   the ten companies with the largest current market capitalization that filed a 2021 Disclosure

20   Statement, people from underrepresented communities made up at least 23.07% of all the

21   boards.[137] Looking to the top twenty companies, all but one reported having three or more female

22   directors.[138] Based on the twenty largest companies (measured by market capitalization) that are

23   compliant with section 301.4 of California's Corporations Code, on average at least one out of

24   every three directors self-identified as a member of an underrepresented community.[139] Given the

25

26   _____

27   [137] *See* SHIRLEY N. WEBER, DIVERSITY ON BOARDS 4–18 (2022), https://bpd.cdn.sos.ca.gov/div-on-
     boards/dob-report-2022.pdf.
     [138] *See id.*
28   [139] *See id.*

stark history of discrimination and exclusion of underrepresented groups, this progress suggests that California's legislature effectively crafted a statute to address persistent discrimination.

**Conclusion**

109.   The principal purpose of the mandate is to counter structural and systemic discrimination, whether based on race, sexual orientation, or gender identity. This is not only about seeming diverse and fairly distributing corporate leadership positions, which are some of the world's highest-paid jobs.

110.   Eliminating discrimination in the nomination and selection process for corporate boards and in the corporate board pipeline matters for every member of excluded groups. Everyone deserves a shot at becoming a corporate leader, and every kid should be able to dream of success, including at the highest level of firm governance.

111.   Until recently, only heterosexual cisgender white men stood a strong chance of becoming leaders of corporations, including publicly held corporations in California.

112.   AB 979 fosters improved corporate governance that alters the process of who becomes part of the board, while allowing substantial flexibility and continuing to allow board members to select and accommodate all potential qualified candidates through board size increases.

113.   AB 979 is specifically crafted to help eliminate structural and systemic discrimination through its mandated inclusion of underrepresented communities. Markets alone will not and have not rectified the structural discrimination delineated above.

114.   Legislation is necessary, and California has provided a solution that should prove effective and flexible and that will bring strong benefits in corporate performance and governance that will benefit the State, the long-term viability of publicly-held corporations, and its economy.

1      I declare under penalty of perjury that the foregoing is true and correct. Executed on

2 January 21, 2023, in New York, NY.

Darren Rosenblum

Declaration of Darren Rosenblum in Support of Defendant California Secretary of State's Opposition to Plaintiff's
Motion for Summary Judgment  (2:21-cv-01951-JAM-AC)

Exhibit 1

# DARREN ROSENBLUM

Faculty of Law - 3644 Peel Street
Montreal, QC H3A 1W9 Canada
darren.rosenblum@mcgill.ca

## ACADEMIC APPOINTMENTS

| | |
|---|---|
| Fall 2021 | **MCGILL UNIVERSITY FACULTY OF LAW**, Montreal, Quebec<br>Associate Dean, Graduate Studies/Vice Doyen.ne aux études supérieures<br>Full Professor/Professeur.e Titulaire<br>Courses: Business Associations, Corporate Governance, Sexuality & the Law |
| Fall 2004<br>-2021 | **PACE UNIVERSITY SCHOOL OF LAW**, White Plains, NY<br>**Professor (2009-2021); Associate Professor (2004-09)**<br>Primary Courses: Corporations, Contracts, International Business Transactions<br>Secondary Courses: Law & Sexuality, International and Comparative Equality<br>**Faculty Director, Institute of International Commercial Law (2011-present)**<br>Member of the governing board of the Vis Moot; coordinate work involving the world's largest CISG database and promoting international arbitration |
| 2019-20 | **COLUMBIA LAW SCHOOL**, New York<br>**Visiting Scholar, Center for Gender and Sexuality Law** |
| Fall 2018 | **MCGILL UNIVERSITY FACULTY OF LAW**, Montreal, Quebec<br>**Wainwright Fellowship** |
| Spring 2018 | **BROOKLYN LAW SCHOOL**, Brooklyn, NY<br>**Visiting Professor**<br>Course taught: Corporations |
| Fall 2014 | **WASHINGTON COLLEGE OF LAW, AMERICAN UNIVERSITY**, Washington, D.C.<br>**Visiting Professor**<br>Courses taught:  Contracts |
| Spring 2011 | **SEATTLE UNIVERSITY SCHOOL OF LAW**, Seattle, WA<br>**Visiting Professor**<br>Courses taught: Business Entities and International Business Transactions |

## OTHER TEACHING

| | |
|---|---|
| Spring 2021-2 | **ÉCOLE DE DROIT, UNIVERSITE DE PARIS II (ASSAS)**, Paris, France<br>**Professeur Invité (intensive course)** Comparative Corporate Law |
| Spring 2015 | **ÉCOLE DE DROIT, INSTITUT D'ÉTUDES POLITIQUES DE PARIS (SCIENCES PO)**, Paris, France<br>**Professeur Invité (intensive course)** The Traveling Corporation: The |

International Finance of State Shopping

| | |
|---|---|
| Spring 2009 -2015 | **UNIVERSITE DE VERSAILLES ST. QUENTIN EN YVELINES**, Versailles, France<br>Faculté de Droit et de Science Politique<br>**Guest Professor**, International Arbitration Law<br>Classes taught in French and English |
| Spring 2004 | **UNIVERSITY OF PENNSYLVANIA LAW SCHOOL**, Philadelphia, PA<br>**Lecturer-in-Law**, Sexuality and the Law |
| Spring 2013<br>Spring 2003-<br>Spring 2004 | **FORDHAM LAW SCHOOL**, New York, NY<br>**Adjunct Professor**, Contracts, International Business Transactions, Law and<br>     Sexuality |

## PRACTICE EXPERIENCE

| | |
|---|---|
| 2000–2004 | **SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**, New York, NY *and* |
| 1998-2000 | **CLIFFORD CHANCE ROGERS & WELLS LLP**, New York, NY<br>**Litigation and International Arbitration Associate**<br>Represented U.S., British, Brazilian, Canadian, Colombian, French and Peruvian clients in various multi-lingual arbitration and litigation matters, including strategic advice regarding multinational litigation and arbitration, and securities fraud litigation. Conducted accounting arbitration in Jamaica. Conducted business in Portuguese, French, and Spanish. |
| 1996-98 | **THE HONORABLE JOSÉ ANTONIO FUSTÉ**, U.S. District Court, San Juan, Puerto Rico<br>**Law Clerk** |
| 1995-96 | **FLEMMING, ZULACK & WILLIAMSON, LLP**, New York, NY<br>**Litigation Associate** |

## EDUCATION

| | |
|---|---|
| 2005 | **Master's in International Affairs, COLUMBIA UNIVERSITY, SCHOOL OF INTERNATIONAL AND PUBLIC AFFAIRS**, New York, NY<br>• Program at the Institute for International Affairs (ISRI), Havana, Cuba |
| 1995 | **JD, UNIVERSITY OF PENNSYLVANIA LAW SCHOOL**, Philadelphia, PA<br>• Board Member, *Journal of Law and Social Change*<br>• Benjamin R. Jones Award (faculty award for legal writing)<br>• Research Assistant, Professor Susan Sturm<br>• First year of law school at City University of New York Law School<br>• Honor Fellowship, Universidad de la Habana, Havana, Cuba |
| 1991 | **BA, UNIVERSITY OF PENNSYLVANIA,** Philadelphia, PA<br>• Majors in Philosophy and French (coursework at Université de Paris III)<br>• Columnist, *Daily Pennsylvanian* |

## AWARDS AND FELLOWSHIPS

2019            **Goettel Prize** (chosen by a team of external reviewers for outstanding scholarship for *When Does Board Diversity Benefit Firms?*)

2011            **Fulbright Research Scholar**, Paris France
                Selected as one of seven Research Scholars in France for work on the French Corporate Board Quota

Fall 2010       **Ottinger Award for Faculty Achievement** (chosen by faculty peers for outstanding service to Pace Law School)

## SCHOLARLY ARTICLES

*Exploring Rationales for LGBT Board Inclusion* (with Jeremy McClane) (forthcoming 2022)

*Manning Up?* (forthcoming 2023)

*Power and Pay in the C-Suite*, MINN. J. OF L. & INEQUALITY 1( with Afra Afsharipour) (2021).

*No More Old Boys' Club: Institutional Investors' Fiduciary Duty to Diversify Corporate Boards* (with Anat Alon-Beck and Michal Agmon-Gonnen) (forthcoming U.C. DAVIS L. REV. 2021)

*Diversity and the Board of Directors: A Comparative Perspective*, RESEARCH HANDBOOK ON COMPARATIVE CORPORATE GOVERNANCE (Afsharipour and Gelter, eds.) (2021)

*Les quotas de femmes pour les entreprises et l'interdiction du burkini*, 50 REVUE GENERALE DE DROIT 87, UNIVERSITY OF OTTAWA (2020) (French version of "Sex Quotas and Burkini Bans", 2017).

*Board Diversity by Term Limits?*, 71 U. ALABAMA LAW REVIEW 211 (with Yaron Nili, U. Wisconsin Law School) (2020)

*California Dreaming?*, 99 BOSTON UNIVERSITY LAW REVIEW 1435 (2019)

*Samsung v. Apple: How Firms and Nations Compete through Intellectual Property Law*, GLOBAL PRIVATE INTERNATIONAL LAW: ADJUDICATION WITHOUT FRONTIERS (Horatia Muir-Watt, ed.) (2019)

*The Futility of Walls: How Traveling Corporations Threaten State Sovereignty*, 93 TULANE LAW REVIEW 645 (2018) (with Scott Wenzel)

*When Does Board Diversity Benefit Firms?*, 20 UNIVERSITY OF PENNSYLVANIA JOURNAL OF BUSINESS LAW 429 (2017)

*Sex Quotas and Burkini Bans*, 92 TULANE LAW REVIEW 469 (2017), GOVERNANCE FEMINISM: A READER (Janet Halley, et. al., eds.,) (2019)

*More than a Woman: Insights into Corporate Governance after the French Sex Quota*, 48 INDIANA LAW REVIEW 889 (with Daria Roithmayr) (2015) (*reprinted in the* Corporate Practice Commentator, edited by Robert Thompson)

*Quotas and the Transatlantic Divergence of Corporate Governance,* 34 NORTHWESTERN JOURNAL OF INTERNATIONAL BUSINESS LAW 249 (2014) *reprinted in* TOWARDS A EUROPEAN LEGAL CULTURE (with Véronique Magnier) (Purnhagen and Helleringer, eds.) (2014)

*Equality Regimes Compared: France's Political and Corporate Quotas,* EUI WORKING PAPERS, ROBERT SCHUMAN CENTRE FOR ADVANCED STUDIES GLOBAL GOVERNANCE PROGRAMME 136 (2014)

Special Issue Editor, *Comparative Sex Regimes and Corporate Governance*, an edition of three articles with an introduction by Darren Rosenblum, *Comparative Sex Regimes and Corporate Governance: An Introduction*, 26 PACE INTERNATIONAL LAW REVIEW v.1 (2014)

*Unsex Mothering: Toward a New Culture of Parenting,* 35 HARVARD JOURNAL OF GENDER AND LAW 57 (2012) (also subject of related online colloquium)

*Unsex CEDAW, or What's Wrong with Women's Rights,* 20 COLUMBIA JOURNAL OF GENDER AND LAW 98 (2011), *reprinted in* GENDER ISSUES AND HUMAN RIGHTS (Dianne Otto, ed.) (2012)

Special Issue Editor, *After Gender?: Examining International Justice Enterprises*, an edition of eight articles with an introduction by Darren Rosenblum, "*After Gender?: Examining International Justice Enterprises: An Introduction*, 31 PACE LAW REVIEW v.2 (2011).

*Pregnant Man?: A Conversation*, 22 YALE JOURNAL OF LAW AND FEMINISM 207 (2010) *excerpted in* AREEN, SPINDELMAN AND TSOUKALA'S FAMILY LAW, 6TH EDITION

*Rethinking International Women's Human Rights through Eve Sedgwick*, 33:1 HARVARD JOURNAL OF GENDER AND LAW 349 (with Janet Halley, et al.) (2010)

*A Little More Mascara: Response to Making Up Is Hard to Do,* 33:1 HARVARD JOURNAL OF GENDER AND LAW 59 (with Adrienne Davis, Robert Chang, et al.) (2010)

*Feminizing Capital: A Corporate Imperative,* 6:1 BERKELEY BUSINESS LAW JOURNAL 55 (2009)

*Queer Intersectionality Revisited: Expanding Legal Victories,* in QUEER MOBILIZATIONS: LGBT ACTIVISTS CONFRONT THE LAW (Anna Maria Marshall and Mary Bernstein, eds.) (NYU Press 2009)

*Loving Gender Balance: Reframing Identity-Based Equality Remedies*, 76 FORDHAM LAW REVIEW 101 (2008)

*Internalizing Gender: Why International Law Theory Should Adopt Comparative Methods*, 45 COLUMBIA JOURNAL OF TRANSNATIONAL LAW 759 (2007)

*Parity/Disparity: Electoral Gender Inequality on the Tightrope of Liberal Constitutional Traditions*, 39 U.C. DAVIS LAW REVIEW 1119 (2006)

*"Trapped" in Sing-Sing: Transgendered Prisoners Caught in the Gender Binarism*, 6 MICHIGAN JOURNAL OF GENDER & LAW 499 (2000)

*Geographically Sexual?: Advancing Lesbian and Gay Interests Through Proportional Representation*, 31 HARVARD CIVIL RIGHTS-CIVIL LIBERTIES LAW REVIEW 119 (1996)

*Overcoming "Stigmas": Lesbian and Gay Districts and Black Electoral Empowerment*, 39 HOWARD LAW REVIEW 149 (1995)

*Queer Intersectionality and the Failure of Lesbian and Gay "Victories"*
4 LAW & SEXUALITY 83 (1994)

## EXPERT WORK

*Expert Report on California's SB 826*, Report prepared for the California Department of Justice (2021)

*Expert Report on California's AB 979*, Report prepared for the California Department of Justice (2021)

## PRACTICE ARTICLES AND EDITORIALS

*If Men Were Targets, Abortion Bans Would Be Unimaginable*, L.A. TIMES (July 26, 2022)

*The Best Mother's Day Gift Is The American Families Plan*, FORBES (May 9, 2021)

*Misgendering students is not 'academic freedom.' It's an abuse of power.*, THE WASHINGTON POST (March 31, 2021)

*When The State Levies Fines On Feminism*, FORBES (Dec. 17, 2020)

*Carrots And Sticks: Why Nasdaq Adopted Its Radical Board Diversity Rule*, FORBES (Dec. 2, 2020)

*Will Quotas For Women Lead To Broader Diversity?*, FORBES (Nov. 18, 2020)

*Amy Coney Barrett, LGBT Rights and Judicial Legitimacy*, FORBES (Oct. 24, 2020)

*California Pioneers New Quota For People Of Color & LGBT People*, FORBES (Oct. 5, 2020)

*Mandatory Paternity Leave: The Key To Workplace Equality*, FORBES (Oct. 1, 2020)

*Citibank's New Leader: Do Women On Boards Yield Diverse CEOs?*, FORBES (Sept. 11, 2020)

*California Dreaming*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE & FINANCIAL REGULATION (August 9, 2019)

*Diversity by Term Limits?*, HARVARD LAW SCHOOL FORUM ON CORPORATE GOVERNANCE & FINANCIAL REGULATION (June 10, 2019)

When *Does Board Diversity Benefit Firms?* THE CONFERENCE BOARD DIRECTORS NOTES (2018)

*The French Corporate Board Quota*, THE CONFERENCE BOARD DIRECTORS NOTES (2017)

*Quotas for Women: A Step toward Equality,* Letter to the Editor, NY TIMES (Feb. 26, 2017)

*Leave Your Laptops at the Door to My Classroom*, NY TIMES (Jan. 2, 2017)

*For Starters, "Unsex" the Birth Certificate*, Room for Debate, NY TIMES (Oct. 20, 2014)

*Should Job Creation Favor Men?*, SAN FRANCISCO CHRONICLE (May 19, 2008) (with Melissa Murray)

*California Exposes New York's Discriminatory Stance on Marriage*, THE RECORDER (May 23, 2008)

*Una Prohibición que Roba el Futuro*, EL NUEVO DÍA (Puerto Rico) (Jan. 30, 2008)

*Livre Comércio e o Meio Ambiente*, VI CADERNOS DO PROGRAMA DE PÓS GRADUAÇÃO EM DIREITO –
   UNIVERSIDADE FEDERAL DO RIO GRANDE DO SUL 99-108 (Sept. 2006)

*Same Sex Marriage and Meritocracy*, NEW YORK LAW JOURNAL 2 (July 12, 2006)

*Sodomy, Buggery, Crimes Against Nature, Disorderly Conduct, and Lewd and Lascivious Law and Policy*, in
   ENCYCLOPEDIA OF LESBIAN, GAY, BISEXUAL, AND TRANSGENDERED HISTORY IN AMERICA
   (Gale, 2004)

*The Bay Hotel Case: Accommodating the Parties' Wishes*, 17.1 MEALEY'S INTERNATIONAL ARBITRATION
   REPORT (2002)

## SELECTED SYMPOSIA, LECTURES AND PRESENTATIONS

*Berle Conference*, Seattle University School of Law (co-organizer with Chuck O'Kelley) (forthcoming
   2022)

*The Fight for Gender Justice, Part II: The Equal Rights in the 21st Century, Panel organized by Women's
   Leadership Network and the Ms. Foundation* (March 2022).

*Summer Academy on Law, Money and Technology: Toward Democratic Futures*, Young Scholars Initiative
   (July 2021)

*(Re)Naming and (Re)Framing: 'Diversity, Equity and Inclusion' in the Age of Anti-Racism*, Plenary Panel at
   2021 Law and Society Association Annual Meeting (May 2021)

*California's Quota: A Roundtable*, Law and Society Association Annual Meeting (May 2021)

*Feminism and Corporate Law: Reforming Corporate Governance Roundtable*, Minnesota Journal of Law &
   Inequality (Summer 2020)

*The Queering of Corporate America*, 2020 Law and Society Association Annual Meeting (May 2020)

*The Political Economy of Corporate Governance: Neutral Rules, Male Capture*, Columbia Law School Faculty
Workshop (May 2020); Law & Society (May 2020), University of Maryland Law Review Symposium
(March 2020); Columbia Law School (May 2020)

*The Transnational Sex Quota Movement*, presentation at conference around Comparative Corporate Law
   Handbook (Afsharipour & Gelter, eds.) (Oct. 2019)

*Quotas pour les Femmes et la Prohibition des Voiles,* Illusions Perdues? Conference at Université de Montréal (Sept. 2019)

*Unsex the Firm,* APPEAL Conference, University of Maryland Law School (2019)

*Dignity and Social Movements*, Mini-Plenary Roundtable at Law and Society Association, Washington, D.C. (2019) (organized panel as member of LSA Planning Committee)

*California Dreaming*, Boston University Law Review Symposium (Nov. 2018)

*Contests of Powers / Conflicts of Values: Law in a Transnational and Transsystemic Society*, day-long conference organized for the Faculty of Law at McGill University including Ignacio Cofone, Amy Cohen, Jaye Ellis, Evan Fox-Decent, Frédéric Megret, Will Moon, Robert Wai, Kerry Rittich, Geneviève Saumier, and Chantal Thomas (Nov. 2018)

*Traveling Corporations*, Harvard Institute for Global Law & Policy (June 2018), Law & Society Association, Mexico City (June 2017)

*Regulating Gender Globally*, Roundtable at Harvard Institute for Global Law & Policy (June 2018)

*Diversity by Term Limits?*, National Business Scholars Conference (June 2018)

*Crises and Diverse Leadership: Insights from the French Sex Quota*, Accenture-Mizuho Joint Lecture (November 2017)

 *Sex Quotas and Burkini Bans,* Fordham Center on Race, Law & Justice (Oct. 2017), Workshop on SDI Conference, Sciences Po (June 2017), Governance Feminism Workshop (Jan. 2015), Institute of Global Law and Policy (June 2015)

*When Does Diversity Benefit Firms?*, Brooklyn Law School (Apr. 2018), Sciences Po Law School (Oct. 2017), Université de Lyon III (Nov. 2017), Florida International University Law School (Jan. 2017) National Business Law Scholars Conference, University of Chicago (June 2016, June 2017), Rutgers Law School (March 2016), Cardozo Law School (April 2016)

*Trans/Feminisms* panel at Queer Disruptions Conference at Columbia University (Oct. 2016).

*Manning Up?* Santa Clara Law School Symposium (February 2016), Sciences Po Law School (June 2016)

*More than a Woman: Insights into Corporate Governance after the French Sex Quota*, presented as Guest of Honor at French National Assembly conference on the Effects of the Copé-Zimmerman Law (June 2015); Challenging Boardroom Homogeneity, Yale Law School (May 2015); Sciences Po Law School Faculty Workshop (Feb. 2015); University of Chicago Law School Workshop on Regulating Family, Sex and Gender (Feb. 2015); AALS Business Associations Section (Jan. 2015); Faculty Workshop, Washington College of Law, American University (Oct. 2014)

Darren Rosenblum

*Corporate Elite Reproduction*, Institute for Global Law and Policy, Harvard Law School (June 2015); Governance Feminism Writer's Workshop, Harvard Law School (Jan. 2015); *Elites*, Queen Critical Legal Studies Conference, Northeastern Law School (June 2014)

*Sex Regimes and Corporate Governance*, Faculty Workshop, Columbia University School of Law Center for Gender and Sexuality Law (March 2014); AALS Comparative Law Program (January 2014); AALS Section on Economic Globalization and Governance Law Program (January 2014); AALS Socio-Economics Panel on Responses to the Crisis (January 2014); Global Governance Programme of the European University Institute (November 2013)*;* University of Utah School of Law (September 2013); Faculty Workshop, Hofstra University School of Law (September 2013

*Quotas in the European Union: An Update*, European Law Panel, International Law Weekend at Fordham Law School (October 2013)

*After Legal Equality: Family, Sex, Kinship*, McGill School of Law (April 2013)

*Sex, Quotas and Corporate Governance*, University of Colorado Law School Critical Theory Workshop (April 2013); Panel organizer and participant at International Law Weekend – American Branch of the International Law Association (October 2012)

*Getting a Seat at the Boardroom Table*, Panelist at NYC Bar Association (May 2012)

*Unsex Mothering*, Live forum hosted by Harvard Journal of Gender and Law, with commentary by Elizabeth Emens, Mary Anne Case, Suzanne Kim and Duncan Kennedy; Online forum with eighteen legal scholars) (Feb. 2012); Seattle University Faculty Workshop (Apr. 2011); Williamette Law School Faculty Workshop (Jan. 2011); U. Connecticut Law School Faculty Workshop (Mar. 2011); New York LGBT Law Scholars Workgroup (Mar. 2011); U. Washington Law School (Mar. 2011)

*Governance, Stakeholders and Quotas: towards a European Corporate Culture?*, Towards a European Legal Culture, Institute of European and Comparative Law, Oxford University (Dec. 2011)

*Parité et Gouvernance*, debate with Veronique Moralie hosted by the Chaire Ethique de l'Université Cergy Pontoise, Paris France (Dec. 2011)

*Compensation et Ethique, une Perspective des Etats Unis, Congres Européen Droit et Ethique*, Organisation of Economic Cooperation and Development and Université de Cergy-Pontoise, Paris France (Nov. 2011)

*La Contradiction du Pouvoir des Accionaires*, Centre Sorbonne Finance, IRJS, Institut Tunc, Paris France (Oct. 2011)

*Corporate Governance, Sex and Quotas: A Transnational Perspective*, Harvard Law School Co-Curricular Lecture on Corporate Governance (Mar. 2011); U. Dayton Law School (Feb. 2011)
*Feminizing Capital: A Corporate Imperative*, Brooklyn Law School Faculty Workshop (Sept. 2010);

Feminism & Legal Theory Workshop, Emory Law School (May 2007)

*Queering Intersectionality* and *Transnational Intersectionalities,* Panel organizer/speaker, Critical Race Studies Conference, U.C.L.A. Law School (March 2010);

*Unsex CEDAW, or What's Wrong with Women's Rights,* Syracuse University (Mar. 2011); U.S.C. Law School (March 2010); Williams Institute, U.C.L.A. Law School (March 2010); University of Maryland Law School (Nov. 2009); Whittier College of Law (Mar. 2009); Hofstra Law and Sexuality Colloquium (Oct. 2008); Columbia University Human Rights Seminar (Oct. 2008); International Political Science Association, Bilgi University, Istanbul, Turkey (June 2008); Law, Culture and the Humanities (Mar. 2008); American Association of Law Schools Annual Conference, Section on International Human Rights Panel (Jan. 2008)

*Nacionalización/Feminización: Post-Crash Desarollo Económico*, South/North Exchange, Santiago Chile (May 2009)

*Arbitraje Estadounidense y el Comercio Latinoamericano*, Universidad Peruana de Ciencias Aplicadas, Lima Peru (Apr. 2009); Jornada Internacional de Arbitraje, University of Buenos Aires (Sept. 2008)

*Democracy, Gender and International Law*, Roundtable organizer/participant, American Society of International Law (Mar. 2007)

*Desigualdade Eleitoral entre Sexos e o Meio Ambiente (Electoral Gender Inequality and the Environment)*, III Seminario Internacional de Direito do Meio Ambiente, Rio de Janiero, Brazil (May 2006)

*Desigualdad de género en matería electoral y respuestas a la Globalización (Globalization and Electoral Gender Inequality)*, South-North Exchange Conference, Bogota (May 2006)

*Internalizing Gender* Faculty Workshop at Rutgers Law School – Camden (Oct. 2006) Global Advancement of Women Symposium at the University of Maryland Law School (Apr. 2006); New York LGBT Scholars' Workshop (Feb. 2006); International Law Society Conference (Oct. 2005); Lat Crit X (Oct. 2005)

*Livre Comércio e Meio Ambiente (Free Trade and the Environment)*, II Seminario Internacional de Direito do Meio Ambiente, Rio de Janiero, Brazil (May 2005) and at Globalização Econômica, Meio Ambiente e Sociedade Civil, Law Faculty of the Federal University of Rio Grande do Sul, Porto Alegre, Brazil (Jun. 2005)

*Parity, Phallocracy, and Comparative Women's Political Representation*, Critical Race Feminism Symposium, U.C. Davis Law School (Apr. 2005)

*Interseccionalidade Queer e a Amplitude das Recentes Vitorias Legais Nos Estados Unidos(Queer Intersectionality and the Breadth of Recent Legal Victories in the United States)*, presented at Congreso da Associação Brasileira de Homocultura (ABEH), University of Brasilia, Brasilia, Brazil (June 2004)

Darren Rosenblum

## LAW SCHOOL AND PROFESSIONAL SERVICE

Member, Grievance Committee, 1st Department Appellate Division of New York State (2019-2022)
Member, Diversity Committee, Law & Society (2019-2023)
Pace Law School Business Concentration Director; Executive Director, Commercial and Private International Law Programs (2015-2019)
Programming Committee, Law & Society, 2019 Annual Meeting
External Evaluator, Université de Montréal International Business Program (2018)
Treasurer, Board of the Vis Moot (2013-present)
Chair, Board of The Ecole (N.Y.C. private French elementary and middle school) (2017 – present)
    Raised nearly $4M in private funding for a transfer of ownership of the school to secure its future.
Chair, Corporate and Securities Law Section of Law & Society (2017-18)
Member, Provost Search Committee (2017-18), Presidential Search Committee (2016-17), Nominating Committee (2012-13, 2016-17), Chair, Appointments Committee (2013-14); Chair, Faculty Development Committee (Fall 2017, 2008-2010); Member, Strategic Planning Committee (Fall 2008-Spring 2010); Appointments Committee (2006-07); Technology Committee (2004-2005)
*Comparative Sex Regimes and Corporate Boards,* symposium organizer and participant (Feb. 2013)
Member, Human Rights Watch LGBT Advisory Committee (2009-2013)
*After Gender: Examining International Justice Enterprises,* symposium organizer and participant, with over twenty speakers including a keynote by Janet Halley (Nov. 2010)
Member, Human Rights Watch LGBT Advisory Committee (2009-present)
Member, Faculty Advisory Council, Williams Institute, UCLA Law School (2010-present)
Lecturer in Pace Law School Brazil Program, in Portuguese (Summer 2006) and in Introduction to U.S. Law Course (Fall 2005, Fall 2006)
Faculty Advisor to Latin American Law Students' Association, LAMBDA Students' Association, and International Law Society (2004-present)
*Pro bono* work including ABCNY September 11 Victim Assistance Program

## AFFILIATIONS AND LANGUAGES

Fluent in French and Spanish, advanced knowledge of Portuguese (lecture and teach in all three languages)
Admitted to practice law in New York, New Jersey (inactive), the District of Columbia (inactive), and Puerto Rico (U.S. District Court) (inactive)
Member, Law and Society Association (2005-present); American Society of International Law (2004-2011), Society of American Law Teachers (2004-present); Association of the Bar of the City of New York (1995-present); LatCrit (1997-present, Board Member 2009-11); New York LGBT Scholars Workshop (2005-present)
Member, Steering Committee Penn GALA (2003-09)