JOHANNA S. SCHIAVONI, SBN 248501
Law Office of Johanna S. Schiavoni
2801 B Street, # 220
San Diego, CA 92102
Telephone: (619) 269-4046
Email:  johanna@schiavoni-law.com

Counsel for *Amicus Curiae*
PROFESSOR JERRY KANG

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

ALLIANCE FOR FAIR BOARD
RECRUITMENT,

     Plaintiff,

v.

DR. SHIRLEY N. WEBER, in her official
capacity as Secretary of State of the State
of California,

     Defendant.

No. 2:21-cv-01951-JAM-AC

**BRIEF OF *AMICUS CURIAE* PROFESSOR JERRY KANG IN SUPPORT OF DEFENDANT SECRETARY OF STATE'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

**Brief submitted with the consent of all parties**

Judge:  Hon. John A. Mendez

1
2
## CORPORATE DISCLOSURE STATEMENT

3    Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A), the undersigned

4 counsel certifies that the *amicus curiae* is not a subsidiary of any other corporation and no

5 publicly held corporation owns 10% or more of its stock.

6                                               */s/ Johanna S. Schiavoni*
7                                               Johanna S. Schiavoni

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................i

INTEREST OF *AMICUS CURIAE* .......................................................................ix

INTRODUCTION ....................................................................................................1

ARGUMENT..............................................................................................................2

   I.   The Science of Implicit Bias ...........................................................................2

       A.     Understanding the Idea of Implicit Bias ..............................................2

       B.     Understanding the Instrument to Measure Implicit Bias ....................3

       C.     Understanding the Impacts of Implicit Bias on Selection of Corporate Board Members....................................................................................................7

            1.    The Potential Impacts of Implicit Bias on the Selection Processes...........7

                a.    Implicit Bias at the Resume Stage ......................................8

                b.    Implicit Bias at the Interview Stage....................................8

                c.    Implicit Bias in Evaluation of Performance Competence ................9

                d.    Implicit Bias in Selection...................................................10

            2.    Meta-analyses Confirm Implicit Bias in Areas of Decisionmaking Relevant to Board Member Selection.......................................................11

            3.    Addressing Potential Objections ................................................14

   II.   Implicit Bias Is Legally Cognizable .....................................................16

       A.     Discrimination Caused by Implicit Bias Is "Different Treatment" on the Basis of Race...........................................................................................16

       B.     Courts Have Recognized Discrimination Caused by Implicit Bias Under Several Different Antidiscrimination Laws ...........................................17

   III. Preventing Discrimination Caused by Implicit Bias Is Legally Compelling *and* a Difficult Problem to Remedy ...............................................................................21

       A.     Legally Compelling...................................................................21

ii

B.     Simplistic Solutions Do Not Effectively Address Implicit Bias ........................24

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Associated General Contractors of California, Inc. v. Coalition for Economic Equity,*
   950 F.2d 1401 (9th Cir. 1991) ........................................................................23

*Bras v. California Public Utilities Commission,*
   59 F.3d 869 (9th Cir. 1995) ............................................................................23

*California, et al., v. U.S. Dep't of the Interior,*
   381 F.Supp.3d 1153 (N.D. Cal. 2019) ..............................................................x

*Comcast Corporation v. National Association African American-Owned Media,*
   140 S.Ct. 1009 (2020) ....................................................................................20

*Earth Island Institute v. Nash,*
   19-cv-01420-DAD-SAB2019, 2019 WL 6790682 (E.D. Cal. Dec. 12, 2019)..............x

*Griggs v. Duke Power Co.,*
   401 U.S. 424 (1971)........................................................................................17

*Grutter v. Bollinger,*
   539 U.S. 306 (2003)........................................................................................21

*Kansas v. Gill,*
   56 Kan.App.2d 1278 (2019) .....................................................................19, 20

*Kimble v. Wisconsin Dept. of Workforce Development,*
   690 F.Supp.2d 765 (E.D. Wis. 2010) ........................................................17, 18

*Los Angeles Department of Water and Power v. Manhart,*
   435 U.S. 702 (1978)........................................................................................21

*Ricci v. DeStefano,*
   557 U.S. 557 (2009)........................................................................................18

*University of Texas Southwestern Medical Center v. Nassar,*
   570 U.S. 338 (2013)........................................................................................21

*Woods v. City of Greensboro,*
   855 F.3d 639 (4th Cir. 2017) ..........................................................................18

*Wygant v. Jackson Bd. of Educ.,*
   476 U.S. 267 (1986)........................................................................................17

1

**STATUTES**

2

AB 979, codified at Cal. Corp. Code § 301.4 ............................................................*passim*

3

42 U.S.C. § 1981 ....................................................................2, 16, 18, 20, 21

4

42 U.S.C. § 1981(a) ..............................................................................2, 18

5

42 U.S.C. § 2000e-2(a)(1) ....................................................................17, 18

6

42 U.S.C. § 2000e-2(m) ............................................................................17

7

Kan. Stat. Ann. § 22-4606(d) ....................................................................19

8

Kan. Stat. Ann. § 22-4609 ..........................................................................19

9

**RULES**

10

Fed. R. App. Proc. 26.1 ..................................................................................i

11

Fed. R. App. Proc. 29(a)(4)(A) ....................................................................i

12

Federal Rule of Civil Procedure 12(b)(6) ..................................................19

13

14

15

**OTHER AUTHORITIES**

16

17

Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable than
Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 Amer.
Econ. Rev. 991 (2004),

18

https://www.aeaweb.org/articles?id=10.1257/0002828042002561 .............................8

19

Marc Bendick Jr. & Ana P. Nunes, *Developing the Research Basis for Controlling Bias
in Hiring*, J. Social Issues, Vol. 68, No. 2, 238, 248 (2012):

20

http://www.bendickegan.com/pdf/BendickNunes.pdf ..................................................15

21

Tessa E.S. Charlesworth & Mahzarin R. Banaji, *Patterns of Implicit and Explicit
Attitudes: 1. Long Term Change and Stability From 2007 to 2016*, 30 Psychological
Science 174 (2019)

22

https://journals.sagepub.com/doi/abs/10.1177/0956797618813087 ........................... 6

23

Susan T. Fiske & Shelley E. Taylor, SOCIAL COGNITION 492 (2d ed. 1991) ...............2

24

Anthony G. Greenwald & Calvin K. Lai, *Annual Review of Psychology: Implicit Social
Cognition*, 71 Ann. Rev. of Psychology 419 (2020),

25

https://www.annualreviews.org/doi/pdf/10.1146/annurev-psych-010419-050837 .......3

26

27

28

Anthony G. Greenwald et al., *Implicit-Bias Remedies: Treating Discriminatory Bias as a Public-Health Problem*, 23 Psychol. Sci. Pub. Int. 7 (2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9121529/ ................................... 5, 11

Anthony G. Greenwald & Mahzarin R. Banaji, *Implicit Social Cognition: Attitudes, Self-Esteem, and Stereotypes*, 102 Psychological Rev. 4 (1995), https://faculty.washington.edu/agg/pdf/Greenwald_Banaji_PsychRev_1995.OCR.pdf ........................................................................................................ 4

Anthony G. Greenwald et al., *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. Personality & Soc. Psychol. 1464 (1998), https://psycnet.apa.org/record/1998-02892-004 ........................................... 4

Anthony G. Greenwald et al., *Statistically Small Effects of the Implicit Association Test Can Have Societally Large Effects*, 108 J. Pers. & Soc. Psych. 553 (2014), https://pubmed.ncbi.nlm.nih.gov/25402677/ ............................................. 13

Anthony G. Greenwald et al., *Understanding and Using the Implicit Association Test: III. Meta-Analysis of Predictive Validity*, 97 J. Personality & Soc. Psychol. 17 (2009), https://faculty.washington.edu/agg/pdf/GPU&B.meta-analysis.JPSP.2009.pdf ........ 12

Kurt Hugenberg & Galen V. Bodenhausen, *Facing Prejudice: Implicit Prejudice and the Perception of Facial Threat*, 14 Psychol. Sci. 640 (2003), https://journals.sagepub.com/doi/10.1046/j.0956-7976.2003.psci_1478.x .................. 9

Kristin A. Lane, Jerry Kang, & Mahzarin R. Banaji, *Implicit Social Cognition and Law*, 3 Ann. Rev. Law. & Soc. Sci. 427 (2007), https://www.annualreviews.org/doi/abs/10.1146/annurev.lawsocsci.3.081806.112748 ...................................................................................................... 3

Alexandra Kalev et al., *Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies*, 71 Am. Soc. Rev. 589 (2006) https://journals.sagepub.com/doi/abs/10.1177/000312240607100404 ....................... 24

Jerry Kang, et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124 (2012) ............. ................................................................................................ 10, 13, 19

Jerry Kang, *Implicit Bias*: *A Primer for Courts* (Aug. 2009), https://www.courts.ca.gov/documents/BTB_XXII_WEDF_3.pdf ............................. 2

Jerry Kang et al., *Are Ideal Litigators White? Measuring the Myth of Colorblindness*, 7 J. Empirical Leg. Studies 886 (2010), https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1740-1461.2010.01199.x ............. 9

Jerry Kang, *Implicit Bias, Behavioral Realism, and the Purposeful Intent Doctrine* (forthcoming Oxford Handbook of Race and the Law 2023), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4238083 ................................ 21

Jerry Kang, *What Judges Can Do About Implicit Bias*, 57 Court Rev. 78 (2021),
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4033906 .............................3, 14

Jerry Kang & Kristin Lane, *Seeing Through Colorblindness: Implicit Bias and The Law*,
58 UCLA L. Rev. 465 (2010).......................................................................................14

Benedikt Kurdi et al., *Relationship Between the Implicit Association Test and Intergroup
Behavior: A Meta-Analysis*, 74 Am. Psychologist 569 (2019)
https://pubmed.ncbi.nlm.nih.gov/30550298/................................................................12

Calvin K. Lai & Megan E. Wilson, *Measuring Implicit Intergroup Biases*, 15 Social &
Personality Psychology Compass 1 (2021)
https://compass.onlinelibrary.wiley.com/doi/10.1111/spc3.12573 ...............................4

Calvin K. Lai et al., *Reducing Implicit Preferences: II. Intervention Effectiveness Across
Time*, 145 J. Experimental Psychology: General 1001 (2016)
https://psycnet.apa.org/record/2016-29854-001 ........................................................24

Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 U.C. Irvine L. Rev. 843
(2015)............................................................................................................................3

Gregory J. Meyer et al., *Psychological Testing and Psychological Assessment: A Review
of Evidence and Issues*, 56 Am. Psychologist 128 (2001),
https://pubmed.ncbi.nlm.nih.gov/11279806/................................................................13

Brian A. Nosek et al., *Pervasiveness and Correlates of Implicit Attitudes and Stereotypes*,
18 Eur. Rev. Soc. Psychol. 1 (2007)
https://faculty.washington.edu/agg/pdf/Nosek%20&%20al.PCIAS.ERSP.2007.pdf
............................................................................................................................5, 6, 7

Christopher D. Petsko & Ashleigh Shelby Rosette, *Are Leaders Still Presumed White by
Default? Racial Bias in Leader Categorization Revisited*, 108 J. Applied Psychology
330 (2023)
https://psycnet.apa.org/doiLanding?doi=10.1037%2Fapl0001020. ........................9, 10

Project Implicit,
https://implicit.harvard.edu/implicit/
…………………………………………………………………………4, 5, 6

Lincoln Quillian et al., *Meta-Analysis of Field Experiments Show No Change in Racial
Discrimination in Hiring Over Time*, 114 Proceedings Nat'l Acad. Sci. 10870 (2017),
https://pubmed.ncbi.nlm.nih.gov/28900012/................................................................15

Kate A. Ratliff et al., *Documenting Bias from 2007-2015: Pervasiveness and Correlates
of Implicit Attitudes and Stereotypes II* (unpublished pre-print),
https://osf.io/jeyc7   ............................................................................................5, 6, 7

Dan-Olof Rooth, *Automatic Associations and Discrimination in Hiring: Real World Evidence*, 17 Labour Economics 523 (2010), https://econpapers.repec.org/article/eeelabeco/v_3a17_3ay_3a2010_3ai_3a3_3ap_3a5 23-534.htm ...............................................................................................................8

***AMICUS CURIAE* BRIEF SUBMITTED WITH THE CONSENT OF ALL PARTIES**

Professor Jerry Kang submits this brief as *amicus curiae* supporting Defendant California Secretary of State's Opposition to Plaintiff's Motion for Summary Judgment.  Both parties consented to the filing of an *amicus curiae* brief by Professor Kang, and this brief is timely filed under this Court's scheduling order.  Doc. No. 118.[1]

**INTEREST OF *AMICUS CURIAE***

Jerry Kang is a Distinguished Professor of Law and (by courtesy) of Asian American Studies at UCLA.  He was the inaugural Korea Times – *Hankook Ilbo* Chair in Korean American Studies and Law (2010-20), and he served as the founding Vice Chancellor for Equity, Diversity and Inclusion for the entire University (2015-20).  He graduated magna cum laude from both Harvard College (physics) and Harvard Law School, where he was a supervising editor of the Harvard Law Review.  After clerking for the Ninth Circuit Court of Appeals, he started his professorship at UCLA in 1995.

Professor Kang is a leading scholar on implicit bias and has written nearly twenty scholarly articles on the topic, often co-authoring with leading scientists in the field.  He has lectured broadly on the topic to bar associations, non-profits, law firms, and major corporations. He has given implicit bias talks or created training materials for the following judicial entities:

Federal Courts

- Fifth Circuit Court of Appeals

- N.D. of California, District of Montana

- Southern District of New York

State Courts

- California (multiple County courts and Traynor Lecture whose video is now used as implicit bias training);

- Connecticut (including prosecutors and public defenders)

- Delaware, Ohio (including training videos), Washington

---

[1] Counsel and *amicus curiae* authored the brief in whole, and no person—other than the *amicus curiae* or its counsel—contributed money intended to fund preparing or submitting this brief.

1       •       National Center for State Courts

2       Others

3       •       Department of Justice, EOIR (training video for all immigration judges)

4       •       Social Security administration, ALJs (training video)

5       •       California ALJs (training video)

6       •       U.S. Attorneys, Central District of California

7       •       EEOC

8       The brief analyzes social science research relating to implicit bias and sets out an

9   independent perspective on the constitutional questions presented.  *See California, et al., v. U.S.*

10  *Dep't of the Interior*, 381 F.Supp.3d 1153, 1164 (N.D. Cal. 2019) ("an individual seeking to

11  appear as amicus must merely make a showing that [the] participation is useful or otherwise

12  desirable to the court"); *Earth Island Institute v. Nash*, 19-cv-01420-DAD-SAB2019, 2019 WL

13  6790682, *1 (E.D. Cal. Dec. 12, 2019) (noting that district court has broad discretion to accept

14  briefs from *amici curiae* and granting motion to file amicus brief submitted in support of

15  defendant's opposition to motion for preliminary injunction).

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

In their motion for summary judgment, Plaintiff Alliance for Fair Board Recruitment briefly mentions "implicit biases."  It clumps the concept together with "structural and systemic" discrimination, which it characterizes as "the sorts of disparate impacts that are said to arise from societal forces, structures, and *implicit biases*, rather than intentional discrimination or animus. . . ."  Doc. No. 88-1 at 14-15 (emphasis added).  Unfortunately, terms such as "structural" or "societal" discrimination are not always defined precisely.  As such, it is easy to lump these terms together with implicit bias, and describe them collectively as vague complaints about historical background unfairness.

Amicus believes that such conflation is scientifically inaccurate, conceptually confused, and legally erroneous.  This brief addresses the concept of *implicit* bias, though it also recognizes that the Defendant Secretary of State presents evidence of many *other* forms of bias and causes of discrimination.

To promote clear and careful consideration of the merits on the issue of implicit bias, this amicus brief has three objectives:

    (1) provide a clear, accurate, objective update to the Court about the scientific research on implicit bias;

    (2) explain that discrimination caused by implicit bias is a form of different *treatment* (not disparate *impact*), which courts have recognized under various state and federal antidiscrimination laws;

    (3) explain that remedying ongoing discrimination—including ongoing discrimination caused by implicit bias—is a legally compelling interest that poses a difficult problem to remedy.

**ARGUMENT**

I.      **The Science of Implicit Bias**

    A.      **Understanding the Idea of Implicit Bias**

       A "bias" is simply a deviation from some baseline of comparison that is accepted as neutral or appropriate.  For instance, 42 U.S.C. § 1981, invoked in Plaintiff's third claim for relief, explicitly defines equal rights as extending the "full and equal benefit" of laws and rights "as is enjoyed by white citizens" as the baseline of comparison.  *Id.*, § 1981(a).

       In social psychology, bias toward a social category is understood in terms of attitudes or stereotypes.  An "attitude" is an overall evaluative valence toward a category, which ranges from positive to negative (e.g., an overall like versus dislike, approach versus avoid reaction).  *See* Susan T. Fiske & Shelley E. Taylor, SOCIAL COGNITION 492 (2d ed. 1991) (defining attitude as an "association in memory between a given object and one's evaluation of that object.").  By contrast, a "stereotype" is a more specific attribute or trait that is probabilistically associated with a category (e.g., generalizing that a group tends to be tall, smart, or charismatic.  *See* Jerry Kang, *Implicit Bias: A Primer for Courts* (Aug. 2009) (prepared for the National Center for State Courts).[1]  One can hold a positive attitude towards a group and still associate that group with a negative stereotype, and vice versa.  For example, one may hold a negative attitude toward Asian Americans (e.g., finding them not especially fun to hang out with) but still have a positive stereotype about their mathematical ability (e.g., good for accounting).

       The adjective "implicit" is best understood in contrast to "explicit."  "Explicit" need not be graphic or extreme as that word is commonly used in terms such as "explicit lyrics."  Instead, it is better to understand "explicit" as being *subject to direct introspection*.  By contrast, an "implicit" bias is an attitude or stereotype that is *not* readily subject to direct introspection.  *See*

---

[1]  Available at:  https://www.courts.ca.gov/documents/BTB_XXII_WEDF_3.pdf

Kristin A. Lane, Jerry Kang, & Mahzarin R. Banaji, *Implicit Social Cognition and Law*, 3 Ann. Rev. Law. & Soc. Sci. 427, 429 (2007)[2] (describing implicit attitudes and stereotypes as "introspectively unidentified (or inaccurately identified) traces of past experiences that mediate" favorable or unfavorable feelings or attributions of qualities).  In other words, implicit social cognitions cannot be measured simply by asking ourselves direct questions about our own thoughts and feelings.  Direct introspection can make us only dimly self-aware of these cognitions and how they might influence our judgments and behavior.

In sum, an *implicit bias is an attitude or stereotype about a social category that we cannot easily ascertain via direct introspection*.  *See* Jerry Kang, *What Judges Can Do About Implicit Bias*, 57 Court Rev. 78, 78-79 (2021).[3]

**B.      Understanding the Instrument to Measure Implicit Bias**

Because *explicit* bias is subject to direct introspection, it is typically measured through direct questioning, for example in a survey instrument.  This is also how *voir dire* works in a jury trial—*viz.,* by asking questions under oath about a potential juror's biases.  *See* Cynthia Lee, *A New Approach to Voir Dire on Racial Bias*, 5 U.C. Irvine L. Rev. 843, 845-46 (2015).

By contrast, because *implicit* bias is not readily subject to direct introspection, it must be measured *indirectly*.  Experimental social psychologists have developed more than eighteen instruments to measure implicit bias.  *See* Anthony G. Greenwald & Calvin K. Lai, *Annual Review of Psychology: Implicit Social Cognition*, 71 Ann. Rev. of Psychology 419, 422-24 (2020)[4] (providing three categories: (1) the Implicit Association Test (IAT) and its variants; (2) priming tasks (where brief exposure to priming stimuli facilitates or inhibits subsequent

---

[2] Available at:
https://www.annualreviews.org/doi/abs/10.1146/annurev.lawsocsci.3.081806.112748
[3] Available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4033906
[4] Available at: https://www.annualreviews.org/doi/pdf/10.1146/annurev-psych-010419-050837

3

reactions); and (3) miscellaneous other tasks including linguistic or writing exercises); Calvin K. Lai & Megan E. Wilson, *Measuring Implicit Intergroup Biases*, 15 Social & Personality Psychology Compass 1 (2021).[5]

The lengthy list emphasizes that the *idea* of implicit bias should be kept separate from any particular *instrument* by which it is measured, such as the well-known Implicit Association Test (IAT).  That instrument was invented by Anthony Greenwald based on theoretical work done together with Mahzarin Banaji.  *See* Anthony G. Greenwald et al., *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. Personality & Soc. Psychol. 1464, 1464-66 (1998) (introducing the IAT)[6]; Anthony G. Greenwald & Mahzarin R. Banaji, *Implicit Social Cognition: Attitudes, Self-Esteem, and Stereotypes*, 102 Psychological Rev. 4 (1995).[7]  Amicus has co-authored articles with both of these world-renowned scientists.

This brief focuses on research using the IAT not because it is a perfect test.  No such test exists.  The IAT is, however, the best available and most widely used scientific measure of implicit biases.  The IAT is essentially a videogame requiring fast sorting of stimuli flashed on a computer screen.[8]  These stimuli represent either two social categories (e.g., White people versus Black people represented by photos) or two social cognitions (e.g., positive versus negative attitude represented by words).  The stimuli are positioned on the screen in a way that demand keyboard responses that are either consistent or inconsistent with our implicit social cognitions.

For instance, if we have a more positive implicit attitude toward White people, then we should respond more quickly when White faces (representing White people) and "good" words

---

[5] Available at: https://compass.onlinelibrary.wiley.com/doi/10.1111/spc3.12573

[6] Available at: https://psycnet.apa.org/record/1998-02892-004

[7] Available at: https://faculty.washington.edu/agg/pdf/Greenwald_Banaji_PsychRev_1995.OCR.pdf

[8] To take an IAT for free, anonymously, visit the Project Implicit website at https://implicit.harvard.edu/implicit/.

(representing a positive attitude) are paired together on the same response key as compared to the opposite arrangement of Black faces and "good" words.  On average, this faster response might be just a fraction of a second.  In the course of an IAT, these raw reaction time deltas are repeatedly measured through multiple blocks of trials, mathematically processed, and transformed into statistical units.  These reaction time latencies roughly signal the comparative strength of the underlying implicit association.  *See* Anthony G. Greenwald et al., *Implicit-Bias Remedies: Treating Discriminatory Bias as a Public-Health Problem*, 23 Psychol. Sci. Pub. Int. 7, 12-14 (2022) (describing the IAT in greater detail).[9]

Millions of people have taken IATs since the late 1990s, in the United States and around the globe.  The first systematic analysis of the pervasiveness and correlates of implicit attitudes and stereotypes, as measured by the IAT, was conducted by Brian Nosek and colleagues in 2007 (describing data collected on 17 different tests at Project Implicit, a publicly available research site, during 2000-2006).  Brian A. Nosek et al., *Pervasiveness and Correlates of Implicit Attitudes and Stereotypes*, 18 Eur. Rev. Soc. Psychol. 1 (2007)[10] (hereafter "Nosek 2007").  The study authors found that implicit bias—as measured by the IAT at Project Implicit—was *pervasive*.  *Id.* at 2.  For example, most respondents show asymmetries in reaction times and find it easier to sort White faces with "good" words (as compared to Black faces with "good" words).  *Id.* at 3 & Table 1.  Implicit bias also was found to be generally *larger* in magnitude than explicit bias self-reported on surveys, especially when measuring biases on socially sensitive topics such as race. *Id.* at 22 & 11, Table 2.

Kate Ratliff and colleagues updated the Nosek analysis with Project Implicit data from 2007-2015.  *See* Kate A. Ratliff et al., *Documenting Bias from 2007-2015: Pervasiveness and*

---

[9] Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9121529/

[10] Available at: https://faculty.washington.edu/agg/pdf/Nosek%20&%20al.PCIAS.ERSP.2007.pdf

*Correlates of Implicit Attitudes and Stereotypes II* (unpublished pre-print) at 2 (hereafter

"Ratliff").[11]   These study authors again found that "results from more than 7 million people who

have completed implicit and explicit measures of bias on the Project Implicit website . . . show

quite clearly that bias favoring culturally dominant or valued groups over those that are less

dominant are pervasive, strong, and widely shared."  *Id.* at 24.  They also found that

"[p]articipants had more positive implicit and explicit attitudes towards the ingroup than

outgroup."  *Id.* at 21.

Overall, these large dataset analyses are consistent with IAT data generated from

experiments conducted in hundreds of laboratories around the world over the past 30 years.  One

might reasonably worry about the representativeness of data collected through volunteers, over

the Internet, at Project Implicit.  This is not a random sample, and the volunteers skew female,

politically left, and towards a younger demographic.  Tessa E.S. Charlesworth & Mahzarin R.

Banaji, *Patterns of Implicit and Explicit Attitudes: 1. Long Term Change and Stability From 2007*

*to 2016*, 30 Psychological Science 174, 176 (2019)[12] (hereafter "Charlesworth & Banaji 2019").

But these demographic groups tend to show slightly *less* implicit bias than their counterparts, *see*

Nosek 2007 at 28, 32, 35-36.  This means that the Project Implicit data likely underestimate (not

overestimate) what a random sample of the U.S. population would show.  To respond to the

problem of a nonrandom sample, some of the large data analyses statistically weight the data to

approximate the demographics of the U.S. population.  Charlesworth & Banaji 2019 at 179.

Finally, one might wonder whether highly educated professionals—like the executives

and existing board members who are deeply involved in the selection of new board members—

might have fewer implicit biases.  But the best evidence suggests otherwise.  Implicit bias tests

---

[11] Available at: https://osf.io/jeyc7

[12] Available at: https://journals.sagepub.com/doi/abs/10.1177/0956797618813087

given to lawyers, judges, doctors, and managers all suggest that higher education and professional training are not tightly correlated with decreased levels of bias.  Rather, education does not diminish the level of implicit bias.[13]   And, if we explore demographic categories besides education and profession, men show more implicit bias on average than women.[14]  People in their 60's tend to show more implicit bias than people in their 20's.[15]  White people show more implicit bias (on the White versus Black attitude IAT) than all other races.[16]  So to the extent that corporate executives are disproportionately White, male, educated, and older, there is no reason to assume that they are immune from the implicit biases that affect us all.

In sum, *implicit bias* toward racial minority groups *is pervasive and larger in magnitude than measures of explicit biases*.  The data further support the finding that those likely to be corporate executives or board members are not immune to implicit bias; they may be slightly more prone to it.

### C.    Understanding the Impacts of Implicit Bias on Selection of Corporate Board Members

The mere fact that implicit bias measured by reaction-time differences is *statistically significant* does not mean that it is *socially* significant, worthy of legislative response.  For that to be the case, there must be evidence that implicit bias causes or at least correlates with real-world discrimination.

### 1.    The Potential Impacts of Implicit Bias on the Selection Processes

Hundreds of studies have found statistically significant correlations between measures of

---

[13] Ratliff at 18 (finding miniscule but positive correlation, *r*=.005, between more education and overall implicit bias).
[14] Nosek 2007 at 28.
[15] *Id.* at 32 (finding both positive and curvilinear relationships, but noting that "[t]he age 60 and older group reported the strongest" biases in six of nine domains, including race, skin-tone, child-race, Arab-Muslim, sexuality, and weight) & 14, Table 5.
[16] *Id.* at 13 & Table 4.

implicit bias, such as the IAT, and some behavior, such as an evaluation, recommendation, or scoring.  Here are a few studies that are relevant in the selection of candidates, which could include a new member of a corporate board.

### a.      Implicit Bias at the Resume Stage

Identical resumes have been evaluated differently as a function of subtle racial cues.  For instance, tester studies show that "Emily" or "Greg" will be more likely to be called back for an interview than "Lakisha" or "Jamaal" even though they have identical merits, human capital, and interests.  Marianne Bertrand & Sendhil Mullainathan, *Are Emily and Greg More Employable than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination*, 94 Amer. Econ. Rev. 991, 992 (2004)[17] ("A White name yields more call-backs as an additional eight years of experience on a resume.  Since applicants' names are randomly assigned, this gap can only be attributed to the name manipulation.").

Research has correlated such differential call-back rates with implicit stereotypes.  Dan-Olof Rooth, *Automatic Associations and Discrimination in Hiring: Real World Evidence*, 17 Labour Economics 523, 529 (2010)[18] (finding that implicit stereotypes predicted differential callbacks of Swedish-named versus Arab/Muslim-named resumes; "What our results then indicate is that there are recruiters who implicitly discriminate, but who would not explicitly do so.  The results present evidence of that recruiting behavior is being affected by implicit prejudice rather than by explicit discrimination being observed by a new and better empirical measure.").

### b.      Implicit Bias at the Interview Stage

Identical body language will be differently read as a function of implicit biases.  For example, the exact same smile will be seen more readily on White faces as compared to Black

---

[17] Available at: https://www.aeaweb.org/articles?id=10.1257/0002828042002561
[18] Available at:
https://econpapers.repec.org/article/eeelabeco/v_3a17_3ay_3a2010_3ai_3a3_3ap_3a523-534.htm

8

faces as a function of implicit attitudes in favor of White people over Black people.  *See* Kurt

Hugenberg & Galen V. Bodenhausen, *Facing Prejudice: Implicit Prejudice and the Perception of*

*Facial Threat*, 14 Psychol. Sci. 640, 643 (2003)[19] ("a measure of the implicit, relatively automatic

aspects of prejudice predicted performance better than the measure of explicit prejudice did.  The

present findings add to the growing evidence that implicit measures such as the IAT have

predictive validity in consequential domains of social cognition.").

**c.**   **Implicit Bias in Evaluation of Performance Competence**

In a study co-authored by amicus, the question presented was whether implicit stereotypes

about Asian American men (as compared to White men) would predict differential evaluations of

an audio recording of a lawyer taking a five-minute deposition.  Jerry Kang et al., *Are Ideal*

*Litigators White? Measuring the Myth of Colorblindness*, 7 J. Empirical Leg. Studies 886, 900

(2010).[20]  Amicus discovered the existence of a moderately strong implicit stereotype associating

"litigator" with "White."  *Id*.  In addition, these implicit stereotypes altered how people evaluated

the same deposition recording when they were tricked into thinking that it was done by a White

versus Asian attorney.  *Id*. at 900-01. Specifically, stronger implicit stereotypes correlated with

more favorable evaluations of the White lawyer in terms of his competence, likeability, and

hireability.  *Id*. at 901 & Table 3.  This finding is consistent with a psychological theory called

"Role Congruity Theory" which suggests that if a person looks like they fit the part, they will be

better accepted in that role.  *Id.* at 890-92 (discussing sources).

This study about litigators is relevant to the selection of board members because many of

the attributes associated with effective lawyers—such as competence and charisma—are those

associated with leaders, including potential members of the board.  *Cf.* Christopher D. Petsko &

---

[19] Available at: https://journals.sagepub.com/doi/10.1046/j.0956-7976.2003.psci_1478.x
[20] Available at: https://onlinelibrary.wiley.com/doi/abs/10.1111/j.1740-1461.2010.01199.x

9

Ashleigh Shelby Rosette, *Are Leaders Still Presumed White by Default? Racial Bias in Leader Categorization Revisited*, 108 J. Applied Psychology 330, 337 & Table 4 (2023)[21] (finding attributes such as intelligent, ambitious, persistent, efficient, aggressive, and arrogant to be associated with "leader" and reporting that "[a]cross three preregistered experiments, we found general evidence in favor of the idea that the White-leader effect holds up to scrutiny, but that White-leader associations may be easier to detect when using methods that circumvent participants' ability to engage in socially desirable responding.").

### d.      Implicit Bias in Selection

The ultimate selection of a board member is highly subjective.  There is no standardized test, no rubric or objective scoring algorithm.  That means that multiple factors ranging from experience, skills, contacts, reputation, luster, cultural fit, work ethic, personality, affinities, friendship, etc. will all combine together to produce a final decision.  But whenever there are multifactor tests that are highly discretionary, humans tend to engage in motivated reasoning and tweak merit criteria and their weightings to justify our selection preferences.  Put in simpler terms, we choose the person we want, then justify to ourselves that selection by molding merit standards accordingly.

The social science literature calls this "constructed criteria," "shifting standards," and "casuistry."  Kang, et al., *Implicit Bias in the Courtroom* at 1156.  Decision-makers tend to alter their decision criteria subtly and unconsciously, in real time, to justify an underlying intuition or preference.  In other words, we often go with our gut, which means preferring people we like (warmth) or seem to be like us (ingroup favoritism), then rationalize a *post hoc* explanation to justify that decision.  *See id.* at 1156-59, 1164-66.

---

[21] Available at:  https://psycnet.apa.org/doiLanding?doi=10.1037%2Fapl0001020

1

2

**2.      Meta-analyses Confirm Implicit Bias in Areas of Decisionmaking Relevant to Board Member Selection**

3        A skeptical reader may be concerned that the studies listed above were cherry-picked.

4   The best way to check against biased reporting of individual studies is to gauge the overall

5   strength of a body of science via meta-analyses.  A "meta-analysis" is an analysis of analyses.  It

6   avoids over-reading the impact of one or a few studies by analyzing *all* the studies that can be

7   identified in the relevant domain and synthesizing their findings into a single composite number,

8   usually the "effect size."

9

10       In implicit social cognition, the effect size is measured by the degree of correlation

11  between an implicit bias measure and discriminatory behavior.  The correlation is a measure of a

12  linear relationship between two variables, such as age and height, height and weight, or in this

13  case implicit bias and discriminatory behavior.  It is quantified by a variable called Pearson's *r*,

14  which runs from 0, which means no relationship between bias and behavior, to ±1, which means a

15  perfectly linear positive or negative relationship.

16

17       As relevant to the discussion here, three large meta-analyses have been conducted by

18  research teams both favorable and hostile to the Implicit Association Test.  The combined

19  correlation from these studies averaged $r = .165$.[22] which by disciplinary convention is called a

20  "small-to-moderate" effect size.[23]

21       The modest effect sizes found in the meta-analyses should not be surprising given how

22  difficult it is to measure accurately the strength of mental associations through reaction times and

23  how difficult it is to measure accurately whether some behavior or judgment is discriminatory,

24  especially in realistic situations.  Imprecise measures of any two variables—in this case, implicit

25

26

27  [22] *See* Greenwald et al., *Implicit-Bias Remedies: Treating Discriminatory Bias as a Public-Health Problem*, 23 Psychol. Sci. Pub. Int. at 11.

28  [23] By convention, $r = .10$ is called "small," and $r = .30$ is called "moderate."

11

bias and behavior—necessarily weaken the strength of the measured relationship that can be calculated between them.  To see why, suppose there were a perfectly linear relationship between *actual* height and *actual* weight (which there is not).  Suppose further that our rulers (measuring height) and scales (measuring weight) are crude and imprecise (off randomly by many inches and pounds).  Because our instruments are imperfect, the relationship calculated between *measured* height and *measured* weight would fail to show that perfectly linear relationship.  If the underlying relationship exists, then better instruments developed over time through scientific advances will likely reveal larger effect sizes.

At this time, however, the best available scientific data show small-to-modest effect sizes.  Accordingly, a legislator or judge may reasonably wonder whether the effect sizes are too small to be of social significance.  One way to answer that question is to inquire, "As compared to what?"

**First**, compare *implicit* bias scores to *explicit* bias scores.  The data reveal that implicit bias predicts intergroup discriminatory behavior *better* than explicit measures of bias.[24]  In other words, implicit bias is more correlated with intergroup behavior than explicit bias is.

**Second**, it is useful to compare the effect sizes of implicit bias scores with the effect sizes of medical commonsense.  Many people take aspirin to reduce the chances of death by heart attack.  Many parents tell their children never to smoke because of the risks of lung cancer.  Many

---

[24] *See, e.g.,* Anthony G. Greenwald et al., *Understanding and Using the Implicit Association Test: III. Meta-Analysis of Predictive Validity*, 97 J. Personality & Soc. Psychol. 17, 24 & Table 3 (2009) (finding that *implicit* attitude scores predicted behavior in the Black/White domain at an average correlation of r=0.24, whereas *explicit* attitude scores had correlations of average r=0.12), available at https://faculty.washington.edu/agg/pdf/GPU&B.meta-analysis.JPSP.2009.pdf; Benedikt Kurdi et al., *Relationship Between the Implicit Association Test and Intergroup Behavior: A Meta-Analysis*, 74 Am. Psychologist 569, 569 (2019) (finding that *implicit biases* provide a unique contribution to predicting behavior ($\beta$ = .14) and does so *more than explicit measures* ($\beta$ = .11), available at: https://pubmed.ncbi.nlm.nih.gov/30550298/).

people worry about low-level lead exposure for fear of its impact on childhood brain development.  But all of these commonsense behaviors turn out to be based on correlations *lower* than the correlation found between implicit bias and discriminatory behavior.  *See* Gregory J. Meyer et al., *Psychological Testing and Psychological Assessment: A Review of Evidence and Issues*, 56 Am. Psychologist 128, 130 & Table 1 (2001).[25]

**Finally**, as has been formally modeled, small differences in treatment and evaluation can accumulate in path-dependent ways over time and across large populations to produce surprisingly significant social disparities.  *See* Anthony G. Greenwald et al., *Statistically Small Effects of the Implicit Association Test Can Have Societally Large Effects*, 108 J. Pers. & Soc. Psych. 553, 557-60 (2014)[26]; Jerry Kang, et al., *Implicit Bias in the Courtroom*, 59 UCLA L. Rev. 1124, 1143, 1151-52 (2012) (discussing the impacts of implicit racial biases of juries in criminal cases)).

Little things accumulate.  For instance, certain criminal law simulations based on modest assumptions about the impact of implicit bias ($r$=0.1) show that Black criminals can expect a sentence of 2.44 years versus a White criminal expecting 1.40 years for a crime with a mean sentence of 5 years.  Kang, *Implicit Bias in the Courtroom* at 1151 ("For a single defendant, these biases may surface for various decisionmakers repeatedly in policing, charging, bail, plea bargaining, pretrial motions, evidentiary motions, witness credibility, lawyer persuasiveness, guilt determination, sentencing recommendations, sentencing itself, appeal, and so on. Even small biases at each stage may aggregate into a substantial effect.").  In another stylized simulation of BigLaw, if implicit bias creates just a 1% difference in a monthly up-or-out model for lawyers progressing on an an eight-year partnership track, the White associate's chances of making

---

[25] Available at: https://pubmed.ncbi.nlm.nih.gov/11279806/
[26] Available at: https://pubmed.ncbi.nlm.nih.gov/25402677/

partner would be 38.1%, while the chances for the Black associate would be only 14.4%.  Jerry

Kang, *What Judges Can Do About Implicit Bias*, 57 Court Rev. at 80-81.

### 3.   Addressing Potential Objections

The implicit bias science has triggered robust and sometimes heated academic and

political debate.  Jerry Kang & Kristin Lane, *Seeing Through Colorblindness: Implicit Bias and*

*The Law*, 58 UCLA L. Rev. 465, 504-09 (2010) (describing "junk science" backlash).  For

example, some commentators do not believe it appropriate to call these mental associations "bias"

because they are not conscious or explicitly embraced.  Others complain that the IAT measures

something else such as familiarity or background knowledge of social conditions.  Some claim

that the correlations with real world behavior are too low to matter.  Many of these objections

have triggered deeper scientific research advancing our collective knowledge.  This is scientific

progress.

Yet some of these objections are more *political* than *scientific*.  Frankly, implicit biases

exist or do not exist, and have an impact or do not have an impact, regardless of what human

beings choose to call them in the English language.  We do not need to place any harsh moral

label on these mental associations, which is why leading scientists and amicus do not call them

"prejudice" or "animus" or even "racism."

Whatever implicit biases are called, the best scientific evidence suggests that they are

mental phenomena that exist, can be measured, are not random, and are correlated to different

treatment of fellow human beings in ways that violate our explicit moral commitments.  Although

scientists can and should continue to dispute and research further the effect sizes especially in

real-world settings, even the research teams most hostile to the idea of implicit bias do not

suggest that they have no impact whatsoever.

14

Finally, one can always retort that correlations never prove causation.  True, but consider the following depressing facts.  According to a summary by Mark Bendick and Ana Nunes, there have been "several dozen testing studies" in the past two decades, in multiple countries, focusing on discrimination against multiple demographic groups (including women, the elderly, racial minorities).  *See* Marc Bendick Jr. & Ana P. Nunes*, Developing the Research Basis for Controlling Bias in Hiring*, J. Social Issues, Vol. 68, No. 2, 238, 248 (2012).[27]  These studies consistently reveal typical "net rates of discrimination" ranging from 20% to 40%.  In other words, in 20 to 40% of cases, employers treat subordinated groups (e.g., racial minorities) worse than privileged groups (e.g., Whites) even though the testers were carefully controlled to be identically qualified.

In a more recent 2021 paper by Lincoln Quillian and colleagues published in the Proceedings of the National Academies of Science, a meta-analysis of field experiments (i.e., using testers to apply for real-world opportunities) showed no real change in racial discrimination in hiring over the past 25 years for Blacks and only a modest change for Latinos.  *See* Lincoln Quillian et al., *Meta-Analysis of Field Experiments Show No Change in Racial Discrimination in Hiring Over Time*, 114 Proceedings Nat'l Acad. Sci. 10870 (2017).[28]  Additionally, the meta-analysis found "no large differences in magnitude across [occupational] categories," which separated out studies for categories called "blue collar, office-focused, and restaurant occupations."  *Id*. at 10872.

In other words, the brute fact of disparate treatment persists.  How can this be when laws and social norms against racial discrimination have strengthened over the past 50 years?  Is it possible that all these employers are just engaging in illicit, covert explicit discrimination and

---

[27] Available at: http://www.bendickegan.com/pdf/BendickNunes.pdf
[28] Available at: https://pubmed.ncbi.nlm.nih.gov/28900012/

hiding their tracks?  Maybe some are.  But for many others, the implicit bias story provides a more scientifically supported explanation why the *disparate treatment* uncovered in the tester studies persists.

## II.        Implicit Bias Is Legally Cognizable

In their motion for summary judgment, Plaintiffs suggest that implicit bias produces a "disparate impact."  Doc. No. 88-1 at 14-15 ("the sorts of disparate impact that are said to arise from societal forces, structures, and *implicit biases*, rather than intentional discrimination or animus.").  To be clear, "disparate impact" is a legal term-of-art that is distinguished from "disparate treatment" in Title VII jurisprudence.  Current constitutional jurisprudence does not recognize pure "disparate impact" as a violation of the Equal Protection Clause.  Also, although other civil rights statutes recognize disparate impact theories, 42 U.S.C. § 1981 does not.

Thus, the gist of Plaintiff's statement is to suggest that implicit biases are part of a vague set of allegations connected to disparate impact that are not legally cognizable.  Such a position reflects an erroneous understanding and application of antidiscrimination law to implicit bias.

### A.        Discrimination Caused by Implicit Bias Is "Different Treatment" on the Basis of Race

Plaintiff makes a categorization error.  A pure disparate impact is a disproportionate impact that is created between racial groups *even when the applied selection rule treats everyone identically regardless of race*.  This is an important social problem, and implicit bias in past decisions no doubt plays an important role.

But the implicit bias research isolates another, more clear and present problem—i.e., that we *do not in fact treat everyone identically* regardless of race *because of implicit bias*.  In other words, even when the merits are identical, we read people's qualities and performance consistent with our implicit attitudes and stereotypes.  Put another way, implicit bias *causes ongoing discrimination*.

16

To avoid any confusion, by "discrimination," amicus means *different treatment* of otherwise identical persons simply because of their race.  Implicit bias directly supports a different treatment claim.  It is not "racial balancing."  It is not the "business case for diversity."  It is not "general societal discrimination," a term originating in *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 274 (1986) (plurality), more than a decade before the scientific discovery of implicit bias.  It is not even remedying past discrimination.  It is aimed at remedying ongoing discrimination.

**B.**     **Courts Have Recognized Discrimination Caused by Implicit Bias Under Several Different Antidiscrimination Laws**

One of Plaintiff's central claims is that to the extent AB 979 is aimed at remedying implicit biases, those biases are merely "disparate impacts" as distinguished from "intentional discrimination or animus."  Doc. 88-1 at 14-15.  This contention implies that different treatment caused by implicit bias is not legally cognizable because it is not "intentional" or driven by "animus."  *Id.*  Not so.  Numerous courts, interpreting several different anti-discrimination laws, have rejected the notion that a purposeful state of mind or animus is strictly necessary to find a discrimination violation.

For example, in *Kimble v. Wisconsin Dept. of Workforce Development*, 690 F.Supp.2d 765, 768 (E.D. Wis. 2010), the plaintiff raised a disparate *treatment* discrimination claim under Title VII of the 1964 Civil Rights Act.  42 U.S.C. § 2000e-2(a)(1), (m).  Before the rise of the scientific data and studies identifying implicit social cognition, it would have been natural to assume that disparate *treatment* requires an explicit, purposeful intent to treat racial minorities worse, especially to distinguish disparate treatment from the disparate *impact* theory of liability set forth in *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).  After all, 30 years ago, that was a commonsense understanding of how racial discrimination occurred.

17

But the plain text of Title VII nowhere includes the words "explicit" or "purposeful." Instead, the statute merely requires "because of"—which by its own terms suggests only a *causal* connection between the adverse employment action and the plaintiff's protected social categories. 42 U.S.C. § 2000e-2(a)(1).  As such, Title VII is textually open to a disparate treatment theory that goes beyond purposeful discrimination.  *Kimble*, 690 F.Supp.2d at 768 ("Nor must a trier of fact decide whether a decision-maker acted *purposively* or based on stereotypical attitudes of which he or she was partially or entirely unaware.") (emphasis added).

With this broader understanding in mind, the Eastern District of Wisconsin declined to require "intentional discrimination" in the sense of requiring purposeful intent; instead, the court embraced racial *causation* as the test for cognizability of the Title VII claim.  The court explained that "in determining whether an employer engaged in disparate treatment, the critical inquiry is *whether its decision was affected* by the employee's membership in a protected class."  *Id.* at 768-69 (emphasis added); *see also Ricci v. DeStefano*, 557 U.S. 557, 579, 580 (2009) (making clear that malevolent or hostile motivations are not required for a disparate treatment claim; "the City made its employment decision *because of race*") (emphasis added).

Applying this legal understanding to the facts in a bench trial, the court observed that "when the evaluation . . . is highly subjective, there is a risk that supervisors will make judgments based on stereotypes of which they *may or may not be entirely aware*."  *Kimble*, 690 F.Supp.2d at 775-76 (emphasis added).  The court noted that because of the ordinary psychological process of categorical thinking, a supervisor may use stereotypes "*whether or not* the supervisor is *fully aware* that this is so."  *Id*. at 776 (emphasis added).

In *Woods v. City of Greensboro*, 855 F.3d 639 (4th Cir. 2017), the plaintiffs alleged federal civil rights violations under 42 U.S.C. § 1981 (equal contracting rights) because the city denied them certain economic development loans.  42 U.S.C. § 1981(a) ("All persons within the

jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts...as is enjoyed by white citizens. . . .").  The defendant moved to dismiss for failure to state a claim upon which the law grants relief, under Federal Rule of Civil Procedure 12(b)(6).  The district court granted the motion to dismiss.[29]

The Fourth Circuit reversed.  The appellate court began its analysis by noting that "many studies have shown that most people harbor *implicit biases* and even well-intentioned people *unknowingly act* on racist attitudes."  *Woods,* 855 F.3d at 641 (emphasis added).  The court pointed out that the same actor may discriminate differently depending on the context: "it is unlikely today that an actor would *explicitly discriminate* under all conditions; it is much more likely that, where discrimination occurs, it does so in the context of *more nuanced decisions* that can be explained based upon reasons *other than illicit bias*, which though *perhaps implicit, is no less intentional*."  *Id*. at 651-52 (emphasis added).  Finally, the court warned that: "there is thus a real risk that legitimate discrimination claims, particularly claims based on more *subtle theories* of stereotyping or *implicit bias*, will be dismissed should a judge substitute his or her view of the likely reason for a particular action in place of the controlling plausibility standard."  *Id*. at 652 (emphasis added).  For these reasons, the Court of Appeals reversed and allowed the case to proceed to discovery.

Recently, in *Kansas v. Gill*, 56 Kan.App.2d 1278 (2019), a Kansas appellate court interpreted a newly-enacted state statute that prohibited "racial or other biased-based policing," Kan. Stat. Ann. § 22-4609, which was defined as "the unreasonable use of race . . . by a law enforcement officer in deciding to initiate an enforcement action."  *Id.* § 22-4606(d).  In this case, a police officer had approached two Black men in an SUV because they were "staring hard" at

---

[29] For discussions about how implicit bias could infect the "plausibility" standard, see Kang, et al. *Implicit Bias in the Courtroom* at 1159-64.

19

him, which approach led to the officer's smelling marijuana and discovering drugs in the car. The trial court found that the police officer had used race unreasonably, and on appeal the majority of the appellate court affirmed.

The dissent framed the issue in stark terms: "Before we brand an officer of the law . . . a racist, there ought to be evidence supporting such a serious charge."  56 Kan.App.2d at 1288 (Powell, J., dissenting).  But the majority explained that "*no one here is branding [the officer] a racist*."  *Id*. at 1286 (emphasis added).  Instead, it framed the question presented as one of racial causation, whether the officer "let racial bias—*conscious or unconscious—affect* his initiation of enforcement action."  *Id*. at 1286-87 (emphasis added).  The court observed that the statute did not expressly require "exceptionally horrific or despicable race-based behavior"; to the contrary, the "[l]egislature recognized that racial bias is not always overt, it is often *subtle*" and that federal law enforcement leadership had publicly recognized that "all people have some form of *unconscious racial biases*."  *Id*. at 1287 (emphasis added).

These cases provide just a few examples of courts recognizing, as a matter of law, that different treatment caused by implicit bias can violate federal and state antidiscrimination laws. While not controlling precedents for this Court, they merit consideration, particularly in light of the Supreme Court's recent pronouncement in *Comcast Corporation v. National Association African American-Owned Media*, 140 S.Ct. 1009 (2020).  At issue was the proper "causation" standard for § 1981 claim.  The Supreme Court stated:

> It is "textbook tort law" that a plaintiff seeking redress for a defendant's legal wrong typically must prove but-for causation. . . . Under this standard, a plaintiff must demonstrate that, but for the defendant's unlawful conduct, its alleged injury would not have occurred.  This ancient and simple "but-for" common law causation test, we have held, supplies the "default" or "background" rule against which Congress is normally presumed to have legislated when creating its own new causes of action. . . . *That includes when it comes to federal antidiscrimination laws* like § 1981.

20

*Id.* at 1014 (emphasis added) (citations omitted).  The quotation above included citations to *Los Angeles Department of Water and Power v. Manhart*, 435 U.S. 702 (1978), an important Equal Protection case, and *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338 (2013), a Title VII case.  The Supreme Court has held that the touchstone for a different treatment claim across multiple bodies of anti-discrimination law is racial causation: Did race *cause* worse treatment, regardless of the level of self-awareness or political valence?[30]

**III.     Preventing Discrimination Caused by Implicit Bias Is Legally Compelling *and* a Difficult Problem to Remedy**

**A.     Legally Compelling**

Under an Equal Protection challenge, the State must provide a compelling interest and demonstrate narrow tailoring.  According to Plaintiff, a compelling interest can only be remedying past discrimination (narrowly circumscribed) and educational diversity in higher education.  Doc. No. 88-1 at 12-15.  This framing is only partly correct.  If remedying *past* discrimination is a compelling interest, preventing or addressing ongoing discrimination taking place right *now* is *a fortiori* compelling.  It is this compelling interest—remedying and preventing ongoing race discrimination—that explains why a statute such as § 1981, which Plaintiff itself invokes, has not been struck down as unconstitutional even though it makes an explicit racial classification (referring to treatment of "white citizens" as a baseline).

Indeed, even the arguments in favor of educational diversity as a compelling interest recognized the separate strand of discrimination prevention as compelling.  In *Grutter v. Bollinger*, 539 U.S. 306 (2003), the Supreme Court noted that one of the reasons why

---

[30] For more examples of judicial opinions acknowledging discrimination caused by implicit bias, see Jerry Kang, *Implicit Bias, Behavioral Realism, and the Purposeful Intent Doctrine* (forthcoming Oxford Handbook of Race and the Law 2023), available at: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4238083.

demographic diversity was valuable was because it could help "break down racial stereotypes," which differs from claims of general pedagogical benefits (such as sharing multiple substantive intellectual perspectives). *Id.* at 330. Breaking down racial stereotypes is compelling in that it is a way to prevent discrimination going forward.

Finally, addressing a potential counter point, amicus acknowledges that one could argue that discrimination caused by implicit bias is a form of different treatment that is too uncertain or probabilistic to be cognizable. In other words, science can provide no certainty in any particular case that one specific person was denied a board directorship because of a specific implicit bias. This states a truism. General scientific principles of causation never speak definitively to the particulars of a single case, whether they be about implicit bias causing different treatment or gamma rays causing cancer.

But it proves too much to suggest that the State cannot address a harm simply because that harm is probabilistic. A toxic waste site produces only probabilistic harms that increase the background rate of cancer in the adjacent neighborhood. Simply because we cannot identify which specific individual's cancer is caused by the toxic site (versus some other background source) should not be a reason to prohibit the State from responding.

Plaintiff actually supports this understanding of harm, at least when it serves its own interest. Although the legal question differs, consider Plaintiff's arguments about standing made in this very case. In its motion for summary judgment, arguing in favor of standing, Plaintiff points out that the flexible floor of AB 979 creates a "competitive disadvantage for corporate board positions," "prevents them from [competing] on an equal basis." Doc. No. 88-1 at 21. In other words, Plaintiff claims to suffer a probabilistic harm regardless of any concrete actualization. *See* Doc. 88-1 at 20-22 (arguing that even if shareholders lack sufficient shares to swing a vote, they have been harmed for standing purposes because they "are denied a level

22

playing field by AB 979"),

In the hearing on the motion to dismiss, this Court already found *Bras v. California Public Utilities Commission*, 59 F.3d 869 (9th Cir. 1995), to be on point.  Doc. No. 73 at 25-26.  In *Bras*, the Ninth Circuit reiterated that "the mere fact that members cannot play on an even playing field . . . subjects them to a legally cognizable injury."  *Id*. at 873 (quoting *Associated General Contractors of California, Inc. v. Coalition for Economic Equity*, 950 F.2d 1401, 1407 (9th Cir. 1991), cert. denied, 503 U.S. 985 (1992)).  In deciding the motion to dismiss, this Court accepted that Plaintiff has standing to make a facial challenge because, according to Plaintiff, AB 979 "encourages [racial] discrimination . . . regardless of whether discrimination is *actually required in every instance*."  Doc. No. 73 at 29 (emphasis added).

The parallel now becomes obvious.  Recent discoveries about implicit bias, coupled with tester studies and undisputed statistical disparities in board representation, show that racial minorities play on an uneven playing field right now (not just in some distant past).  *This* is a harm of racial discrimination regardless of whether discrimination actually occurs in every instance.  This also is a harm that a legislature can respond to, as did the California Legislature in enacting AB 979.  *See* Doc. 114 at 15 ("Existing directors' bias and concomitant discriminatory practices perpetuate the exclusion of members of groups to which AB 979 applies.");  *id.* at 24 ("AB 979's purpose is to break down discriminatory barriers and to prevent discrimination going forward.")  Indeed, a search for "implicit" or "unconscious" in the exhibits attached to the Plaintiff's own motion for summary judgment reveals more than 20 instances.  In other words, implicit bias-caused discrimination was indeed in the record that the Legislature relied upon.

Remedying ongoing disparate treatment caused by implicit racial bias is a compelling interest.  That judgment does not change simply because we lack omniscience and our understanding of the disparate treatment is probabilistic.  Finally, Plaintiff cannot have it both

ways.  It cannot assert that its harms warrant a facial constitutional challenge *regardless of being probabilistic* while arguing that the State's interest in remedying ongoing discrimination cannot be important *by virtue of being probabilistic*.

### B.      Simplistic Solutions Do Not Effectively Address Implicit Bias

It would be wonderful if scientists had discovered an easy solution to counter implicit bias.  Unfortunately, notwithstanding substantial research, there is no silver bullet or panacea to prevent discrimination caused by implicit bias.

*First*, general educational programs often called "diversity training" are unlikely to produce demographic changes in the managerial class.  *See* Alexandra Kalev et al., *Best Practices or Best Guesses? Assessing the Efficacy of Corporate Affirmative Action and Diversity Policies*, 71 Am. Soc. Rev. 589, 602-04 & Table 2 (2006).[31]

*Second*, there is no simple way to scrub our brains clean of implicit biases through some short intervention.  Short-term interventions produce only short-term results.  *See* Calvin K. Lai et al., *Reducing Implicit Preferences: II. Intervention Effectiveness Across Time*, 145 J. Experimental Psychology: General 1001 (2016).[32]

*Third*, it is unclear what a race-neutral alternative might look like.  Commanding corporations to be a race neutral does not counter the problem of *implicit* biases, which operate invisibly, without self-awareness.

*Fourth*, one way to prevent different treatment could be to "blind" selectors of candidates' racial category.  This strategy may be feasible when sorting paper applications of entry-level workers or, in the education context, grading exams blind.  But this approach does not work when selecting senior executives, including members of a corporation's board of directors.

---

[31] Available at: https://journals.sagepub.com/doi/abs/10.1177/000312240607100404
[32] Available at: https://psycnet.apa.org/record/2016-29854-001

This would require selectors not to know the very identity of the potential board member, which is unrealistic.

**Finally**, a focus on remedying ongoing discrimination makes certain design challenges more tractable. For example, there is no need to try to identify the specific victims of *past* discrimination to create a well-tailored remedy, as Plaintiff argues. Instead, the objective is to remedy discrimination that is taking place *right now* partly due to implicit bias. Still, the way forward is difficult, which helps explain why the California Legislature adopted a flexible floor countermeasure to respond to the probabilistic harm caused by implicit bias while "impos[ing] at most a negligible burden on those seeking corporate board positions." Doc. No. 114 at 21. Probabilistic harms require probabilistic countermeasures.

## CONCLUSION

For the reasons discussed herein, amicus curiae Professor Kang respectfully urges this Court to deny the requested motion for summary judgment and permit the claims to proceed to trial.


DATED:   February 7, 2023                    Respectfully submitted,


                                             */s/ Johanna S. Schiavoni*
                                             JOHANNA S. SCHIAVONI

                                             Attorney for *Amicus Curiae*
                                             PROFESSOR JERRY KANG

**CERTIFICATE OF SERVICE**

*Alliance for Fair Board Recruitment v. Weber*

D.C. No. 2:21-cv-01951-JAM-AC
Eastern District of California

I hereby certify that on February 7, 2023, I electronically filed the foregoing with the Clerk of the Court of the U.S. District Court for the Eastern District of California by using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the Court's CM/ECF system.

*/s/ Johanna S. Schiavoni*
Johanna S. Schiavoni