1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

*What follows is an appendix of quotations from California's evidentiary record submissions that discuss the purpose of AB 979. Many statements could be categorized under multiple purposes, but are generally included only once for brevity's sake.*

## Pre-Enactment Record Materials

### I. Diversity

#### a. Diversity as good for society

(s) Directors that hold numerous board seats exert considerable influence over United States corporations and broader society. As directors gain seats on more boards, they gain influence over the creation of policy in more companies and rise in corporate status amongst the corporate elite, which in turn enhances their influence on the
creation of policy.

(t) Therefore, it is the intent of the Legislature to require, by January 2023, every publicly held corporation in California to achieve diversity on its board of directors by having a minimum of directors from underrepresented communities on its board, as specified in this measure.

(ECF No. 115-1, p 2-4, AB 979, Oct 2, 2020)

I like to think that people and companies are going to do the right thing, that they're going to recognize the inherent value in diversity at the highest level because if they're selling a product or they're engaging in some kind of commerce, which they all are, it's better to know what's out in the community, and it's better to know what the needs are. And frankly, it's important to have people at the table so that the kinds of things that get said and done don't happen. And so I really appreciate this bill because it starts to move us in a direction that says, "Look, it is important." Diversity is important in California, and we need to have people at the table at the highest level in order to be able to make really good decisions on behalf of all of our community, and hopefully we serve as a model for the rest of the country. And all you have to do is look at what's happening on the streets to recognize that we need hope, we need action, and this is the time. So I want to thank you. I intend to vote aye, and I want to encourage everybody else to do so as well.

(ECF No. 114-21, p 83, Anna Caballero, Aug 13, 2020)

I write to support Assembly Bill 979 as amended July 28, which would require every publicly held corporation in California to strive for racial diversity by appointing board directors strive for racial diversity by appointing board directors from underrepresented communities.

(ECF No. 115-3, p 145, Betty T. Yee, Aug 10, 2020)

When many corporations have not been able to, or willing to, make meaningful change, Hewlett Packard and Bloom Energy have made strides in diversifying the corporate landscape. These two groups show that the intent of AB 979 is not impossible but attainable.

(ECF No. 114-21, p 63, Chris Holden, Aug 13, 2020).

When we first got elected, a number of us -- including Mr. Holden and I -- have been urging corporations, especially in the tech industry to diversify their boards and their workforce.

(ECF No. 114-21, p 64, Christina Garcia, Aug 13, 2020).

I rise on the issue of having a healthy society that integrates everyone from our communities, where everybody has the opportunity.

(ECF No. 114-8, p 16, Sen Maria Elena Durazo, Aug 29, 2020)

**b. Diversity good for businesses**

We know intuitively that diversity matters. It's also increasingly clear that it makes sense in purely business terms. Our latest research finds that companies in the top quartile for gender or racial and ethnic diversity are more likely to have financial returns above their national industry medians. Companies in the bottom quartile in these dimensions are statistically less likely to achieve above-average returns. And diversity is probably a competitive differentiator that shifts market share toward more diverse companies over time.

While correlation does not equal causation (greater gender and ethnic diversity in corporate leadership doesn't automatically translate into more profit), the correlation does indicate that when companies commit themselves to diverse leadership, they are more successful. More diverse companies, we believe, are better able to win top talent and improve their customer orientation, employee satisfaction, and decision making, and all that leads to a virtuous cycle of increasing returns. This in turn suggests that other kinds of diversity-for example, in age, sexual orientation, and experience (such as a global mind-set and cultural fluency)-are also likely to bring some level of competitive advantage for companies that can attract and retain such diverse talent.

(ECF No. 114-25, p 18-19, McKinsey "Why Diversity Matters", Jan 2015)

And as a person who's spent 20 years in corporate America, I was always amazed at the lack of diversity despite wanting that diverse customer base to buy your product or support your product, but in these corporations, you very rarely saw the rich diversity and tapestry of this state or this nation.

(ECF No. 114-21, p 93, Chairman Steven Bradford, Aug 13, 2020)

Several reports provided by the author's office identify the relative lack of racial and ethnic diversity on corporate boards and support the value that diverse boards have to corporate performance. For example, the 2018 Board Diversity Census of Women and Minorities on Fortune 500 Boards (https://corpgov.law.harvard.edu/2019/02/05/missing-pieces-report-the-2018-board-diversity-census-of-women-and-minorities-on-fortune-500-boards/) found that 80% of the 1,033 available board seats in Fortune 500 companies were filled by white directors. Similarly, out of the 1,222 new board members of Fortune 100 companies, 77% were white. A report in the Harvard Business Review (https://hbr.org/2020/06/how-diverse-isyour-board-really) concluded

that a diverse board can contribute to better decision making, improve company governance, and can respond to market shifts more effectively. The McKinsey & Company Consulting Firm (https://www.mckinsey.com/business-functions/organization/our-insights/whydiversity-matters#) suggests that these benefits are not restricted to the board of directors, but can benefit entire companies; for example, McKinsey found that companies in the top quartile for racial and ethnic diversity are 35% more likely to have financial returns above their respective national industry medians.

(ECF No. 115-1, p 56, Third Reading Analysis of AB 979, Aug 20, 2020)

A broad coalition of groups promoting Asian American inclusions writes, "The Harvard Business Review argues that a diverse board contributes to better decision making, improve company governance, and can respond to market shifts more effectively. These benefits are not restricted to the board of directors; the benefits of greater diversity contribute to the overall health of the company. A cultural shift in the boardroom cultivates an environment that values different perspectives and visibly signals a commitment to more equitably hire, retain, and promote women and minorities.

(ECF No. 115-1, p 60, Third Reading Analysis of AB 979, Aug 20, 2020)

A recent report by the McKinsey & Company shows that companies with a diverse workforce and a diverse corporate board perform better than boards without diversity, yet the face of the white-collar employee remains unchanged. By changing the corporate board, you change the company's culture. A diverse board contributes to a company that values diversity and could readily adapt to the changing needs of its workforce and customer base.

(ECF No. 114-21, p 116, Chris Holden, Aug 20, 2020) (Identical presentation made: ECF No. 114-21, p 62-3, Chris Holden, Aug 13, 2020)

A recent report by McKinsey & Company shows that companies with a diverse workforce and a diverse corporate board perform better than boards without diversity.

(ECF No. 114-8, p 9, Senator Ben Hueso, Aug 29, 2020).

And so I just wanted to make sure that wasn't lost in the messaging but that this is about -- this is really about making our businesses more competitive. And if there is a certain element happening at a very high level that is being more concerned about holding on to power and not necessarily working in the best interests of California corporations to function at their highest level. I think this bill makes its best case arguing that our corporations are going to improve, which I believe they will, especially when the population, the consumer base of not only the -- our state but of the world is diverse, and it requires people of diverse language, and culture, and ideas to communicate with the -- our own state and the rest of the world. But thank you very much for your work. I'll be supporting this bill.

(ECF No. 114-21, p 87-8, Ben Huesco, Aug 13, 2020)

You know, I have a ship-building company in my district called NASSCO. They've been there for several years, and they also have a ship-building -- another yard in eastern United States, and they

have another yard in Asia, and they've always found that the San Diego location outperforms every other shipyard. They have lower liabilities. They have higher productivity. And so they commissioned a study to find out why that location was more productive, and their conclusion was that they had a more diverse workforce. And because of that, there was a diversity of ideas that led to better problem solving. And I think that is the California -- the success story, why California has so much success and why it hasn't trickled up to the leadership positions I think has -- requires some involvement to make that happen.

(ECF No. 114-21, p 84-5, Ben Huesco, Aug 13, 2020)

Studies have shown that corporations with a more diverse and equitable board improve company governance and have better decision making, which leads to a more successful company. Diversity and equity on corporate boards is necessary for the health of the company while also providing opportunities to those who experience racism and microaggressions on a daily basis. California's underrepresented groups deserve a seat at the table.

(ECF No. 114-21, p 64-65, Cristina Garcia, Aug 13, 2020)

Studies also show that corporations with more diverse and equitable boards improve company governance and have better decision making, which leads to a better company overall.

(ECF No. 114-8, p 36, Cristina Garcia, Aug 30, 2020)

Diversity should be in corporation's DNA and not just checking a box. And I think this is a strong measure to make sure that diversity is part of these corporations by diversifying their boards.

(ECF No. 114-8, p 14, Sen Bradford Aug. 20, 2020)

By changing the corporate board, you change the company's culture. A diverse board contributes to that company and its values for diversity and can readily adapt to the changing needs of its workforce and customer base. Adding diversity to business will help business in our state become more successful. I also want to remind people that this bill is very appropriate for the time right now and why we need to approve this immediately. This pandemic has showed us how people of color have been affected disproportionately by the pandemic.

(ECF No. 114-8, p 18, Senator Ben Hueso, Aug 29, 2020).

By changing the corporate board, you change the company's culture. A diverse board contributes to a company that values diversity and could readily adapt to the changing needs of its workforce and customer base.

(ECF No. 114-21, p 62-63, Chris Holden, Aug 13, 2020)

Thank you for the opportunity to testify today on the important issue of diversity on corporate boards of directors. At HP, we're proud to have the most diverse board of directors in the U.S. technology industry with 58 percent minorities, 42 percent women, and 33 percent members from underrepresented communities, including, Latinx, and Asian members. We understand one of the goals of AB 979 is encourage board makeup that is as diverse as possible rather than including only

one underrepresented community, and at HP, we support that intent, and we endeavor to meet that goal. We recognize that HP's diverse board enables us to better serve our customers and to position our business for future success. We believe it's important to encourage high standards for corporate board diversity, and for this reason, we support AB 979, which will encourage California to lead the nation in being underrepresented communities to corporate boards. Everyone benefits when leadership reflects the demographics of our diverse state and nation. Simply saying we support diversity is not enough. We must lead by putting these values into action every day.

(ECF No. 114-21, p 74-5, Kim Rivera, Aug 13, 2020).

California corporations must represent the population of our beautifully diverse state. This is not only just and equitable, but also a smart business practice. According to a recent multi-year study released in May 2020 by McKinsey and Company, in 2019, "top-quartile companies outperformed those in the fourth one by 36 percent in profitability, slightly up from 33· percent in 2017 and 35 percent in 2014." Consistent with prior years' report findings, "the likelihood of outperformance continues to be higher for diversity in ethnicity than for gender."

To thrive, diversity must exist in the boardroom, and California is positioned to take the lead in this significant endeavor. I believe that building corporate boards that are reflective of the diverse population of California is meaningful and necessary. We must work together and create equitable opportunities in the boardroom, especially for board leaders from communities that have been historically left out There is no better time than now. Now is our moment.
For these reasons, I respectfully request that you SUPPORT AB 979.

(ECF No. 114-10, p 10, Ricardo Lara, Aug 6, 2020)

As a member of the CalPERS and Ca1STRS boards, I have long advocated for corporate board diversity. Our pension funds understand the research showing that companies with diverse boards are associated with improved corporate performance, higher earnings, and shareholder returns. A 2019 study of the Russell 3000 Index by Institutional Shareholders Services showed ethnic diversity on boards is proceeding at a glacial pace with ten percent of Black, Hispanic, and Asian American board directors, compared to eight percent in 2008. Ignoring a large segment of executive talent is alarming in California, the most diverse state in the nation.

(ECF No. 115-3, p 145, Betty Yee, Aug 10, 2020)

We believe that having diverse representation throughout any organization provides added value to the organization, and we believe that the tech industry should work harder to make this a reality. Having a diverse Board of Directors and senior management team communicates to women and minorities that seeking diverse perspectives and ideas are important to the organization, and that the organization is dedicated to diversity and inclusion.

(ECF No. 114-10, p 21, Holden, Hueso, Bonta, and Garcia, May 15, 2017)

To successfully execute a long-term business strategy and mitigate risk, a company's board should reflect a diverse mix of skills, backgrounds, and experience. The initial 504 companies were selected based on a lack of gender diversity on their boards. "Simply put, board diversity is good for business," said Anne Simpson, CalPERS investment director, sustainability. "It is essential in

today's global economy that boards avoid "group think" and ensure there is the breadth of experience, skills and knowledge necessary to meet complex business needs.

(ECF No. 114-25, p 7, CalPERS, Aug 22, 2017)

There is ample evidence that diverse and inclusive companies are more likely to make better, bolder decisions a critical capability in the crisis. The business case for inclusion and diversity (I&D) is stronger than ever. For diverse companies, the likelihood of outperforming industry peers on profitability has increased over time, while the penalties are getting steeper for those lacking diversity.

(ECF No. 115-2, p 71, CAIDs California, quoting McKinsey's "Diversity Wins: How Inclusion Matters", 2020 Virtual Insurance Diversity Summit)

Thank you for your letter regarding board diversity, specifically the lack of women on corporate boards and questions regarding the makeup of CalPERS' senior leadership. CalPERS believes this is a very important issue. Our board and leadership are committed to working with companies, policymakers, advocacy groups and internally within our operations to help accelerate gender parity. We agree that CalPERS is uniquely situated *to* help advance this effort. We are passionate about the issue of corporate board diversity for several reasons, but one key objective stands out: Repeated studies have shown it leads to better financial performance.
…
Reports such as this demonstrate that board diversity is not only a social issue, but also a fiscal one. As a long-term investor, CalPERS is deeply concerned with this problem because it impacts the financial health of the companies in our investment portfolio. Ultimately, for CalPERS to succeed the companies we invest in must succeed as well. We appreciate the opportunity to discuss what CalPERS has done to date to address the current lack of women on corporate boards and the makeup of our internal structure.
…
We specifically call out our policy on diversity in Belief 10, which states: Strong processes and teamwork and deep resources are needed to achieve CalPERS goals and objectives. Diversity of talent (including a broad range of education, experience, perspectives and skills) at all levels (Board, staff, external managers, corporate boards) is important.
(ECF No. 115-2, p77-8, CalPERS, Nov 14, 2016)

Since *Why Diversity Matters* was published in 2015, we have seen growing awareness of the business case for inclusion and diversity (l&D). Widely cited, the report has influenced l&D policy-setting and transformation efforts by corporations, the public sector, and third-sector organizations worldwide. While social justice, legal compliance, or maintaining industry standard employee environment protocols is typically the initial impetus behind these efforts, many successful companies regard l&D as a source of competitive advantage, and specifically as a key enabler of growth.

(ECF No. 115-2, p 88, McKinsey & Co., "Delivering Through Diversity", Jan 2018)

This research extends and deepens the quantitative correlation analysis approach taken by *Why Diversity Matters,* and complements it with qualitative company research, with the practical aim of sharing insights from the experiences of companies effectively engaging with l&D. The same

caveats apply to the correlation analyses reported here as did in *Why Diversity Matters:* correlation is not causation. While not causal, we observe a real relationship between diversity and performance that has persisted over time and across geographies. There are clear and compelling hypotheses for why this relationship persists, including improved access to talent, enhanced decision making and depth of consumer insight, and strengthened employee engagement and license to operate. We encourage businesses to examine the case for I&D at a more granular level to craft an approach that is tailored to their business, learning from leading diverse companies around the world as to ways to do this with high impact.

(ECF No. 115-2, p 92, McKinsey & Co., "Delivering Through Diversity", Jan 2018)

The Harvard Business Review states that a diverse board contributes to better decision making, improve company governance, and can respond to market shifts more effectively. In fact, a recent study found that ethnically diverse companies are 35% more likely to outperform other companies that lack a diverse workforce. Without a diverse board it is increasingly difficult to attract diverse talent which then reinforces unconscious biases at the managerial and staff level. Even when staff from underrepresented communities are hired, the turnover rate is high due to feelings of isolation and prevalence of micro aggressions. A culture shift in the boardroom cultivates an environment that values different perspectives and is more likely to hire and retain racial and gender minorities.

(ECF No. 115-3, p 177, Shirley Weber, Lorena Gonzalez, David Chiu, Aug 13, 2020)

Today I am writing on behalf of the over 340 member companies of the Silicon Valley Leadership Group to express our organization's support AB 979 and request that you sign it into law. Increased diversity in our leadership and taking steps to better reflect the communities we serve is not only a business imperative, simply put: it's the right thing to do.
…
I believe AB 979 is a step forward. And, I am optimistic that it will not only help facilitate opportunities for underrepresented communities to secure greater and more visible representation within corporations, but it will demonstrate California's leadership in this space and show the world that more voices at the table is *always* a good thing.
…
Thank you for your bold leadership on issues around racial justice and equity.

(ECF No. 115-3, p 185, Ahmad Thomas of Silicon Valley Leadership Group, Sep 1, 2020)

Requiring corporations to have leaders which reflect the diversity of our state is one action we should require to address the civil rights challenges of our times. While many corporations have expressed support for diversity and Black lives this past year many have struggled with how to best address how to enrich their corporation with a more diverse board and customer base, whatever their industry. Adding board members from underrepresented communities will assist them in this challenge. Serving on a corporate board is an experience too few members of the Hispanic, Latinos, Black, Asian, Native American, and LGBT communities experience. Research has indicated continuously the absence of these communities being represented on corporations headquartered in California. This legislation will be a step in changing this.

(ECF No. 115-3, p 187, Alex Padilla, CA Secretary of State, Sep 1, 2020)

### c. Diversity in business good for society

At Bloom Energy, we know that a diverse workforce and diverse leadership makes for a diversity of backgrounds, experiences, points of view, and ultimately better decisions. As was noted in the Harvard Business Review, a diverse board contributes to better decision making, improved company governance, and can respond to market shifts more effectively.

A recent McKinsey report found that ethnically diverse companies are 35 percent more likely to outperform other companies that lack a diverse workforce. The mission of Bloom Energy is to make clean, reliable energy affordable to everyone in the world in these challenging times. That mission is not only inspiring. It is essential. We know we will be most effective in achieving that mission with a diverse board, a diverse leadership team, and a diverse employee population that best serves our customers and the communities in which we do business. For these reasons, we are honored to stand in support of Assembly Bill 979.

(ECF No. 114-21, p 118-9, Carl Guardino, Aug 20, 2020)

In recent months, racial disparities have been illuminated in every aspect of our country. This bill recognizes that leadership on our corporate boards must be diverse to guide California companies to make strategic decisions that are innovative and serve all Californians.

(ECF No. 114-8, p 37,  David Chiu, Aug 30, 2020).

So this is an important bill to try to bring better equity to be sure the policymaking parts of our corporations -- that's what the boards are. They hold the CEOs accountable. They also establish policy that we have the representation there so that the corporations, which control a vast amount of our financial resources not only in our state but across the country, are more responsive to the true diversity of our state and our communities.

(ECF No. 114-8, p 11, Richard Pan, Aug 29, 2020)

This is an important bill and this would really set California apart as a nation that's really recognizing that diversity matters and that it's good for business, and that'll improve our social and economic climate. Thank you.

(ECF No. 114-8, p 19, Sen Ben Huesco, Aug 29, 2020)

The New America Alliance is pleased to support AB 979, an important measure that will advance meaningful representation on corporate boards by requiring every publicly held corporation in California to have directors from underrepresented communities starting in 2021. California continues to reel from the collapse of the economy as a result of the COVID-19 pandemic, along with historic levels of civil unrest. Ensuring California's corporate boards benefit from the state's vibrant diversity will not only improve corporate performance, but it will lay the foundation for ensuring the state's economic recovery benefits all of California's diverse communities.
…
We firmly believe access to investment capital for women and minority-owned businesses is one of the last frontiers of the civil rights movement. For our communities, the availability of capital means the difference between a community that can build both individual and community wealth

through flourishing businesses and job opportunities, and those communities that stagnate, with ever higher levels of poverty and lack of opportunity.

…

California cannot have shared success without shared opportunity and achieving that goal will require the state to enact a more formal, rigorous standard for diversity as proposed in AB 979. We thank you for introducing this important legislation and look forward to assisting you as you work to advance the measure.

(ECF No. 115-3, p 122-3, Solange Fernandez Brooks of New America Alliance, Jul 28, 2020)

Closing the representation gap in the boardroom is an important step in ensuring that publicly traded corporations are more reflective of the diversity of our state. Diversity at the highest levels of management can help create a culture shift that helps to attract diverse talent at every level of employment, in the boardroom, and beyond. AB 979 will also be of benefit to the corporations themselves, because diverse boards tend to make better business decisions, improve company governance, and respond more effectively to market shifts. Further, ethnically diverse companies are thirty-give percent more likely to outperform their non-diverse competitors. For the reasons, the ACLU of California is in support of AB 979.

(ECF No. 115-3, p 140, ALCU of California, Aug 5, 2020)

We know that when policy makers in Sacramento prioritize the rise of California's business communities, our state's wider economic outlook improves.

…

Board diversity provides many benefits including greater value for shareholders, improved corporate governance, and enhanced business performance. According to the 2018 McKinsey study, Delivering Through Diversity, companies in the top quartile for racial and ethnic diversity are 33% more likely to have financial returns above their respective national industry medians. The common sense corporate governance principles endorsed by 13 of the nation's largest corporations and investment managers stress that for long-term prosperity, corporations should be managed with diversity as a prominent principle: "Diverse boards make better decisions, so every board should have members with complementary and diverse skills, backgrounds and experience [that foster fresh thinking]." In summary, greater boardroom equity that is inclusive of Latinos will lead to greater results for business and our state. I appreciate your consideration of these views.

(ECF No. 115-3, p 162, Julian Cañete of the California Hispanic Chambers of Commerce, Aug 13, 2020)

The racial justice protests that continue across our state and nation shine an enduring light on the immediate and critical need to advance diversity, equity, and inclusion. This is true for all segments of society, including leadership roles from historically underrepresented communities in the boardrooms of Corporate America. I believe AB 979 has far-reaching implications for the California Department of Insurance (Department) considered to be the largest insurance market in the nation where insurance companies collect $310 billion annually in premiums. I remain committed to advancing diversity within this industry.

…

California corporations must represent the population of our beautifully diverse state. This is not only just and equitable, but also a smart business practice.

…

To thrive, diversity must exist in the boardroom, and California is positioned to take the lead in this significant endeavor. I believe that building corporate boards that are reflective of the diverse population of California is meaningful and necessary. We must work together and create equitable opportunities in the boardroom, especially for board leaders from communities that have been historically left out. There is no better time than now. Now is our moment.

(ECF No. 115-3, p 179-80, Ricardo Lara, Aug 30, 2020)

On behalf of HP Inc., I am writing in support of AB 979 (Holden) and urge a signature. Diversity on corporate boards is an important issue and one that HP supports not only in principle but in practice. We applaud this initiative to empower California to lead the nation in bringing underrepresented communities to corporate boards. Everyone benefits when leadership is reflective of the demographics of our diverse state and nation.

(ECF No. 115-3, p 193, Enrique Lores, President of HP, Sep 8, 2020)

By ensuring diversity on their boards, we know the corporations are more likely to both create opportunities for people of color and give them the support to thrive within that corporation. Corporations have money, power, and influence. We need to address racial injustice and inequity in our society Corporations have long shown their support for diverse boards, but that support has not translated to a lasting change in the structure of their boards. To put this in perspective, 80% of the 1,033 available board seats on Fortune 500 companies were filled by White or Caucasian directors and 59.6% of those directors were White men.

Similarly, out of the 1,222 new board members of Fortune 100 companies, 77% of new directors were White or Caucasian and 51% of those directors were White men. while Latino make up 39% of the population, Asian and Pacific Islanders make up 15% and African Americans 77% and 80% Whites respectively.

The Harvard Business Review states that a diverse board contributes to better decision making, improve company governance, and can respond to market shifts more effectively.3 In fact, a recent study found that ethnically diverse companies are 35% more likely to outperform other companies that lack a diverse workforce. Without a diverse board it is increasingly difficult to attract diverse talent which then reinforces unconscious biases at the managerial and staff level. Even when staff from underrepresented communities are hired, the turnover rate is high due to feelings of isolation and prevalence of micro aggressions. A culture shift in the boardroom cultivates an environment that values different perspectives and is more likely to hire and retain racial and gender minorities.

(ECF No. 115-3, p 200-1, Shirley Weber, Lorena Gonzalez, David Chiu, Sep 4, 2020)

The time for this legislation is now. The lack of diversity on California's corporate boards and upper level positions is an issue we urged corporations to address on their own during our time in the Legislature. However, it is clear we can no longer wait for corporations to figure it out on their own. By ensuring diversity on their boards, we know the corporations are more likely to both create opportunities for people of color and give them the support to thrive within that corporation. Corporations have money, power, and influence. We need to address racial injustice and inequity in our society and a good start would be to ensure California's corporate boards reflect the diversity

1
2
3

of our State. Corporations have long shown their support for diverse boards, but that support has not translated to a lasting change in the structure of their boards. To put this in perspective, 80% of the 1,033 available board seats on Fortune 500 companies were filled by White or Caucasian directors and 59.6% of those directors were White men.

4
5
6
7

Similarly, out of the 1,222 new board members of Fortune 100 companies, 77% of new directors were White or Caucasian and 51 % of those directors were White men. California's population breakdown has evolved over the years. Whites make up 37% of California residents while Latino make up 39% of the population, Asian and Pacific Islanders make up 15% and African Americans make up 6% of the population. Yet the boards of our Fortune 100 and 500 companies' boards are made up of 77% and 80% Whites respectively.

8

(ECF No. 115-3, p 176, Shirley Weber, Lorena Gonzalez, David Chiu, Aug 13, 2020)

9

**d. Equitable or equal access**

10
11

We understand how important it is for cultural change to happen, and that happens at the top, and it disseminates thorough the organization.

12

(ECF No. 114-21, p 89, Chris Holden, Aug 13, 2020)

13
14

AB 979 has been a part of a larger effort to ensure people of color have equitable access to upward mobility in American corporate society.

15

(ECF No. 114-21, p 60, Chris Holden, Aug 13, 2020)

16
17

AB 979 has been a part of a larger effort to ensure people of color have equitable access to upward mobility in American society.

18

(ECF No. 114-8, p 33, Chris Holden, Aug 30, 2020)

19
20

AB 979 has been part of a larger effort to ensure that people of color have equitable access to upward mobility in California.

21

(ECF No. 114-8, p 6, Senator Ben Hueso, Aug 29, 2020).

22
23
24
25
26

But we also have the issue playing out in our institutions. And as we thought about how we could make this bill effective and meet the times, we recognized that when you look at the education gap and that black and brown children are falling between the gap; when you look at minority businesses that are having a hard time getting access to capital; you see it at so many different levels. You realize this is a place that we had started this conversation back in 2017. And the tech communities did not respond with a sense of urgency. I want to say tonight that with the effort that we are putting forth as a legislative body to make some real change in this area, there are some companies in California that on their own accord are doing the right thing. And so this is an opportunity to spur the others on to take the same course of affirmative action.

27
28

(ECF No. 114-8, p 39, Assemblymember Chris Holden, Aug 30, 2020).

This bill is sponsored by the author to help address the ethnic pay gap, facilitate employment and outreach opportunities for underrepresented communities, promote board diversification, establish pipeline creation and upward mobility of diverse technical talent, and facilitate retention of that talent through company culture and development.

(ECF No. 115-3, p 128, Senate Committee on Banking and Financial Institutions, Aug 13, 2020)

Since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long- term structural change.
…
AB 979 will serve as a springboard to: address ethnic pay gap, employment and outreach opportunities, board diversification, pipeline creation and upward mobility of diverse technical talent, and retention of that talent through company culture and development. For these reasons, I am proud to support this bill and respectfully request you sign this measure into law.

(ECF No. 115-3, p 203-4, Fiona Ma, CA State Treasurer, Aug 31, 2020)

**e. Racial Balancing**

The California Hispanic Chambers of Commerce write, "We are pleased to support AB 979 because California company boards of directors do not reflect the diversity of our great state. A recent study by the Latino Corporate Directors Association determined that 233 of the 662 public-company boards in California have no ethnic or racial representation. Latinos, who make up 39.4% of the state of California, are severely underrepresented in the boardroom. Of the 662 public California companies, 571 corporations, or 87%, do not have a Latino on their board. These low numbers are in stark contrast to the size and economic strength of California's Latino population. California is home to 15.5 million Latinos with $320 billion in annual purchasing power, and 800,000 Latino business owners."

(ECF No. 115-1, p 60, Third Reading Analysis of AB 979, Aug 20, 2020)

These communities represent 67 percent of California's population but hold only 14 percent of Fortune 1000 board seats in California. My analysis has found that AB 979 will double that number and add 155 minority board members to Fortune 1000 boards.

(ECF No. 114-21, p 121, Buck Gee, Aug 20, 2020)

The U.S. Department of Labor Bureau of Statistics has reported that in 2018, 90 percent of chief executives in the United States were white. While California prides itself on having a majority/minority population and economic powerhouse, corporations do not reflect the vast cultural wealth of this state.

(ECF No. 114-21, p 114-15, Chris Holden, Aug 20, 2020)

The U.S. Department of Labor Statistics has reported that in 2018, 90 percent of chief executives in the United States were white. While California prides itself on being a majority/minority state,

corporations do not reflect the vast cultural wealth of this state.

(ECF No. 114-21, p 62, Chris Holden, Aug 13, 2020)

While California prides itself on being a minority majority state, corporations do not reflect the vast cultural wealth in this state. For example, of the top 10 California banks, only 30 percent of the directors are people of color. This statistic pales in comparison to the 67 percent of California's population that are people of color. Research by the Latino Corporate Directors Association found that as of July 1, 2020, 87 percent of California's 662 public companies do not have a Latino onboard. As you all know, Latinos make up 39.4 of the state of California, but they are severely underrepresented in the boardroom. California is better than this. We are the most diverse state in the nation and our corporations need to emulate our diversity.

(ECF No. 114-8, p 7-9, Sen Ben Huesco, Aug 29, 2020)

While California prides itself on being an economic powerhouse and having a majority minority population, corporations do not reflect the vast cultural wealth of this state. For example, of the top 10 California banks, only 30 percent of directors are people of color. This statistic pales in comparison to the 67 percent of California's population that are people of color. On average, Black and Latino tech employees make less than 10 percent of workers at premier tech companies. This percentage is disproportionate to the roughly 20 percent of computer science graduates that are Black and Latino.

(ECF No. 114-8, p 35, Chris Holden, Aug 30, 2020)

The California Hispanic Chambers of Commerce writes: We are pleased to support AB 979 because California company boards of directors do not reflect the diversity of our great state. A recent study by the Latino Corporate Directors Association determined that 233 of the 662 public-company boards in California have no ethnic or racial representation…Latinos, who make up 39.4% of the state of California, are severely underrepresented in the boardroom. Of the 662 public California companies, 571 corporations, or 87% do not have a Latino on their board…Greater boardroom equity that is inclusive of Latinos will lead to greater results for business and our state. I appreciate your consideration of these views.

Chinese for Affirmative Action writes: The Missing Pieces Report and multiple other research, how Asian Americans are often an overlooked group for management and executive level positions and in representation at the corporate board of director's level. The Report demonstrates that Asians/Pacific Islander make up the lowest percentage of underrepresented groups in both Fortune 100 (3.8%) and Fortune 500 (3.7%) board of directors. This persistent lack of representation in corporate boardrooms needs continuous focus, oversight, and change. CAA believes AB 979 creates a cultural shift in California's board seats towards that end.

(ECF No. 115-1, p 65, Concurrence in Senate Amendments analysis of AB 979, Aug 20, 2020)

I'm happy to speak in support of this bill because I believe our boards need to be like people who are on this dais right now. Our boards need to reflect our communities where we have women and people of color, and I'm proud to stand here in support of Assemblymember Holden's bill.

(ECF No. 114-21, p 77, Joaquin Arambula, Aug 13, 2020)

I'm testifying as the Chair of the API Legislative Caucus and also as a joint author of this bill to urge you to support this measure, to ensure that our California corporate boards reflect the diversity of our state.

(ECF No. 114-21, p 72, David Chiu, Aug 13, 2020)

My research has found that very little progress has been made to diversify the higher levels of leadership in the past, despite best efforts of the corporate sector. My review of the EOC (indiscernible) California shows that white men and women are now only 46 percent of the professional workforce but still represent 71 percent of all executives in California in 2018. So the data is clear. Existing strategies to diversify have failed. That's why it's time for a new approach to accelerate leadership changes at the highest levels. It's time for California to require seats in the boardroom for its underrepresented communities. Those communities represent 67 percent of California's population but hold only 14 percent of Fortune 1000 board seats in California. My analysis has found that AB 979 will double that number and add 155 minority board members to Fortune 1000 boards.

(ECF No. 114-21, p 68-9, Buck Gee, Aug 13, 2020)

In California, 39 percent of Latinos -- I mean 39 percent of the population are Latinos, but we only hold 2.3 percent to the directors in the Fortune 1000 companies in California. Asian and Pacific Islanders make up a combined 16 percent of the population here in California, yet only make 3.7 percent of directors of Fortune 500 companies in California. In a recent USC Race and Equity Center study show that blacks tend to be employed in the lowest-paying, least powerful positions and least likely to show up on a board. We must do better than that.

(ECF No. 114-21, p 64, Cristina Garcia, Aug 13, 2020)

California's population is 39 percent Latino, but 87 percent of California corporate boards do not have Latino representation. API make up a combined 16 percent of the population, yet only 3.7 percent of directors of Fortune 500 companies in California. A recent USC Race and Equities Center study also shows that Blacks then to be employed in the lowest paying, least powerful positions. We must and we can do better than that.

(ECF No. 114-8, p 36, Cristina Garcia, Aug 30, 2020)

The diversity and inclusion data is appalling: the leadership and workforce of the technology industry does not reflect our state or the population and customers that it relies upon for success. It is imperative that diversity be a priority starting at the very top of every company in Silicon Valley.

(ECF No. 114-10, p 21, Holden, Hueso, Bonta, and Garcia, May 15, 2017)

We, the undersigned members of the California Legislative Black Caucus, California Latino Legislative Caucus, the California Legislative Women's Caucus, and the California Asian Pacific Islander Caucus, write to express our strong concern over the technology industry's lack of diversity in their board, management, and technical roles.

Shortly after I was sworn in 2011 I asked my staff given that California has one of the most diverse populations in the United States, given that California has the largest number of women-owned, minority-owned, LGBT owned, veteran-owned businesses to what extent are insurance companies buying goods and services from these diverse suppliers, and to what extent do their boards reflect the diversity of the State of California? There was silence.

(ECF No. 114-18, p 6, Dave Jones, Aug 29, 2017)

While California prides itself on being an economic powerhouse and having a majority minority population, corporations do not reflect the vast cultural wealth of this state.
(114-8, p 34, Chris Holden, Aug 30, 2020)

In California, 39 percent of Latinos -- I mean 39 percent of the population are Latinos, but we only hold 2.3 percent to the directors in the Fortune 1000 companies in California. Asian and Pacific Islanders make up a combined 16 percent of the population here in California, yet only make 3.7 percent of 21 directors of Fortune 500 companies in California.

(ECF No. 114-21, p 64, Christina Garcia, Aug 13, 2020)

I'm testifying as the Chair of the API Legislative Caucus and also as a joint author of this bill to urge you to support this measure, to ensure that our California corporate boards reflect the diversity of our state.

(ECF No. 114-21, p 72, David Chiu, Aug 13, 2020)

A 2019 study of the Russell 3000 Index by Institutional Shareholders Services showed ethnic diversity on boards is proceeding at a glacial pace with ten percent of Black, Hispanic, and Asian American board directors, compared to eight percent in 2008. Ignoring a large segment of executive talent is alarming in California, the most diverse state in the nation.

(ECF No. 114-10, p 12, Betty T. Yee, Aug 10, 2020)

As noted in the language of AB 979, a recent study of all 662 California -based public companies conducted by the Latino Corporate Directors Association (LCDA), found that 35%, or 233 of the corporations, had all white boards of directors; and, 87%, or 571 California public companies had no Latino representation on their boards. These low numbers are in stark contrast to the size and economic strength of California's Latino population. California is home to 15.5 million Latinos with $320 billion in annual purchasing power, and 800,000 Latino business owners. Nationwide, Latinos account for 18% of the population and over $2 trillion in purchasing power.

AB 979 Co-Author, Senator Ben Hueso, stated it best on the Senate Floor, "Corporations do not reflect the vast cultural wealth in this state. Latinos are severely underrepresented in the boardroom. California is better than this. We are the most diverse state in the nation, and our corporations need to emulate our diversity."

(ECF No. 115-3, p 197, Latino Voices for Boardroom Equality, Sept 11, 2020)

**f.  Role Model**

Thank you, and I agree with all of the previous remarks and testimony that has been given, and that is the obviously the more diverse everywhere in society, that's a healthier society because if you can see yourself being in the corporate board room or being wherever you want to be -- doctor or a farmworker, it doesn't matter -- then what we have is an integrated society at all levels, and I think that's the value of this.

…

I'm hoping that that diversity leads to a much more ethical and sensitive leadership boards that really care about their communities, and I hope that we can look forward to that as well. There are so many needs throughout our society and throughout our community, and our hope -- my hope is that by having a more diverse as one piece of integration that by doing this on the corporate boards, they will see not only how to sell more products but how to care about that community that's buying their products, and that's on all levels, whether it's education, healthcare, everything.

(ECF No. 114-21, p 89-90, Elena Durazo, Aug 13, 2020)

Role modelling is very big. Young girls, they don't go nontraditional roles because they don't see women in them. They need to look and see someone who looks kind of like them, whether it's gender, whether it's race, whether it's ethnicity, you got to know that it's possible.

(ECF No. 114-13, p 25, Declaration of Herft, Hannah-Beth Jackson, Aug 29, 2017)

**g.  Retributive**

"And I was somewhat taken aback by Mr. Bishop's comments that he was fearful that this would discriminate against men. Well, men have been discriminating against women for 400 years in this country, so it's time to level the playing field and allow folks --"

(ECF No. 114-21, p 93, Steven Bradford, Aug 13, 2020).

## II. Discrimination

**a.  Societal, "structural" or "systemic"**

As stated in the findings and declarations of the bill, according to 2018 data from Deloitte and the Alliance for Board Diversity, the percentages of Fortune 500 company board seats held by people identified as African American/Black, Hispanic/Latino(a), and Asian/Pacific Islander were 8.6%, 3.8%, and 3.7%, respectively. The same study showed that 84 %of board seats were held by people identified as white, which over-represents the group's share of the general population by 22 percentage points.

This relative lack of diversity may have consequences that negatively affect all stakeholders in a corporation, including workers, customers, and investors. Workers from communities that are not represented on the board may find limited opportunities for advancement through the executive ranks, as boards hire CEOs who look like themselves and CEOs surround themselves with other executives who also look like them. With a lack of diversity throughout the board and senior management, customers or potential customers from underrepresented communities may find that

products or services offered by the corporation do not consider the preferences of their communities. A failure to capitalize on a diverse range of consumer preferences harms investors who would benefit from higher returns if corporations were meeting their full potential. The lack of diversity in corporate America is not a product of happenstance; rather, it is a product of systemic discrimination and bias that affects so many facets of our society housing, education, criminal justice, and employment. This bill seeks to remedy one specific discriminatory outcome by ensuring that corporate boards meet a minimum standard of diversity.

(ECF No. 115-1, p 64, Concurrence in Senate Amendments analysis of AB 979, Aug 20, 2020)

If we're going to address the racial injustice and inequity in our society, people of color must have a seat at the table where an overwhelming amount of wealth is based, especially in a state as diverse as California.

(ECF No. 114-21, p 116, Chris Holden, Aug 20, 2020)

This bill emerges at a time where we see racial tension and discord, and racism is institutionalized in our country. And so this bill was designed to address -- as the women's bill addressed women's issues and concerns, this bill was designed to address racial issues as it impacts on our thinking.

(ECF No. 114-21, p 91, Chris Holden, Aug 13, 2020)

If we're going to address the racial injustice and inequity in our society, people of color must have a seat at the table where an overwhelming amount of wealth is based, especially in a state as diverse as California.

(ECF No. 114-21, p 63, Chris Holden, Aug 13, 2020)

The one question we haven't answered is why now, why we can't wait any longer. Over the last few months, we've seen the racial reckoning triggered by the killing of George Floyd. The public continues to protest and demand that we tear down racial biases in all of our institutions. The message is clear and the legislature must do all it can to prioritize equality in equity now, and we can no longer wait to answer the cries for justice. For those reasons, I respectfully ask for an aye vote.

(ECF No. 114-8, p 36-7, Cristina Garcia – also cited below, Aug 30, 2020)

The face of those that control wealth in our state has not changed, even when reports show that diversity on corporate boards benefits the corporation. If we are going to address the racial injustice and inequality in our society, we must be intentional. People of color must have a seat at the table, where an overwhelming amount of wealth is based, especially in a state as diverse as California. AB 979 sets a framework for California to engage in this critical and timely issue.

(ECF No. 114-8, p 35, Chris Holden, Aug 30, 2020)

The one question we haven't answered is why now, why we can't wait any longer. Over the last few months, we've seen the racial reckoning triggered by the killing of George Floyd. The public continues to protest and demand that we tear down racial biases in all of our institutions. The

1    message is clear and the legislature must do all it can to prioritize equality in equity now, and we
2    can no longer wait to answer the cries for justice.

3    (ECF No. 114-8, p 36, Chris Holden, Aug 30, 2020).

4    If we're going to address the racial injustice and inequity in our society, people of color must have
5    a seat at the table where an overwhelming amount of wealth is based, especially in a state as diverse
     as California.

6    (ECF No. 114-8, p 35, Chris Holden, Aug 30, 2020).

7    Our legislative caucus, along with our counterparts, have prioritized diversity and executive
8    management and leadership in recent years. In recent months, a bright light has illuminated the
     disparities in all aspects of our society, revealed the systematic barriers that have prevented us from
9    achieving real equity. This is a bill that recognizes that leadership on our corporate boards must be
10   diverse to guide California companies to make the strategic decisions that are innovative and best
     for the organization to serve our state.

11   (ECF No. 114-21, p 73, David Chiu, Aug 13, 2020)
12
13   But I understand what we're doing because far too often we see folks being excluded simply
     because of their color.

14   (ECF No. 114-21, p 95, Chairman Steven Bradford, Aug 13, 2020)
15
16   The reality is that forever, as long as there have been corporations, we have seen a profound lack
     of representation on corporate boards by women, by people of color, and by LGBTQ people, not
17   because there aren't an innermost number of qualified directors in these communities, but because
     our society has been structured that those communities are just not represented.

18   (ECF No. 114-8, p 13, Scott Wiener, Aug 29, 2020)
19
20   And to have more diverse boards, we have to take proactive steps to remedy the structural racism
     and homophobia and transphobia that has infected this society and this world forever.

21   (ECF No. 114-8, p 14, Senator Scott Wiener, Aug 29, 2020)
22
23   The public continues to protest, demanding that we tear down racial biases, starting with our police
     departments.

24   (ECF No. 114-21, p 65, Cristina Garcia, Aug 13, 2020)
25
26   And there is no doubt that there is a structural and inherent bias in our economic system in our
     country. And that's why this bill is absolutely necessary. This bill is a good for business bill. Adding
     diversity to business will help business in our state become more successful.

27   (ECF No. 114-8, p 18, Ben Hueso, Aug 29, 2020)
28

I also want to share an example of a friend of mine that happens to be Latino that was partnered with an Anglo partner on a housing development. He went to the bank to ask for a loan and they declined him. When he sent his Anglo partner to ask for this, and at the same bank for the loan, they granted it. And there is no doubt that there is a structural and inherent bias in our economic system in our country. And that's why this bill is absolutely necessary.

(ECF No. 114-8, p 18, Sen Ben Huesco, Aug 29, 2020)

But we also have the issue [of discrimination] playing out in our institutions. And as we thought about how we could make this bill effective and meet the times, we recognized that when you look at the education gap and that black and brown children are falling between the gap; when you look at minority businesses that are having a hard time getting access to capital; you see it at so many different levels.

…

And so this is an opportunity to spur the others on to take the same course of affirmative action.

(ECF No. 114-8, p 39, Chris Holden – cited above, Aug 30, 2020)

Dismantling systemic racism in the United States is the right step toward racial and social equity. Providing equal opportunities to all minority groups and committing to increasing the diversity on a corporate board will yield positive outcomes as many studies have shown. Diverse leadership leads to better decision-making, innovation and business outcomes, and increased cultural competency, which in turn leads to enhanced organizational performance and services.

(ECF No. 115-3, p 134-5, David Ryu, League of California Cities Asian Pacific Islander Caucus, Aug 3, 2020)

The deaths of George Floyd, Breonna Taylor, Ahmaud Arbery, Rayshard Brooks, and so many other Black Americans has brought the long history of systemic racism in the United States into sharp focus over the past several months. Pressure is mounting on corporate leaders to consider how their companies can address and rectify ongoing racial injustices. So what are the factors that perpetuate the continuing underrepresentation of Black professionals on boards? And what can be done to change the systems that reinforce these disparities?

…

One factor that reinforces the racial status quo on boards is the way in which new directors are typically recruited. These systems are especially ingrained on boards that do not have any directors who are racial/ethnic minorities.

…

Because corporate America is predominantly led by white men, this type of network-based recruiting can perpetuate long-standing racial inequities.

…

To dismantle ingrained processes that contribute to the systemic underrepresentation of minority directors.

(ECF No. 115-3, p 148-159, *Why Do Boards Have So Few Black Directors?*, Aug 13, 2020)

According to the Author: Since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long-term structural

change. AB 979 will serve as a springboard to: address the ethnic pay gap, facilitate employment and outreach opportunities, promote board diversification, establish pipeline creation and upward mobility of diverse technical talent, and retention of that talent through company culture and development.

(ECF No. 115-1, p 64-5, Concurrence in Senate Amendments analysis of AB 979, Aug 20, 2020)

But I understand what we're doing because far too often we see folks being excluded simply because of their color. Simply -- we never get to anything else -- simply because of their gender. And far too often, they often say, "We can't find." I'm always blown away when they say black engineers. They say, "We can't find black engineers to work at some of these high-tech or construction companies," when there's organization NSBE, National Society of Black Engineers. There are -- historically black colleges graduate thousands of engineers every year, but they continue to say that they can't find. They can't find because they're not looking, so I commend this bill.

(ECF No. 114-21, p 95, Steven Bradford, Aug 13, 2020)

Since the beginning of recent social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support will not improve corporate diversity unless corporations implement long-term structural changes to remedy obvious inequities. The most obvious is board representation, where minorities represent 16% of board seats in the Fortune 500 yet are 40% of the U.S. population and 63% of California's. …
The API community joins with the other underrepresented communities to hope that AB 979 serves as a springboard to address ethnic pay gap, employment and outreach opportunities, board diversification, pipeline creation and upward mobility of diverse technical talent, and retention of that talent through company culture and development.

(ECF No. 115-3, p 134-5, Asian American Bar Association of the Greater Bay Area, Aug 3, 2020)

Though a few companies have acted upon their commitments to diversity, severe underrepresentation of women and minorities in the tech industry have continued to this day. Unfortunately, this problem is not unique to tech companies. Women and minorities are underrepresented across white-collar industries, especially at the managerial and executive levels. In response to the pervasive underrepresentation of minorities and following the success of Senator Jackson's SB 826, Assembly Bill 979 would require a minimum of one director from an underrepresented community on all boards of publicly traded corporations headquartered in California by the end of 2021.

(ECF No. 114-21, p 113-114, Chris Holden, Aug 20, 2020)

And one of the -- there was a case, an actual -- that happened recently in which one farm located next to another one, one of them was African-American, one of them was Anglo. The Anglo got a hefty loan that was able to help them get a tractor. And the farmer next-door could not get a loan, so they had to perform a lot of these tasks manually and spend more time trying to run their farm. And it talks about a condition that exists in our country, that currently exists, that doesn't allow a level playing field for people to participate in this economy.

(ECF No. 114-8, p 17, Sen Ben Huesco, Aug 29, 2020)

According to the author's office, "since the beginning of social unrest, corporations have publicly messaged their support for diversity and Black lives. However, critics have pointed out this public support does not translate to diversity within a company and will not lead to long-term structural change. According to the USC Race and Equity Center, black employees in every industry tend to be concentrated in the lowest paying, least powerful positions… All of this strongly conveys to black professionals that their lives do not matter at work hence their doubtful reactions to company statements about George Floyd.

(ECF No. 115-1, p 56, Third Reading Analysis of AB 979, Aug 20, 2020)

"I've spoken to a black VC who could run circles around me intellectually on finance, product, you name it, but didn't know you needed strong references to go to LPs credibly," Maqubela said. "It is a testament to the structural nature of how venture capital is broken."
…
Since the national protests over the killing of George Floyd in police custody sparked an examination of structural racism across American society, a number of venture capital funds and tech companies have announced initiatives to readdress the lack of Black and Latino representation.
…
Without that, he said, "I don't see much structural change."

(ECF No. 115-3, p 114-6, Sam Dean and Johana Bhuiyan, Jun 24, 2020)

Asian Americans are the fastest growing ethnic group in our country. Nationally, we are 6 percent of the population but hold a little over 3 percent of all Fortune 500 board seats. The model minority myth that Asian Americans perform well has served to mask the challenges that our communities have faced in corporate America.

(ECF No. 114-21, p 72, David Chiu, Aug 13, 2020)

### III. AB 979 in response to current events

**a. Covid-19 Pandemic**

I also want to remind people that this bill is very appropriate for the time right now and why we need to approve this immediately. This pandemic has showed us how people of color have been affected disproportionately by the pandemic. We know that Latinos and African Americans happen to be a disproportionate number of the in other words, a disproportionate number of the people of California, or that Latinos and African-Americans are essential workers. They don't have access to quality jobs in healthcare and because of that, they've been affected disproportionately by the pandemic. That's why this bill is so much more important at this time that we start to move forward to create opportunity in the state to people of color in an environment where they have been disproportionately denied that same opportunity. So I ask for your aye vote today.

(ECF No. 114-8, p 18-9, Sen Ben Huesco, Aug 29, 2020)

**b. Murder of George Floyd**

In light of recent social and racial injustice protests, corporations across the country have conducted reviews of their workforce and have made promises to increase diversity.

(ECF No. 114-21, p 115, Chris Holden, Aug 20, 2020)

The one question we haven't answered is why now, why we can't wait any longer. Over the last few months, we've seen the racial reckoning triggered by the killing of George Floyd. The public continues to protest and demand that we tear down racial biases in all of our institutions. The message is clear and the legislature must do all it can to prioritize equality in equity now, and we can no longer wait to answer the cries for justice.

(ECF No. 114-8, p 36, Chris Holden, Aug 30, 2020).

I would simply just ask for your aye vote. But I think it is, as my joint authors have outlined, been a very challenging year. I think when we all witnessed George Floyd being murdered in the streets of Minneapolis, that we thought that our social conscience has just been rocked to its core. But then we see how even in weeks preceding and after that, how it just seems to continue to repeat itself. And so, when we look at how can we make change and know there is an effort under way under the dome to find ways to create more effective relationships with the police department in their relationships with the community, and how excessive force is handled. But we also have the issue playing out in our institutions.

(ECF No. 114-8, p 38-9, Chris Holden, Aug 30, 2020)

The one question I haven't answered is why now? Why not wait a little bit longer? Why not give these companies a little more time? Over the last few months, we have seen racial -- the racial reckoning triggered by the killing of George Floyd. The public continues to protest, demanding that we tear down racial biases, starting with our police departments but really demanding that racial biases be turned on in all our systems. The message is clear, and the legislature must do all they can to prioritize equality and equity now. We can no longer wait to answer the cries for justice with meaningful legislation like AB 979. And for those reasons, I respectfully ask for an aye vote.

(ECF No. 114-21, p 65-66, Cristina Garcia, Aug 13, 2020)

The current racial justice protests that continue to transpire across our state and nation are shining an enduring light on the immediate and critical need to create and maintain opportunities that will work to advance diversity, equity, and inclusion of board leaders from historically underrepresented communities into the boardrooms of Corporate America.

(ECF No. 115-3, p 142, Ricardo Lara, Aug 6, 2020)

### "Post-Enactment" Legislative History Materials

I do want to mention a couple hashtags that we will be using on social media, AB -- #AB979, #Corporate - - corpdiversity, and #opportunityforall to help track the discussion on social media.

(ECF No. 114-21, p 179, Cristina Garcia, Oct 1, 2021)

AB 979 also inspired change across the nation. In the summer of 2021, NASDAQ successfully changed its rules to require its member companies to have at least one woman or person of color on their board of directors. Both of our offices worked together, letters and signatures to support this effort. In this hearing, we will continue those conversation around the importance of creating inclusive work environments and highlight the very real impacts of diversity and inclusion policies has on people and businesses. We will hear from many experts in this field and hope to learn more about what the legislature can do to help efforts at implementing current law and creating new laws to assist in diversity and inclusion policies at all levels of employment

(ECF No. 114-21, p 181-2, Chris Holden, Oct 1, 2021)

I'm very happy that we are pursuing this because while we have legislation, we know that it -- we have a long way to go to achieve diversity in our private sector and even the public sector for that matter; though, it's better in the public sector.

(ECF No. 114-21, p 183, Nancy Skinner, Oct 1, 2021)

And certainly, I'm not saying that there aren't certain pipeline issues, particularly for many communities of color where there are -- there are not enough opportunities for advancement and structural racism has prevented people of color from being able to even get onto the entry rungs.
…
So, it's not because of lack of talent -- and I know our community struggles with the model minority myth -- it's not lack of talent, it's not lack of experience or skill to the degree that those opportunities afforded our communities, it's frankly racism.

(ECF No. 114-21, p 185-6, Richard Pan, Oct 1, 2021).

I can't tell you how critical it is that we have diversity and representation, both of women, of people of color. I myself get the fortune of participating in the Women's Caucus, the Latino Caucus, and the Black Caucus here in the legislature, and believe that one of the ways that we need to ensure that we have representation in our communities as we make critical decisions, whether it be around health, health justice, economic justice, housing justice, workforce justice, it is really that we have people that understand the perspective and the experience of what it means to not be in those rooms. For far too long, we have not been in those rooms, and I really appreciate your leadership, Assembly Member Holden and Garcia, and the space to make sure we have an opportunity to have the kind of diversity that will the state in a stronger direction together.

(ECF No. 114-21, p 187-8, Mia Bonta, Oct 1, 2021).

Bottom line is that the board composition of California companies do not reflect its demographic and its strength of its population. In terms of board appointments, Latinos are underrepresented by any measure. Of those serving on boards, as of Q2 of 2021, only 2.5 percent of all board seats of California public company boards are held by Latinos. Whites continue to hold the lion's share of board seats at 82 percent, Asians hold 12 percent of the seats, and blacks are 4.3 percent.
…
And I asked myself, how does this happen in 21st Century California and 21st Century America.

1   So, we absolutely want to see some change.

2   (ECF No. 114-21, p 196-7, Esther Aguilera, Oct 1, 2021)

3   The bill 979 helped to increase some diversity for women of color on the boards, but there still
4   remains a great deal of barriers for Latinas and Latinos in California.
    …
5   There continues to be structural racism for Latinos in the pipeline, in the C-suite, in the board room,
    and in every sector of the country. Latinos, nationwide are two and ten Americans. We contribute
6   28 percent of the nation's GDP growth. Our market share is increasing 70 percent, higher than any
    other group, and we contribute 72 percent of new entrants to the workforce. Investing and
7   promoting Latinos for positions of leadership and power will only help the economy and the state.

8   (ECF No. 114-21, p 201-2, Esther Aguilera, Oct 1, 2021)
9

10  So, instead of focusing more on the numbers, I wanted to share some thoughts on how we and the
    legislature could further improve on the statistics of board diversity in the state of California and
11  beyond.

12  (ECF No. 114-21, p 207, Janet Wong, Oct 1, 2021)

13  When we were having the discussions around AB 979, the discussion of equity is something that
    Mr. Holden and I kept going back and forth on, and we wanted to make sure that as we saw
14  improvements, that we saw it equitably across all marginalized groups, and not just one group or
    the -- versus another out there. And the data, that as it presented to us, let's us know that that concern
15  is real and we need to find ways to address that equity issue. So, in addition to individuals board of
    directors' diversity information that you recommended, yourself or Mr. Aguilera, have additional
16  policy recommendations that will help us get to a more equitable situation? As a Latina, and as the
    Chair of the Women's Caucus, you know, I take a brief moment to be thankful for the progress
17  we've made, but I think for the most part, still pretty alarmed of where we're at and how slow the
    change is happening for these community groups. And so, I do welcome additional ideas that you
18  think we need to do to create more equity in these numbers.
19

20  (ECF No. 114-21, p 214, Christina Garcia, Oct 1, 2021)

21  Thank you so much for the presentation. I think what really is highlighted for me is that the -- it's
    not only important to ensure that we have diversity and representation on our boards, but once we
22  have that representation that it actually has an impact on the policies and practices of the companies,
    particularly as it relates to diversity, equity, and inclusion practices throughout the company. I'm
23  wondering if either of the panelists have additional information about or have been tracking the
    extent to which there has been a shift in policy and practice in broader diverse -- broader policies
24  around diversity, equity inclusion in the companies as they are also increasing the number of board
    members who are from diverse -- from diverse communities?
25

26  (ECF No. 114-21, p 233, Mia Bonita, Oct 1, 2021)

27  And I would say that recent legislation such as AB 979, that Assembly Member Holden and
28  Assembly Member Garcia championed, will strengthen the foundation of an inclusive California,

rooted in economic, social, and legal equality.

(ECF No. 114-21, p 268, Fabrice Houdart, Oct 1, 2021)

Given my former experiences as a member of the California legislature, it is important for me to continue pushing forward policies that really center around consumer protection through the lens of equity and justice for all. As a regulator, this means amplifying our impact and push for equity and justice for all at both the local and national levels. Ultimately, the insurance industry needs to really reflect the diversity of the people it serves, especially in the most diverse state in the Union. In order for this to happen, the industry needs to get very comfortable speaking the language of diversity, equity, and inclusion. We have already seen how purpose translates into policies with laws like California's first board gender diversity law, as you know, SB 826, in 2018. And that was spearheaded by our former colleague, Senator Hannah Beth Jackson. And our first diversity corporate director law really coauthored by our -- obviously our Co-Chairs Holden and Assemblywoman Garcia, alongside Senator Chiu. We have to, you know, lead with these policies so that the industry can then follow and implement as we continue to really look at a future that is much more diverse, that speaks multiple languages. And I'm certain that our – and hopeful that our collective efforts will not only transform the policy landscape, but also the extent to the cultural landscape of the insurance industry as well.

(ECF No. 114-21, p 271-2, Ricardo Lara, Oct 1, 2021)

what we do, and how we're responding to a national call to action, recognizing that California's leading a way with the recent passage of AB 979.

(ECF No. 114-21, p 286, Jonathan Sandville, Oct 1, 2021)

AB 979 served as a call to action for businesses to take measurable action in light of data that shows that people of color face barriers to getting hired, face hostile environments, and microaggressions once hired, obstacles to getting promoted, and are not able to climb up the ladder of success.

(ECF No. 114-21, p 180, Chris Holden, Oct 1, 2021)

So, our diversity, equity, and inclusiveness role provides confirmation of what researchers have said, you know, that this recent public support for social justice movements doesn't always translate into long-term structural change in board members, in hiring, in recruitment, and retention policies. comes to play.

…

So, this is key because exactly one year ago Governor Newsom signed landmark legislation which requires diversity on corporate boards. We're certainly appreciative for the vision by Assembly Member Holden, Assembly Member Garcia, Assembly Member David Chiu, and Assembly Member Reyes, and also Senator Ben Hueso, for coauthoring this bill.

…

So, as the saying goes, as goes California, you know, so do the -- does the rest of the country. And we've seen what's happening based upon this visionary leadership. We've seen states like Illinois and Washington and Hawaii and Massachusetts, and others are following in California's lead.

(ECF No. 114-21, p 289-90, Jonathan Sandville, Oct 1, 2021)

The federal government has long recognize that without discrimination, an employer's workforce should reflect the proportional representation along race and gender of the available workforce. So, it's not just a problem of representation at board levels. But it should be reflect throughout the labor market. We know that racial discrimination, both historically and through current empirical evidence, we know that there is discrimination in the labor market, both overt and implicit labor discrimination, and it is still very prominent.

(ECF No. 114-21, p 299-300, Hina Shah, Oct 1, 2021)

Numerous empirical studies have demonstrated that discrimination against blacks is not disappearing or even gradually diminishing in the labor market. In fact, in one study, a white male felon out on parole had a higher chance of getting employment than a black male with no criminal record.

(ECF No. 114-21, p 300, Hina Shah, Oct 1, 2021)

I also urge the Committee to not think starkly in a binary fashion. The choice is not between color or gender blindness and/or preferential treatment. Inequity permeates every aspect of the employment relationship from recruitment to retention to promotion decisions. Affirmative action really just comes at the tail end to force a choice based on race or gender. However, we need to embrace a mandate that employers eliminate all barriers, explicit and implicit, in their process to truly diversify their workforce.

(ECF No. 114-21, p 304, Hina Shah, Oct 1, 2021)

The statements should include adoptions of company-wide hiring goals to address any inequities and a commitment to reduce unconscious bias and structural barriers.

(ECF No. 114-21, p 305, Hina Shah, Oct 1, 2021)

Implicit bias creates barriers throughout the process. The painstaking steps of evaluating and eliminating bias in every step of the process will result in a more diverse applicant pool. So, for example, when setting minimum qualifications, studies have shown that women are reluctant to apply to jobs where they do not meet 100 percent of the hiring criteria.

(ECF No. 114-21, p 306, Hina Shah, Oct 1, 2021)

These are just some suggestions that businesses and the legislature should explore to ensure that California's workforce reflects the true diversity of its population. But I think that there is a lot to be learned both by steps that the private employers have taken, the public sector has taken, and also by the legislature's focus and commitment to creating a truly diverse and inclusive workforce

(ECF No. 114-21, p 307-8, Hina Shah, Oct 1, 2021)

it takes sometimes the act of legislature in order to push a certain change in the culture of thinking. And once we do that, it precipitates, and over time, we see other steps take effect. So, that's

1    hopefully what we can achieve with a marginal movement from our institution.

2    (ECF No. 114-21, p 311, Adrin Nazarian, Oct 1, 2021)

3    I am happy to start with some feedback to the question. From a public company board diversity
4    perspective, I had referenced our Diverse Corporate Directors Coalition call to action, which was
     released two years ago. And in that we thought what we would ultimately like to see is a board that
5    is at least 50 percent diverse. We are very appreciative of the legislation in the state of California,
     SB 826 and AB 979 because, you know, that helps put some focus on board diversity. But we hope
6    over time to see, you know, up to 50 percent diverse board. We didn't put a time frame on it.

7    (ECF No. 114-21, p 312, Janet Wong, Oct 1, 2021)

8    But the hard truth is that for women, people of color, and women of color in particular, accessing
9    the capital their companies need to flourish and grow is difficult, if not impossible. Today, only
     one percent of venture capital backed founders are black, and less than two percent are Latinx.
10   Women founders in a country where women make up a majority of the population, receive a dismal
11   2.7 percent of venture capital funding. And despite becoming an increasingly diverse nation,
     women of color founders receive less than one percent -- 0.64 percent, to be exact, of venture
12   funding. This disparity is systemic, but not surprising when only 1.3 percent of the $69 trillion
13   investment management industries entrusted to investment firms owned by women or minorities.
     As the Committee continues this important work, we urge you to take a hard look at the disparities
14   in who manages the trillions of dollars that drive business growth because the lack of corporate
     board diversity is inextricably linked to the lack of diversity in the firms that invest in these
15   companies as they are getting started and go on to become major corporations.

16   (ECF No. 114-21, p 313, Oracio Gonzalez – public comment, Oct 1, 2021)

17   The history of our nation is plagued with decades of racial inequality and discrimination, and we
18   find this manifested in all aspects of our society, and systemic reform such as -- such as this one,
     such as AB 979 (indiscernible) needed to overcome historic inequalities and the BLC, the Black
19   Leadership Council, praises the intent of AB 979 to acknowledge diversity and ensure fair
     representation from underrepresented communities.
20
     (ECF No. 114-21, p 324, Tasha Henneman – public comment, Oct 1, 2021)
21

22   I want to -- a couple reminders. SB 829 and AB 979, were just the beginning of the discussion and
23   should be seen as the floor and not the ceiling of where we need to be going as we only set some
     minimums that are not necessarily reflective of the total inclusion and diversity that is within our
24   state.

25   (ECF No. 114-21, p 330-1, Cristina Garcia, Oct 1, 2021)

26   This has obviously been -- 979 has been what we had hoped that it would be, a bill that would cause
27   there to be more conversation around inclusion and diversity in the workplace and in the corporate
     boardroom.

28

(ECF No. 114-21, p 332, Chris Holden, Oct 1, 2021)

When I introduced AB 979, my goal was to start a conversation about diversity and create a matrix that sets a floor for diversity, not a ceiling. Our efforts through AB 979 and SB 826 here in California have been crucial to supporting diversity and inclusion policies on a national scale.

(ECF No. 114-21, p 180, Chris Holden, Oct 1, 2021)

The research behind AB 979 is sound. Studies have shown that corporations with a more diverse and equitable board have better company governance and have better decision making, which leads to a more successful company. Diversity and equity are necessary for the health of the company, while also providing opportunities for those who experience racism, microaggressions on a daily basis.

(ECF No. 114-21, p 178, Cristina Garcia, Oct 1, 2021)

And we hope through these hearings that are starting today, we will be able to figure out where we're at and where we need to be going in order to continue to create a workforce that looks more like our society out there.

(ECF No. 114-21, p 179-80, Cristina Garcia, Oct 1, 2021)

**Made-For-Litigation Documents**

**I. Diversity**

**a. Diversity as good for society**

They often speak of the positive impact of having women and people of color on their boards.

(ECF No. 114-7, p 13, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023).

While they have been helpful, the efforts of CalPERS and its partners have not been sufficient to address the historical exclusion of members of underrepresented groups from California's publicly held corporate boards, nor to achieve corporate board diversity that reflects the diversity of California as a whole or ofits highly talented labor pool. CalPERS agrees with the California Legislature's findings in Senate Bill 826 (Reg. Sess. 2017-2018) (SB 826) that "[m]ore women directors serving op boards of directors of publicly held corporations will boost the California economy, [] and protect California taxpayers shareholders, and retirees, including retired California state employees and teachers whose pensions are managed by CalPERS and CalSTRS." And ultimately the enactment of SB 826 helped our efforts to increase gender diversity on the boards of corporations in which CalPERS invests, and thereby benefits California state retirees.

CalPERS also believes that Assembly Bill 979 (Reg. Sess. 2019-2020) (AB 979) will further increase the diversity of the boards of corporations in which CalPERS invests, and thereby will likewise benefit California state retirees. Both SB. 826 and AB 979 are necessary to achieving CalPERS's goals of addressing historical exclusion of underrepresented groups on California's publicly held corporate boards, increasing the diversity on the boards of the corporations in which

it invests, and providing the resulting benefits to California retirees.

(ECF No. 114-25, p 4-5, Declaration of Simiso Nzima, Jan 17, 2023)

**b. Diversity good for business**

The fewer Latinos serving as directors and senior executives, the more likely that corporations will exhibit a lack of understanding, both culturally and economically, of the fastest growing consumer segment in the United States.

(ECF No. 114-24, p 17-8, Declaration of Oswaldo Meza, Jan 20, 2023)

I knew if we put a woman on the board of every Series B company and beyond, we could improve the performance and change the culture of tech companies that have discriminated against qualified women and people of color and kept them out of leadership positions, starting today and from the top.

(ECF No. 114-7, p 7, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023)

Our ultimate goal is to help companies create full and true representation in their leadership, so that they can better serve their customers, employees and communities. Focusing also on people of color and other underrepresented groups was a natural extension for the Board list.

(ECF No. 114-7, p 9, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023).

As a founder, CEO, and board director, I know diversity on corporate boards makes a company more agile and effective across multiple metrics.

(ECF No. 114-7, p 12, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023).

In order for boards to keep pace and for companies to anticipate market changes, companies should ensure that the people on their boards reflect the changing employee and consumer base and can respond and anticipate the next disruptions in their business.

(ECF No. 114-7, p 12-13, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023).

Diversity on the Board Improves Corporate Performance Across Multiple Metrics and Reduces Discrimination in the Corporate Pipeline and Workforce. As a founder, CEO, and board director, I know diversity on corporate boards makes a company more agile and effective across multiple metrics.

(ECF No. 114-7, p 12, Declaration of of Sukhinder Singh Cassidy, Jan 18, 2023)

As an investor, CalPERS has concluded from its own assessment of empirical research that diversity-including diversity of race, gender, sexual orientation, and gender identity-in the leadership of the companies in which it invests leads to higher performance by those companies. That in turn leads to better returns on Cal PERS' s investments, which is essential to providing pension benefits to retirees in the CalPERS system. Accordingly, for more than a decade CalPERS has engaged in sustained efforts to increase the diversity of corporations in which it invests or

1    prospectively could invest.

2    (ECF No. 114-25, p 3, Declaration of Simiso Nzima, Jan 17, 2023)

3    Based on my personal experiences, which are also supported by research, I know that diversity in
4    corporate leadership breeds excellence: diversity brings different ways of thinking, different
     approaches to problems, different solutions, and a diversity of opinion that helps break the mold of
5    groupthink, increase innovation, and increase profits and create value.

6    (ECF No. 114-26, p 12, Declaration of Guy Primus, Jan 20, 2023)

7    Studies show that more diverse boards provide a number of benefits for corporate governance and
8    performance. Diverse boards reduce costs associated with having one homogenous group making
     all of the corporation's key decisions. Decision-making from a board with a variety of identities is
9    more likely to produce effective and well-considered decisions. Diversity is also important because
     of the board's symbolic and strategic role in corporate governance and because diverse boards are
10   more likely to select a diverse CEO. Research shows that diverse boards also incentivize inclusion
     in other areas of the firm. A more diverse board may inspire or pressure a CEO—regardless of their
11   identity—to hire a diverse management team. In short, board diversity mandates are a minor
12   intervention with a substantial impact on improved governance and inclusion in corporate
     leadership.

13   (ECF No. 114-29, p 3, Declaration of Darren Rosenblum, Jan 21, 2023)
14

15   By contrast, diversity improves decision-making. One problem from the capture and resulting
     groupthink described above is that homogenous board members will analyze situations similarly
16   due to their similar backgrounds. Diversity solves this problem…This conclusion has been
     confirmed by various management consultancies. In a study on diversity in the workforce, Ernst
17   and Young found that more diverse groups performed better than homogeneous ones, even if the
     members of the homogeneous groups were substantially more capable.
18

19   (ECF No. 114-29, p 24-5, Declaration of Darren Rosenblum, Jan 21, 2023)

20   One serious shortcoming of the domination by straight cisgender white people on corporate boards
     in the United States is groupthink. This occurs when a specific demographic group forms a
21   decision-making body and only deliberates around the dominant group's thought processes and
     points of view. Their perspectives dominate discussions and exclude other perspectives. Diverse
22   opinions from women, people of color, and LGBT people are rendered voiceless and irrelevant,
     often to the firm's detriment. For example, homogenous boards only focus on certain markets in
23   their supply and distribution chains, a routine choice that weakens the firm from lack of
     deliberation.
24

25   (ECF No. 114-29, p 23, Declaration of Darren Rosenblum, Jan 21, 2023)
     Diverse perspectives in the boardroom not only improve company business performance, they also
26   help accelerate opportunities for more diversity within the organization itself.

27   (ECF No. 114-7, p 13, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023).

28

[R]esearchers demonstrate that the proportions of executives of color are out of balance with their proportions as professionals. To measure this difference, researchers used a simple formula to determine the "Executive Parity Index" by considering the percentage of executives divided by the percentage of professionals, shown below.

(ECF No. 114-11, p 20, Declaration of Jessica N. Grounds, Jan 21, 2023)

### c.  Diversity in business good for society

Responding to these calls for diversity from investors and institutional players makes prioritizing diversity for companies at the board level a smart investment. Critical to the conversation about the growth of diversity on boards is the significant benefits that are achieved when directors from underrepresented backgrounds serve on boards. While evidence remains strong that diverse teams financially outperform teams with less diversity, a slew of additional diversity benefits emerge which leads to better short-term and long-term decision-making at the highest level of leaders at publicly held companies.

(ECF No. 114-11, p 24, Declaration of Jessica N. Grounds, Jan 21, 2023)

Diverse, independent voices are needed in corporate boardrooms, and AB 979 is necessary to increase opportunities for qualified LGBT directors and directors of color to serve in these critical roles that profoundly impact our state and society at large.

(ECF No. 114-12, p 15, Declaration of Catherine A. Halligan, Jan 20, 2023)

In 2020, I co-authored Assembly Bill No. 979 (2019-2020 Reg. Sess.) (AB 979), which addresses discrimination that has kept Black, African American, Hispanic, Latino, Asian, Pacific Islander, Native American, Native Hawaiian, or Alaska Natives, or those who self-identify as lesbian, gay, bisexual, or transgender (LGBT) (hereinafter, underrepresented communities) individuals out of a subset of California's corporate boardrooms, by requiring publicly held corporations headquartered in California (hereinafter, California's publicly held corporations) to have a minimum number of directors from underrepresented communities on their boards. We focused on California's publicly held corporations because these tend to be the largest corporations with significant impact on the public and the state economy. Over the years, I have supported legislation that grows the California economy, strengthens our infrastructure, and supports working families.

(ECF No. 114-15, p 3, Declaration of Chris Holden, Jan 23, 2023)

### d.  Equitable or equal access

I want to thank you for joining us today for a timely discussion on the importance of diversity, both on corporate boards and down the ladder for all employment in California.

(ECF No. 114-21, p 178, Cristina Garcia Oct 1, 2021).

### e.  Role model

Even beyond the benefits to any one company, bringing women and people of color on boards amplifies the number of visible diverse role models we have in the business world as a whole.

(ECF No. 114-7, p 13, Declaration of of Sukhinder Singh Cassidy, Jan 18, 2023)

### f.  AB 979 necessary because other attempts to diversify failed

We had hoped to see marked change in gender diversity on California public corporate boards following passage of Senate Resolution 62, but the numbers barely budged. Likewise, there was no change in racial and ethnic diversity. We ultimately realized that the resolution failed to achieve meaningful change. That is why SB 826 and AB 979 are needed.
(ECF No. 114-04, p 10, Declaration of Betsy Berkhemer-Credaire, Jan 16, 2023).

A range of approaches and alternatives to AB 979 had been tested in California. Yet these attempts did not successfully undo the discriminatory patterns in corporate board selection, nor advance diversity as necessary, to achieve the associated benefits for corporations and the public at large. AB 979 is necessary to fix a long history of discrimination in the corporate board process.
(ECF No. 114-04, p 10, Declaration of Betsy Berkhemer-Credaire, Jan 16, 2023).

Despite the availability of people from underrepresented communities qualified to serve on corporate boards, corporate boards were not selecting them for these positions. I had qualified Latina women approach me and tell me that despite the enactment of SB 826, there was no traction for them or other women from underrepresented groups. Boards were not selecting them for board positions, and they believed there needed to be a law that addressed race and ethnicity specifically.
(ECF No. 114-10, p 2-3, Declaration of Cristina Garcia, Garcia, Jan 19, 2023)

## II. Discrimination

### a.  Societal, "structural," or "systemic"

The principal purpose of the mandate is to counter structural and systemic discrimination, whether based on race, sexual orientation, or gender identity. This is not only about seeming diverse and fairly distributing corporate leadership positions, which are some of the world's highest-paid jobs. Eliminating discrimination in the nomination and selection process for corporate boards and in the corporate board pipeline matters for every member of excluded groups. Everyone deserves a shot at becoming a corporate leader, and every kid should be able to dream of success, including at the highest level of firm governance. Until recently, only heterosexual cisgender white men stood a strong chance of becoming leaders of corporations, including publicly held corporations in California. AB 979 fosters improved corporate governance that alters the process of who becomes part of the board, while allowing substantial flexibility and continuing to allow board members to select and accommodate all potential qualified candidates through board size increases.

AB 979 is specifically crafted to help eliminate structural and systemic discrimination through its mandated inclusion of underrepresented communities. Markets alone will not and
have not rectified the structural discrimination delineated above. Legislation is necessary, and California has provided a solution that should prove effective and flexible and that will bring strong benefits in corporate performance and governance that will benefit the State, the long-term viability of publicly-held corporations, and its economy.

(ECF No. 114-29, p 6 n 3, Declaration of Darren Rosenblum, Jan 21, 2023)

Many scholars agree that discrimination is the cause of the stark underrepresentation of people of color and lesbian, gay, bisexual, and transgender ("LGBT") people in corporate leadership. Members of these minority groups face significant barriers not only to being appointed to corporate boards, but also to inclusion in the pipelines that provide board candidates for future selection.

…

These inequalities perpetuate structural discrimination, because former executives typically become board members through selection processes in which executives hand-select board directors most like them. This has led to significant underrepresentation of minority groups at the board level, even though greater inclusion would improve governance.

(ECF No. 114-29, p 2, Declaration of Darren Rosenblum, Jan 21, 2023)

Anecdotally, when I speak to leaders of color, they routinely report that they face pervasive adverse, biased treatment from their white male peers.

(ECF No. 114-7, p 8, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023)

we sent Silicon Valley leaders a letter regarding our concern over the underrepresentation of the communities covered by AB 979 within tech corporations

(ECF No. 114-10, p 5, Declaration of Cristina Garcia, Christina Garcia, Jan 19, 2023).

**b.  In board selection**

[T]he Declaration will examine the effects of demographic homogeneity and the benefits of diversity for corporate governance and performance The still-dominant group of white cisgender heterosexual male corporate leaders has systematically excluded underrepresented communities, including people of color and LGBT people, from the board. Data speak volumes about this exclusion.

(ECF No. 114-29, p 12, Declaration of Darren Rosenblum, Jan 21, 2023)

In my experience, one reason why Black candidates do not obtain board seats, despite their excellent and often superlative qualifications, is because racial bias can creep into the board nomination and selection process.

(ECF No. 114-26, p 9, Declaration of Guy Primus, Jan 20, 2023)

Based on my decades of experience as a board member, CEO, and executive, and as an advocate seeking to accelerate diversity on corporate boards, I believe that AB 979 is necessary to achieve corporate board diversity because corporations need an external catalyst to eliminate the barriers and exclusion for Black and other underrepresented corporate leaders and make diversity a priority.

…

Corporations need a push to expand their circles, and AB 979 provides a systematic catalyst that can open the doors for Black professionals who have long been ready and able to serve to contribute their many talents to the highest levels of corporate leadership.

(ECF No. 114-26, p 14-5, Declaration of Guy Primus, Jan 20, 2023)

Based on my decades of experience representing corporate boards as an attorney, I believe that AB 979 is necessary to address the systemic barriers that exclude Asian and other diverse individuals from corporate boards. Such barriers exist for Asians and other diverse individuals but not for white men.

(ECF No. 114-22, p 12, Declaration of Lawrence Low, Jan 18, 2023)

Through my decades of experience working with boards of directors as a corporate attorney, my work advocating for Asian corporate leadership, and the research and conversations I have had with corporate leaders about diversity, I understand that one barrier to Asian diversity on corporate boards is bias and stereotypes against Asians. I observed this kind of bias in my career. As a junior associate, I was assigned to work on a matter for a Hong Kong investor. During one meeting with this client, the client had some difficulty expressing herself. Following the meeting, in a debriefing with other attorneys, a senior partner, referencing the communication difficulties, made the comment, "the only thing straight about the Chinese is their hair." I understood him to be making a derogatory comment perpetuating a stereotype about Asians as inscrutable, lacking honesty and ethics. Statements like these reflect stereotypes or bias that treat Asians as "other," and the persistence of these biases in the corporate world can limit the professional. opportunities of Asians in the workforce. Another stereotype against Asians is the "Model Minority" myth, which portrays Asians, as a whole, as quiet, industrious, and rule abiding. While the "Model Minority" myth may seem flattering on the surface, it also includes the less positive attributes of being weak, ECF No.ile, complacent, and overly deferential. The "Model Minority" myth includes the perception that Asian individuals are succeeding in corporate America, which causes companies to overlook the absence of Asians at the highest levels of corporate leadership, resulting in the exclusion of Asians from important diversity policies, initiatives, and discussions.

(ECF No. 114-22, p 5-6, Declaration of Lawrence Low, Jan 18, 2023)

In summary, I believe there are many barriers to board diversity; however, in my professional opinion, AB 979 gets at the root of problem. It boils down to process: AB 979 forces boards to reconsider how they slate and select new corporate directors to ensure their fiduciary duty to help obtain better business outcomes for the business organizations they serve by exploring the full range of talent that exists to fill these director roles across the full range of our citizenry.

(ECF No. 114-20, p 12, Declaration of Dennis Lanham, Jan 19, 2023)

Given the documented bias across the population of publicly held corporations in the U.S. and California, there are simply too few non-discriminating corporations in this population to overcome the substantial barriers created by systematic preferences for the small, insular ingroup of directors who know each other through shared board experiences, but also, shared schooling, shared exclusive social clubs, and listing in the highly exclusive Social Register, which indicate substantial preferences for an extremely narrow slice of the U.S. population in these positions. AB 979 is a necessary measure to lead CEOs and existing directors to change their bias influenced patterns of behavior and instead to look beyond their homogeneous networks and select qualified racioethnic minority directors.

(ECF No. 114-19, p 37, Declaration of Alison Konrad, Jan 23, 2023)

1

2   Given the informality of the board director selection process and the use of "chemistry/comfort" as
    an impactful screen, the board selection process is highly vulnerable to racioethnic discrimination,
3   and several studies described in the next section race discrimination in this process. Furthermore,
    boardroom culture results in discrimination because leaders' shared preferences drive the selection
4   of individuals on the basis of factors that favor white people and are not bona fide occupational
    qualifications.
5

6   (ECF No. 114-19, p 16, Declaration of Alison Konrad, Jan 23, 2023)

7   Reskin and Bielby (2005) explain that discriminatory behavior persists over time because the
    stereotypical beliefs driving discriminatory selection against racioethnic minority groups are
8   widely shared across corporate leaders, such that the market does not correct for this bias. The
    shared nature of stereotypes means that discrimination arising from individual preferences for any
9   particular demographic group, such as white men being preferred for board positions, is
    widespread. For this reason, the foundations of discrimination go beyond the preferences of
10  individuals, because these shared preferences determine how leaders drive the development of
    systems and dynamics that serve to maintain racial inequality.
11

12  (ECF No. 114-19, p 15, Declaration of Alison Konrad, Jan 23, 2023)

13  As explained above, discrimination is indicated when membership in a demographic
    group has a systematic negative impact on the treatment individuals receive in the workplace.
14

15  (ECF No. 114-19, p 19, Declaration of Alison Konrad, Jan 23, 2023)

16  Evidence of discrimination against racioethnic minority groups in the board selection process
    (described in the next section) indicates that without explicit requirements that racioethnic
17  minorities be included on boards, it is unlikely that the voluntary processes are effective for
    overcoming CEO and existing members' patterns of behavior influenced by bias.
18

19  (ECF No. 114-19, p 14, Declaration of Alison Konrad, Jan 23, 2023)

20  Studies have that discriminatory dynamics significantly influence the selection of board directors
    in ways that limit opportunities for racioethnic minority candidates and women. Research ECF that
21  powerful CEOs, who are mostly white men, build homogeneous white male boards if they are
    allowed to do so.
22

23  And a large and substantial body of evidence supports the proposition that members of racioethnic
    minority communities experience racial bias in management and the professions that traditionally
24  can lead to board directorships. Interview and survey studies that racioethnic minorities report
    receiving discrimination and negative treatment in the workplace. Experimental studies
25  demonstrate that race is the cause of such negative treatment, even at the senior executive levels.

26
    Large scale quantitative studies show that such race discrimination is widespread and has
27  significant material impacts on people's careers, even at the highest executive levels. Given that
    such high-level executives are frequently the ones selected for board service, discrimination at the
28  executive level impedes access to corporate boards for racioethnic minorities. The wide range of

1
2
3

work that has considered many different aspects of discrimination against members of these communities in corporate board selection and in the corporate board selection pipeline allows me to draw the conclusion that discrimination is the cause for the stark underrepresentation of racioethnic minorities and the overall lack of diversity on corporate boards.
(ECF No. 114-19, p 11-2, Declaration of Alison Konrad, Jan 23, 2023)

4

5
6
7
8
9
10
11

The primary reason why members of racioethnic minority communities are underrepresented on corporate boards of directors is due to discrimination. As will be discussed in more detail throughout this declaration, discriminatory barriers limit access to board directorships for racioethnic minorities in two ways. First, much evidence exists which that boards discriminate against members of racioethnic minority communities in appointing board directors. Second, barriers to career advancement, including hiring and promotion discrimination, limit the opportunities of members of these communities to access the executive level positions that have traditionally led to board memberships. Because of this discrimination, racioethnic minorities remain underrepresented at the highest organizational levels despite the substantial number of racioethnic minorities qualified for the positions.
(ECF No. 114-19, p 9, Declaration of Alison Konrad, Jan 23, 2023)

12
13
14
15
16
17

The purpose of AB 979 was to remedy discrimination against underrepresented communities in the corporate board director selection process on publicly held corporation boards, as well as in corporate leadership positions, which often serve as feeder positions for board director positions. During the Senate Banking and Financial Institutions Committee, the Assembly Banking and Finance Committee, and the Assembly Floor Session hearings held in August 2020, my co-authors, Assemblymembers Cristina Garcia and David Chiu, and I shared with our colleagues the data and information we reviewed showing the stark underrepresentation and pervasive exclusion of underrepresented communities from board service.

18

(ECF No. 114-15, p 3-4, Declaration of Chris Holden, Jan 23, 2023)

19
20
21
22
23

The overwhelming majority of these corporate leaders, including the executive leadership and board directors, were white men. As an African American man, there were many times when I walked into California's publicly held boardrooms and did not see any directors who looked like me. My colleagues in the Legislature, who are members of underrepresented communities, shared the same experiences. Based on my own experiences, as well as data and information that I am aware of, I know that there is no shortage of eminently qualified underrepresented community members to serve on California's publicly held corporations' boards. But these individuals are not being selected for board service because of discrimination.

24

(ECF No. 114-15, p 3, Declaration of Chris Holden, Jan 23, 2023)

25
26
27
28

The Legislature also reviewed 2019 data from the United States Bureau of Labor Statistics, which reported that 90% of chief executives in the United States were white. Although not a requirement for board service, Chief Executive Officer (CEO) positions are often in the feeder pool for director selection. Because existing board members, the majority of whom are white, may look to these high-level leadership positions to select new board members, new appointees will likely be white. This perpetuates the discriminatory exclusion of underrepresented communities from board service.

(ECF No. 114-15, p 4-5, Declaration of Chris Holden, Jan 23, 2023)

CEOs and existing board members who are mainly white men-are not selecting these qualified candidates. The data we reviewed, as well as my own personal observations and outreach efforts, reflected that this is because those decision makers tend to hire people who look like themselves. There is no intentionality to hire people who look different. The bottom line is that if you do not look white, you are far less likely to get a board position, regardless of your qualifications.

(ECF No. 114-15, p 6, Declaration of Chris Holden, Jan 23, 2023)

"My recognition that the corporate director nominations and selection processes have historically been highly insular, and frequently failed to include qualified women and men of color due to historical discrimination, motivated me to seek and advocate for solutions to this problem."

(ECF No. 114-04, p 9, Declaration of Sukhinder Singh Cassidy, Jan 16, 2023).

The reason these and other alternatives would be ineffective is because they do not get to the root of the problem: bias and discrimination against people from underrepresented communities. People of color are continually stereotyped and seen as inferior. Even as a legislator, it has been my experience that there are different standards and expectations for me as a Latina woman.
Getting a person from an underrepresented community "through the door" to an interview for a board seat does not address the fact that existing board members, who are largely white, do not select candidates from underrepresented communities for a seat despite their qualifications. I understand from my review of studies, anecdotes, interactions with corporate and community constituents, and my own personal experiences, that largely white boards tend to select white candidates-despite substantial numbers of qualified candidates from underrepresented communities-because of biases against people of color. The only way to address this problem of discrimination in the selection process is through a mandate such as AB 979, a mandate that requires existing boardroom directors to change their behavior and open the doors that had long been shut for qualified people of color.

(ECF No. 114-10, p 7, Declaration of Cristina Garcia, Christina Garcia, Jan 19, 2023)

Based upon my education and experience as a multi-time CEO, board director, and executive, I believe that AB 979 is necessary to remedy the discriminatory barriers that shut out qualified women and people of color1 from receiving the full and equal opportunity to serve and lead on corporate boards.

(ECF No. 114-7, p 3, Declaration of Sukhinder Singh Cassidy, Jan 18, 2023)

Other potential solutions would not have worked to address this discrimination. For example, California corporations have had access to state and private registries of diverse candidates from underrepresented communities for the last 20 years, but these registries did not work to increase board diversity. Requiring corporations to interview candidates from underrepresented communities or make the application process less secretive would not work either. At most, imposing this requirement might lead to an increase in interviews for these candidates but would

not ensure actual board seats. Moreover, promises by California corporations to diversify their boardrooms-similar to the promises that corporations were making in the aftermath of George Floyd's death-did not work either, as I learned through my own personal efforts meeting with and encouraging California's technology corporations to stop excluding qualified individuals from underrepresented communities on their boards. Though they knew there was a longstanding problem, corporations failed to remedy these discriminatory barriers.

(ECF No. 114-10, p 6, Declaration of Cristina Garcia, Garcia, Jan 19, 2023).

[D]iscriminatory patterns in corporate board selection perpetuate the exclusion of women and men of color from California publicly held corporations' boards. Existing directors and Chief Executive Officers (CEOs), who are largely white men, select new director candidates from their personal networks and who are most like themselves, often white men to the exclusion of qualified women and men of color. AB 979 is necessary to fix this long history of discrimination in the corporate board process.

(ECF No. 114-04, p 2, Declaration of Betsy Berkhemer-Credaire, Jan 16, 2023).

In my advisory role with workplaces and leaders across industry, many racially diverse executives have shared with me the bias-driven challenges they face moving into the most competitive executive roles. For example, a racially diverse executive recently shared that during an interview process for a board position, she was asked at length about her technical experience and capacities. The heightened level of questioning of her expertise and tenure was typical in her experience, something she has had to endure throughout her career. This experience is similar among most experienced executives from underrepresented groups, who have shared that they feel they are held to a higher standard and must prove their expertise and that these experiences are not shared by white, straight, and male executives. This is primarily because white executives are perceived as the "norm" and already assumed to be qualified to serve.

(ECF No. 114-11, p 20, Declaration of Jessica N. Grounds, Jan 21, 2023)

the reluctance of existing board directors to proactively respond to these benefits by adding board directors who are diverse, including demographic diversity of underrepresented groups as detailed in AB 979, is evidence that bias, as discussed above in paragraphs 47-64, continues to drive board director selection and that discrimination exists against these groups. Further, it is compelling evidence for the need of legislation like AB 979 because a requirement to select diverse directors will lead existing board directors to change their bias-driven behavior.

(ECF No. 114-11, p 23, Declaration of Jessica N. Grounds, Jan 21, 2023)

Based on my experience with the Initiative, my role as the insurance commissioner, my interactions with insurance companies and their executives and board members and my observations after having served on nonprofit corporate and other boards, the reason for the lack of diversity on governing boards is because existing board members- who, as the data collected through our efforts showed, are principally (and on some boards) all white men-tend to replicate themselves. Historically, there has been discrimination against people of color, women, and LGBTQ persons in employment and access to leadership positions in corporations, including corporate boards. Board members or the corporation's management are responsible for recruiting, nominating, and

approving board members, and they tend to look for people who are like them and from their own social and economic circles.

(ECF No. 114-17, p 9, Declaration of Dave Jones, Jones, Jan 23, 2023)

Based on my experience with business leaders from these underrepresented communities, and my knowledge of registries of individuals from these communities who are qualified and ready to serve on corporate boards, I know there are many, many qualified individuals from those communities who would serve admirably.

(ECF No. 114-17, p 9, Declaration of Dave Jones, Jones, Jan 23, 2023)

Underrepresented groups are crucial to firm diversification efforts. As above, structural discrimination has left people of color and LGBT people outside of much of the country's corporate leadership.

(ECF No. 114-29, p 26, Declaration of Darren Rosenblum, Jan 21, 2023)

Cognizant of the systematic exclusion of and discrimination against underrepresented groups in the corporate selection and pipeline to selection, California passed AB 979 into law.

(ECF No. 114-29, p 26, Declaration of Darren Rosenblum, Jan 21, 2023)

AB 979 reflects a turn to corporate law to counter the ongoing structural and systemic discrimination against specific groups. Despite the Civil Rights Act's enactment more than fifty years ago and its substantial effect in many sectors of the economy, existing CEOs and corporate board members continue to systematically exclude individuals from underrepresented communities from the corporate board and corporate board pipeline
…
However, AB 979 diverges from the Norwegian quota law in several key respects that facilitate its efficacy in addressing long-standing discrimination despite its relatively unimposing mandate. In particular, AB 979 adopts a level of flexibility that provides significant deference to corporations' governance choices and selection processes and imposes only a marginal requirement with respect to board composition.
(ECF No. 114-29, p 29, Declaration of Darren Rosenblum, Jan 21, 2023)

Given the stark history of discrimination and exclusion of underrepresented groups, this progress suggests that California's legislature effectively crafted a statute to address persistent discrimination.

(ECF No. 114-29, p 31-2, Declaration of Darren Rosenblum, Jan 21, 2023)

Because most major companies officially encourage inclusion, some may presume that the stigma against being LGBT has diminished against being LGBT has diminished…But the straight cisgender white corporate elite in United States corporations adhere to extraordinarily exclusionary practices to prevent individuals from underrepresented communities from moving up within the corporation; these are practices that would not be recognized elsewhere in society. Publicly held corporations in California are no different. Homogeneity in leadership proves exclusionary, as nominating committees select people with traits similar to their own. As firms recruit and promote

people, "forces [exist] which lead the men who manage to reproduce themselves in kind." Corporate leaders see themselves as the standard-bearers for the corporation's success; they believe their traits prove essential for the firm's continued profitability. These leaders, in turn, identify for promotion subordinates whose traits mirror their own. They use their established networks to find these people, which functionally creates a closed loop in which leaders find replacements who look like them.

(ECF No. 114-29, p 15-6, Declaration of Darren Rosenblum, Jan 21, 2023)

How do straight cisgender white people achieve this level of domination? This section sets forth two mechanisms through which straight cisgender white people have excluded would-be leaders from underrepresented communities to obtain and maintain positions of great power and wealth: corporate masculinity and capture theory. Each of these mechanisms involves the use of stereotypes or other forms of bias related to racial, ethnic, sexual orientation, and gender identities and result in different treatment of people based on those identities.

The nature of corporate masculinity clarifies how this rarified competition takes place. A significant body of research indicates various masculine-identified traits drive CEO decisions: hubris, over-confidence, narcissism, a desire to build empires, rivalry, and envy (e.g., the desire to keep up with peer CEOs).73 Studies suggest that these traits are more commonly expressed in men,74 who face significant pressure to conform to masculinity norms.

…

Masculinity norms also define the corporate ladder and affect people of different genders, sexualities, races, and ethnicities. Traditionally masculine traits, including dominance and assertiveness, are seen as necessary for leadership. Yet when women or non-white cisgender men79 exhibit such traits, they are perceived as unlikable, leading to double standards and "double binds." This would similarly plague anyone not expected to exhibit traditionally masculine traits, like LGBT people and people of color.

For example, "[w]orkplace consequences include the 'teddy bear effect,' whereby Black men need to do extra 'identity work' to ensure that other White colleagues do not feel threatened."

…

Because of this exclusionary dynamic, which is infected by bias based on racial, ethnic, and gender characteristics, people from underrepresented communities have yet to substantially hold leadership positions, limiting their perceived qualifications for board positions. This exclusion from leadership positions, as well as perceived differences based on identity, bars otherwise valuable employees from underrepresented groups from accessing the networks through which directors are selected, denying them meaningful director experience and further exacerbating the issue to create a self-perpetuating cycle. In this way, straight cisgender white people have locked in their advantage in corporate leadership to the exclusion of underrepresented groups.

…

The term "capture" refers to a special interest co-opting and maintaining control over a public good by manipulating public processes.88 Disaggregated, individual corporate leadership positions are not necessarily a public good. But, taken collectively, who runs firms reflects a socio-political choice about what demographic should hold power

…

[T]he compensatory rewards of being CEO incentivize leaders to keep this labor market artificially tight. Excluding non-white, non-straight, and non-male persons who may otherwise be strong

candidates helps achieve this.

…

Cisgender, straight, white male corporate leaders have captured executive positions in the sense that they have taken and maintain control of the processes that determine who becomes an executive, and in so doing they exclude women, LGBT people, and people of color. These individuals holding existing corporate board and other elite positions exercise power to maintain control over their replacements, making it difficult for people in underrepresented communities to penetrate these exclusionary boards because of their homogeneity.

(ECF No. 114-29, p 18-23, Declaration of Darren Rosenblum, Jan 21, 2023)

At LCDA, we encourage corporations that are seeking diverse board candidates to construct a slate that is comprised of all candidates from underrepresented communities, in order to disrupt decision-makers' automatic tendency to choose people who are more like themselves. This kind of discrimination against qualified minority board candidates results in them being excluded from California public corporation boards.

(ECF No. 114-24, p 17, Declaration of Oswaldo Meza, Jan 20, 2023)

Board gatekeepers often fall into the decision-making trap of affinity bias. Affinity bias is the act of having a more favorable opinion of someone who is like yourself. While affinity bias may be a natural function of human behavior, unless consciously discussed and considered, this kind of bias toward choosing someone like yourself will impact an individual board director's decision making when considering someone with a significantly different background. Given that white people hold most of these gatekeeper roles, affinity bias plays out to exclude members of racial and ethnic underrepresented communities.

(ECF No. 114-11, p 17, Declaration of Jessica N. Grounds, Jan 21, 2023)

Another practice that has driven the pattern of exclusion of racially and ethnically diverse individuals from California public corporation boards is reliance on the idea that a board director must be a "culture fit" to be effective and work well with other directors.  During my own qualitative research, many of the focus group participants shared that current board directors often fall into the trap of thinking a new director must be a culture fit. They perceive people who are different from themselves (particularly in the context of racial, ethnic, sexual orientation, or gender identity) as someone who would not "make it" as a board director - and will not fit the cultural expectations of the majority of the board. This kind of bias (which is rooted in stereotyping) is another barrier that members of underrepresented groups must overcome in their pursuit of a corporate board appointment.

(ECF No. 114-11, p 17, Declaration of Jessica N. Grounds, Jan 21, 2023)

As an initial matter, AB 979 is tailored to increase the number of racially and ethnically diverse individuals on covered corporation boards, which is in itself a way to secure the inclusion of many qualified racially and ethnically diverse people who have been or would be kept off boards because of the discriminatory selection process I have described. But more significant to what my declaration has been discussing, AB 979 is tailored to help break down the pattern of discriminatory exclusion and prevent it from recurring. As reviewed above, the director-selection process without

AB 979 is a process in which predominantly white board members pick as new board directors people they know from their predominantly white professional and social networks. The process is driven by affinity bias, as people tend to network and connect and socialize with people like themselves. This bias is a trap that white board directors have and influences their behavior: They tend to be white and so they pick others who are white. The requirement that covered corporations have a minimum number of directors from underrepresented communities helps to break down the effects of this bias because it leads existing directors to change their behavior and to include qualified directors from underrepresented communities on their boards.

(ECF No. 114-11, p 26, Declaration of Jessica N. Grounds, Jan 21, 2023)

This also reinforced my opinion that the reason for the lack of representation of people from these communities is because boards tend to replicate themselves-existing, predominantly white directors continue to select individuals who look like them-and that corporations are unwilling to change absent diversity requirements such as those in SB 826 and AB 979.

(ECF No. 114-17, p 12, Declaration of Dave Jones, Jones Jan 23, 2023)

Findings showed that nominating committee members were significantly less likely to recommend peers who were racioethnic minorities or demographically dissimilar to themselves, whereas they were more likely to recommend white men as well as peers whom they liked, admired, and considered to be racioethnically similar to themselves. Furthermore, liking, admiration and similarity amplified each other such that liking/admiration had a stronger positive effect on recommendation for a board position if the nominating committee member reflected upon their similarities with the liked/admired peer.

(ECF No. 114-19, p 20, Declaration of Alison Konrad, Jan 23, 2023)

In a recent conversation with a long-time public company board director, he affirmed to me the reality that board directors are chosen by the insular networks that already exist among board members. This is common practice and has institutionalized a process that has inhibited racial and ethnic diversity at the corporate board level.

(ECF No. 114-11, p 22, Declaration of Jessica N. Grounds, Jan 21, 2023)

Furthermore, all of these studies indicate the impact of insular networks in their findings of the beneficial effects for board appointments of social factors favoring the predominant white group, specifically, listing in the Social Register, attending predominantly white preparatory schools, and memberships in predominantly white social clubs none of which constitute bona fide occupational qualifications that justify their impact in further excluding historically marginalized racial groups.

(ECF No. 114-19, p 21, Declaration of Alison Konrad, Jan 23, 2023)

Companies, including California's publicly held corporations, often fill open board positions through the insular social networks and personal connections of existing directors and CEOs, who in my personal experience are nearly all white men. I have observed that their insular social networks lack diversity of people from underrepresented backgrounds. Because existing corporate board members and CEOs have decided to look only to their own networks to select their board

candidates, Asian candidates and other candidates from underrepresented backgrounds are excluded from consideration.

(ECF No. 114-22, p 7, Declaration of Lawrence Low, Jan 18, 2023)

The use of personal networks often excludes diverse candidates, who are not part of the social or professional networks of sitting board members, who are overwhelmingly straight, cisgender, white men.

….

Therefore, unless a corporation specifically requests a search firm to provide diverse candidates for a board slate or executive position, systemic barriers in the process act to exclude Latinos and people from other underrepresented communities who are qualified from consideration.

(ECF No. 114-24, p 16, Declaration of Oswaldo Meza, Jan 20, 2023)

From my experience, efforts to add transparency to the selection process would not necessarily fix this problem because even being transparent about the criteria they use, board members who make the decision about who to add to the board may still consciously or unconsciously rely on criteria that ultimately excludes minority candidates.

(ECF No. 114-26, p 5, Declaration of Guy Primus, Jan 20, 2023)

The discrimination has taken the following form: Predominantly white sitting board members and CEOs—who themselves are typically board members—would limit their searches for new directors to their existing networks (or those of professional search firms) which likewise were predominantly white. They knew the practice was reproducing predominantly white boards and preventing people of color from getting serious looks, and that it would reproduce predominantly white boards as a result, but they continued the practice anyway.

(ECF No. 114-20, p 7-8, Declaration of Dennis Lanham, Jan 19, 2023)

AB 979 is a necessary measure to open doors to board participation to well-qualified Latinos and individuals from other underrepresented groups that are not within the personal networks of the vast majority of sitting directors and CEOs and have therefore been excluded from consideration for board positions. AB 979 presents a critically important and necessary way to ensure that sitting directors, who in California public corporations before AB 979 were 86% white, resist their default preferences for new board members who are similar to themselves—who look like them, and come from their racially and ethnically homogeneous social and professional networks. In this way, AB 979 addresses bias and discrimination against Latinos and members of other underrepresented communities who are equally qualified but largely excluded in the corporate board selection process.

(ECF No. 114-24, p 19, Declaration of Oswaldo Meza, Jan 20, 2023)

For instance, I nominated a Black woman I knew for an open position as CEO of a nonprofit organization that I also served on. Despite her superlative qualifications, the rest of the board gave her little consideration, and she withdrew her name from consideration several weeks later. At a meeting, one white board member even snickered dismissively at the news of her withdrawal. Yet,

shortly after, she was selected as interim CEO of a much larger organization that works in the same industry.

(ECF No. 114-26, p 9, Declaration of Guy Primus, Jan 20, 2023)

I have firsthand experience and a deep understanding of the barriers that LGBT business leaders commonly face as they pursue their executive-level careers in major U.S. corporations. While I was able to navigate many of the challenges and gain corporate director positions, I believe that I am an exception to a common pattern of exclusion because of my specialized knowledge in technology, ecommerce, digital marketing and data, and my experience as an executive with recognizable, world-class businesses and brands. Technology innovations have accelerated and transformed consumer retail businesses since the 1990s, and this revolution created a specialized demand for my expertise on corporate boards. By comparison, it has been my experience that business leaders who are white, straight, cisgender men generally do not need such a specialized skillset during a time of uniquely high demand to gain an opportunity to serve on a corporate board.

(ECF No. 114-12, p 14, Declaration of Catherine A. Halligan, Jan 20, 2023)

Even still, throughout my career, I have experienced firsthand multiple instances of adverse, discriminatory treatment as a female leader and leader of color, in both the C-suite and in boardroom discussions. For example, on numerous occasions, I have had my ideas dismissed by coworkers and fellow board members-only to have my ideas repeated by a white man, who was then taken more seriously for saying the same thing. Similarly, in one of my first companies, a white male board member profanely disparaged the language capabilities of an Indian engineer, even though myself and my five co-founders were also Indian; his remarks went unchecked by the other board members, who were all white men as well. In these types of power dynamics, it is very difficult to combat biased statements and treatment, even in the boardroom. When I left Google mid-career, and returned to my roots as an entrepreneur, I was shocked to hear the many stories of discrimination and harassment faced firsthand by fellow female entrepreneurs and entrepreneurs of color. Through these stories, I came to realize how widespread issues of bias are, even within an industry considered largely meritocratic, like tech. As one simple example, a first-time female founder and CEO whom I personally mentored grappled with ongoing sexual harassment from a white male venture capitalist who funded her and was sitting on her board. Another female founder and CEO described to me the questions she was asked by a white male venture capitalist about her future plans for having children and how they might affect her ability to serve as CEO. Anecdotally, when I speak to leaders of color, they routinely report that they face pervasive adverse, biased treatment from their white male peers. Stories like this are frequent among the women leaders and leaders of color I know. I decided I wanted to contribute in some way to leveling the playing field of opportunity for diverse leaders in tech.

(ECF No. 114-7, p 8, Declaration of of Sukhinder Singh Cassidy, Jan 18, 2023)

During the course of my service as a Legislator, I frequently met with many lobbyists, executive leaders, and corporate board members. In my experience, the majority of the individuals that lobbied my office or that held board director positions in corporations were white men. They were rarely people from underrepresented groups. On multiple occasions, I also met with many representatives from corporations to discuss their diversity efforts, but these representatives were mostly white.

1

2   I know from speaking with my colleagues-many of whom are members of underrepresented groups-that they also had similar observations and experiences. Colleagues of color shared with me

3   that they rarely saw anyone who looked like them on corporate boards and often had been the only persons of color in attendance at meetings. I also had women, including women of color, tell me

4   that despite being eligible for a board seat and signing up for registries and board readiness programs, they had not been able to secure a board seat or even an interview.

5   (ECF No. 114-10, p 2-3, Declaration of Cristina Garcia, Garcia, Jan 19, 2023)

6

7   My statements about these matters are based on what I have heard from BCBR program participants, program mentors, and Black people who have succeeded in overcoming the

8   barriers I am describing, and who have related their experiences and observations about how board selection works in practice.

…

9   In my work with the BCBR program, I have heard accounts of racial bias and

10   stereotypes that further substantiate the discrimination that has occurred against Black people in board selection. In one case, a Black corporate board member—who was a Black Corporate

11   Board Readiness program participant and mentor—reported overhearing one of her fellow board members, who was white, telling another of their fellow board members that he had just bought a

12   new house, and that the best thing about the new house was that there were no Black people in the neighborhood. Another Black board member reported cases of people thinking that he was in the

13   wrong room when he was in the boardroom, reflecting the stereotype and bias that Black people do not belong in the corporate boardroom.

14

15   Another Black board member who is tall relates that fellow board members assumed he must have played basketball. Black Corporate Readiness Program participants talk about being racially

16   profiled in their own, affluent neighborhoods. One woman who mentors and advises in the BCBR program is a very experienced executive search professional. She was asked to do a search for a

17   public corporation board seat. She gave the board an incredible slate of potential candidates, including two Black Corporate Board Readiness program alumni. But the board went with someone

18   in its own network, who the search professional described as being not nearly as qualified as the BCBR program participants she had forwarded for the board's consideration In another case, one

19   Black Corporate Board Readiness program participant related the story that when she was hired as the CFO of a large corporation in the Silicon Valley, a white person who had expected to get the

20   job said to her words to the effect of, "How did you get into this role?" and "You took my role."

21   This person was questioning how a Black woman could be hired as CFO, and communicating that the CFO job was for him. As noted above, boards have often limited their searches to CFO positions

22   and other executive positions, despite the qualified pool being broader; bias and stereotyping at this level therefore reflects bias and stereotyping at the board level.

23   (ECF No. 114-20, p 8-10, Declaration of Dennis Lanham, Jan 19, 2023)

24

25   The other CEO—Tim Cook, who held that role at Apple beginning in 2011—came out in 2014 when his hand was forced by a Gawker article, akin to what happened to Peter Thiel, another

26   prominent corporate leader who only came out involuntarily in 2007. Both men were among the most powerful in the world at the time of their outing. They managed firms and portfolios worth

27   more than many entire nations. The fact that individuals of this economic and political power were nonetheless too afraid to come out reveals the power of anti-LGBT stigma in the corporate elite.

28

(ECF No. 114-29, p 14, Declaration of Darren Rosenblum, Jan 21, 2023)

[T]hese corporate networks often operate through other settings like their country club, but such settings have expressly discriminated against minorities. The Los Angeles Country Club, for instance, excluded non-white members until at least 1987.5 This problem is worsened by the fact that these clubs maintain limits on their total members, which means that these past policies of exclusion have ongoing effects with the limited opportunities minorities have to access them now.

(ECF No. 114-26, p 10, Declaration of Guy Primus, Jan 20, 2023)

One example that comes to mind was a high profile Black female executive of a $300 billion household public company who did not get her board seat until summer 2021. Before AB 979, she was clearly overlooked, to the detriment of the companies she could have served and the corporate community at large.

(ECF No. 114-7, p 11, Declaration of Sukhinder Cassidy, Jan 18, 2023).

However, The Board Challenge has experienced difficulty getting other corporations to sign the diversity pledge; many corporations and CEOs have declined to do so, afraid of the backlash they might receive for making a public statement about the importance of racial diversity among boards of directors. For example, Brad Gerstner, one of the Co-Founders of The Board Challenge, has a friend who serves as the CEO of a pre-IPO corporation. This friend reached out for The Board Challenge's help in recruiting a Black director for its board. But when Gerstner asked the CEO and his corporation to sign onto The Board Challenge pledge, the CEO declined, citing fear of backlash for making a public statement supporting efforts to remedy the exclusion of Black candidates from corporate boards. Based on my many conversations and experiences in this field, I know that CEOs fear actual backlash to signing a commitment to remedying board discrimination. I know of at least one corporation based in California- Ripple Labs, Inc.- that received a storm of criticism on social media from investors and customers for its decision to sign onto the Board Challenge pledge. The Board Challenge has encountered at least a dozen corporations and CEOs that have refused to publicly sign onto The Board Challenge pledge…I believe that AB 979 is necessary to remedy the barriers and bias that have prevented Black Americans from receiving the full and equal opportunity to serve and lead on publicly held corporate boards.

(ECF No. 114-26, p 4-5, Declaration of Guy Primus, Jan 20, 2023)